

About Us       Industries & Clients

Products & Services       Media Network

For Consumers       News & Press       Investor Relations       Careers

# Publisher Service Orders

As used in these Service Orders, the term "QS" refers to QuinStreet, Inc., a Delaware corporation, and the term "Publisher" refers to the person or entity who accepts these Service Orders. These Service Orders are subject to the QuinStreet Publisher Terms ("QS Terms") which are incorporated herein by reference and are binding on the Parties. Capitalized terms not otherwise defined herein shall have the meanings set forth in the QS Terms. In the event of a conflict between the QS Terms and a Service Order, the Service Order prevails.

For the avoidance of doubt, Publisher is only subject to the SERVICE ORDER Applicable to the type of Traffic that Publisher provides to QS (e.g., if a Publisher only delivers Online Leads, the Service Orders below applicable to CPC (Non-Display), Display, Email Publishers and Call Center Leads do NOT apply).

I. QuinStreet Service Order for Online Leads

II. QuinStreet Service Order for Clicks (Non-Display)

III. QuinStreet Service Order for Display

IV. QuinStreet Service Order for Email Publishers

V. QuinStreet Service Order for Call Center Leads

VI. Privacy and Data Security applicable to all Service Orders

VII. Payment Terms applicable to all Service Orders

VIII. Term; Termination applicable to all Service Orders       Exhibit B to Complaint

1. **Description of Services**. Publisher may generate Leads for QS through a QS Implementation or a Publisher Implementation, as Approved by QS.

2. **Definitions**.

a. "**Lead Form**" means the web or mobile page where a consumer submits Lead Data.

b. "**Publisher Implementation**" means the generation of Leads by Publisher through Lead Forms hosted by Publisher.

c. "**QS Implementation**" means the generation of Leads through Lead Forms hosted by QS.

3. **Additional Publisher Obligations**.

a. **Approval of Materials**.  Prior to generating any Traffic hereunder, Publisher will obtain QS's Approval of each Publisher Site.  In the event QS requires edits or changes to a Publisher Site prior to the start of Traffic generation hereunder, Publisher shall make commercially reasonable efforts to implement such changes or edits. In the event Publisher is unable to make requested changes or edits, either Party shall have the right to immediately terminate this SO. In the event QS requires edits or changes to an Approved Publisher Site after Traffic generation has begun in order to comply with applicable laws, rules or regulations or with QS policies ("Mandatory Changes"), Publisher will implement such Mandatory Changes as soon as practicable but in any event within three (3) business days of QS's notification ("Compliance Time Period").  If Publisher is unable to make the Mandatory Changes within the Compliance Time Period, Publisher will notify QS of such delay in writing and provide QS a timeframe for compliance.  QS may pause this Agreement and withhold any payments owed until such Mandatory Changes are implemented and QS Approved.  If Publisher materially modifies a Publisher Site, it shall obtain QS's Approval prior to publishing the QS Content on such modified Publisher Site.

b. **Acceptable Traffic Sources**.   Publisher may only use the following traffic sources to generate Traffic under this SO:  banner advertisements, organic website traffic, paid search marketing (e.g., Google AdWords and MSN adCenter) and mobile applications.  Publisher is prohibited from generating Traffic hereunder through any other traffic source without QS Approval, including (i) call centers (including verifying any leads and/or sales via any call center), (ii) text messages or SMS, (iii) any type of email promotions, and (iv) any social media applications.

c. **Lead Source**.  Unless otherwise QS Approved, Publisher must pass to QS along with each Lead hereunder a source ID that permits QS to identify Leads according to the source from which the consumer associated with the Lead was referred to Publisher Sites (without disclosing to QS the identity of the source). Upon request, Publisher shall provide to QS, the URLs of all Subcontractors.

d. **Lead Data**. Publisher represents and warrants that (i) Publisher will use commercially reasonable efforts to only submit Leads to QS that were generated in real time, (ii) Publisher will submit all Lead Data to QS in real time, and (iii) the Lead Data was submitted directly by the consumer associated with the Lead Data and not by a third party on the consumer's behalf.

4. **Subcontractors**. Where the use of Subcontractors is QS Approved pursuant to the Publisher Terms, Publishers that generates Leads hereunder through a Publisher Implementation are only authorized to use such Subcontractors if (a) the Subcontractor is QS Approved in accordance with Section 3.b. of the QS Terms, (b) all Lead Data provided to QS is entered by consumers directly into forms hosted by Publisher (i.e., Subcontractors cannot post the Lead Data to Publisher or QS), and (c) the Subcontractor does not have access to the Lead Data or the Consents.

## II. QUINSTREET SERVICE ORDER FOR CLICKS (NON-DISPLAY)

1. **Description of Services**.  Publisher may generate Clicks for QS by publishing Listings on the Publisher Sites. This SO applies only to QS's CPC Platform and does not cover clicks from display or other advertising.

2. **Definitions**.

a. "**Buyer**" means a company that buys Clicks using the CPC Platform.

b. "**Clic**k" means a click by a consumer on a Listing where the consumer is taken from the Listing to a QS or QS Client website via a hyperlink.

c. "**CPC Platform**" means the technology and business product/program deployed by QS that allows publishers to generate commissions on a per-Click basis.  The "CPC Platform" shall include QS's rate table products.

d. "**CPC Visitor Data**" means data associated with CPC Visitors, including name, email address and telephone number that are provided to QS by Publisher.

e. "**CPC Visitors**" mean consumers who visit a web page on the Publisher Sites on which the Listings are displayed.

f. "**Listings**" means QS Content that is generated through the CPC Platform that includes hyperlinks that direct traffic to a QS or QS Client's website.

3. **Additional Publisher Obligations**.

a. Two types of Listings are permitted: (i) Listings displayed on a Publisher Site or (ii) a simple hyperlinked QS-provided logo with text. In the case of clause (ii) the consumer will be linked to a QS site for Listings. These hyperlinks must be appended with the State code (e.g., NY), if applicable, and pre-approved by QS.

b. Publisher is solely responsible for all content and materials on Publisher Sites that it is using as part of the CPC Platform, except for unmodified content served by QS through the CPC Platform.

c. Publisher will not, on its own or with the assistance of any third-party: (i) edit the Listings or hyperlinks that are delivered by the CPC Platform in any way, (ii) use framing or other technology to retain a consumer of the CPC Platform on Publisher Sites after such consumer has clicked on a Listing, (iii) implement the CPC Platform in any way without QS Approval, other than by placing QS-provided code and/or hyperlinks directly on Publisher Sites as provided under this Agreement, or (iv) display cached Listings.

d. Publisher will only display Listings on web pages that are accessible by a consumer who has manipulated the applicable number of the following five (5) web page form elements, if applicable: (i) a drop-down box which displays a list of U.S. states, (ii) a zipcode box which, upon entering a valid U.S. zipcode, takes a consumer to a page displaying Listings, (iii) account type and dollar amount, (iv) card type, credit score and/or card issuer, or (v) account type, state, collar amount, and/or loan type. Listings may be displayed on pages that can only be reached after the applicable number of the aforementioned actions has taken place. Other means of deciphering a consumer's location before showing the Listings, including but not limited to a linked map of the United States, simple text links, or interpreting IP addresses, are prohibited.

e. If applicable, Publisher will pass a state code or zipcode to the CPC Platform that represents the U.S. state or postal zipcode a consumer has chosen on a Publisher Site. Publisher will only display Listings that have been made available for the web page form elements chosen by the consumer. Publisher will only pass state or zipcodes that have been obtained through QS-approved means as described in Paragraph (d) above.

f. QS's results must be triggered from pages that are contextually relevant to the product being offered.

4. **Email & CAN-SPAM Obligations**. Publisher is prohibited from engaging in any email marketing containing or relating to the Listings ("Campaigns") without prior QS Approval.   If Publisher sends, directly or indirectly through a Subcontractor, any email that links, directly or indirectly, to a website that contains QS Content or any reference to QS or a QS Client, Publisher shall comply with each of the following  requirements set forth below.

a. Emails shall use only creative, from lines, and subject lines provided or Approved by QS in writing. Publisher shall not remove or alter subject lines, from lines, or creative provided or Approved by QS in writing.

b. Publisher must comply with all applicable laws, rules and regulations including but not limited to, TCPA, CAN-SPAM, CASL, California Business & Professions Code Section 17529.1 et seq., the Federal Trade Commission Act, and any other applicable laws, rules and regulations.  Additionally, Publisher must comply with each of the following:

i. Any email sent by Publisher must have, in the "from" line, a domain name registered to the sender that accurately identifies the Publisher and which can be confirmed by performing a WHOIS look-up.

ii. Publisher is prohibited from using "subject" lines that contain "Re:…", "Fwd:…" or other similar short-hands that obscure the email as an original advertising communication from the Publisher.

iii. Publisher shall not send email messages from accounts obtained using scripts or other automated means of registering for multiple email accounts.

c. Publisher shall submit the content for each email to QS for review and QS Approval prior to sending such email as part of any email campaign. Publisher shall not alter the content of emails in any way after QS's Approval, including the "subject" lines and "from" lines of emails, without the prior written consent of QS.

d. Publisher shall immediately stop sending any Campaigns upon written notice from QS.

5. **Use of CPC Visitor Data**. QS shall have the right to transfer CPC Visitor Data to QS Clients to (i) pre-populate lead forms on the QS Client website or (ii) allow QS Clients to set the price such QS Client will pay QS for a Click by such CPC Visitor on the QS Client's Listing. Except as set forth in this Section 5, QS shall have no right to use the CPC Visitor Data for any other purpose and the CPC Visitor Data shall be Confidential Information of Publisher; provided that: (a) QS shall have the right to

use the CPC Visitor Data for internal, non-commercial purposes, including testing; and (b) the restrictions set forth above shall not apply to the extent any CPC Visitor Data is also Lead Data collected by QS from sources other than Publisher pursuant to this Agreement. In addition, Publisher represents and warrants that as of the date of transmission of the CPC Visitor Data to QS, (i) Publisher has the right to provide such CPC Visitor Data to QS and (ii) the CPC Visitor was notified that the CPC Visitor Data may be shared with third parties as contemplated in this SO.

### III. QUINSTREET SERVICE ORDER FOR DISPLAY

1. **Description of Services**.  Publisher may publish QS Content on the Publisher Sites for the purposes of generating Display Traffic.  The terms of this SO for Display does not apply to Traffic generated though QS's CPC Platform, emails or call centers.

2. **Definitions**.

a. "**Call Display Number**" means a telephone number provided (i) to Publisher by QS, (ii) by Publisher that connects to Publisher's IVR, or (iii) by Publisher that redirects to QS's call center.

b. "**CPC Platform**" means the technology and business product/program deployed by QS that allows publishers to generate commissions on a per-click basis.  The "CPC Platform" shall include QS's rate table products.

c. "**Display Traffic**" means display clicks, CPM-based Traffic, calls generated from a Call Display Number and any other actions QS Approved in an IO.

3. **Additional Publisher Obligations**.

a. **Approval of Materials**.  Prior to generating any Traffic hereunder, Publisher will obtain QS's Approval of each Publisher Site.  In the event QS requires edits or changes to a Publisher Site prior to the start of Traffic generation hereunder, Publisher shall make commercially reasonable efforts to implement such changes or edits. In the event Publisher is unable to make requested changes or edits, either Party shall have the right to immediately terminate this SO. In the event QS requires edits or changes to an Approved Publisher Site after Traffic generation has begun in order to comply with applicable laws, rules or regulations or with QS policies ("Mandatory Changes"), Publisher will implement such Mandatory Changes as soon as practicable but in any event within three (3) business days of QS's notification ("Compliance Time Period"). If Publisher is unable to make the Mandatory Changes within the Compliance Time Period, Publisher will notify QS of such delay in writing and provide QS a timeframe for compliance. QS may pause this Agreement and withhold any payments owed until such Mandatory Changes are implemented and QS Approved.  If Publisher materially

modifies a Publisher Site, it shall obtain QS's Approval prior to publishing the QS Content on such modified Publisher Site. If Publisher uses an IVR in connection with this Agreement, Publisher shall only record and use IVR scripts and/or prompts as provided or Approved by QS.

b. **Acceptable Traffic Sources**. Publisher may only use the following sources to generate Traffic under this SO:  banner advertisements, organic website traffic, paid search marketing (e.g., Google AdWords and MSN adCenter) and mobile applications.  Publisher is prohibited from generating Traffic hereunder through any other traffic source without QS Approval, including (i) call centers (including verifying any leads and/or sales via any call center), (ii) text messages or SMS, (iii) any type of email, or (iv) any social media applications.

### IV. QUINSTREET SERVICE ORDER FOR EMAIL PUBLISHERS

1. **Services**.  Publisher may publish QS Content within emails distributed by Publisher, subject to the terms of this SO for Email Publishers and any associated IO.

a. **Campaigns**. Unless otherwise QS Approved, Publisher shall only engage in email campaigns pursuant to this SO that are dedicated solely to QS or to QS Clients (the "Campaigns").  Nothing herein shall authorize Publisher to engage in co-registration activities on behalf of QS or QS Clients for generating Leads hereunder.

b. **Direct Access**. Publisher shall only execute Campaigns on behalf of QS or QS's Clients using email data to which Publisher has Direct Access (e.g., no brokerage relationships).  "Direct Access" means data that Publisher owns or has been granted custody of under a list management agreement and includes prompt access to all Consent (as defined in the PPDS Annex, see Section XI below) records and unsubscribe requests for all managed email addresses.  Publisher represents and warrants that it has the ability to manage directly all unsubscribe requests.

c. **Cadence**. Publisher shall not email more than one (1) QS offer to each email address within Publisher's then current managed mailing list every seven (7) calendar days, unless otherwise QS Approved.  Publisher will cooperate with QS in good faith to address any complaints relating to Campaigns.

2. **Consent by Consumers to Receive Commercial Emails/Privacy Notice**.

a. **Email Consent**. All email addresses used for Campaigns hereunder will have been collected by Publisher with the applicable express written Consents and such Consent shall not have been withdrawn. If a complaint is made to QS contending that an email address owner has not given its

Consent or has withdrawn its Consent, Publisher will provide, in a timely manner, relevant information to QS, as reasonably requested, to prove that the complaining owner's Consent was obtained and not withdrawn.  Publisher agrees that it shall not send any emails on QS's behalf to email recipients whose email address was obtained through any form of incentivization.

b. **Privacy Policies**. Publisher represents and warrants that prior to, or at the time email addresses were collected, consumers were notified of the applicable website's privacy policy and practices pertaining to the collection of email addresses and use or distribution of consumer information.

3. **Compliance with Laws; Suppressions Lists**

a. If Publisher sends, directly or indirectly through a Subcontractor, any email that links, directly or indirectly, to a website that contains QS Content or any reference to QS or a QS Client, Publisher shall comply with each of the following requirements set forth below.

i. Emails shall use only creative, from lines, and subject lines provided or Approved by QS in writing. Publisher shall not remove or alter subject lines, from lines, or creative provided or Approved by QS in writing.

ii. Publisher must comply with all applicable laws, rules and regulations including but not limited to, TCPA, CAN-SPAM, CASL, California Business & Professions Code Section 17529.1 et seq., the Federal Trade Commission Act, and any other applicable laws, rules and regulations.  Additionally, Publisher must comply with each of the following:

1. Any email sent by Publisher must have, in the "from" line, a domain name registered to the sender that accurately identifies the Publisher and which can be confirmed by performing a WHOIS look-up.

2. Publisher is prohibited from using "subject" lines that contain "Re:…", "Fwd:…" or other similar short-hands that obscure the email as an original advertising communication from the Publisher.

3. Publisher shall not send email messages from accounts obtained using scripts or other automated means of registering for multiple email accounts.

iii. Publisher shall submit the content for each email to QS for review and QS Approval prior to sending such email as part of any email campaign. Publisher shall not alter the content of emails in any way after QS's Approval, including the "subject" lines and "from" lines of emails, without the prior written consent of QS.

iv. Publisher shall immediately stop sending any email campaigns upon written notice from QS.

b. **State Anti-Spam Laws**. In the event that Publisher, or any third party performing services on its behalf, sends, or causes to be sent, a Campaign email that violates any state law governing unsolicited commercial emails ("State Anti-Spam Laws"), Publisher shall pay QS $1,000 for each such email sent (the "Liquidated Damages Amount"). Publisher and QS agree that the Liquidated Damages Amount is reasonable, and, further, that the Liquidated Damages Amount shall not limit QS's remedies nor Publisher's liability for losses incurred other than in connection with the violation of State Anti-Spam Laws. QS may offset an amount equal to the Liquidated Damages Amount from any payments it otherwise owes Publisher, if it reasonably believes Publisher is in violation of any State Anti-Spam Law.

c. **Unsubscribe Requests**. Publisher shall promptly honor all consumer requests to unsubscribe from its list(s). All e-mail addresses collected must be from sites that honor consumer requests in a timely manner and in accordance with applicable laws. Publisher agrees to scrub its address list against its most recent list of consumers who have requested to be removed from e-mail solicitation lists prior to sending a QS Campaign email. Publisher further warrants that it will not send email to, or sell, lease, exchange, or otherwise transfer or release the email address of any consumer known to have made a request to be unsubscribed from Publisher's list or any lists under management of Publisher.

d. **Suppression Lists**. Contemporaneously with each Campaign, QS shall make available to Publisher the suppression list consisting of email addresses of consumers who have requested to be unsubscribed from emails from QS or any QS Client ("Suppression List"). Publisher warrants that it will not send any e-mail pursuant to this Agreement or on behalf of QS or any QS Client to any of the e-mail addresses: set forth on the Suppression List. Publisher shall use the most current Suppression List provided to obtain unsubscribe information and shall remove emails on the Suppression List within twenty-four (24) hours prior to any email send on QS's behalf. QS will not be liable for any claims arising out of or relating to Publisher's negligence or failure to comply with applicable laws, rules and regulations including CAN-SPAM or for any damages arising by virtue of Publisher's sending e-mail to any email address on the Suppression List. The Suppression List is Confidential Information of and owned by QS. Publisher represents and warrants to QS that it has established and maintains reasonable security procedures and practices to protect against the unauthorized access, use or disclosure of the Suppression Lists provided to Publisher and Publisher will delete the Suppression Lists from its servers immediately following the sending of any Campaign hereunder.

4. **Supplied Materials**.

a. **Creative**. As directed by QS, either QS or Publisher may be responsible for the drafting and creative design of a Campaign, including the 'Subject' and 'From' lines in any way ("Creative").

b. **Approval**. If QS is responsible for the Creative, Publisher shall not modify the Creative in any way without QS Approval. If Publisher is responsible for the Creative, Publisher shall promptly submit all Creative content for each Campaign to QS for review and Approval before the commencement of any Campaign. Without the prior written consent of QS, Publisher shall not alter the Creative content of any Campaign after QS's Approval. Any modification after QS's Approval must be resubmitted for QS Approval.

c. **Test Emails**. Publisher must obtain QS Approval for all test e-mails prior to any Campaign. The test e-mails shall include all the different variations that will be sent, including variations to the 'From' line and 'Subject' line, header and footer information. Publisher represents and warrants that the 'From' line, the 'Subject' line, header and footer information will not be misleading and will comply in all respects with applicable laws, rules and regulations.

## V. QUINSTREET SERVICE ORDER FOR CALL CENTER LEADS

1. **Description of Services**. Publisher may sell Leads to QS in accordance with the terms and conditions set forth herein. Publisher may provide Leads to QS either by (i) inputting Lead Data into QS's web portal, (ii) warm telephonic transfer to QS or QS Client, or (iii) another QS Approved method. Notwithstanding Section 3(b) of the QS Terms, Publisher is prohibited from using any Subcontractors whose identity is not disclosed to QS to generate any Traffic pursuant to this SO.

2. **Additional Publisher Obligations**.

a. **Compliance with Laws for Outbound Calls to Leads**.

i. Publisher represents and warrants that it will only contact consumers Publisher is legally permitted to contact, and only in the manner permitted under and in compliance with applicable laws, rules and regulations including the FTC's Telemarketing Sales Rule, TCPA and any federal and state Do-Not-Call and telemarketing laws. Publisher shall update its system(s) and Do-Not-Call list(s) as necessary when a consumer requests not to be called. Publisher accepts sole responsibility for and agrees to regularly monitor Publisher's practices so that Publisher's outbound calls comply with all applicable laws, rules and regulations, including the FTC's Telemarketing Sales Rule and the FCC's TCPA. In addition, Publisher agrees to provide consumers that Publisher contacts, or from whom Publisher obtains consent for QS or a QS Client to contact with all disclosures required by law, including those required at the outset of a telemarketing call, prior to a consumer purchase or payment, or in conjunction with lead generation services offered by Publisher, including that the consumer may receive telemarketing calls as a consequence of submitting consumer's telephone number and the maximum number of entities from which the consumer may receive telemarketing calls as a result of submitting their information.

ii. Publisher represents and warrants to QS that it has access to and shall maintain evidence of the express written consent under the TCPA upon which Publisher relied to place an outbound call to any consumer that becomes a Lead ("Outbound TCPA Consent") for a period of no less than five (5) years from the date the outbound call was placed.  The Outbound TCPA Consent must be in a format that meets the definition of a "Consent" as set forth in the PPDS Annex.  Publisher shall deliver to QS with each Lead a Jornaya LeadiD or other QS Approved method to evidence the Outbound TCPA Consent.

b. **Call Recordings**. Publisher must record telephone calls with the underlying consumers of Leads or potential Leads. Each such recording must be: (i) made electronically and saved in a format as reasonably specified by QS (and not copied or otherwise transferred to any non-electronic media); (ii) indexed such that each recording is easily searchable and accessible; (iii) stored for five (5) years after the date the recording is made, unless otherwise required by applicable law; (iv) immediately be stopped or otherwise terminated upon transfer of the Lead or potential Lead from Publisher to QS. Publisher must upload daily a digital copy of the voice recordings of each distinct call session in a format reasonably requested by QS to a QS-controlled online storage website for QS's review and storage within forty-eight (48) hours of the voice recording's creation.

c. **No Agency**. Publisher shall use its best efforts to provide QS with Leads associated with consumers who have identified themselves as being interested in QS or QS Client products ("Products") set forth in an IO.  Through its promotional efforts, Publisher shall not (i) misrepresent QS or any QS Client (or their Products),  (ii) misrepresent its possession of professional qualifications, licenses, or affiliations or (iii) represent itself as QS or an agent thereof. The parties' relationship is one of independent contractors and nothing in this Agreement is intended to or will create any form of partnership, joint venture, agency or employment relationship between Publisher and QS.

d. **Training**. Publisher shall set its own training standards and do its own training for its personnel. Publisher represents and warrants that such training and training standards will be sufficient to ensure the professional operation of the call center and strict compliance with applicable laws, rules and regulations as well as the terms of this Agreement.  Publisher shall adhere to scripts that are QS Approved.  Publisher shall not provide Publisher's call center personnel or representatives any monetary incentives that violates any applicable laws, rules, or regulations.

e. **Call Center Location**. In providing services hereunder and unless otherwise QS Approved, Publisher shall only use call center personnel and representatives located in the United States of America.

f. **No Remarketing**. Publisher shall not retain or make use of Lead Data other than to enter it into QS's web portal.  Publisher shall not, directly or indirectly (a) re-market to any Valid Lead or (b) disclose,

redistribute or resell Lead Data in any manner to anyone unless QS Approved.

Case 8:24-cv-01667-LKG   Document 16-2   Filed 07/16/24   Page 12 of 13

## VI. PRIVACY AND DATA SECURITY

Publisher shall comply with the <u>QuinStreet Publisher Privacy and Data Security Annex</u> ("PPDS Annex"), including with respect to TCPA and other required consumer consents. Any changes to the PPDS Annex made subsequent to the Publisher clickthrough date where the Publisher clicks "Accept terms and enroll" or such similar terms displayed on the Publisher Enrollment portal ("Effective Date") shall not bind the Publisher unless Publisher agrees to such changes in writing.

## VII. PAYMENT TERMS

1. **Payment Terms for Online Leads, Display, Email and Call Center Leads**.  QS will pay Publisher for each Valid Lead within forty-five (45) days following the end of each calendar month, unless otherwise set forth on an IO. The amount per Valid Lead owing to Publisher will be set forth on an IO or as calculated by the Platform. QS will use commercially reasonable care in determining whether Leads generated from the QS Content on Publisher Sites are Valid Leads and will only pay for Traffic which it determines is a Valid Lead. A Lead shall be deemed a "Valid Lead" if the Lead satisfies each of the following requirements, as applicable: (i) complies with all posting instructions as provided by QS; (ii) originates from one of the acceptable traffic sources set in the applicable Service Order terms; (iii) originates from an Internet consumer meeting all applicable QS criteria (e.g., geographic location, type of good or service sought, etc.) provided to Publisher; (iv) is not a duplicate, inaccurate or incomplete; (v) does not originate from any fraudulent, misleading, incentivized or automated activity used to increase the generation of Leads; (vi) does not contain a clearly false information (e.g., Mickey Mouse) or a telephone number or an email address which is invalid; (vii) does not exceed any predetermined caps; (viii) is not generated through methods that are considered inappropriate by search engines, for example: SPAM, cloaking, link farms, hidden text, etc.; (ix) is correctly coded by Publisher; (x) meets all other requirements under this Agreement and any IO; and (xi) in the case of Call Center Leads to QS or a QS Client: (a) results in a telephone transfer that lasts for at least the Call Duration set forth in an IO and (b) is transmitted to QS within the Call Center Hours set forth in an IO. QS's reasonable determination of whether a lead is a Valid Lead shall be final and binding.

2. **Payment Terms for CPC Platform Clicks**. QS will pay Publisher the percentage of the revenue attributed by the CPC Platform to Valid Clicks delivered by Publisher from QS Approved Publisher Sites as set forth in an IO or otherwise Approved by the parties (the "Fee").  QS will pay Publisher the Fee within forty-five (45) days following the end of each calendar month, unless otherwise set forth on an IO. The amount per Valid Click owing to Publisher will be calculated by the CPC Platform.  A "Valid Click" is a Click made by consumers in the United States who are shopping for the products advertised by Buyers, which are not identified by the CPC Platform as fraudulent, invalid or duplicative, or are

otherwise reasonably determined by QS to be valid. QS's calculation is the sole and binding accounting of amounts due.

## VIII. TERM; TERMINATION

Unless otherwise set forth in an IO, each SO will commence on the Effective Date and will continue unless and until terminated as provided herein. Either Party may terminate a SO for any particular type of Traffic for any reason upon three (3) business days prior written notice to the other Party. Termination of a SO for one type of Traffic does not terminate the SOs for any other type of Traffic delivered by Publisher.

**QUINSTREET SERVICE ORDERS – Version 03-01-2018**

# Ready to start a conversation? Contact us today

©2024 QuinStreet, Inc. All Rights Reserved. Privacy Notice | Terms of Use | Client Terms | Client Privacy And Data Security Annex | Publisher Terms | Publisher Service Orders | Publisher Privacy And Data Security Annex | Do Not Sell or Share My Personal Information | Accessibility Statement


