IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**STANLEY SHAPIRO**
on behalf of himself and all
others similarly situated

**Plaintiff**

v. Case No. 8:24-cv-01667

**QUINSTREET, INC.**

and

**SELECTQUOTE AUTO & HOME INSURANCE SERVICES, LLC**

**and**

**DOE DEFENDANTS 1 - 20**

**Defendants**

**<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>**
**<u>FOR DAMAGES AND INJUNCTIVE RELIEF</u>**

Plaintiff, Stanley Shapiro, individually and on behalf of all others similarly situated, files this second amended complaint against Defendants, QuinStreet, Inc. (“QuinStreet”), Selectquote Auto & Home Insurance Services, LLC (“Selectquote”) and Doe Defendants 1 – 20.

## NATURE OF THE ACTION

1. This case arises from telemarketing calls by Defendants to Plaintiff and the Class Members advertising insurance products and services (“the Calls”).

2. The Calls were made in disregard of do-no-call lists (*see* 47 U.S.C. §227(c)(5) and 47 C.F.R. §64.1200(c)(2)), using artificial or pre-recorded voicing (*see* 47 C.F.R. § 64.1200(a)(2)), without the recipients’ prior express written consent (id.), using false caller identification information, in violation of the Telephone Consumer Protection Act, 47 U.S.C. §

227 et seq. ("TCPA") and its regulations, and in violation of state statutes as further alleged below.

3. Past litigation against Defendants[1] has done little to deter their unlawful and high volume telemarketing practices as detailed below.

4. Plaintiff, for himself and for the Class Members, seeks statutory damages under FRCP 23(b)(3), 47 U.S.C. § 227(b)(3)(B) and state law, and seeks injunctive relief under FRCP 23(b)(2) and 47 U.S.C. § 227(c)(5)(A).

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C.§ 227 et seq.

6. This Court has personal jurisdiction over Defendants because they regularly conduct business in Maryland, direct the solicitation of business to individuals in this state, and purposefully avail themselves of the laws of this state.

---

[1] Past suits against Defendants include the following:

| |
|---|
| Debusk v. Quinstreet, Inc. dba Insure.com, Case 6:17-cv-00608-GAP-GJK USDC-FL 2017. |
| Baker v. QuinStreet Media, Inc., Case 3:20-cv-05632-LB ND Cal. 2020. |
| Castello v. QuinStreet PL, Inc., Case 3:24-cv-00635-BEN-KSC, ND Cal 2024. |
| Nickson v. QuinStreet, Inc. dba Inusre.com, Case 8:22-cv-01166-DLB, SD-MD 2022. |
| Pizarro v. QuinStreet, Inc. Case 3:22-cv-02803-MMC, ND Cal. 2022. |
| Pizarro v. QuinStreet, AmOne, Case. 1:21-cv-10139-ER, USDC-NY 2021. |
| Becker v. QuinStreet, Inc. dba Schools.Com, Campuscorner.Com, Searchschoolsnetwork.Com, Case 0:17-cv-61941-CMA, SD FL 2017. |
| Mousa v. QuinStreet, Inc. dba Debhelp.com, Does 1 – 10 ; Case 2:20-cv-01136-MWF-GJS, CD Cal. 2020. |
| Sanders v. Quinstreet, Inc. dba Collegefinder, Case 3:14-cv-00061, SD TX filed 2.16, 2014. |
| Schick v. Selectquote Insurance Services, Yasha Marketing Llc, and Datalot, Inc., Case 3:19-cv-04902-LB, ND Cal.. 2019 |
| Tsolumba v. Selectquote Ins. Services, and Online Insurance Solutions LLC dba Digital Thrive, 5:22-cv-00712, ND OH 2022. |

7. Venue is proper because Plaintiff resides in, and received the Calls in, this District.

8. At all times relevant to this action QuinStreet maintained offices in Annapolis, Maryland.

9. At all times relevant to this action Defendants regularly conducted business in Maryland.

10. Defendants purposefully caused and directed the transmission of hundreds or thousands of Calls to the cellular telephones of persons in Maryland.

**PARTIES**

11. At all times relevant to this action Plaintiff was an individual residing in Maryland.

12. At all times relevant to this action Defendant QuinStreet was a corporation formed under the laws of Delaware, maintaining its principal offices in California, registered with the state of Maryland to conduct business in Maryland.

13. At all times relevant to this action Defendant Selectquote was a limited liability company formed under the laws of Delaware, maintaining its principal offices in Kansas, registered with the state of Maryland, Exhibit E, and regularly conducting business in Maryland.

14. At all times relevant to this action Doe Defendants 1 – 20 were persons or entities who regularly conduct business in Maryland, direct the solicitation of business to individuals in this state, and purposefully avail themselves of the laws of this state. The Doe Defendants are alter-egos, partners, joint-venturers, agents and affiliates of QuinStreet and Selectquote.

15. Defendants purposely conceal their identities in their telemarketing calls. Plaintiff will fully identify the Doe Defendants when their identities become known through discovery.

## ALLEGATIONS OF FACT – CALLS TO PLAINTIFF

16. Plaintiff is a "person," as defined by 47 U.S.C. § 153(39).

17. Since 2003 or earlier Plaintiff has been a residential subscriber, and the regular user, of the cellular telephone number 301-xxx-1979, and Verizon has been his only service provider for that telephone number under an account in Plaintiff's individual name.

18. Since 2003 Plaintiff's cellular number, above, has been on the Federal Trade Commission's Do Not Call Registry.

19. Plaintiff was born and raised in the United States, speaks American English, is familiar with American conversational intonations and pronunciations, and is reasonably facile at detecting foreign accents and artificial voicing.

### a. The QuinStreet Calls to Plaintiff

20. On July 5, 2023 at 4:22 p.m. QuinStreet, through its agents, initiated a call to Plaintiff's cellular telephone served by the number 301-xxx-1979. The caller ID on Plaintiff's phone for that call showed "207-xxx-3247 Maine."

21. For an instant, based on the caller ID Plaintiff believed the call might be from a local caller who was not a telemarketer and answered. The caller ID turned out to be falsified, to deceive Plaintiff into answering the call.

22. The call started with an artificial voice, apparent from its flat, inhuman and robotic intonation and pronunciation. The artificial voice called itself "Nia Davis" and asked

questions about Plaintiff's need for insurance. Plaintiff made bland responses to reach a human who could identify the parties who caused the call.

23. On July 6, 2024 at 9:12 a.m. Plaintiff received a call on his cellular telephone served by 301-xxx-1979, and the caller ID showed the call was from 301-xxx-3445. The caller was a human who identified herself as "Andrea," asked for Plaintiff by name, and recited information about Plaintiff that had been stated during the call of July 5 described above.

24. "Andrea" confirmed that she had obtained Plaintiff's identity and other information from the call of July 5, 202, taking ownership and responsibility for that call. Andrea said that her number was 855-xxx-7755 and recited a script offering insurance. Plaintiff declined the offer. Plaintiff later called the number Andrea had provided and heard an announcement for Insurance.com, which is owned and operated by defendant Quinstreet, further confirming that QuinStreet was the party behind the July 5 call.

25. Plaintiff never gave express prior written consent to QuinStreet or to anyone else for the call of July 5, 2023 described above, or for any automated calls from QuinStreet or its affiliates, or for any calls that contain automated voicing or use false caller ID information.

26. Plaintiff received several calls having the same features as the one described above, starting with a script promoting insurance spoken by a robotic artificial voice similar to that heard in the call on July 5, 2023, including calls on July 31, 2023 at 6:36 p.m., January 18, 2024 at3:34 p.m., June 6, 2024 at 4:25 p.m., July 22, 2024 at 2:22 p.m. and more, from QuinStreet and its agents.

27. During the months preceding the calls to Plaintiff, QuinStreet directed, controlled, designed and implemented the telemarketing campaigns that included the calls to Plaintiff. QuinStreet specified, created, edited and implemented the scripts to be used in the calls,

specified the criteria for selection of numbers to be called, and controlled and managed the data that resulted from the calls including call detail records and customer details that include name, address, age, health history, occupation, income range, and other demographic and personal information.

### b. Quinstreet's Telemarketing Business

28. QuinStreet's business involves telemarketing for "lead generation," which entails calling consumers to gather information about them and to qualify them as possible purchasers of various products. QuinStreet operates the "QS Network," a group of websites, call centers and email service providers, components of its lead generation business. Exhibit A.

29. QuinStreet creates, edits and approves scripts and wording used in its Calls to Plaintiff and the Class Members.

30. QuinStreet's telemarketing business uses callers who generate "call leads." ("Publisher may generate Leads for QS through a QS Implementation or a Publisher Implementation . . .") Exhibit B.

31. QuinStreet advertises its role as a matchmaker between consumers and insurers. Exhibit C.

32. QuinStreet owns Insure.com and Insurance.com, which have the same office address as QuinStreet, and market Medicare A and B insurance plans similar to those promoted in the call of July 13, 2023. See www.insure.com and www.insurance.com. Last viewed July 15, 2024. Calls made for insure.com or insurance.com are calls made for Quinstreet.

33. QuinStreet's form 10k filed with the Securities and Exchange Commission for the year ending June 30, 2023 states, "We are predominantly paid on a negotiated or market-driven "per click," "per lead," or other "per action" basis that aligns with the customer acquisition cost

targets of our clients. . . . . Our media sources include . . . social media and mobile programs, . . . call center operations, . . . and more." https://investor.quinstreet.com/static-files/1806764c-b747-49f3-8c85-a675fb20f59d At pg. 4. Last viewed July 16, 2024. [Emphasis added.]

34. QuinStreet routinely conceals its identity in automated voicing in the Calls.

**c. The Selectquote Calls to Plaintiff**

35. On July 13, 2023 at 10:05 a.m. Selectquote or its agents initiated a telephone call to Plaintiff's cellular phone showing 301-xxx-5907 on the caller ID display. Plaintiff subscribes to that number through Verizon in his individual name.

36. For an instant Plaintiff believed that the caller ID might be accurate, that the call might actually be from a local caller who was not a telemarketer, and answered it. The caller ID was false and was intended to deceive Plaintiff into answering the call.

37. Upon answering the call Plaintiff heard a robotic voice talking about Medicare Parts A and B. Plaintiff believed that the voice was artificial because of its unnatural intonation and cadence, and the mechanical and overly precise phonetic pronunciation of certain words.

38. Plaintiff stayed on the call and was transferred to a male human who identified himself as "Samuel" and spoke with a foreign accent, which Plaintiff believes was Indian. Samuel asked Plaintiff for certain information pertaining to insurance coverage, and Plaintiff answered in order to learn the identity of the calling organization. The call ended and Samuel said he would call again later.

39. At 3:37 p.m. on July 13, 2023 Plaintiff received a call on his cell phone showing a caller ID of "301-xxx-2839 HLY CROSS GT HOS" suggesting it was from a well-known local hospital. The caller ID did not suggest in any way that the call was from Samuel or any organization that might have been associated with him. Relying on the caller ID information,

Plaintiff answered the call and heard an adult male human voice identifying himself as "Samuel," having the same accent as the individual on the 10:05 a.m. call. Samuel repeated information from the earlier call, further confirming that he was the same "Samuel" as before.

40. "Samuel" asked Plaintiff to answer "yes" to a scripted question that Samuel described as a waiver under telemarketing laws. Plaintiff declined to do so.

41. The second call with "Samuel" was transferred to an adult male who identified himself as Heath Raynor and said he was a licensed health insurance agent for Selectquote, thereby identifying Selectquote as being responsible for the first call. Mr. Raynor gave Plaintiff the contact number 855-xxx-3489, which indeed appears on a website for Selectquote at https://www.selectquote.com/contact-us. Last viewed July 15, 2024.

42. Plaintiff terminated the call with Mr. Raynor without making a purchase.

43. Plaintiff never gave express prior written consent to Selectquote or to anyone else for the initial call of July 13, 2023 described above, or for any automated calls from Selectquote or its affiliates, or for any calls that contain automated voicing or used false caller ID information.

44. Plaintiff has received numerous calls similar to the first call on July 13, 2023 described above, containing pre-recorded voicing, using scripted promotions of insurance products, starting with artificial voices and then transferred to humans, including calls on July 31, 2023 at 6:36 p.m., January 18, 2024 at3:34 p.m., June 6, 2024 at 4:25 p.m., July 22, 2024 at 2:22 p.m. and more from Selectquote and its agents.

45. During the initial telemarketing calls received by Plaintiff that promote insurance products, prior to any transfer to a live agent, the true identities of the callers and the vendors on whose behalf the calls were made were not disclosed. Discovery is necessary to confirm and/or

identify the parties responsible for all of the violative calls and the relationships among those responsible for the calls.

46. During the months preceding the calls to Plaintiff, Selectquote directed, controlled, designed and implemented the telemarketing campaigns that included the calls to Plaintiff. Selectquote specified, created, edited and implemented the scripts to be used in the calls, specified the criteria for selection of numbers to be called, and controlled and managed the data that resulted from the calls including call detail records and customer details that include name, address, age, health history, occupation, income range, and other demographic and personal information.

**d. Selectquote's Telemarketing Business**

47. Selectquote's business involves telemarketing for "lead generation," which entails calling consumers to gather information about them and to qualify them as possible purchasers of various products.

48. Selectquote creates, edits and approves scripts and wording used in its Calls to Plaintiff and the Class Members.

49. Selectquote's Form 10-K filed with the U.S. Securities and Exchange Commission for the year ending June 30, 2023 states: "We are a leading technology-enabled, direct-to-consumer ("DTC") distribution platform for insurance products and healthcare services. . . . for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans . . . MA and MS plans accounted for 89%, 82%, and 78% of our approved Senior policies for the years ended June 30, 2023, 2022, and 2021, respectively . . ." https://s23.q4cdn.com/545595037/files/doc_financials/2023/ar/slqt_2023_10k.pdf (Last viewed July 15, 2024.)

50. Selectquote is not an insurance company and does not issue insurance policies. (". . . because we are not the issuer of the insurance policy to the consumer, we bear no underwriting risks." Id. at 4.) However, Selectquote promotes insurance products, qualifies leads, and transfers the leads to persons who close the sales, throughout the United States and in Maryland. ("We are a licensed insurance producer in all 50 U.S. states and the District of Columbia. Id. at 15) See also, Exhibits D, F.

51. Plaintiff has never given express prior written consent to Selectquote or to anyone else for the initial call of July 13, 2023 described above, or for any automated calls from Selectquote or its affiliates, or for any calls that contain automated voicing or use false caller ID information.

**e. "Doe Calls"**

52. Plaintiff has received dozens of unsolicited automated calls using artificial or pre-recorded voicing, promoting insurance, similar in format and content to the calls described above, without Plaintiff's prior express written permission during the calls during this suit. These calls violate the DNC list, use falsified or "spoofed" caller ID information and fail to provide complete and accurate identification of the persons and entities that cause them. ("Doe Calls") Defendants Doe 1 – 20 caused these calls.

53. Defendants Doe 1-20 are persons or entities who regularly conduct business in Maryland, direct the solicitation of business to individuals in Maryland, and purposefully avail themselves of the laws of Maryland. The Doe defendants purposely conceal and falsify their identities to evade liability under the telemarketing laws. The full legal names of the Doe Defendants will be provided via amendment when their identities have been disclosed through discovery.

## CAMPAIGNS; DATA; ASCERTAINABILITY

54. Defendants use "campaigns" in which automated calls are placed to thousands of phone numbers based on scripts, lists and calling plans that generate data held or saved by Defendants or their agents.

55. Defendants' campaigns are identified by numbers or codes by which one campaign can be distinguished from another. Each campaign has a start and end time, data defining the numbers to be called, existing lead data, scripts to be used, specifics of the calling plan, and more information that allows identification of each campaign.

56. Defendants use vendors, contractors and subcontractors in some of their campaigns, but retain control over key features relevant to this action.

57. Each campaign results in data showing the outcome of the calls, the date and time of each attempted call, whether the call resulted in a successful connection, the duration of connected and answered calls, whether the call was transferred to a live human, and more details.

58. Assignment of a particular number to a cellular telephone can be ascertained via records of telephone carriers.

59. Qualified experts and technicians can ascertain the Classes using the data described above and automated procedures.

## TELEMARKETING LAW

60. The U.S. Supreme Court has observed, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020); and that Congress enacted the TCPA in 1991 because it found "[m]any consumers are outraged over the proliferation of intrusive, nuisance [telemarketing] calls to their homes," which they "rightly regarded…as 'an invasion of

privacy.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (quoting the TCPA §2, 105 Stat. at 2394 (bracketed alterations in original)); see *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264–65 (11th Cir. 2019).

61. The TCPA was enacted in response to Americans' growing frustration with repeated telemarketing calls.[2] *Krakauer v. Dish Network, LLC*, 925 F.3d 643, at 663 (4th Cir. 2019). Among other proscribed practices, the TCPA prohibits "mak[ing] any call... using any automatic telephone dialing system or an artificial or prerecorded voice... to any telephone number assigned to a... cellular telephone service" without "prior express consent of the called party." 47 U.S.C. § 227(b) (1)(A) (iii). If an "automatic telephone dialing system" or "artificial or prerecorded voice" is being used for "any telephone call that includes or introduces an advertisement or constitutes telemarketing," the caller must have the "prior express written consent of the called party." 47 C.F.R. § 64.1200(a)(2) (emphasis added). *Bradley v. Dentalplans.com*, Civil 20-1094-BAH, 7 (D. Md. Jun. 6, 2024), 2024 WL 2865075.

62. Thousands of consumers have complained to federal and state government agencies, and to callers, that unsolicited telemarketing communications, including calls, faxes and texts, interrupt their work and private activity, intrude upon their time and privacy, and consume their resources.

63. Section 227(b)(1)(A)(iii) of the TCPA prohibits the use of autodialers to make any call to a wireless number absent an emergency, or absent express the prior written consent of

---

[2] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA). The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201*et seq.*

the called party.

64. The State of Maryland adopts federal statutes in prohibiting certain telemarketing practices:

A person may not violate:

(1) The Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101 through 6108, as implemented by the Federal Trade Commission in the Telemarketing Sales Rule (16 C.F.R. Part 310); or

(2) The Telephone Consumer Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart L).

Maryland Commercial Code §14-3201.

Maryland has created a private cause of action for violations of §14-3201:

(a) A violation of this subtitle is an unfair or deceptive trade practice within the meaning of Title 13 of this article and is subject to the enforcement and penalty provisions contained in Title 13 of this article.

(b) In addition to the remedies provided in §13-408 of this article, an individual who is affected by a violation of this subtitle may bring an action against a person that violates this subtitle to recover:

(1) Reasonable attorney's fees; and

(2) Damages in the amount of the greater of:

(i) $500 for each violation; or

(ii) Actual damages sustained as a result of the violation.

(c) For purposes of this section, each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation.

Maryland Commercial Code §14-3202.

65. The Telemarketing Sales Rule, referenced in 14-3201(1), supra, provides in relevant part:

§ 310.4 Abusive telemarketing acts or practices.

> (a) *Abusive conduct generally*. It is an abusive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in the following conduct: . . .
>
> (8) Failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call . . .
>
> 16 CFR § 310.4

66. Section §13-408 of the Commercial Law Article of the Maryland Code (referenced above in §14-3202(b)) provides for a private cause of action:

> (a) In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.
>
> (b) Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.

Id. [Emphasis added.]

## ARTIFICIAL AND PRE-RECORDED VOICING

67. Congress found that calls using automated dialing and calls using artificial or prerecorded voicing are a greater nuisance and invasion of privacy than calls individually initiated and voiced by humans in real time due to the massive quantities of calls possible via such automation.

68. Congress vested the Federal Communications Commission with authority to issue regulations implementing the TCPA.

69. The FCC has recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[3]

70. The receipt of an unsolicited call in violation of the TCPA is sufficient to confer standing not only for do-not-call list violations, *Krakauer* at 653, but also for unsolicited call violations generally. *Bradley*, slip opinion at 8. "The statute requires that an individual receive a call on his own... number.... There is nothing ethereal or abstract about it.... Since that harm is both particular to each person and imposes a concrete burden on his privacy, it is sufficient to confer standing." Id.

## PRIOR EXPRESS WRITTEN CONSENT

71. The FCC defines prior express written consent as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8).

72. Under the TCPA, prior consent is an affirmative defense for which the defendant bears the burden of proof. *Bradley*, at 10.

73. Telemarketing calls under the TCPA require a higher standard of consent, "prior express written consent," than non-telemarketing calls. Id. at 11; 47 C.F.R. § 64.1200(a)(2). The latter merely need "prior express consent." 47 C.F.R. § 64.1200(a)(1).

---

[3] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003)

74. The "prior express written consent" required for telemarketing calls must also be "clear and conspicuous." 47 C.F.R. § 64.1200(f)(9)(i);

75. Under the TCPA, "[t]he term telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(13). Telemarketing includes "winback" calls to renew an expired or terminated customer account, and such calls require prior express written consent. *Bradley* at 11.

76. A voice recording is insufficient to provide the disclosure component of the consent required for telemarketing calls. Id. at 19.

**VICARIOUS LIABILITY; APPARENT AUTHORITY**

77. The FCC issued a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of . . . section 227(b) . . . that are committed by third-party telemarketers."[4] This vicarious liability may apply if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 F.C.C.R. at 6586 (¶ 34).

---

[4] In the Matter of The Joint Petition Filed by DISH Network, LLC, the United States of America, and the States of California, Illinois, North Carolina, and Ohio for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules, et al., CG Docket No. 11-50, 28 F.C.C.R. 6574, 6574 (¶ 1) (May 9, 2013) ("May 2013 FCC Ruling"). Regarding vicarious liability the FCC stated in part,

> . . . The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller

78. The FCC has rejected the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.*at n.107.

79. The May 2013 FCC Ruling further clarifies a seller's liability via apparent authority:

80. Apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including access to detailed information

81. Defendants are responsible for ensuring that their calling vendors comply with the TCPA, even if Defendants did not directly make the calls.

82. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See* FCC Declaratory Ruling, Memorandum and Order, 10 FCC Rcd. 12391, 12397 (¶ 13) (1995).

83. The FCC expects that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information. " May 2013 FCC Ruling, *supra*, at 6592-93 (¶ 46). Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

---

knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 F.C.C.R. at 6592 (¶ 46).

## DO NOT CALL REGISTRY

84. The National Do Not Call Registry ("Registry"), which is managed by the Federal Trade Commission, allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations on those numbers. See 47 C.F.R. § 64.1200(c)(2).

85. A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

86. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provide a private right of action against those making such calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

## CLASS ALLEGATIONS

87. Defendants made Calls to persons throughout the United States that were substantially similar to the Calls placed to Plaintiff.

88. The Calls to the Class Members were placed to cellular telephones by an "automatic telephone dialing system" for non-emergency purposes and in the absence of the recipients' prior express written consent, in violation of 47 U.S.C. § 227(b)(1)(A).

89. The Calls to the Class Members were made in disregard of do-no-call lists (*see* 47 U.S.C. §227(c)(5) and 47 C.F.R. §64.1200(c)(2)), using artificial or pre-recorded voicing (*see* 47 C.F.R. § 64.1200(a)(2)), without the recipients' prior express written consent (id.), using false caller identification information, in violation of the Telephone Consumer Protection Act, 47

U.S.C. § 227 et seq. (“TCPA”) and its regulations, and in violation of consumer protection laws in Maryland and in all 50 states.

90. Defendants have the burden of proving any prior express written consent by Plaintiff and Class Members within the meaning of the statute.

91. The Calls went to cellular telephones throughout the United States.

92. Defendants acted carelessly and negligently in causing the Calls to Class Members.

93. Plaintiff alleges in the alternative that Defendants acted willfully and knowingly in causing the calls to be initiated as described above, and in ignoring the Registry.

94. Defendants knew that the calls were in violation of the TCPA and accepted benefits, including sales, that resulted from the Calls, thereby ratifying and assuming responsibility for the Calls.

95. Defendants have been previously sued for robocalls in violation of the TCPA and state law, have participated in proceedings with the FCC regarding the TCPA, and are fully aware of the statutory requirements as alleged above.

96. During the months preceding the calls to Plaintiff, Defendants directed, controlled, designed and implemented the telemarketing campaigns that included the calls to Plaintiff. Defendants specified, created, edited and implemented the scripts to be used in the calls, specified the criteria for selection of numbers to be called, and controlled and managed the data that resulted from the calls including call detail records and customer details that include name, address, age, health history, occupation, income range, and other demographic and personal information.

97. Defendant QuinStreet describes its exposure to TCPA claims and its call center activity in part as follows:

> . . . in connection with our owned and our third-party publishers' telemarketing campaigns to generate traffic for our clients, we are subject to various state and federal laws regulating telemarketing communications (including SMS or text messaging), including the federal Telephone Consumer Protection Act (the "TCPA"), which requires prior express written consent for certain types of telemarketing calls. Our efforts to comply with the TCPA have not had a material impact on traffic conversion rates. However, depending on future traffic and product mix, it could potentially have a material effect on our revenue and profitability, including increasing our and our clients' exposure to enforcement actions and litigation. The TCPA regulations have resulted in an increase in individual and class action litigation against marketing companies for alleged TCPA violations. TCPA violations can result in significant financial penalties, including penalties or criminal fines imposed by the Federal Communications Commission (the "FCC") or fines of up to $1,500 per violation imposed through private litigation or by state authorities. . . . a significant amount of revenue comes from calls made by our internal call centers as well as, in some cases, by third-party publishers' call centers. We also purchase a portion of inquiry data from third-party publishers . . .

QuinStreet, Inc. 10-K for Fiscal Year Ended June 30, 2023 at 15.
https://investor.quinstreet.com/sec-filings/sec-filing/10-k/0000950170-23-043659
last viewed August 17, 2024.

## THE DO-NOT-CALL CLASS

98. The Do-Not-Call Class ("DNC Class") consists of all persons within the United States who had not given express prior written consent, to whom a defendant caused the transmission of at least two Calls, at least one of which was on or after July 16, 2024, and whose number, at the time of the call, had been registered on the National Do-Not-Call Registry for at least 30 days prior to the call.

99. The members of the DNC Class number in the thousands.

## THE PRE-RECORDED VOICE CLASS

100. The Pre-recorded Voice Class consists of all persons in the United States to whom a Defendant caused the transmission of at least one Call on or after July 16, 2020 using an artificial or pre-recorded voice, without prior express written consent from the recipient.

101. The members of the Pre-recorded Voice Class number in the thousands.

## THE MARYLAND CLASS

102. The Maryland Class consists of all persons in Maryland to whom a Defendant caused the transmission of at least one Call on or after July 16, 2020 using a pre-recorded voice, without prior express written consent from the recipient, or without providing accurate caller ID information including the name of the caller and the originating number of the call.

103. The members of the Maryland Class number in the thousands.

## ADDITIONAL CLASS ALLEGATIONS

104. Excluded from the classes are Defendants and their affiliated entities, Defendants' agents and employees, any judge to whom this action is assigned and any member of such judge's staff and immediate family.

105. Plaintiff and all members of the classes have been harmed by the acts of Defendants because their privacy has been violated, they were subject to annoying and harassing calls that constitute a nuisance, and many were charged for incoming calls.

106. The joinder of all class members is impracticable due to the size and relatively modest value of each individual claim.

107. The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of nearly identical suits.

108. The classes are ascertainable through records in the possession of Defendants and their agents and affiliates, and in the possession of contractors and the communications carriers who carried the transmissions. QuinStreet has confirmed that it consulted transmission records regarding Plaintiff's claims.

109. There are well-defined, nearly identical questions of law and fact affecting all of the parties.

110. The questions of law and fact involving the class claims predominate over questions which may affect individual Class members.

111. The common questions of law and fact include, but are not limited to, the following:

a. Whether Defendants used an automatic telephone dialing system in making non-emergency calls to Class members' cell phones;

b. Whether Defendants used an artificial or prerecorded voice in their non-emergency calls to Class members' cell phones;

c. Whether Defendants engaged in telemarketing activities without first obtaining prior express written consent (i.e., written consent that is clearly and unmistakably stated);

d. Whether Defendants can meet their burden of showing they obtained prior express written consent (i.e., written consent that is clearly and unmistakably stated), to make such calls;

e. Whether Defendants' conduct was knowing and/or willful;

f. Whether Defendants are liable for statutory damages; and

g. Whether Defendants should be enjoined from engaging in such conduct in the future.

112. Plaintiff's claims are typical of the claims of the Class Members.

113. Plaintiff will fairly and adequately represent the interests of the Classes.

114. Plaintiff has no interests which are antagonistic to any member of the Classes.

115. Plaintiff has retained counsel experienced in handling class action claims involving violations of the TCPA and state statutes as they pertain to robocalls.

116. A class action is the superior method for the fair and efficient adjudication of this controversy.

117. Class-wide relief is essential to compel the defendants to comply with the TCPA.

118. The Class members' interest in pursuing individual claims against Defendants is slight because the statutory damages for an individual action are relatively small, relative to the time and expense required for such litigation. Any such individual actions are not likely to deter Defendants from engaging in the same behavior in the future.

119. The class claims will be manageable; the calls were automated, involving data for their transmission and data reflecting their results and outcomes; the Class members did not provide the prior express written consent required under the statute to authorize such calls to their cellular telephones; the classes are ascertainable via data in the possession or control of defendants and their contractors, subcontractors, carriers and service providers; Defendants have been reminded of their obligation, imposed by law, to preserve data relevant to this action.

120. The data produced in similar class actions over telemarketing have been ably managed by experts and technicians and the same approach will apply here.

121. Defendants have acted on grounds generally applicable to the Classes , thereby making final injunctive relief with respect to the Class as a whole appropriate.

122. On information and belief, Plaintiff alleges that the TCPA and state law violations complained of herein are likely to continue in the future if injunctive relief is not entered.

123. Plaintiff seeks class relief in the form of damages under FRCP 23(b)(3) and injunctive relief under FRCP 23(b)(2).

124. The TCPA provides for damages of the greater of $500 per violation or actual damages; and empowers the Court to award up to treble damages if the violative conduct was knowing or willful. 47 U.S.C. § 227(b)(3)(B).

**COUNT I – DO NOT CALL VIOLATIONS**

125. The allegations above are hereby incorporated by reference.

126. Defendants violated the TCPA, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d) by causing the transmission of telephone calls advertising insurance products to Plaintiff and the members of the DNC Class, more than once within a 12-month period, despite the fact that those recipients' numbers were on the Registry.

127. Defendants negligently and carelessly failed to check the DNC Registry, and negligently and carelessly failed to delete from their calling plans and lists the numbers of Plaintiff and the DNC Class members.

128. Plaintiff alleges in the alternative that Defendants' failure to check the DNC Registry and its conduct in causing the Calls to be made to Plaintiff and the members of the DNC Class was knowing and willful.

129. The DNC Class is ascertainable via automated means using call data records and related data from Defendants, vendors, carriers, service providers and contractors engaged in the

planning, preparation and transmission of the Calls, and via the DNC database maintained by the FTC.

## COUNT II –PRE-RECORDED VOICE VIOLATIONS

130. The allegations above are hereby incorporated by reference.

131. Defendants caused the Calls to Plaintiff and the members of the Pre-recorded Voice Class without prior express written permission, in violation of 47 U.S.C. § 227(b)(1)(A).

132. Defendants' failure to obtain prior express written permission for the Calls was careless and negligent.

133. Plaintiff alleges in the alternative that Defendants' conduct in failing to obtain prior express written permission for the Calls, and its conduct in causing the Calls, was knowing or willful.

134. The Pre-recorded Voice Class is ascertainable via automated means using call data records and related data from Defendants, vendors, carriers, service providers and contractors engaged in the planning, preparation and transmission of the Calls.

## COUNT III – MARYLAND CLASS

135. The allegations above are hereby incorporated by reference.

136. Defendants violated Maryland Commercial Code §14-3201 by violating the TCPA in at least the following ways:

a. Failure to obtain the required consent for the Calls;

b. Sending the Calls to numbers on the Registry;

c. Failure to use accurate caller ID information including the name of the caller and the number from which the call was sent.

137. Defendant's failures alleged above in this count were careless and negligent.

138. Plaintiff alleges in the alternative that Defendant's failures alleged above in this count were knowing or willful.

139. The Maryland Class is ascertainable via automated means using call data records and related data from Defendants, vendors, carriers, service providers and contractors engaged in the planning, preparation and transmission of the Calls, and via the DNC database maintained by the FTC.

**COUNT IV – INJUNCTIVE RELIEF**

140. The allegations above are hereby incorporated by reference.

141. Plaintiff avers that the conduct alleged above in violation of the TCPA and state law is likely to continue, causing intrusion, interruption and outrage among the public, as recognized by Congress as a compelling basis for injunctive relief under the TCPA and its regulations. Defendants have continued their unlawful conduct despite prior lawsuits. Absent injunctive relief, the conduct is likely to continue, causing intrusion, invasion of privacy, deception, interruption of personal time, and other loss. Plaintiff therefore requests injunctive relief pursuant to FRCP 23(b)(2).

142. Plaintiff requests an order prohibiting Defendants and their affiliates and agents from a) causing the transmission of telemarketing calls to telephone numbers that are registered on the National Do Not Call Registry maintained by the Federal Trade Commission; b) causing the transmission of telemarketing calls using a pre-recorded voice without the prior express written consent of the intended recipient of the call; and c) causing the transmission of telemarketing calls without disclosing to the recipient of the call the true identity of the organization making the call and the telephone number from which the call was originated.

## CONSOLIDATED PRAYER FOR RELIEF

143. Plaintiff, individually and on behalf of the Classes, prays for the following relief:

a. Certification of the proposed Classes;

b. Appointment of Plaintiff as representative of the Classes;

c. Appointment of the undersigned counsel as counsel for the Classes;

d. An order pursuant to FRCP 23(b)(2), and 47 U.S.C. § 227(c)(5)(A) enjoining Defendants and their affiliates, agents, and anyone acting on Defendant' behalf from making telemarketing calls to numbers on the National Do Not Call Registry absent an emergency circumstance; enjoining Defendants from making telemarketing calls using artificial or pre-recorded voicing; and enjoining Defendants from using false caller ID information in telemarketing calls;

e. Statutory damages under FRCP 23(b)(3) and 47 U.S.C. § 227(b)(3)(B) consisting of $500 per each violation that was not knowing or willful and $1,500 for each violation that was knowing or willful;

f. Statutory damages and all other relief available under Maryland Commercial Code §14-3201 and §14-3202;

g. Such other and further relief as the Court deems necessary, just, and proper.

___________/s/___________________

Stephen H. Ring
STEPHEN H. RING, PC
401 North Washington Street, Suite 500
Rockville, Maryland 20850
(301) 563-9249
USDC-MD Attorney No. 00405
shr@ringlaw.us
Attorney for Plaintiff and the Proposed Classes

## JURY DEMAND

Plaintiff requests a trial by jury as to all issues so triable.

___________/s/____________________
Stephen H. Ring

## CERTIFICATE OF SERVICE

I certify that copies of this document and its attachments were sent on the date stamped on them by the Court, to the following:

Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Email: ikasdan@kelleydrye.com

James B. Saylor (*pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Email: jsaylor@kelleydrye.com

Michael D. Alltmont, Esquire
Sessions, Israel & Shartle, LLC
3838 N. Causeway Blvd., Te. 2800
Metairie, LA 7002
malltmont@sessions.legal

Baabak Zarrabian
Jordan Coyne, LLP
10201 Fairfax Blvd., Ste. 520
Fairfax, VA 22030
b.zarrabian@jocs-law.com

___________/s/____________________
Stephen H. Ring