# QuinStreet Client Terms

These QuinStreet Client Terms ("Terms") set forth the terms and conditions pursuant to which QS may provide Traffic to Client. Traffic type, pricing and other terms will be specified in one or more IOs entered into between the Parties or selected by the Client in the Platform.

1) **DEFINITIONS**.

a) **"Agreement"** means these Terms, together with any applicable IO. Each IO, when combined with these Terms, shall be a separate Agreement.

b) **"Approval"** and/or **"Approved"** means the written consent by an authorized representative of the approving Party, sent in accordance with the Notice provision of these Terms.

c) **"Call Lead"** means a telephone call placed by consumer to a Client or QS telephone number that routes to a Client call center, which telephone number is promoted on the QS Network.

d) **"Click"** means a method that takes a consumer from advertising creative displayed on the QS Network and is redirected to a Client-designated website via a hyperlink provided by QS.

e) **"Click Lead"** means Lead Data associated with an consumer that Clicks on a Listing and is hyperlinked to a Client-designed website.

f) **"Client"** means the company or entity that agrees to purchase Traffic from QS.

g) **"Client Content"** means banners, buttons, trademarks, trade names, logos, graphical images, text, photographs, descriptions, rates, payment terms and other advertising materials provided by Client to QS.

Exhibit A to Complaint

h) **“Creative”** means any Client Approved marketing content concerning Client products and services created by QS for use in connection with this Agreement. Creative may include Client Content.

i) **“Display Traffic”** means Clicks (other than Platform Clicks) or advertising impressions generated by QS through the display of banners, sponsored listings, featured placements, text links or other promotion content on the QS Network.

j) **“Effective Date”** means the effective date set forth on an IO or other agreement between QS and Client.

k) **“IO”** means an insertion order signed by the Parties that references or incorporates these Terms. IOs may specify (i) the type and quantity of Traffic to be delivered, (ii) the price, (iii) the maximum spends, (iv) campaign start and end dates, and (v) Traffic delivery criteria.

l) **“Lead(s)”** means collectively Call Leads, Click Leads, Online Leads and Warm Transfer Leads.

m) **“Lead Data”** means PII and other information associated with a Lead that is delivered by QS to Client for the purpose of enabling Client to contact and market its products and services to the associated consumer.

n) **“Listing”** means Creative displayed through the Platform.

o) **“Online Lead”** means Lead Data submitted by a consumer through a lead form on the QS Network.

p) **“Parties”** means collectively QS and Client.

q) **“PII”** means information that: (i) identifies or can be used to identify an individual (including names, addresses, telephone numbers, e-mail addresses and other unique identifiers); or (ii) can be used to authenticate an individual (including government-issued identification numbers, passwords or PINs, financial account numbers, credit report information, health data and other personal identifiers).

r) **“Platform”** means QS’ proprietary online marketplace, including the QuinStreet Media Platform (“QMP”), through which Client can bid on, purchase, manage and track Leads and Clicks generated from the QS Network and provides ad serving, ad management and ad reporting services.

s) **“QS”** means QuinStreet, Inc. To the extent any activities or services to be performed by QS under an Agreement are required to be performed under applicable law by a licensed affiliate (e.g., insurance or personal loan-related activities), QS is responsible for ensuring that such activities or services are performed by such licensed affiliate.

t) **“QS Network”** means collectively websites, call centers and email service providers owned by QS, its corporate affiliates and QS’ network of third party publishers. QS has sole discretion over the selection of publishers to the QS Network; provided that QS shall not promote Client via any website that includes content that falls within the exclusion guidelines provided by Client to QS.

u) **“Traffic”** means a Lead, Click or Display Traffic delivered by QS to Client as specified in an IO.

v) **“Warm Transfer Lead”** means a consumer that is transferred via telephone to Client and whose associated Lead Data is delivered by QS to Client.

2) **LEADS.** Client may purchase Leads from QS pursuant to an IO or by placing bids through the Platform. QS may publish Creative on the QS Network or in other ways generate Leads associated with consumers who expressed an interest in Client’s products or services and refer such Leads to Client. QS will transmit Leads to Client in a mutually agreed manner.

a) **Lead Criteria**. Client may specify filter criteria to be used by QS to match Leads to Client (“Lead Criteria”). Unless otherwise agreed by the Parties, Client requested updates to Lead Criteria will take effect within (x) three (3) days of Client’s request in the case of Warm Transfer Leads and (y) twenty (20) days of Client’s request for all other Leads. Changes to Lead Criteria may result in mutually agreed upon price changes.

b) **Warm Transfer Leads**. Each Warm Transfer Lead will be forwarded in an attempted live transfer to only one Client sales associate. If an attempted live transfer is unsuccessful due to the unavailability of a Client sales associate or a disconnection before the transfer is complete, the Warm Transfer Lead will still be deemed valid and QS will submit the Lead Data associated with such Warm Transfer Lead to Client for follow-up by designating the Warm Transfer Lead as having an incomplete transfer status.

c) **Lead Returns**.

(1) Except as otherwise set forth herein, QS will only accept the return of a Lead delivered to Client that (A) fails to contain the Lead Criteria; (B) is a duplicate lead (defined as a lead sent more than once by QS to Client within the past 30 calendar days);
(C) contains clearly false information (e.g., Mickey Mouse, Santa Clause, etc.); or (D) contains a disconnected telephone number or fax number (on both primary and alternate numbers, if provided) AND contains an invalid email address (i.e., bounces back). Notwithstanding the foregoing, Leads with which Client has established a contact shall in all cases be considered valid. Unless otherwise set forth in an IO, Warm Transfer Leads are not subject to return.

(2) Client shall submit credit requests for invalid leads via the Client Services interface or other method specified by QS. Returned leads must include the reason for the return, all information originally sent by QS to Client, and any other information reasonably requested by QS. Unless otherwise QS Approved, Client must submit all credit requests for invalid leads within five (5) business days of delivery to Client and QS will not accept the return of any delivered leads following that date. If QS reasonably confirms the returned Lead is invalid, QS will credit the appropriate amount to Client.
d) **Use of Lead Data**. QS will deliver Lead Data to Client with each Lead. Client will make commercially reasonable efforts to contact the consumer associated with the Lead Data within one (1) business day of receipt of the Lead Data or such longer time period as QS Approved. Client acknowledges that Leads delivered to Client may be matched with other QS clients and nothing herein obligates QS to deliver Leads exclusively to Client or restricts QS' provision of services to any competitor of Client.

3) **PLATFORM CLICKS**

a) Clicks. Client may purchase Clicks through the Platform ("Platform Clicks") as set forth in an IO or by Client placing bids through the Platform. Client will not, on its own or with the assistance of any third-party (1) cause competing bidders to be charged for Platform Clicks (i.e., by clicking on competitors' ads delivered by the Platform), or (2) use any automation technology to place bids on the Platform.
b) Invalid Clicks. Client's sole and exclusive remedy and QS' exclusive liability for suspected invalid Platform Clicks is for Client to make a request for a refund within five (5) days of being charged for the Clicks. Any refund shall be in QS' reasonable discretion.

4) **DISPLAY ADVERTISING**. Client may purchase Display Traffic as set forth in an IO. QS does not guarantee the quantity or timing of delivery of Display Traffic.

5) **EMAILS**. QS may generate Leads or Clicks for Client by distributing Creative in email messages (either directly or through a third party list or service provider) ("Emails"). QS shall determine the times and dates on which Emails will be sent. Client is responsible for ensuring that any Client Content provided to QS for use in Emails complies with the CAN-SPAM Act of 2003 ("CAN-SPAM") and all other laws applicable to email solicitations. In particular, Client Content must confirm with the following:

a) "from" lines must be accurate and non-misleading and must accurately identify the Client;

b) "subject" lines must be accurate and non-misleading and must accurately identify the content of the Email;

c) all Emails must contain a clear and conspicuous notice that the message is an advertisement or solicitation;

d) all Emails must include a clear and conspicuous notice of the opportunity to decline to receive further communications from Client. The opt-out mechanism must be effective for no less than 30 days following the original date the Email is transmitted;

e) all Emails must include a valid physical postal address of the Client (Client shall notify QS of any change in its physical address within 24 hours of such change); and

f) Client must provide QS with a list in a mutually agreed format containing the email addresses of all consumers who have requested not to receive emails from Client (the “Suppression List”). Client shall provide an up-to-date Suppression List no earlier than five (5) days prior to and no later than three (3) days prior to the scheduled sending of any Email campaign, or such other QS Approved frequency. Client agrees to indemnify, defend and hold harmless QS from and against any and all claims, costs, fees or items of expense arising from a claim that Client failed either to honor any consumer’s unsubscribe request or deliver to QS an accurate Suppression List. Client agrees that QS can provide Client’s Suppression List to any QS email service provider (“ESP”). The Suppression List shall be Client Confidential Information.

6) **PRIVACY AND DATA SECURITY**

a) IF CLIENT RECEIVES LEAD DATA HEREUNDER, CLIENT SHALL COMPLY WITH THE TERMS OF THE QS CLIENT PRIVACY AND DATA SECURITY ANNEX (“PDS ANNEX”).
b) IF SET FORTH ON AN IO OR OTHERWISE QS APPROVED, QS MAY DELIVER TO CLIENT (i) PING DATA IN CONNECTION WITH THE PROVISION OF LEADS HEREUNDER AND (ii) SUPERCLICK DATA IN CONNECTION WITH THE PROVISION OF CLICKS HEREUNDER. TO THE EXTENT CLIENT RECEIVES PING DATA OR SUPERCLICK DATA FROM QS, CLIENT SHALL COMPLY WITH THE TERMS OF THE PDS ANNEX. “PING DATA” AND “SUPERCLICK DATA” HAVE THE MEANINGS GIVEN TO SUCH TERMS IN THE PDS ANNEX.

7) **CREATIVE**. QS may develop Creative for use on the QS Network that contains Client Content. QS make commercially reasonable efforts to comply with any Client Approved creative guidelines provided in writing or made available online to QS in developing the Creative and will provide the Creative to Client for review. Within five (5) business days after receipt of such Creative, Client will either (1) Approve such Creative, or (2) provide detailed required revisions to allow for Client’s subsequent Approval, after which QS will revise the Creative and provide it to Client. If Client desires to discontinue or change any Client Content, (i) Client will provide at least fifteen (15) days written notice to QS of such change and (ii) within fifteen (15) days of receiving all revised Client Content, QS will revise the Creative and provide to it Client for Approval.

8) **LICENSE**. Client grants QS a non-exclusive, non-transferable, royalty-free license to access, reproduce, display and communicate to consumers the Client Content, including where agreed to by Client, Client's rating content through either an integration of Client's quoting interface with QS' comparative platform or a third party comparative rater. Such licenses will terminate automatically upon the termination of this Agreement.

9) **NON-CIRCUMVENTION**. During the term of this Agreement, Client will not displace, and will use best efforts to preclude any person or entity working on Client's behalf from displacing, QS's media placements on any websites that promote or have promoted QS proprietary web properties and/or QS clients in connection with this Agreement. During the term of this Agreement and for a period of one (1) year following termination, Client will not, directly or indirectly, contract for the provision of Internet advertising or marketing services with any QS publisher.

10) **PAYMENTS**

a) Client will pay QS the fees indicated on any IO or as established by Client via the Platform and such payment will be in accordance with the payment terms set forth therein. The Lead Criteria and fees set forth on an IO may be modified via email upon Approval by the other Party of the proposed modifications.

b) If Client purchases Leads or Clicks through the Platform, all bids placed on the Platform are immediately binding and cannot be revoked or changed retroactively once placed. The amounts due to QS will be calculated by the Platform, which is the sole and binding accounting of amounts due. The Lead Criteria and bids within the Platform may be modified via email upon Approval by the other Party of the proposed modifications.

c) With respect to a cost-per-action campaign other than a cost-per-Lead or cost-per-Click campaign ("CPA Campaigns"), the applicable IO shall specify the amount and terms under which QS will receive a fee for campaign-related actions, such as funded loans, registrations, enrollments, subscriptions or sales.

d) Payment must be made to QS within thirty (30) days of the invoice date. Payments not received by QS within 30 days of the date of any invoice shall bear interest at a rate of 1.5% per month or the maximum rate allowed by law, whichever is lower, until paid in full.

11) **REPORTING AND AUDITING**

a) **Leads**. Client will make commercially reasonable efforts to provide to QS a Conversion Report on a weekly basis or such other time period mutually agreed by the Parties. A "Conversion Report" means a

written report that identifies each Lead delivered to Client by QS for the prior period using the QS lead identification number, the date the Lead was delivered to Client, and whether the Lead converted into or resulted in an action agreed upon by the Parties (e.g., the Lead was successfully contacted by Client or the Lead closed on a Client mortgage). Conversion Report shall constitute Confidential Information of Client. At QS' request, Client shall enable QS to monitor telephone calls between Client's call center personnel and any Leads or provide QS with a transcript or recording of such calls.

b) **Display Traffic**. Unless otherwise set forth on an IO, (i) QS will track delivery of Display Traffic through its ad server and (ii) QS will make reporting available at least weekly. Notwithstanding the foregoing, Client may also track delivery through its proprietary or subcontracted third-party ad server. In the event the discrepancy between QS and Client's measurements exceeds 10% over the invoice period and QS' measurement is lower, the Parties will make a good faith effort to reconcile QS and Client's measurements. If the discrepancy cannot be resolved and a good faith effort to facilitate the reconciliation has been made, QS' measurements will be regarded as the correct record of the campaign.

c) **CPA Campaigns**. Client will track compensation events for CPA Campaigns and will provide monthly reporting to QS no later than three (3) business days following the end of a calendar month, unless otherwise specified in an IO. Reports shall specify all compensation events, charge-backs, returns, commissions, discounts or other charges. Billing shall be based on Client's reports, provided that QS shall be able to independently verify such reports by placing a pixel on Client's applicable thank-you or comparable page, or a pixel as otherwise agreed upon by the Parties in writing (email acceptable).

d) **Audits**. QS shall have the right, upon ten (10) business days' notice, to audit Client's books and records relating to any CPA campaign to verify the accuracy of all amounts payable to QS. If an audit reveals a shortfall, Client will pay QS any outstanding amounts. If there is a shortfall in excess of five percent (5%) of the reported amounts by Client, Client shall reimburse QS for the reasonable costs of such audit.

12) **TERM; TERMINTATION**

a) **Term**. This Agreement commences on the Effective Date and continues as long as an IO is in effect. Termination under one IO shall not impact the terms, rights or obligations of the Parties under these Terms with respect to any other IO.

b) **Termination by Either Party**. Either Party may terminate this Agreement immediately upon written notice if the other Party is in breach of a material term of this Agreement and fails to cure such

breach (if curable) within fifteen (15) days of written notice of such material breach. Either Party may terminate this Agreement at any time on ninety (90) days prior written notice to the other Party unless otherwise set forth in an IO. Notwithstanding the foregoing, in the event the number of Leads returned by Client is equal to or greater than five percent (5%) of Leads delivered by QS in any month, QS may terminate this Agreement and any active IO upon fourteen (14) days' written notice to Client

c) **Effect of Termination**.  Termination of this Agreement shall not relieve Client of its obligations to QS in respect of services delivered prior to such termination date.

13) **CONFIDENTIALITY**.  Neither Party shall use or disclose Confidential Information disclosed by the other Party except as expressly provided in this Agreement.  As used herein, "Confidential Information" means, with respect to each Party, all data related to the sources of a Party's web traffic ("Source Data"), the terms of this Agreement, marketing, financial, employee, planning, technical and other confidential or proprietary information, and with respect to QS, all pricing information and any information regarding the members or performance of the QS Network and any consumer PII delivered to Client in connection with this Agreement.  The obligations of the recipient of Confidential Information hereunder will terminate if such information: (a) was already lawfully known to the recipient at the time of disclosure; (b) is disclosed to the recipient by a third party who had the right to make such disclosure without any confidentiality restrictions; (c) is, or through no fault of the recipient has become, generally available to the public; or (d) is independently developed by the recipient without access to or use of the other Party's Confidential Information.  In addition, the recipient will be allowed to disclose Confidential Information of the other Party to the extent that such disclosure is (i) Approved, (ii) necessary for the recipient to enforce its rights under this Agreement, or (iii) required by law or by the order of a court or similar judicial or administrative body, provided that the recipient notifies the other Party of such required disclosure promptly and in writing and cooperates with the other Party, at the other Party's request and expense, in any lawful action to contest or limit the scope of such required disclosure.

14) **OWNERSHIP**. Each Party will retain all right, title and interest in and to its Confidential Information, websites, intellectual property, its Source Data, any data it obtains from its websites, and any creative that it develops hereunder (other than the content or intellectual property provided by the other Party). QS' websites and all software, programming code, computerized data, hypertext language (HTML) or similar files created, generated, assembled or developed in the process of providing the Platform, methods of operation, processes, algorithms, documents, trademarks, and other intellectual property developed by QS relating thereto (collectively "Property"), are the sole and exclusive property of QS. Client agrees and acknowledges that no right, title, interest or license in or to any of the Property is or shall be conveyed or granted to Client.  Client shall not and shall not attempt to copy, transfer, modify, translate, reverse engineer, decompile or disassemble QS website(s), Property, or any part thereof.

15) **REPRESENTATIONS AND WARRANTIES**.

a) Each Party represents, warrants and covenants to the other Party that (i) it has all necessary rights and authority to enter into this Agreement and to grant the rights and licenses hereunder; (ii) the execution or electronic acceptance of this Agreement and the performance of its obligations hereunder do not and will not violate any agreement to which such Party is a party or by which it is otherwise bound, and (iii) its performance hereunder will comply with all applicable federal, state and local laws, regulations, and self-regulatory obligations, including, but not limited to, the Telemarketing Sales Rule, 16 C.F.R. Part 310, as amended from time to time, the Telephone Consumer Protection Act, 47 U.S.C. § 227, and implementing regulations, 47 C.F.R. § 64.1200, as amended from time to time, and the CTIA Short Code Monitoring Handbook, as amended from time to time.

b) Client represents and warrants that (i) it shall maintain any and all licenses, bonds, or similar items required by applicable state or federal statute or regulatory authority for the conduct of Client's business ("Required Authority") in any jurisdiction from which Client receives Traffic and that it shall notify QS of the loss or expiration of any such Required Authority within three (3) business days of such loss or expiration, (ii) it owns all intellectual property rights in the Client Content or has all rights needed to grant the licenses granted to QS in this Agreement, (iii) all information contained in any Client Content, including rate, payment, or product information provided to QS will at all times be accurate in all respects, and (iv) in the case that Client is an advertising agency, it is authorized to act as agency on behalf of the principal indicated on the Client Insertion Order and that it is the agency of record for such principal.

c) QS represents and warrants that it (i) will not make or accept any offers, or make any representations, on behalf of Client or regarding Client's products or services except as authorized by Client, (ii) will not collect a fee from a consumer associated with Traffic delivered from user, (iii) will not compensate any consumer to take a particular action resulting in Traffic delivered to Client, and (iv) has all necessary rights to transfer any PII provided to Client as contemplated under the Agreement.

d) Except as otherwise expressly set forth in this Agreement, QS provides the services performed hereunder "AS IS" and without any warranty of any kind and assumes no responsibility or liability for the accuracy or completeness of any data transmitted to Client at any time under this Agreement. QS EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR INTENDED PURPOSE RELATED TO THE SERVICES TO BE PROVIDED TO CLIENT HEREUNDER. QS IS NOT RESPONSIBLE FOR AND MAKES NO REPRESENTATION WITH RESPECT TO THE ADEQUACY OF CLIENT'S CURRENT OR PROPOSED HARDWARE, ITS CONFIGURATION OR ITS COMPATIBILITY WITH THE PLATFORMS OF QS OR ANY OTHER PERSON OR ENTITY. CLIENT WILL NOT HOLD QS OR ITS RELATED PARTIES LIABLE OR RESPONSIBLE FOR THE ACTIVITIES OF VISITORS OF ANY CLIENT WEBSITE OR FOR ANY

LOSSES WHICH MAY RESULT FROM SUCH INTERRUPTION OF AVAILABILITY OF THE SERVICES OR PLATFORM. CLIENT ACKNOWLEDGES AND AGREES THAT IT HAS INDEPENDENTLY DECIDED THAT THE SERVICES (INCLUDING THE PLATFORM) ARE APPROPRIATE FOR THE PURPOSES FOR WHICH CLIENT INTENDS, AND THAT CLIENT DID NOT RELY ON ANY SKILL OR JUDGMENT OF QS IN SUCH SELECTION.

16) **MUTUAL INDEMNIFICATION**. Each of the parties (the **"Indemnitor"**) will indemnify, defend and hold harmless the other Party (the **"Indemnitee"**) from and against any and all claims, suits, losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses) related to any breach by the Indemnitor of its representations, warranties and obligations set forth herein; provided, however, that the Indemnitee (a) promptly gives written notice of such claims to the Indemnitor; (b) gives the sole control of the defense and settlement of such claims to the Indemnitor; provided, however, that the Indemnitor shall not enter into any settlement on the part of the Indemnitee without Approval of the Indemnitee; and (c) provides to the Indemnitor all reasonable assistance.

17) **LIMITATION OF LIABILITY**. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY: CONSEQUENTIAL, INDIRECT, EXEMPLARY, SPECIAL, OR INCIDENTAL DAMAGES, INCLUDING ANY LOST PROFITS, ARISING FROM OR RELATING TO THIS AGREEMENT EVEN IF SUCH PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EACH PARTY'S TOTAL CUMULATIVE LIABILITY IN CONNECTION WITH THIS AGREEMENT, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, WILL NOT EXCEED THE AMOUNTS PAID BY CLIENT TO QS PURSUANT TO THIS AGREEMENT WITHIN THE ONE HUNDRED AND EIGHTY (180) DAY PERIOD PRIOR TO THE DATE ON WHICH SUCH CLAIM AROSE.

18) **TAXES; OTHER FEES AND CHARGES.** CUSTOMER SHALL PAY AND DISCHARGE WHEN DUE ALL LICENSE AND REGISTRATION FEES, ASSESSMENTS, SALES, USE, PROPERTY AND OTHER TAXES, AND OTHER EXPENSES AND CHARGES, together with any applicable penalties, interest, and administrative fees now or at any time imposed upon any equipment, the payments, or Client's performance or non-performance of its obligations hereunder, whether payable by or assessed to QS or Client. If Client fails to pay any such fees, assessments, taxes, expenses or charges as required hereunder, QS shall have the right but not the obligation to pay those fees, assessments, taxes, expenses and charges, and Client shall promptly reimburse QS, upon demand, for all such payments made plus administrative fees and cost, if any.

19) **MISCELLANEOUS**.

a) **Publicity**. Neither Party may use the other Party's names or marks without prior written approval. QS may state in its marketing materials that Client is a QS client.

b) **Survival**.  The following Sections of this Agreement shall survive the expiration or termination of this Agreement indefinitely or in accordance with the survival periods expressly set forth therein: 2(d), 3(b), 6, 9, 10(d), 11, 12(c), 13, 14, 15(d), 16, 17, 18 and 19.

c) **Relationship of the Parties**.  The Parties' relationship is one of independent contractors and nothing in this Agreement is intended to or will create any form of partnership, joint venture, agency, or employment relationship between the Parties.

d) **Assignment**.  Neither Party may assign this Agreement, by operation of law or otherwise, without the prior written consent of the other Party. Notwithstanding the foregoing, either Party shall have the right to assign this Agreement to a successor by reason of merger, reorganization, sale of all or substantially all of a Party's assets, provided that the assigning Party shall promptly notify the other Party in writing of such an event and the non-assigning Party shall have the right to immediately terminate this Agreement by written notice to the assigning Party.

e) **Entire Agreement**.  This Agreement and IO constitute the entire agreement between the Parties regarding the subject matter hereof and supersede any other agreements or understandings (whether written or oral) between the Parties regarding the subject matter hereof.  Except as expressly provided herein, this Agreement may not be amended without the written consent of the Parties.  If there is a conflict between these Terms and an IO, the IO will prevail. Notwithstanding the foregoing, these Terms may only be modified in an IO if such IO includes a specific cross-reference to the section of the Terms intended to be modified. Execution or electronic acceptance of any IO that references these Terms shall be deemed acceptance of these Terms by the Parties.

f) **Waiver**.  A Party's waiver of, or failure to enforce, any right hereunder on one occasion will not be deemed a waiver of any other right on the same occasion or the same right on any other occasion.

g) **Severability**.  If a court of competent jurisdiction declares any provision of this Agreement to be invalid or unenforceable, the remainder of this Agreement will continue in full force and effect.

h) **Governing Law; Venue**.  This Agreement will be governed by the laws of the State of California without reference to its choice of law principles.  The parties agree to submit to the exclusive jurisdiction of the state courts located in San Mateo County, California or the federal courts located in the Northern District of California with respect to disputes hereunder.

i) **Notifications**.   Any notice, Approval or other communication to the other Party under this Agreement must be submitted by email, overnight express mail or certified or registered mail (postage prepaid, return receipt requested) to the other Party's contact details set forth in the IO.

Ready to start a conversation? Contact us today

©2024 QuinStreet, Inc. All Rights Reserved. Privacy Notice | Terms of Use | Client Terms | Client Privacy And Data Security Annex | Publisher Terms | Publisher Service Orders | Publisher Privacy And Data Security Annex | Do Not Sell or Share My Personal Information | Accessibility Statement