# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION - GREENBELT

| | |
|---|---|
| Stanley Shapiro,<br><br>Plaintiff,<br><br>v.<br><br>QuinStreet, Inc.,<br><br>Defendant. | Case No. |

**NOTICE OF REMOVAL**

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1446, Defendant QuinStreet, Inc. ("QuinStreet"), by and through its undersigned counsel, hereby removes the above-captioned complaint from the District Court of Maryland for Montgomery County, Rockville. Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Plaintiff's claims for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), and, pursuant to 28 U.S.C. § 1367, supplemental jurisdiction over Plaintiff's state law claims. In support of removal, QuinStreet states the following:

1. On April 25, 2024, Plaintiff filed his Complaint in the District Court of Maryland for Montgomery County, Rockville, under the case caption *Stanley Shapiro v. QuinStreet, Inc.*, Case No. D-06-CV-24-013639 (the "State Court Action").

2. The Complaint alleges that QuinStreet made unsolicited calls to Plaintiff's phone number ending in -1979. (Ex A. at 6.)

3. Plaintiff purports that this alleged activity violates both the TCPA and Maryland's version of the TCPA, Maryland Annotated Code, Commercial Art. § 14-3201-3202. (*Id.*)

## REMOVAL IS TIMELY

4. Removal of this action is timely, as QuinStreet was served Plaintiff with a copy of the Complaint on May 8, 2024 (*see* Ex. A at 1), and this Notice is being filed within 30 days of service, as prescribed under 28 U.S.C. § 1446(b).

## GROUNDS FOR REMOVAL

5. This Court has subject matter jurisdiction over Plaintiff's claims due to the presence of a federal question. Moreover, the Court may exercise supplemental jurisdiction over Plaintiff's state law claims because they arise from a common nucleus of operative fact.

### I. The Court Has Original Subject Matter Jurisdiction Over Plaintiff's TCPA Claims Due to the Presence of a Federal Question

6. Federal question jurisdiction exists when an action presents a claim "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Indeed, a federal district court has original jurisdiction over claims when "a federal question is presented on the face of the plaintiff's" complaint. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987).

7. Here Plaintiff alleges claims under the TCPA, a federal statute. (Ex. A at 6.) The Supreme Court has expressly recognized that "federal and state courts have concurrent jurisdiction over private suits arising under the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Thus, because "Plaintiff['s] statement of his own cause of action shows that it is based" on a federal statute, a federal question exists. *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1906).

### II. The Court May Exercise Supplemental Jurisdiction over Plaintiff's Maryland Claims

8. Supplemental Jurisdiction exists when an action contains "other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case and controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

For this to be met, all state and federal claims must share a "common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

9. Plaintiff’s TCPA and MD-TCPA claims share a common nucleus of operative fact because they all arise from the same conduct—alleged unsolicited calls to Plaintiff by QuinStreet.

10. Accordingly, removal of this action is proper on the basis that, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, this Court has subject matter jurisdiction over Plaintiff’s TCPA and MD-TCPA claims.

**REMOVAL IS PROCEDURALLY PROPER**

11. Removal to this Court is proper because the United States District Court for the District of Maryland, Southern Division – Greenbelt, embraces the location where the State Court Action was commenced and is pending: Montgomery County, Maryland. *See* 28 U.S.C. § 1446(a).

12. Pursuant to 28 U.S.C. § 1446(a) and Local Rule 103.5(1), true and accurate copies of the Complaint and all other process, pleadings, documents, and orders which have been served upon QuinStreet are attached:

a. A copy of the Complaint against QuinStreet is attached hereto as **Exhibit A**.
b. A copy of the Summons against QuinStreet is attached hereto as **Exhibit B**.
c. A copy of Plaintiff’s Interrogatories to QuinStreet is attached hereto as **Exhibit C**.
d. A copy of Plaintiff’s cover letter and mailing is attached hereto as **Exhibit D**.
e. A copy of the Notice of Service of Process is attached hereto as **Exhibit E**.
f. A copy of the current State Court Action’s docket sheet is attached hereto as **Exhibit F**.

13. As of this date, QuinStreet has not filed a responsive pleading in the State Court Action.

14. QuinStreet will provide prompt written notice to Plaintiff, through counsel, of this removal, in accordance with 28 U.S.C. § 1446(d).

15. QuinStreet will promptly file the Notice to State Court of Removal, attached hereto

as **Exhibit G**, with a copy of this Notice of Removal with the District Court of Maryland for Montgomery County, in accordance with 28 U.S.C. § 1446(d).

16. Pursuant to Rule 81(c)(2)(C) of the Federal Rules of Civil Procedure, QuinStreet will file with this Court its response to Plaintiff's Complaint within seven (7) days of filing the Notice of Removal.

WHEREFORE, QuinStreet respectfully requests that this action be removed to the United States District Court for the District of Maryland, Southern Division – Greenbelt, from the District Court of Maryland for Montgomery County, Rockville, and that this action proceed in this Court as an action properly removed.

DATED: June 7, 2024

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By: ______________________
Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Tel: (202) 342-8864
Fax: (202) 342-8451
Email: ikasdan@kelleydrye.com

James B. Saylor (pro hac vice to be filed)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel.: (212) 808-5052
Fax: (212) 808-7897
Email: jsaylor@kelleydrye.com

*Counsel for Defendant, QuinStreet, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 7th day of June, 2024, a copy of the foregoing NOTICE OF REMOVAL with the attachments thereto was served by first class mail and e-mail on:

Stephen H. Ring, P.C.
Law Offices of Stephen H. Ring, P.C.,
401 North Washington Street, Suite 500
Rockville, MD 20850
shr@ringlaw.us

*Counsel for Plaintiff*

Ira T. Kasdan

# EXHIBIT A

E-FILED; Montgomery County District Court - Rockville
Docket: 4/24/2024 5:33 PM; Submission: 4/24/2024 5:33 PM
Envelope: 16214939

# DISTRICT COURT OF MARYLAND FOR

LOCATED AT (COURT ADDRESS)

CASE NO.
CV D-06-CV-24-013639

## COMPLAINT/APPLICATION AND AFFIDAVIT IN SUPPORT OF JUDGMENT

☐ $5,000 or under ☒ over $5,000

Clerk: Please docket this case in an action of ☐ contract ☒ tort ☐ replevin ☐ detinue ☐ bad faith insurance claim ☐ consumer debt (original creditor)

**PARTIES**

Plaintiff - Name Address, Telephone Number
Stanley Shapiro c/o Law Offices of Stephen H. Ring, P.C., 401 North Washington Street, Suite 500, Rockville, MD 20850
301-563-9249

VS.

Defendant(s) - Name, Address, Telephone Number

1. QuinStreet, Inc., 8th Floor, 1051 E. Hillsdale Blvd., Foster City, CA 94404 Serve: CSC-Lawyers Incorporating Service Company, 7 St. Paul Street, suite 820, Baltimore, MD 21202
Serve by: ☐ Certified Mail ☒ Private Process ☐ Constable ☐ Sheriff

2.
Serve by: ☐ Certified Mail ☐ Private Process ☐ Constable ☐ Sheriff

3.
Serve by: ☐ Certified Mail ☐ Private Process ☐ Constable ☐ Sheriff

4.
Serve by: ☐ Certified Mail ☐ Private Process ☐ Constable ☐ Sheriff

**ATTORNEYS**

For Plaintiff – Name, Address, Telephone Number & Code

The particulars of this case are:
On July 13, 2023 and several other occasions I received unsolicited calls to my cellular telephone served by the number XXX-XXX-1979 that were initiated by Defendant, in violation of 47 USC 227 and the FCC's regulations thereunder, and in violation of MD-TCPA, Maryland Annotated Code, Commercial Art. § 14-3201-3202.

(See Continuation Sheet)

☐ I am interested in trying to resolve this dispute through mediation/ADR. (You will be contacted about ADR services after the defendant is served.)

The plaintiff claims:
Principal: $ 30,000
Pre-judgment interest at the ☒ legal rate ☐ contractual rate, calculated at ______ %, from 7/13/2023 to present
( ______ days x $ ______ per day)
Total Principal + pre-judgment interest: $ ______
Post-judgment interest at the ☐ legal rate ☐ contractual rate until ______, legal rate thereafter ☐ waived
and attorney's fees of $ 30,000 plus court costs.
☐ Return of the property valued at $ ______ and damages of $ ______ for its detention in an action of replevin.
☐ Return of the property, or its value, $ ______ and damages of $ ______ for its detention in action of detinue.
☐ Other: ______
and demands judgment for relief.

[signature] AIS 7806010137
Signature of Plaintiff/Attorney/Attorney Code — Attorney Number
Printed Name: Stephen H. Ring AIS
Address: 401 North Washington Street, Suite 500, Rockville, MD 20850
Telephone: 301-562-9249 Fax: 301-563-9639
E-mail:

## MILITARY SERVICE AFFIDAVIT

☐ Verified through DOD at: http://scra.dmdc.osd.mil/

☐ Defendant(s) ______ (Name) is/are in the military service.
☒ No defendant is in the military service. The facts supporting this statement are: defendant is a corporation

Specific facts must be given for the court to conclude that each defendant who is a natural person is not in the military.

☐ I am unable to determine whether or not any defendant is in military service.
I hereby declare or affirm under the penalties of perjury that the facts and matters set forth in this Affidavit are true and correct to the best of my knowledge, information, and belief.

Date ______ Signature of Affiant ______

## APPLICATION AND AFFIDAVIT IN SUPPORT OF JUDGMENT (See Plaintiff Notice on Back Page)

The attached documents contain sufficient detail as to liability and damage to notify the defendant clearly of the claim against the defendant, including the amount of any interest claimed.
☐ Properly authenticated copy of any note, security agreement upon which claim is based ☐ Itemized statement of account ☐ Interest worksheet ☐ Vouchers ☐ Check ☐ Other written document ☐ ______ ☐ Verified itemized repair bill or estimate

I HEREBY CERTIFY: That I am the ☐ plaintiff ☐ ______ of the plaintiff herein and am competent to testify to the matters stated in this complaint, which are made on my personal knowledge; that there is justly due and owing by the defendant to the plaintiff the sum set forth in the complaint.
I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of this document are true.

Date ______ Signature of Affiant ______

JR-8

Case 8:25-cv-01722 Document 1-2 Filed 06/07/25 Page 9 of 446

## NOTICE TO DEFENDANT

**Before Trial**

**This complaint contains the details of the plaintiff's claim against you** and the relief that the plaintiff (the person or company suing you) seeks. The plaintiff has the burden to provide evidence to prove their case at trial. If the plaintiff has completed the affidavit portion of the complaint form, the evidence should be attached to the complaint.

**You may hire your own attorney.** If you're not able to hire an attorney, you can get legal help from an attorney through a **Maryland Court Help Center.** Court locations are open Monday to Friday from 8:30 a.m. to 4:30 p.m. Help is available by phone at 410-260-1392 or by live chat Monday through Friday from 8:30 a.m. to 8:00 p.m. For Help Center locations, visit: mdcourts.gov/helpcenter.

Court staff, including clerks are not permitted to give you legal advice. If you have any questions, you should consult the Maryland Court Help Center or your own attorney.

**If you wish to contest (fight) the claim,** you must file the Notice of Intention to Defend (located at the bottom of your summons). The case will be set for trial. If you wish to have your witnesses appear at trial, you should contact the clerk's office at least two (2) weeks before the trial date to request subpoenas, and you should bring to court on the trial date all evidence you want the court to consider. **If you don't bring your evidence to the hearing, the judge can't consider it.**

**If you do nothing, a judgment could be entered against you that may result in a lien on your property, garnishment of your wages, and freezing your bank account.**

**You may request a remote hearing.** For more information about remote hearings, visit mdcourts.gov/district/remotehearings or contact the court (mdcourts.gov/district/directories/courtmap). If you do not attend the hearing, a judgment could be entered against you.

**If Judgment is Entered Against You (If You Lose)**

**IF YOU <u>DISAGREE</u> WITH THE COURT'S RULING,** you may:

1. Ask the court for a new trial by filing a Motion for a New Trial within **ten (10) days** after the entry of judgment, stating your reasons clearly. If the court denies your motion, you may still file an appeal; if the court grants your motion, you must appear in the District Court for a new trial.
2. Ask the court to change the judgment by filing a Motion to Alter or Amend the Judgment within **ten (10) days** after the entry of judgment.
3. Ask the court to change or undo the judgment by filing a Motion to Revise or Vacate the Judgment within **30 days** after the entry of judgment.
4. **APPEAL** to the circuit court, by filing a Notice of Appeal in the District Court within **30 days** after the entry of judgment. You will have to pay a filing fee (see Guide to Appeal Fees - DCA-109A), unless the court determines that you are indigent. If the amount of the claim, not including court costs, interest, and attorney's fees, was $5,000 or less, you will have a new trial in the circuit court. If the amount of the claim was more than $5,000, you will also have to order and pay for a transcript of the District Court trial record by contacting the District Court clerk's office (see Transcripts & Recordings Brochure - DCA-027BR).

**IF YOU DECIDE <u>NOT</u> TO APPEAL AND <u>NOT</u> TO FILE ONE OF THE ABOVE MOTIONS,** you may contact the plaintiff or plaintiff's attorney to arrange to pay the amount owed. If you do not pay the amount owed, the plaintiff or plaintiff's attorney may initiate further proceedings to enforce the judgment, including:

1. **Judgment Debtor Information Sheet:** You may receive form CC-DC-CV-114 from the plaintiff requesting information about your income and debts. If you complete the form accurately and return it to the creditor as indicated, you will not have to answer interrogatories or appear for an oral examination for at least a year from the date of judgment. **NOTE:** A Judgment Debtor Information Sheet may not be used to enforce a money judgment resulting from a small claims action (amount sued for was $5,000 or less, exclusive of interest, costs, and attorney's fees).
2. **Interrogatories:** These are written questions. You must answer these written questions about your income and assets in writing under penalties of perjury. **NOTE:** Interrogatories may not be used to enforce a money judgment resulting from a small claims action (amount sued for was $5,000 or less, exclusive of interest, costs, and attorney's fees).
3. **Oral Examination:** You must appear in court to testify in response to questions about your assets and income. **NOTE:** An oral examination may not be used to enforce a money judgment resulting from a small claims action (amount sued for was $5,000 or less, exclusive of interest, costs, and attorney's fees).
4. **Writ of Execution:** This document requires the sale or seizure of any of your possessions. Some of your property or possessions may be protected from the writ. These exemptions are explained in detail on the reverse side of the Writ of Execution form DC-CV-040. The court could order you to pay additional expenses such as towing, moving, storage fees, advertising costs, and auctioneer's fees incurred in executing the writ.
5. **Garnishment of Property:** The court may issue a writ freezing your bank account or holding your assets until further court proceedings.
6. **Garnishment of Wages:** The court may issue a writ ordering your employer to withhold a portion of your wages to pay your debt. The law provides certain exemptions from garnishment.

**If you have any questions, you should consult an attorney. Court staff are not permitted to give you legal advice. More information can be found in court brochures located in the clerk's office or online at: mdcourts.gov/district/public_brochures or mdcourts.gov/legalhelp/moneyissues**

## NOTICE TO PLAINTIFF

**REQUESTING A JUDGMENT BY AFFIDAVIT OR DEFAULT:**

Federal Law requires the filing of a military service affidavit. Information about the Servicemembers Civil Relief Act and the required affidavit can be found on the court's website at: mdcourts.gov/reference/scra.

**AFTER THE COURT ENTERS A JUDGMENT:**

1. If the court enters a judgment for a sum certain, you have the right to file for a lien on real property.
2. If you disagree with the outcome of the case, you have the same post-trial rights as the defendant does: you may file an Appeal, a Motion for New Trial, a Motion to Alter or Amend the Judgment or a Motion to Revise or Vacate the Judgment. See above for further information concerning these rights.

# EXHIBIT B

E-FILED; Montgomery County District Court - Rockville
Docket: 4/25/2024 3:40 PM; Submission: 4/25/2024 3:40 PM
Envelope: 16227993

**DISTRICT COURT OF MARYLAND FOR**
**MONTGOMERY COUNTY**
191 East Jefferson Street
Rockville, Maryland 20850

**Case Number: D-06-CV-24-013639**

**STANLEY SHAPIRO VS. QUINSTREET, INC.**

## WRIT OF SUMMONS

Serve on:
Quinstreet, Inc.
SERVE RA:
CSC-LAWYERS INCORPORATING SERVICE COMPANY
7 ST. PAUL STREET, SUITE 820
BALTIMORE, MD 21202

| | |
|---|---|
| Date Filed: | 04/24/2024 |
| Issue Date: | 4/25/2024 |
| Trial Date: | 7/10/2024 |
| Trial Time: | 9:00 AM |
| Trial Room: | LRGE |

You are summoned to appear for trial at the date, time, and location shown above. **If you intend to be present at the trial, you must file the attached Notice of Intention to Defend within ☒ 15 days ☐ 60 days of receiving this complaint**. Failure to file the Notice of Intention to Defend may result in a judgment against you.

**MUST BE SERVED BY:** 06/24/2024 (Date) — Kathy Hefner (Administrative Clerk)

## NOTICE OF INTENTION TO DEFEND

Case Number: D-06-CV-24-013639 Trial Date: 7/10/2024
Defendant: Quinstreet, Inc.

NOTICE: **If you contest all or part of the claim**, complete this Notice of Intention to Defend and file it with the court listed at the top of this summons no later than ☒ 15 days ☐ 60 days after you receive this summons. You may request a remote hearing. For more information about remote hearings, visit mdcourts.gov/district/remotehearings or contact the court (mdcourts.gov/district/directories/courtmap). If you do not attend the hearing, a judgment could be entered against you.
**ATTENTION CORPORATIONS & LLCs:** this notice must be filed by an attorney, and you must be represented at trial by an attorney. EXCEPTION: where the amount claimed doesn't exceed $5,000.00, corporations may be represented by an officer; LLCs may be represented by a member. Both may be represented by a properly designated employee. See Maryland Annotated Code, Business Occupations and Professions, § 10-206(b)(4) for details.
**To request a foreign language interpreter or a reasonable accommodation under the ADA, please contact the court immediately. Possession and use of cell phones and other electronic devices may be limited or prohibited in designated areas of the court facility.**

**SEE NOTICE TO DEFENDANT ON COMPLAINT FORM FOR IMPORTANT INFORMATION**

I intend to be present at the trial of this claim and demand proof of the plaintiff's claim.
**Brief explanation of defense:** ______________________________

______________________________

Date ____ Signature ____ Print Name ____

Address ____ City, State ____ ie/Work Telephone Number ____

E-mail ____ ione Number ____

**DISTRICT COURT OF MARYLAND FOR MONTGOMERY COUNTY**
191 East Jefferson Street
Rockville, Maryland 20850

Main: 301-563-8800

**Case Number: D-06-CV-24-013639**

**Stanley Shapiro vs. Quinstreet, Inc.**

Serve on:
Quinstreet, Inc.
SERVE RA:
CSC-LAWYERS INCORPORATING SERVICE COMPANY
7 ST. PAUL STREET, SUITE 820
BALTIMORE, MD 21202

| | |
|---|---|
| Date Filed: | 04/24/2024 |
| Issue Date: | 4/25/2024 |
| Trial Date: | 7/10/2024 |
| Trial Time: | 9:00 AM |
| Trial Room: | LRGE |

**MUST BE SERVED BY:** 06/24/2024
Date

Kathy Hefner
Administrative Clerk

**FOR PROCESS SERVER USE ONLY**

To ☐ Sheriff/Constable ☐ Private Process Server

You are commanded to serve this Writ of Summons and to make your return promptly if served. If you are unable to serve, you are to make your return below and return the original process to the court no later than ten (10) days following the termination of the validity of the process.

I certify that:

☐ I served a summons by delivery of the complaint and all supporting papers to: ____________________
Name

on __________ __________ ☐ A.M. ☐ P.M. at ______________________________
Date Time Location

The person I left the papers with acknowledged being: (1) A resident of the above listed address; (2) 18 years of age or older; (3) of suitable discretion in that relationship to the defendant is ____________________; and that (4) the above listed address is the defendant's residence or usual place of abode. The facts upon which I concluded that the individual served is of suitable age and discretion are: ____________________

______________________________

The cost of service is $ ____________________

Description of the defendant/person served: Race ________ Sex ________ Ht. ________ Wt. ________ Age ________

☐ I was unable to serve because ____________________

ATTEMPT: __________ ATTEMPT: __________ ATTEMPT: __________ ATTEMPT: __________

REFUND TO:

I solemnly affirm under the penalties of perjury that the contents of this document are true to the best of my knowledge, information, and belief and do further affirm I am a competent person over 18 years of age and not party to the case.

Print Name of Process Server

Address

City, State, Zip / Telephone Number

Signature of Process Server / Date

**"Insert Barcode Here"**

# EXHIBIT C

**IN THE DISTRICT COURT OF MARYLAND**
**FOR MONTGOMERY COUNTY**

| | |
|---|---|
| STANLEY SHAPIRO<br>Plaintiff<br>v.<br>QUINSTREET, INC.<br>Defendant | CASE NO. D-06-cv-24-013639 |

## PLAINTIFF'S INTERROGATORIES TO DEFENDANT

Plaintiff, Stanley Shapiro, issues these interrogatories to Defendant, QuinStreet, Inc. pursuant to Maryland Rule 3-421.

## INSTRUCTIONS

1. Submit your answers to the interrogatories herein in writing and under oath to the undersigned counsel within 30 days of the date of service on you. If any of these interrogatories cannot be answered in full, then you should answer to the fullest extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information or knowledge you have concerning the unanswered portion or portions. In answering these interrogatories, furnish such information as is available to you, regardless of whether this information is obtained directly by you, through your agents or representatives or by any of your attorneys. For each interrogatory, please identify all persons who provided information used in answering it.

2. These interrogatories are continuing in nature. In accordance with Rule 26, you are required to supplement your answers to the interrogatories when new or additional information becomes known to you.

**FOR DOCUMENTS PRODUCED PURSUANT TO RULE 3-421(a)(3), THE FOLLOWING ADDITIONAL INSTRUCTIONS SHALL APPLY:**

3. Please produce the documents in legible, searchable form in a digital format.

4. Produce the documents as they are kept in the ordinary and usual course of business, or organize and label the documents to correspond with the categories in this request.

5. A draft and a final version are two distinct documents.

6. If Defendant withholds the production of any responsive document on the grounds that the document is privileged or otherwise protected, Defendant shall state in a privilege log the nature of the claim of privilege or protection; the type and nature of the document; the date of the document; the author(s), the addressee(s), and recipient(s) of the document; the document's present location; and any other information that will enable Plaintiff and the Court to assess the applicability of the privilege or protection.

## DEFINITIONS

The following terms shall have the following meanings, even when not capitalized or bolded:

7. **"Communication"** includes all forms of correspondence, including, but not limited to, letters, emails, voicemails, text messages, instant messages, or social media messages.

8. "**Defendant**" means the defendant named in this lawsuit who is being served with these requests and includes, without limitation, any of its past or present offices, locations, divisions, affiliates, subsidiaries, successors, predecessors, partners, joint venturers, officers, directors, employees, agents, attorneys or representatives.

9. "**Describe**" means to identify and explain fully the characteristics, nature and substance of a given thing, action, communication or event, to set forth all details, physical

properties and dimensions of a physical thing inquired about, and to specify all pertinent dates, locations, causes, purposes, effects and results of the thing, action, communication or event inquired about.

10. "**Document**" means any writing however produced, reproduced, archived or stored, within your possession or subject to your control, of which you have knowledge or to which you now have or previously had access, including all ESI.

11. "**Identify**" (when used in reference to a document) means to state the date of preparation of the document, its author, the sender (if any), the recipient (if any), the nature of the document (e.g., letter, memorandum or tape) and other means of identification sufficient to specify the document for purposes of a request for production, and to further state its present location and custodian. If any such document was, but no longer is, in your possession or custody or subject to your control, describe what disposition was made of it and give the name, address and telephone number of the person presently having possession, custody or control of the document.

12. "**Identify**" (when used in reference to an natural person) means to state that person's full name, title, business address, telephone number, email address, occupation and employer, along with a statement of whether that person is represented by your counsel in this litigation.

13. **Identify**" (when used in reference to an entity) means to state the entity's full name, address, telephone number, state of incorporation or organization and web address. Unless it otherwise appears from the context, a request for the identity of a person relates to all persons in the relevant classification or category, and the request for the identity of an entity includes all affiliated entities.

14. **"Person"** means any natural person or legal entity, including, without limitation, any business or governmental entity or association.

15. **"Plaintiff"** means the Plaintiff in this lawsuit. **Plaintiff's fax number** means 301-657-0031.

16. **"Policy"** means any instruction, practice, procedure, directive, routine, guideline, rule, course of conduct or code of conduct that was or has been recognized, adopted, issued or followed by you—regardless of whether written or unwritten, formal or informal, recorded or unrecorded.

17. **"TCPA"** means the Telephone Consumer Protection Act, 47 U.S.C. § 227.

18. **"Telemarketing"** means a telecommunication that could have generated or was intended to generate leads, customers or sales for you or any entity affiliated with You or under contract with You within the United States. A communication is telemarketing even though it (1) had other, additional purposes (e.g., fulfillment of a partially completed transaction or verification of information); (2) was to a person who had consented to receive it; (3) was to a person who had a prior existing business relationship with you; (4) was not made by you; and/or (5) was not made for your exclusive or direct benefit.

19. **"Third party"** means any natural person, partnership, association, corporation, joint venture, or other business or legal entity not owned or controlled by you.

20. **"Vendor"** means any third party under contract with, hired by, employed by, paid by or working for you, directly or indirectly, for purposes of telemarketing or phone-based activities or services, including, but not limited to, generating leads, warm transfers, hot transfers or any other call transfers, making outbound telemarketing calls, or tracking or aggregating data related to any of those activities, including, but not limited to, any co-defendant.

21. "**You,**" whether capitalized or not, means the party to which these requests are propounded and includes, without limitation, any of its past or present offices, locations, divisions, affiliates, subsidiaries, successors, predecessors, partners, joint venturers, officers, directors, employees, agents, attorneys or representatives.

22. "The Calls" means all telephone calls to Plaintiff's telephone number 301-580-1979 promoting Your goods and/or services utilizing any automated device or system during the Relevant Time Period.

23. The Relevant Time Period as used herein means the time period starting four years before the filing of the original complaint in this case and continuing through this suit until its final resolution.

24. All other words shall have their ordinary definition as defined by Merriam-Webster's online dictionary, located at http://www.merriam-webster.com/.

**INTERROGATORIES**

1. Identify each person who provided the information for Your responses to these interrogatories and specify the interrogatories about which each such person provided information.
2. Identify all individuals and entities who participated or assisted in the initiation of the Calls.
3. Give the date, time, duration and originating telephone/facsimile number for each of the Calls.
4. If You contend that Plaintiff provided consent to receive the Calls state all facts in support of that contention and produce the documents that support that contention.

5. Identify the sources that provided Plaintiff's telephone number to You and to anyone who caused the transmissions of the Calls.
6. Identify by brand, manufacturer, author, creator, make, model, revision, structure and location of the system(s), platform(s), software and equipment used to cause the Calls to be initiated.
7. Identify all records that contain the information requested in these interrogatories.
8. Identify and produce all documents you intend to introduce into evidence at trial.

Respectfully submitted,

_________/s/____________________

Stephen H. Ring
Stephen H. Ring, PC
401 North Washington Street, Suite 500
Rockville, MD 20850
Telephone: 301.563.9249
Attorney No. 7806010137
shr@ringlaw.us

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing interrogatories was sent with the summons and complaint in the package of documents for original service on the defendant in this case.

**/s/ Stephen H. Ring**
Stephen H. Ring 5/2/2024

# EXHIBIT D

Law Offices
**STEPHEN H. RING, P.C.**
401 NORTH WASHINGTON STREET, SUITE 500
ROCKVILLE, MARYLAND 20850
Telephone 301-563-9249
Facsimile 301-563-9639
www.ringlaw.us; shr@ringlaw.us

May 2, 2024

CSC-Lawyers Incorporating Service Company
7 St. Paul Street, Suite 820
Baltimore Md 21202

**Re:** Shapiro v. Quinstreet, Inc.
DCMC Case No. D-06-cv-24-013639
CERT. MAIL # 7018 2290 0000 4876 9726

Ladies and Gentlemen:

This letter and its enclosures are directed to you as registered agent for the following entity:

QuinStreet, Inc., 8th Floor, 1051 E. Hillsdale Blvd., Foster City, CA 94404

Enclosed are the summons, complaint and Plaintiff's Interrogatories to Defendant in the above matter, to be forwarded to the defendant.

Sincerely,

Stephen H Ring

Stephen H. Ring

RING LAW
401 N. WAS[...]
ROCKVILLE, MD 20850

U.S. POSTAGE PAID
FCM LG ENV
GAITHERSBURG, MD 20878
MAY 04, 2024

UNITED STATES POSTAL SERVICE®

21202

$9.92

RDC 99

R2305K132880-16

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

7018 2290 0000 4876 9726

CSC LAWYERS INCORPORATING SERVICE CO.
7 ST. PAUL STREET, STE. 820
BALTIMORE, MD 21202

JR-22

Case 8:24-cv-01667-AAQ Document 1-5 Filed 06/07/24 Page 1 of 2

# EXHIBIT E

**null / ALL**
**Transmittal Number: 29073868**
**Date Processed: 05/09/2024**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Jawad Eltaki<br>QuinStreet, Inc.<br>950 Tower Ln<br>Fl 6<br>Foster City, CA 94404-2121 |
| **Electronic copy provided to:** | Marty Collins<br>Legal Counsel<br>Christina Fua |

| | |
|---|---|
| **Entity:** | Quinstreet, Inc.<br>Entity ID Number 3350085 |
| **Entity Served:** | Quinstreet, Inc. |
| **Title of Action:** | Stanley Shapiro vs. Quinstreet, Inc. |
| **Matter Name/ID:** | Stanley Shapiro vs. Quinstreet, Inc. (15680483) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Violation of State/Federal Act |
| **Court/Agency:** | Montgomery County District Court, MD |
| **Case/Reference No:** | D-06-CV-24-013639 |
| **Jurisdiction Served:** | Maryland |
| **Date Served on CSC:** | 05/08/2024 |
| **Answer or Appearance Due:** | 10 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| Sender Information: | Law Offices Of Stephen H. Ring, P.C.<br>301-562-9249 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674 (888) 690-2882 | sop@cscglobal.com

# EXHIBIT F

# Maryland Judiciary Case Search

NOTICE: Available

## Case Detail

### Case Information

Court System: **District Court For Montgomery County - Civil**
Location: **Rockville**
Case Number: **D-06-CV-24-013639**
Title: **Stanley Shapiro vs. Quinstreet, Inc.**
Case Type: **Tort - Large Claims**
Filing Date: **04/24/2024**
Case Status: **Open**

### Involved Parties Information

#### Plaintiff

Name: **Shapiro, Stanley**

Address: **20745 New Hampshire Avenue**
City: **Brookeville** State: **MD** Zip Code: **20833-1906**

#### Attorney(s) for the Plaintiff

Name: **RING, STEPHEN HOWARD**
Appearance Date: **04/24/2024**
Address Line 1: **Law Offices of Stephen H. Ring, P.C.**
Address Line 2: **401 North Washington Street**
Address Line 3: **Suite 500**
City: **ROCKVILLE** State: **MD** Zip Code: **20850**

#### Defendant

Name: **Quinstreet, Inc.**

Address: **1051 E. Hillsdale Blvd.**
City: **Foster City** State: **CA** Zip Code: **94404**

### Court Scheduling Information

| Event Type | Event Date | Event Time | Judge | Court Location | Court Room | Result |
|---|---|---|---|---|---|---|
| **Hearing - Tentative** | **07/10/2024** | **09:00:00** | | **Montgomery District Court - Rockville** | | |

### Document Information

File Date: **04/24/2024**
Document Name: **Complaint / Petition**
Comment: **Complaint**

File Date: **04/25/2024**
Document Name: **Summons Issued (Service Event)**
Comment:

File Date: **04/25/2024**
Document Name: **Writ /Summons/Pleading - Electronic Service**
Comment: **SUMMONS TO BE SERVED**

## Service Information

| Service Type | Issued Date |
|---|---|
| **Summons Issued** | **04/25/2024** |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland Rules, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

Copyright © 2024. Maryland Judiciary. All rights reserved.
Service Desk: (410) 260-1114

# EXHIBIT G

**DISTRICT COURT OF MARYLAND FOR MONTGOMERY COUNTY, ROCKVILLE**

Stanley Shapiro,

Plaintiff,

v.

QuinStreet, Inc.,

Defendants.

Case No. D-06-CV-24-013639

**DEFENDANT'S NOTICE TO STATE COURT AND ADVERSE PARTIES OF REMOVAL OF ACTION TO FEDERAL COURT**

Complaint Served: May 8, 2024
Removal Date: June 7, 2024
Trial Date: July 10, 2024

**TO THE MONTGOMERY COUNTY DISTRICT COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on June 7, 2024, Defendant QuinStreet, Inc. filed a Notice of Removal of this action from this Court to the United States District Court for the District of Maryland. A copy of the Notice of Removal is attached hereto as Exhibit 1.

PLEASE TAKE FURTHER NOTICE that, pursuant to 28 U.S.C. § 1446(d), filing the Notice of Removal with the United States District Court for the District of Maryland, along with filing a copy of the Notice of Removal with this Court, effects the removal of this action and requires that this Court take no further action unless and until this matter is remanded.

DATED: June 7, 2024

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By:______________________________

Ira T. Kasdan (8006010014)
3050 K Street, NW
Washington, DC 20007
Tel: (202) 342-8864
Fax: (202) 342-8451
Email: ikasdan@kelleydrye.com

James B. Saylor (pro hac vice to be filed)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel.: (212) 808-5052
Fax: (212) 808-7897
Email: jsaylor@kelleydrye.com

*Counsel for Defendant, QuinStreet, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 7th day of June, 2024, a copy of the foregoing NOTICE TO STATE COURT OF REMOVAL with the attached exhibit thereto was served by first class mail and e-mail on:

Stephen H. Ring, P.C.
Law Offices of Stephen H. Ring, P.C.,
401 North Washington Street, Suite 500
Rockville, MD 20850
shr@ringlaw.us

*Counsel for Plaintiff*

Ira T. Kasdan

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Stanley Shapiro

**(b)** County of Residence of First Listed Plaintiff ____________
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Law Offices of Stephen H. Ring, P.C., 401 North Washington Street, Suite 500, Rockville, MD 20850 / 301-563-9249

## DEFENDANTS

QuinStreet Inc.

County of Residence of First Listed Defendant San Mateo County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Kelley Drye & Warren LLP, Washington Harbour, Suite 400, 3050 K Street NW, Washington, DC 20007, (202) 342-8400

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☒ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
28 U.S.C. §§ 1331, 1367, 1441, and 1446, 47 U.S.C. §§ 227

Brief description of cause:
Alleged violation of 47 USC 227 and Maryland Annotated Code, Commercial Art. § 14-3201-3202

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $** 30,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE
June 7, 2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ Ira Kasdan

**FOR OFFICE USE ONLY**

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

# EXHIBIT 2

**Ira T. Kasdan**

Kelley Drye

Kelley Drye & Warren LLP
Washington Harbour, Suite 400
3050 K Street, NW
Washington, DC 20007

Tel: (202) 342-8864
Fax: (202) 342-8451
ikasdan@kelleydrye.com

July 8, 2024

**By ECF**

Hon. Lydia Kay Griggsby
United States District Judge
U.S. District Court for the District of Maryland
6500 Cherrywood Lane, Suite 400
Greenbelt, Maryland 20770

Re: *Shapiro v. QuinStreet, Inc.*, No. 8:24-cv-01667
**Notice of Intent to File Motion for More Definite Statement**

Dear Judge Griggsby:

Pursuant to Part II(A) of the Case Management Order (ECF 11), we write on behalf of Defendant QuinStreet, Inc. ("QuinStreet") to request a pre-motion conference concerning QuinStreet's intent to file a short motion for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e).

## I. Facts and Procedural Posture

On April 24, 2024 Plaintiff, Stanley Shapiro ("Plaintiff"), filed a Complaint against QuinStreet in the District Court of Maryland for Montgomery County, captioned *Stanley Shapiro v. QuinStreet, Inc.*, No. D-6-cv-24-013639, which purports to assert claims under the federal Telephone Consumer Protection Act, 47 USC § 227 ("TCPA"), and the Maryland Telephone Consumer Protection Act, MD COML § 14-3201-3202 ("MD-TCPA"). On June 7, 2024, QuinStreet timely removed this case pursuant to 28 U.S.C. §§ 1331, 1367. *See* ECF 1. Pursuant to the Magistrate Judge Direct Assignment Order, QuinStreet's deadline to file a responsive pleading to the Complaint is July 9, 2024. *See* ECF No. 5.

## II. Legal Standard

Federal Rule of Civil Procedure 12(e) provides a mechanism by which a party can seek relief when a pleading fails to comply with pleading requirements. Rule 12(e) provides, in pertinent part:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move

Case 8:24-cv-01667-LKG  Document 12  Filed 11/04/24  Page 2 of 4

for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired.

Fed. R. Civ. P. 12(e). As the Supreme Court explained: "[i]f a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513–14 (2002). If a pleading is so vague or ambiguous that the opposing party cannot respond to it, then the opposing party is entitled to a more definite statement. *Id.*; 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1376, at 311 (3d ed 2004).

## III. Grounds for the Motion for a More Definite Statement

Plaintiff's Complaint is filed with the form provided by the District Court of Maryland for Montgomery County. Plaintiff only generally alleged violations of the TCPA and the MD-TCPA. The Complaint, as written, fails to indicate what conduct Plaintiff believes constitutes alleged violations of the TCPA and MD-TCPA, how many calls he alleges he received, and when he received them. It further does not articulate what claims Plaintiff is bringing under each of these statutes. For example, the TCPA has two main provisions that a Plaintiff can bring a claim for, including a "Do Not Call" claim and an "Automatic Telephone Dialing System" claim. Plaintiff does not state under which provision he brings his claims.

Plaintiff's Complaint lacks sufficient information for QuinStreet to reasonably respond to the Complaint. QuinStreet cannot decipher which factual allegations tie to which causes of action—or even what causes of action are being alleged—as the Complaint is devoid of factual allegations. Likewise, it makes it impossible for QuinStreet to investigate the claims alleged or prepare any defenses.

## IV. Meet and Confer

An attorney from our firm ("KDW Attorney") conferred with counsel for Plaintiff regarding the Motion for a More Definite Statement via e-mail. On July 2, 2024, the KDW Attorney sent an e-mail to Plaintiff's counsel initiating conferral on the Motion. On July 3, 2024, counsel for Plaintiff responded and informed that Plaintiff intends on filing an amended complaint on July 12, 2024. Given that QuinStreet's deadline to respond to the Complaint is tomorrow, July 9, 2024, the KDW Attorney informed Plaintiff's counsel that QuinStreet would proceed with filing this Notice in an abundance of caution to preserve its rights.

## V. Proposed Briefing Schedule

QuinStreet proposes filing its Motion for a More Definite Statement three (3) business days following the pre-motion conference, or should a pre-motion conference be unnecessary, three (3) business days following the entry of an order permitting QuinStreet to file its Motion for a More Definite Statement. QuinStreet proposes that Plaintiff should have fourteen (14) days to file its opposition, and QuinStreet seven (7) days to file its reply. Should this Court find that briefing on this matter is unnecessary, QuinStreet proposes that the Court order Plaintiff to file his amended complaint by July

12. If Plaintiff files a sufficient amended complaint, QuinStreet will withdraw its request for a pre-motion conference concerning QuinStreet's intent to file a short motion for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e).

Thank you in advance for your attention to this matter.

Respectfully submitted,

Ira T. Kasdan

CC: James B. Saylor, Esq.
Stephen H. Ring, Esq.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 8th day of July, 2024, the foregoing **NOTICE OF INTENT TO FILE MOTION FOR MORE DEFINITE STATEMENT** was filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all counsel of record.

Ira T. Kasdan

# EXHIBIT 3

**Law Offices**
**STEPHEN H. RING, P.C.**
401 North Washington Street, Suite 500
Rockville, Maryland 20850
Telephone 301-563-9249
Facsimile 301-563-9639
shr@ringlaw.us
www.ringlaw.us

July 12, 2024

Hon. Lydia Kay Griggsby
United States District Judge
U.S. District Court for the District of Maryland
6500 Cherrywood Lane, Suite 400
Greenbelt, Maryland 20770

Re: Shapiro v. QuinStreet, Inc.,
USDC-MD Case No. 8:24-cv-01667

Dear Judge Grigsby:

I write as counsel for the plaintiff in the above matter.

The letter of July 8, 2024 accurately identifies the defendant's request for a pre-motion conference and my response indicating that I would be filing an amended complaint. I expect that the amended complaint will contain sufficient facts to obviate the need for a motion for more definite statement. I was expecting to have the amended complaint ready for filing by today, but find that I will not have it ready until Monday, July 15.

I had the pleasure of speaking with Mr. Saylor, counsel for Defendant QuinStreet, Inc., on May 20, 2024 at which time he requested informal discovery from Plaintiff so that he could research records, and I complied. I have also asked for the defendant's consent to early discovery, as the telemarketing activity at issue here was automated and requires review of records including communications and contracts with call services as well as call detail records and similar data not readily accessible to plaintiff without discovery. The defendant has responded by rejecting my request for consent to early discovery, so I would ask that this letter be taken as a request for leave to file a motion for leave to take such discovery.

Thank you.

Sincerely,

Stephen H. Ring

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT FOR MARYLAND**
**SOUTHERN DIVISION**

**STANLEY SHAPIRO**
on behalf of himself and
others similarly situated

Plaintiff

v. Case No. 8:24-cv-01667

**QUINSTREET, INC.**

and

**SELECTQUOTE AUTO & HOME INSURANCE SERVICES**
3500 W 75th Street, Suite 110
Prairie Village, KS 66208

Serve:
Cogency Global Inc.
1519 York Road
Lutherville, MD 21093

Defendants

**AMENDED COMPLAINT UPON REMOVAL –**
**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff, Stanley Shapiro, individually and on behalf of all others similarly situated, files this amended complaint against Defendants, QuinStreet, Inc. (“QuinStreet”) and Selectquote Auto & Home Insurance Services (“Selectquote”) and states as follows:

## NATURE OF ACTION

1. This case arises from telemarketing calls by and on behalf of Defendants, directed to Plaintiff and the Class Members to encourage and promote the purchase of insurance products and services. (“the Calls”)

2. The Calls were initiated by Defendants and their agents in disregard of do-no-call lists (47 U.S.C. §227(c)(5) and 47 C.F.R. §64.1200(c)(2)), using pre-recorded voicing (47 C.F.R. §

64.1200(a)(2), without the recipients' prior express written consent (id.), in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA") and its regulations, and in violation of state statutes.

3. This case was originally filed in the Maryland District Court for Montgomery County using abbreviated pleading on that court's civil complaint form. The case was removed from state court by Quinstreet.

4. Plaintiff seeks class relief under FRCP 23(b)(3) and seeks injunctive relief under FRCP 23(b)(2).

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C.§ 227 et seq.

6. This Court has personal jurisdiction over Defendants because they regularly conduct business in Maryland, direct the solicitation of business to individuals in this state, and purposefully avail themselves of the laws of this state.

7. Venue is proper because Plaintiff resides in, and received the calls in, this District, and Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time the action was commenced.

## PARTIES

8. At all times relevant to this action Plaintiff was an individual residing in Maryland.

9.At all times relevant to this action Defendant QuinStreet was a corporation formed under the laws of Delaware, maintaining its principal offices in California.

10.At all times relevant to this action Defendant Selectquote was a corporation formed under the laws of Delaware, maintaining its principal offices in Kansas.

**APPLICABLE LAW**

<u>The Telephone Consumer Protection Act Of 1991 (TCPA), 47 U.S.C. § 227</u>

11.“Americans passionately disagree about many things. But they are largely united in their disdain for robocalls.” *Barr v. Am. Ass’n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020). Congress enacted the TCPA in 1991 because it found “[m]any consumers are outraged over the proliferation of intrusive, nuisance [telemarketing] calls to their homes,” which they “rightly regarded…as ‘an invasion of privacy.’” *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (quoting the TCPA §2, 105 Stat. at 2394 (bracketed alterations in original)); see *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264–65 (11th Cir. 2019).

12. The TCPA was enacted in response to Americans' growing frustration with repeated telemarketing calls.[1]. *Krakauer v. Dish Network, LLC*, 925 F.3d 643, at 663 (4th Cir. 2019). Among other proscribed practices, the TCPA prohibits “mak[ing] any call... using any automatic telephone dialing system or an artificial or prerecorded voice... to any telephone number assigned to a... cellular telephone service” without “prior express consent of the called party.” 47 U.S.C. § 227(b) (1)(A) (iii). If an “automatic telephone dialing system” or “artificial or prerecorded voice” is being used for “any telephone call that includes or introduces an advertisement or constitutes telemarketing,” the caller must have the “prior express written consent of the called party.” 47 C.F.R. § 64.1200(a)(2) (emphasis added). *Bradley v. Dentalplans.com*, Civil 20-1094-BAH, 7 (D. Md. Jun. 6, 2024), 2024 WL 2865075.

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA). The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201*et seq.*

13. Thousands of consumers have complained to federal and state government agencies, and to callers, that unsolicited telemarketing communications, including calls, faxes and texts, interrupt their work and private activity, intrude upon their time and privacy, and consume their resources.

14. Section 227(b)(1)(A)(iii) of the TCPA prohibits the use of autodialers to make any call to a wireless number absent an emergency, or absent express the prior written consent of the called party.

**<u>The Maryland Telephone Consumer Protection Act</u>**

15. The State of Maryland adopts federal statutes in prohibiting certain telemarketing practices as follows:

> A person may not violate:
>
> (1) The Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101 through 6108, as implemented by the Federal Trade Commission in the Telemarketing Sales Rule (16 C.F.R. Part 310); or
>
> (2) The Telephone Consumer Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart L).
>
> Maryland Commercial Code §14-3201.

16. Maryland has created a private cause of action for violations of §14-3201, *supra*, as follows:

> (a) A violation of this subtitle is an unfair or deceptive trade practice within the meaning of Title 13 of this article and is subject to the enforcement and penalty provisions contained in Title 13 of this article.
>
> (b) In addition to the remedies provided in §13-408 of this article, an individual who is affected by a violation of this subtitle may bring an action against a person that violates this subtitle to recover:
>
> (1) Reasonable attorney's fees; and

> (2) Damages in the amount of the greater of:
>
> (i) $500 for each violation; or
>
> (ii) Actual damages sustained as a result of the violation.
>
> (c) For purposes of this section, each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation.

Maryland Commercial Code §14-3202.

17. Maryland thus clarifies that multiple claims can arise from a single violation. Maryland further provides that a plaintiff may recover attorney's fees.

18. The Telemarketing Sales Rule, referenced in 14-3201(1), supra, provides in relevant part:

> § 310.4 Abusive telemarketing acts or practices.
>
> (a) *Abusive conduct generally.* It is an abusive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in the following conduct:
>
> . . .
>
> (8) Failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call . . .

19. Section §13-408 of the Commercial Law Article of the Maryland Code (referenced above in §14-3202(b)) provides for a private cause of action.

**PRE-RECORDED VOICING**

20. Congress found that automated and prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls due to the massive quantities of calls possible via such automation.

21. Congress vested the Federal Communications Commission with authority to issue regulations implementing the TCPA.

22. The FCC has recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[2]

23. The receipt of an unsolicited call in violation of the TCPA is sufficient to confer standing not only for do-not-call list violations, *Krakauer* at 653, but also for unsolicited call violations generally. *Bradley*, slip opinion at 8. "The statute requires that an individual receive a call on his own... number.... There is nothing ethereal or abstract about it.... Since that harm is both particular to each person and imposes a concrete burden on his privacy, it is sufficient to confer standing." Id.

**PRIOR EXPRESS WRITTEN CONSENT**

24. The FCC defines prior express written consent as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8).

25. Under the TCPA, prior consent is an affirmative defense for which the defendant bears the burden of proof. *Bradley*, at 10.

26. Telemarketing calls under the TCP A require a higher standard of consent, "prior express written consent," than non-telemarketing calls. Id. at 11; 47 C.F.R. § 64.1200(a)(2). The latter need merely "prior express consent." 47 C.F.R. § 64.1200(a)(1).

[2] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003)

27. The "prior express written consent" required for telemarketing calls must also be "clear and conspicuous." 47 C.F.R. § 64.1200(f)(9)(i).

28. Under the TCPA, "[t]he term telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(13). Telemarketing includes "winback" calls to renew an expired or terminated customer account, and such calls require prior express written consent. Bradley at 11.

29. A voice recording is insufficient to provide the disclosure component of the consent required for telemarketing calls. Id. at 19.

**VICARIOUS LIABILITY; APPARENT AUTHORITY**

30. The FCC issued a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of . . . section 227(b) . . . that are committed by third-party telemarketers."[3] This vicarious liability may apply if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 F.C.C.R. at 6586 (¶ 34).

---

[3] In the Matter of The Joint Petition Filed by DISH Network, LLC, the United States of America, and the States of California, Illinois, North Carolina, and Ohio for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules, et al., CG Docket No. 11-50, 28 F.C.C.R. 6574, 6574 (¶ 1) (May 9, 2013) ("May 2013 FCC Ruling"). Regarding vicarious liability the FCC stated in part,

> . . . The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller

31. The FCC has rejected the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at n.107.

32. The May 2013 FCC Ruling further clarifies a seller's liability via apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information

33. Defendants are legally responsible for ensuring that their calling vendors comply with the TCPA, even if Defendants did not directly make the calls.

34. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See* FCC Declaratory Ruling, Memorandum and Order, 10 FCC Rcd. 12391, 12397 (¶ 13) (1995).

35. The FCC expects that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information. " May 2013 FCC Ruling, *supra*, at 6592-93 (¶ 46). Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

**<u>DO NOT CALL REGISTRY</u>**

36. The National Do Not Call Registry ("Registry"), which is managed by the Federal Trade Commission, allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations on those numbers. See 47 C.F.R. § 64.1200(c)(2).

---

failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 F.C.C.R. at 6592 (¶ 46).

37. A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

38. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provide a private right of action against those making such calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

## ALLEGATIONS OF FACT

### Facts Related to Plaintiff

39. Plaintiff is, and at all times mentioned herein was, a "person," as defined by 47 U.S.C. § 153(39).

40. Since 2003 or earlier Plaintiff has been the exclusive subscriber and user of the cellular telephone number 301-xxx-1979 and Verizon has been the service provider.

41. Since 2003 Plaintiff's cellular number, above, has been on the Federal Trade Commission's Do Not Call Registry.

42. On July 13, 2023 at 10:05 a.m. Plaintiff received a telephone call on his cell phone showing 301-xxx-5907 on the caller ID display. Plaintiff saw that number, believed that the call might actually be from a local caller who was not a telemarketer, and answered it. Upon information and belief, the number shown on the caller ID did not belong to the caller and was intended to deceive Plaintiff into answering the call.

43. Upon answering the call Plaintiff heard a robotic voice talking about Medicare Parts A and B. Plaintiff determined that the voice as artificial because of its unnatural intonation, its unnatural cadence, and the mechanical and overly precise phonetic pronunciation of certain words.

44. Plaintiff is a native speaker of American English, is reasonably familiar with American conversational intonations and pronunciations, and is reasonable facile at detecting foreign accents.

45. To try to learn the true identity of the calling organization Plaintiff stayed on the call and was transferred to a male human who identified himself as "Samuel" and spoke with a foreign accent, which Plaintiff believes was Indian. Samual asked Plaintiff for certain information pertaining to insurance coverage, and Plaintiff answered in order to direct the conversation toward identification of the calling organization. Samuel said he would call again later.

46. At 3:37 p.m. on July 13, 2023 Plaintiff received a call on his cell phone showing a caller ID of "301-xxx-2839 HLY CROSS GT HOS" suggesting it was from a well-known local hospital. The caller ID did not suggest in any way that the call was from Samuel or any organization that might have been associated with him. Again relying on the caller ID information, Plaintiff answered the call and an adult male spoke, identifying himself as "Samuel," speaking with the same voice and accent as the individual on the 10:05 a.m. call. Samuel repeated information from the earlier call, further confirming that he was the same individual.

47. Samuel asked Plaintiff to answer "yes" to a scripted question that Samuel described as a waiver of federal and state laws regarding telemarketing. Plaintiff declined to do so.

48. The second call was eventually transferred to an adult male who identified himself as Heath Raynor, a "licensed health insurance agent for Selectquote," who gave Plaintiff the contact number 855-xxx-3489, which indeed appears on a website for Selectquote at https://www.selectquote.com/contact-us. Last viewed July 15, 2024.

49. Plaintiff terminated the call with Mr. Raynor without making a purchase.

50. Plaintiff never gave express prior written consent to Selectquote or to anyone else for the initial call of July 13, 2023 described above, or for any automated calls from Selectquote or its affiliates, or for any calls that contain automated voicing.

51. Plaintiff has received numerous calls similar to the first call on July 13, 2023 described above, containing pre-recorded voicing, promoting Medicare A and B plans, within 12 months of the call of July 13, 2023.

52. During the initial telemarketing calls received by Plaintiff that promote insurance products, prior to any transfer to a live agent, the true identities of the callers and the vendors on whose behalf the calls are made were not disclosed. The automated call of July 13, 2023, was an exception in that it was followed by live conversations that led to a disclosure of the name, Selectquote. Discovery is necessary to confirm and/or identify the parties responsible for the front-line violative calls, and the relationships among those responsible for the calls.

53. Upon information and belief, the calls to Plaintiff's cell phone promoting insurance products were caused, initiated and/or generated by Defendants Selectquote and QuinStreet, both of whom use telemarketing with automated voicing to promote identical or similar insurance plans under Medicare A and B, transfer auto-generated calls to live agents, employ similar scripts, use follow-up calls and sell the same products.

## SELECTQUOTE

54. The Form 10-K filed for Selectquote with the Securities and Exchange commission for the year ending June 30, 2023 states: "We are a leading technology-enabled, direct-to-consumer ("DTC") distribution platform for insurance products and healthcare services. . . . for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans . . . MA and MS plans accounted for 89%, 82%, and 78% of our approved Senior policies for the years ended June 30,

2023, 2022, and 2021, respectively . . ."

https://s23.q4cdn.com/545595037/files/doc_financials/2023/ar/slqt_2023_10k.pdf

(Last viewed July 15, 2024.)

55. Selectquote is not an insurance company and does not issue insurance policies. (". . . because we are not the issuer of the insurance policy to the consumer, we bear no underwriting risks." Id. at 4.)

56. Plaintiff has never given express prior written consent to Selectquote or to anyone else for the initial call of July 13, 2023 described above, or for any automated calls from Selectquote or its affiliates, or for any calls that contain automated voicing.

## QUINSTREET

57. QuinStreet operates and controls a network of entities engaged in lead generation: "t) '**QS Network'** means collectively websites, call centers and email service providers owned by QS, its corporate affiliates and QS' network of third party publishers. QS has sole discretion over the selection of publishers to the QS Network . . ." Exhibit A.

58. QuinStreet has identified its corporate affiliates. ECF No. 7.

59. QuinStreet engages service providers that include "Publishers," who gather customer information including "call leads." ("Publisher may generate Leads for QS through a QS Implementation or a Publisher Implementation . . .") Exhibit B.

60. QuinStreet advertises, "We match consumers to carriers and agents in auto, home, health, life, and other insurance verticals." Exhibit C.

61. QuinStreet owns Insure.com and Insurance.com, which list the same office address as QuinStreet, and market Medicare A and B insurance plans similar to those promoted in the call of July 13, 2023.

See www.insure.com and www.insurance.com. Last viewed July 15, 2024.

62. QuinStreet's form 10k filed with the Securities and Exchange Commission for the year ending June 30, 2023 states, "We are predominantly paid on a negotiated or market-driven "per click," "per lead," or other "per action" basis that aligns with the customer acquisition cost targets of our clients. . . . . Our media sources include . . . social media and mobile programs, . . . call center operations, . . . and more." https://investor.quinstreet.com/static-files/1806764c-b747-49f3-8c85-a675fb20f59d At pg. 4. Last viewed July 16, 2024. [Emphasis added.]

63. Upon information and belief, Selectquote engages QuinStreet to provide or collaborate in telemarketing to obtain "call leads."

64. Upon information and belief, Selectquote and Quinstreet acted jointly, in collaboration and in a joint venture, and generated and placed the automated call of July 13, 2023 to Plaintiff.

65. Upon information and belief, Selectquote and Quinstreet acted jointly, in collaboration and in a joint venture, and generated and placed the Calls, including numerous automated calls to Plaintiff and the Class Members promoting insurance products, including several calls within 12 months of July 13, 2023. The Calls used automated voicing and were made to recipients whose numbers were registered in the Registry

66. At all times relevant to this action Selectquote and QuinStreet acted as agents for each other.

**CLASS ALLEGATIONS**

67. The calls to Plaintiff and the Class Members were placed to cellular telephones by an "automatic telephone dialing system" for non-emergency purposes and in the absence of the recipients' prior express written consent, in violation of 47 U.S.C. § 227(b)(1)(A).

68. Defendants have the burden of proving any prior express written consent by Plaintiff and Class members within the meaning of the statute.

69. Thousands of the calls to Class Members went to cellular telephones.

70. Defendants failed to ascertain whether Plaintiff and the Class Members were on the Do Not Call Registry.

71. Defendants acted carelessly and negligently in failing to obtain the required express prior written consents for the calls.

72. Defendants acted carelessly and negligently in failing to ascertain whether Plaintiff and the Class Members were on the Do Not Call Registry.

73. Plaintiff alleges in the alternative that Defendants acted willfully and knowingly in causing the calls to be initiated as described above, and in ignoring the Registry.

74. Defendants knew that the calls were in violation of the TCPA and accepted benefits, including sales, that resulted from the calls, thereby ratifying and assuming responsibility for the calls.

**75.** Defendants have been previously sued for TCPA violations arising from the same type of activity alleged here, and are fully aware of the statutory requirements as alleged above.

**CLASS DEFINITIONS**

76. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

77. Plaintiff brings this action individually and on behalf of all other persons similarly situated with regard to the classes identified below, pursuant to FRCP 23.

78. "Class" generically means all of the three classes defined below.

79. "Class Member" generically means a member of any of the three defined classes.

80. "DNC Class Member" means a member of the DNC Class as defined below, and this principle applies to all of the defined classes.

81. Plaintiff seeks class certification pursuant to FRCP 23 of the following classes:

a. The Do Not Call (DNC) Class;

b. The Pre-Recorded Voice Class;

c. The Maryland Class.

**a. THE DO NOT CALL CLASS**

82. The class concerning the National Do-Not-Call violation (47 C.F.R. § 64.1200(d)); (hereafter "The DNC Class") is defined as follows:

All persons within the United States who, at the time of the call, had been registered on the National Do-Not-Call Registry for at least 30 days, had not granted a Defendant prior express consent, had no prior established business relationship with a Defendant, and received more than one call made by or on behalf of a Defendant that promoted that Defendant's products or services during any twelve-month period, and the call was within four years prior to the filing of the complaint.

83. Plaintiff believes and therefore alleges that the members of the DNC Class number in the thousands.

**b. THE PRE-RECORDED VOICE CLASS**

84. The class concerning pre-recorded voice calls is defined as follows:

All persons in the United States to whom Defendants made one or more calls for the purpose of encouraging the purchase of insurance within four years prior to the filing of this suit, using a pre-recorded voice, without prior express written consent from the recipient.

85. Plaintiff believes and therefore alleges that the members of the Pre-recorded Voice Class number in the thousands.

Case 8:24-cv-01676-AQKG Document 126 Filed 07/14/25 Page 57 of 446

### c. THE MARYLAND CLASS

86. The Maryland class concerning pre-recorded voice calls is defined as follows:

> All persons in Maryland to whom Defendants made one or more calls for the purpose of encouraging the purchase of insurance within four years prior to the filing of this suit, using a pre-recorded voice, without prior express written consent from the recipient, or without providing accurate caller ID information including the name of the caller and the originating number of the call.

87. Plaintiff believes and therefore alleges that the members of the Maryland Class number in the hundreds or thousands.

## ADDITIONAL CLASS ALLEGATIONS

88. Excluded from the Classes are Defendants and their affiliated entities, Defendants' agents and employees, any judge to whom this action is assigned and any member of such judge's staff and immediate family.

89. Plaintiff and all members of the Class have been harmed by the acts of Defendants because their privacy has been violated, they were subject to annoying and harassing calls that constitute a nuisance, and many were charged for incoming calls.

90. This Class Action Complaint seeks injunctive relief and money damages.

91. The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim.

92. The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of nearly identical suits.

93. The Class is ascertainable through records in the possession of Defendants, their agents and affiliates, and in the possession of contractors and the communications carriers who carried

the transmissions. QuinStreet has confirmed that it consulted transmission records regarding Plaintiff's claims.

94. There are well-defined, nearly identical, questions of law and fact affecting all of the parties.

95. The questions of law and fact, referred to above, involving the class claims predominate over questions which may affect individual Class members.

96. Such common questions of law and fact include, but are not limited to, the following:

a. Whether Defendants used an automatic telephone dialing system in making non-emergency calls to Class members' cell phones;

b. Whether Defendants used an artificial or prerecorded voice in its non-emergency calls to Class members' cell phones;

c. Whether Defendants engaged in telemarketing activities without first obtaining prior express written consent (i.e., written consent that is clearly and unmistakably stated);

d. Whether Defendants can meet their burden of showing they obtained prior express written consent (i.e., written consent that is clearly and unmistakably stated), to make such calls;

e. Whether Defendants' conduct was knowing and/or willful;

f. Whether Defendants are liable for statutory damages; and

g. Whether Defendants should be enjoined from engaging in such conduct in the future.

97. As a person who received non-emergency telephone calls using an automatic telephone dialing system or an artificial or prerecorded voice, without prior express written consent to

Case 2:25-cv-01674-TOD Document 20 Filed 11/14/25 Page 59 of 446

Defendants within the meaning of the TCPA, Plaintiff asserts claims that are typical of each Class member who also received such phone calls.

98. As a person who received more than one call within a twelve month period to his cellular phone number that had been previously registered with the National Do Not Call Registry, Plaintiff asserts claims that are typical of each Class member who also received such phone calls.

99. Plaintiff will fairly and adequately represent and protect the interests of the Class.

100. Plaintiff has no interests which are antagonistic to any member of the Class.

101. Plaintiff has retained counsel experienced in handling class action claims involving violations of federal consumer protection statutes, including claims under the TCPA.

102. A class action is the superior method for the fair and efficient adjudication of this controversy.

103. Class wide relief is essential to compel Allstate to comply with the TCPA.

104. The interest of the Class members in individually pursuing claims against Defendants is slight because the statutory damages for an individual action are relatively small, and are therefore not likely to deter Defendants from engaging in the same behavior in the future.

105. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated and the Class members, by definition, did not provide the prior express written consent required under the statute to authorize such calls to their cellular telephones.

106. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate.

107. Moreover, on information and belief, Plaintiff alleges that the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

108. Plaintiff seeks class relief under FRCP 23(b)(3) and injunctive relief under FRCP 23(b)(2).

109. The TCPA provides for damages of the greater of $500 per violation or actual damages; and empowers the Court to award up to treble damages if the violative conduct was knowing or willful. 47 U.S.C. § 227(b)(3)(B).

**COUNT I – DO NOT CALL VIOLATIONS**

110. The allegations above are hereby incorporated by reference.

111. Defendants violated the TCPA, 47 U.S.C. § 227(c)(5) and (47 C.F.R. § 64.1200(d)) by causing the transmission of telephone calls for the purpose of encouraging the purchase of insurance products, to Plaintiff and other members of the DNC Class, more than once within a 12-month period, despite the fact that those recipients' numbers were on the Registry.

112. The DNC Class is ascertainable via automated means using Defendants' call data, service providers' call data and the Registry.

113. WHEREFORE, Plaintiff seeks judgment against Defendants QuinStreet and Selectquote for himself and for the DNC Class in the amount of $500 for each violation, $1,500 for each violation found to be knowing or willful, attorneys' fees, costs and such other relief as the Court finds just.

**COUNT II – THE PRE-RECORDED VOICE CLASS**

114. The allegations above are hereby incorporated by reference.

115. Defendants caused the Calls without having prior express written permission of Plaintiff and the members of the Pre-Recorded Voice Class, in violation of 47 U.S.C. § 227(b)(1)(A).

116. Defendants' failure to obtain prior express written permission for the Calls was careless and negligent.

117. Plaintiff alleges in the alternative that Defendants' failure to obtain prior express written permission for the Calls was knowing or willful.

118. WHEREFORE, Plaintiff seeks judgment against Defendants QuinStreet and Selectquote for himself and for the Pre-recorded Voice Class in the amount of $500 for each violation, $1,500 for each violation found to be knowing or willful, attorneys' fees, costs and such other relief as the Court finds just.

**COUNT III – THE MARYLAND CLASS**

119. The allegations above are hereby incorporated by reference.

120. Defendants violated Maryland Commercial Code §14-3201 by violating the TCPA in at least the following ways:

a. Failure to obtain the required consent for the Calls;

b. Sending the Calls to numbers on the Registry;

c. Failure to use accurate caller ID information including the name of the caller and the number from which the call was sent.

121. WHEREFORE, Plaintiff seeks judgment against seeks judgment against Defendants QuinStreet and Selectquote for himself and for the Maryland Class in the amount of $500 for each violation, $1,500 for each violation found to be knowing or willful, attorneys' fees, costs and such other relief as the Court finds just.

**COUNT IV – INJUNCTIVE RELIEF**

122. The allegations above are hereby incorporated by reference.

123. Plaintiff avers that the conduct alleged above in violation of the TCPA is likely to continue, causing intrusion, interruption and outrage among the public, as recognized by Congress as a compelling

basis for the TCPA and its regulations. Plaintiff therefore request injunctive relief pursuant to FRCP 23(b)(2).

124. Plaintiff requests an order prohibiting Defendants and their affiliates and agents from a) causing the transmission of telemarketing calls using a pre-recorded voice without the prior express written consent of the intended recipient of the call; b) causing the transmission of telemarketing calls to telephone numbers that are registered on the National Do Not Call Registry maintained by the Federal Trade Commission; and c) causing the transmission of telemarketing calls without disclosing to the recipient of the call the true identity of the organization making the call and the telephone number from which the call was originated.

125. Plaintiff requests costs, attorney's fees and such additional relief as the Court deems just in connection with the injunctive relief sought in this count.

## CONSOLIDATED PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Class, prays for the following relief:

A. Certification of the proposed Classes;

B. Appointment of Plaintiff as representative of the Classes;

C. Appointment of the undersigned counsel as counsel for the Classes;

D. An order enjoining Defendant and/or their affiliates, agents, and/or other persons or entities acting on Defendant' behalf from making telemarketing calls to numbers on the National Do Not Call Registry, absent an emergency circumstance; enjoining Defendants from making calls with pre-recorded voicing; and enjoining Defendants from using false caller ID information.

E. An award to Plaintiff and the Classes of damages, as allowed by law; and

F. Such other and further relief as the Court deems necessary, just, and proper.

____________/s/____________________
Stephen H. Ring
STEPHEN H. RING, PC
401 North Washington Street, Suite 500
Rockville, Maryland 20850
(301) 563-9249
USDC-MD Attorney No. 00405
shr@ringlaw.us
Attorney for Plaintiff and the Proposed Classes

## JURY DEMAND

Plaintiff requests a trial by jury as to all issues so triable.

____________/s/____________________
Stephen H. Ring

## CERTIFICATE OF SERVICE

I certify that copies of this document and its attachments were sent on the date stamped on them by the Court, to the following:

Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Email: ikasdan@kelleydrye.com

James B. Saylor (*pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Email: jsaylor@kelleydrye.com

____________/s/____________________
Stephen H. Ring

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION - GREENBELT

| | |
|---|---|
| Stanley Shapiro, *on behalf of himself and all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>QuinStreet, Inc., *et al.*,<br><br>Defendants. | Case No. 8:24-cv-01667 |

**DEFENDANT QUINSTREET, INC.'S NOTICE OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

PLEASE TAKE NOTICE that, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rule 105 of the Local Rules of the United States District Court for the District of Maryland, Defendant QuinStreet, Inc. ("QuinStreet") hereby moves to dismiss the First Amended Complaint with prejudice and without leave to amend, for the reasons stated in the accompanying Memorandum of Law.

Dated: August 9, 2024

KELLEY DRYE & WARREN LLP

*<u>/s/ Ira T. Kasdan</u>*

Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Tel: (202) 342-8864
Fax: (202) 342-8451
Email: ikasdan@kelleydrye.com

James B. Saylor (*pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-5052
Fax: (212) 808-7897
Email: jsaylor@kelleydrye.com

*Counsel for Defendant, QuinStreet, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of August, 2024, the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all counsel of record. I additionally caused the foregoing to be served on SelectQuote by email, as agreed by counsel for SelectQuote.

*<u>/s/ Ira T. Kasdan</u>*
Ira T. Kasdan

# EXHIBIT 6

**Law Offices**
**STEPHEN H. RING, P.C.**
401 North Washington Street, Suite 500
Rockville, Maryland 20850
Telephone 301-563-9249
Facsimile 301-563-9639
shr@ringlaw.us
www.ringlaw.us

August 14, 2024

Hon. Lydia Kay Griggsby
United States District Judge
U.S. District Court for the District of Maryland
6500 Cherrywood Lane, Suite 400
Greenbelt, Maryland 20770

Re: Shapiro v. QuinStreet, Inc.,
USDC-MD Case No. 8:24-cv-01667

Dear Judge Grigsby:

I write as counsel for the plaintiff in the above matter. This is to request leave to file a second amended complaint, and if necessary, a motion for leave. The original statement of claim was compressed into a few lines on a printed form in state court, so there has been just one complaint prepared under federal standards of pleading.

Both defendants now have counsel of record. Now pending are my motion for expedited discovery and Defendant QuinStreet's motion to dismiss. I have consented to Defendant Selectquote's request for a three-week extension for their response to the amended complaint.

I have spoken with Mr. Saylor for Defendant QuinStreet and yesterday with Mr. Alltmont, and these conversations have been productive; it appears that efficiency is a common goal and thus far we are acting in cooperative fashion on procedural issues.

I would like to file a second amended complaint to add a defendant pursuant to information that developed during one of the calls with counsel, and to provide more particularized allegations of fact. I believe that further amendment of the claims is needed for better clarity and will allow the parties and the Court to focus more exactly on the claims and defenses. I am agreeable to reasonable extensions of time that may follow from this further amendment.

Thank you.

Sincerely,

Stephen H. Ring

Cc: Counsel of record via ECF

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STANLEY SHAPIRO,<br><br>Plaintiff,<br><br>v.<br><br>QUINSTREET, INC.,<br><br>Defendant. | ) | Civil Action No. 24-cv-01667-LKG<br><br>Dated: October 22, 2024 |

## SCHEDULING ORDER

On October 22, 2024, the parties participated in a telephonic status conference in the above-captioned civil action. ECF No. 52. For the reasons stated during the status conference, the Court:

(1) **GRANTS** Plaintiff's motion for leave to file second amended complaint (ECF No. 38);

(2) **DENIES-AS-MOOT** Defendant QuinStreet's motion to dismiss the first amended complaint (ECF No. 30);

(3) **DENIES-AS-MOOT** the Defendants' joint motion for extension of time to respond to the Plaintiff's motion for leave to file a second amended complaint (ECF No. 45); and

(4) **DENIES-AS-MOOT** the Plaintiff's motion for expedited discovery (ECF No. 32).

The parties shall adhere to the following schedule for the filing of the Plaintiff's second amended complaint and the briefing of the Defendants' respective motions to dismiss or other dispositive motions:

| | |
|---|---|
| Plaintiff's second amended complaint. | **October 25, 2024** |
| Defendants' motions to dismiss or other dispositive motions. | **November 22, 2024** |

| | |
|---|---|
| Plaintiff's responses in opposition to Defendants' motions to dismiss or other dispositive motions. | **December 13, 2024** |
| Defendants' reply briefs. | **January 3, 2025** |

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**STANLEY SHAPIRO**
on behalf of himself and all
others similarly situated

**Plaintiff**

v. Case No. 8:24-cv-01667

**QUINSTREET, INC.**

and

**SELECTQUOTE AUTO & HOME INSURANCE SERVICES, LLC**

**and**

**DOE DEFENDANTS 1 - 20**

**Defendants**

**SECOND AMENDED CLASS ACTION COMPLAINT**
**FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff, Stanley Shapiro, individually and on behalf of all others similarly situated, files this second amended complaint against Defendants, QuinStreet, Inc. ("QuinStreet"), Selectquote Auto & Home Insurance Services, LLC ("Selectquote") and Doe Defendants 1 – 20.

## NATURE OF THE ACTION

1. This case arises from telemarketing calls by Defendants to Plaintiff and the Class Members advertising insurance products and services ("the Calls").

2. The Calls were made in disregard of do-no-call lists (*see* 47 U.S.C. §227(c)(5) and 47 C.F.R. §64.1200(c)(2)), using artificial or pre-recorded voicing (*see* 47 C.F.R. § 64.1200(a)(2)), without the recipients' prior express written consent (id.), using false caller identification information, in violation of the Telephone Consumer Protection Act, 47 U.S.C. §

227 et seq. ("TCPA") and its regulations, and in violation of state statutes as further alleged below.

3. Past litigation against Defendants[1] has done little to deter their unlawful and high volume telemarketing practices as detailed below.

4. Plaintiff, for himself and for the Class Members, seeks statutory damages under FRCP 23(b)(3), 47 U.S.C. § 227(b)(3)(B) and state law, and seeks injunctive relief under FRCP 23(b)(2) and 47 U.S.C. § 227(c)(5)(A).

**JURISDICTION AND VENUE**

5. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C.§ 227 et seq.

6. This Court has personal jurisdiction over Defendants because they regularly conduct business in Maryland, direct the solicitation of business to individuals in this state, and purposefully avail themselves of the laws of this state.

---

[1] Past suits against Defendants include the following:

| |
|---|
| Debusk v. Quinstreet, Inc. dba Insure.com, Case 6:17-cv-00608-GAP-GJK USDC-FL 2017. |
| Baker v. QuinStreet Media, Inc., Case 3:20-cv-05632-LB ND Cal. 2020. |
| Castello v. QuinStreet PL, Inc., Case 3:24-cv-00635-BEN-KSC, ND Cal 2024. |
| Nickson v. QuinStreet, Inc. dba Inusre.com, Case 8:22-cv-01166-DLB, SD-MD 2022. |
| Pizarro v. QuinStreet, Inc. Case 3:22-cv-02803-MMC, ND Cal. 2022. |
| Pizarro v. QuinStreet, AmOne, Case. 1:21-cv-10139-ER, USDC-NY 2021. |
| Becker v. QuinStreet, Inc. dba Schools.Com, Campuscorner.Com, Searchschoolsnetwork.Com, Case 0:17-cv-61941-CMA, SD FL 2017. |
| Mousa v. QuinStreet, Inc. dba Debhelp.com, Does 1 – 10 ; Case 2:20-cv-01136-MWF-GJS, CD Cal. 2020. |
| Sanders v. Quinstreet, Inc. dba Collegefinder, Case 3:14-cv-00061, SD TX filed 2.16, 2014. |
| Schick v. Selectquote Insurance Services, Yasha Marketing Llc, and Datalot, Inc., Case 3:19-cv-04902-LB, ND Cal.. 2019 |
| Tsolumba v. Selectquote Ins. Services, and Online Insurance Solutions LLC dba Digital Thrive, 5:22-cv-00712, ND OH 2022. |

7. Venue is proper because Plaintiff resides in, and received the Calls in, this District.

8. At all times relevant to this action QuinStreet maintained offices in Annapolis, Maryland.

9. At all times relevant to this action Defendants regularly conducted business in Maryland.

10. Defendants purposefully caused and directed the transmission of hundreds or thousands of Calls to the cellular telephones of persons in Maryland.

**PARTIES**

11. At all times relevant to this action Plaintiff was an individual residing in Maryland.

12. At all times relevant to this action Defendant QuinStreet was a corporation formed under the laws of Delaware, maintaining its principal offices in California, registered with the state of Maryland to conduct business in Maryland.

13. At all times relevant to this action Defendant Selectquote was a limited liability company formed under the laws of Delaware, maintaining its principal offices in Kansas, registered with the state of Maryland, Exhibit E, and regularly conducting business in Maryland.

14. At all times relevant to this action Doe Defendants 1 – 20 were persons or entities who regularly conduct business in Maryland, direct the solicitation of business to individuals in this state, and purposefully avail themselves of the laws of this state. The Doe Defendants are alter-egos, partners, joint-venturers, agents and affiliates of QuinStreet and Selectquote.

15. Defendants purposely conceal their identities in their telemarketing calls. Plaintiff will fully identify the Doe Defendants when their identities become known through discovery.

**ALLEGATIONS OF FACT – CALLS TO PLAINTIFF**

16. Plaintiff is a "person," as defined by 47 U.S.C. § 153(39).

17. Since 2003 or earlier Plaintiff has been a residential subscriber, and the regular user, of the cellular telephone number 301-xxx-1979, and Verizon has been his only service provider for that telephone number under an account in Plaintiff's individual name.

18. Since 2003 Plaintiff's cellular number, above, has been on the Federal Trade Commission's Do Not Call Registry.

19. Plaintiff was born and raised in the United States, speaks American English, is familiar with American conversational intonations and pronunciations, and is reasonably facile at detecting foreign accents and artificial voicing.

**a. The QuinStreet Calls to Plaintiff**

20. On July 5, 2023 at 4:22 p.m. QuinStreet, through its agents, initiated a call to Plaintiff's cellular telephone served by the number 301-xxx-1979. The caller ID on Plaintiff's phone for that call showed "207-xxx-3247 Maine."

21. For an instant, based on the caller ID Plaintiff believed the call might be from a local caller who was not a telemarketer and answered. The caller ID turned out to be falsified, to deceive Plaintiff into answering the call.

22. The call started with an artificial voice, apparent from its flat, inhuman and robotic intonation and pronunciation. The artificial voice called itself "Nia Davis" and asked

questions about Plaintiff's need for insurance. Plaintiff made bland responses to reach a human who could identify the parties who caused the call.

23. On July 6, 2024 at 9:12 a.m. Plaintiff received a call on his cellular telephone served by 301-xxx-1979, and the caller ID showed the call was from 301-xxx-3445. The caller was a human who identified herself as "Andrea," asked for Plaintiff by name, and recited information about Plaintiff that had been stated during the call of July 5 described above.

24. "Andrea" confirmed that she had obtained Plaintiff's identity and other information from the call of July 5, 202, taking ownership and responsibility for that call. Andrea said that her number was 855-xxx-7755 and recited a script offering insurance. Plaintiff declined the offer. Plaintiff later called the number Andrea had provided and heard an announcement for Insurance.com, which is owned and operated by defendant Quinstreet, further confirming that QuinStreet was the party behind the July 5 call.

25. Plaintiff never gave express prior written consent to QuinStreet or to anyone else for the call of July 5, 2023 described above, or for any automated calls from QuinStreet or its affiliates, or for any calls that contain automated voicing or use false caller ID information.

26. Plaintiff received several calls having the same features as the one described above, starting with a script promoting insurance spoken by a robotic artificial voice similar to that heard in the call on July 5, 2023, including calls on July 31, 2023 at 6:36 p.m., January 18, 2024 at3:34 p.m., June 6, 2024 at 4:25 p.m., July 22, 2024 at 2:22 p.m. and more, from QuinStreet and its agents.

27. During the months preceding the calls to Plaintiff, QuinStreet directed, controlled, designed and implemented the telemarketing campaigns that included the calls to Plaintiff. QuinStreet specified, created, edited and implemented the scripts to be used in the calls,

specified the criteria for selection of numbers to be called, and controlled and managed the data that resulted from the calls including call detail records and customer details that include name, address, age, health history, occupation, income range, and other demographic and personal information.

**b. Quinstreet's Telemarketing Business**

28. QuinStreet's business involves telemarketing for "lead generation," which entails calling consumers to gather information about them and to qualify them as possible purchasers of various products. QuinStreet operates the "QS Network," a group of websites, call centers and email service providers, components of its lead generation business. Exhibit A.

29. QuinStreet creates, edits and approves scripts and wording used in its Calls to Plaintiff and the Class Members.

30. QuinStreet's telemarketing business uses callers who generate "call leads." ("Publisher may generate Leads for QS through a QS Implementation or a Publisher Implementation . . .") Exhibit B.

31. QuinStreet advertises its role as a matchmaker between consumers and insurers. Exhibit C.

32. QuinStreet owns Insure.com and Insurance.com, which have the same office address as QuinStreet, and market Medicare A and B insurance plans similar to those promoted in the call of July 13, 2023. See www.insure.com and www.insurance.com. Last viewed July 15, 2024. Calls made for insure.com or insurance.com are calls made for Quinstreet.

33. QuinStreet's form 10k filed with the Securities and Exchange Commission for the year ending June 30, 2023 states, "We are predominantly paid on a negotiated or market-driven "per click," "per lead," or other "per action" basis that aligns with the customer acquisition cost

targets of our clients. . . . . Our media sources include . . . social media and mobile programs, . . . call center operations, . . .  and more.” [https://investor.quinstreet.com/static-files/1806764c-b747-49f3-8c85-a675fb20f59d](https://investor.quinstreet.com/static-files/1806764c-b747-49f3-8c85-a675fb20f59d) At pg. 4.  Last viewed July 16, 2024. [Emphasis added.]

34. QuinStreet routinely conceals its identity in automated voicing in the Calls.

**c. The Selectquote Calls to Plaintiff**

35. On July 13, 2023 at 10:05 a.m. Selectquote or its agents initiated a telephone call to Plaintiff’s cellular phone showing 301-xxx-5907 on the caller ID display.  Plaintiff subscribes to that number through Verizon in his individual name.

36. For an instant Plaintiff  believed that the caller ID might be accurate, that the call might actually be from a local caller who was not a telemarketer, and answered it.  The caller ID was false and was intended to deceive Plaintiff into answering the call.

37. Upon answering the call Plaintiff heard a robotic voice talking about Medicare Parts A and B.  Plaintiff believed that the voice was artificial because of its unnatural intonation and cadence, and the mechanical and overly precise phonetic pronunciation of certain words.

38. Plaintiff stayed on the call and was transferred to a male human who identified himself as “Samuel” and spoke with a foreign accent, which Plaintiff believes was Indian. Samuel asked Plaintiff for certain information pertaining to insurance coverage, and Plaintiff answered in order to learn the identity of the calling organization.  The call ended and Samuel said he would call again later.

39. At 3:37 p.m. on July 13, 2023 Plaintiff received a call on his cell phone showing a caller ID of “301-xxx-2839 HLY CROSS GT HOS” suggesting it was from a well-known local hospital. The caller ID did not suggest in any way that the call was from Samuel or any organization that might have been associated with him.  Relying on the caller ID information,

Plaintiff answered the call and heard an adult male human voice identifying himself as "Samuel," having the same accent as the individual on the 10:05 a.m. call. Samuel repeated information from the earlier call, further confirming that he was the same "Samuel" as before.

40. "Samuel" asked Plaintiff to answer "yes" to a scripted question that Samuel described as a waiver under telemarketing laws. Plaintiff declined to do so.

41. The second call with "Samuel" was transferred to an adult male who identified himself as Heath Raynor and said he was a licensed health insurance agent for Selectquote, thereby identifying Selectquote as being responsible for the first call. Mr. Raynor gave Plaintiff the contact number 855-xxx-3489, which indeed appears on a website for Selectquote at https://www.selectquote.com/contact-us. Last viewed July 15, 2024.

42. Plaintiff terminated the call with Mr. Raynor without making a purchase.

43. Plaintiff never gave express prior written consent to Selectquote or to anyone else for the initial call of July 13, 2023 described above, or for any automated calls from Selectquote or its affiliates, or for any calls that contain automated voicing or used false caller ID information.

44. Plaintiff has received numerous calls similar to the first call on July 13, 2023 described above, containing pre-recorded voicing, using scripted promotions of insurance products, starting with artificial voices and then transferred to humans, including calls on July 31, 2023 at 6:36 p.m., January 18, 2024 at3:34 p.m., June 6, 2024 at 4:25 p.m., July 22, 2024 at 2:22 p.m. and more from Selectquote and its agents.

45. During the initial telemarketing calls received by Plaintiff that promote insurance products, prior to any transfer to a live agent, the true identities of the callers and the vendors on whose behalf the calls were made were not disclosed. Discovery is necessary to confirm and/or

identify the parties responsible for all of the violative calls and the relationships among those responsible for the calls.

46. During the months preceding the calls to Plaintiff, Selectquote directed, controlled, designed and implemented the telemarketing campaigns that included the calls to Plaintiff. Selectquote specified, created, edited and implemented the scripts to be used in the calls, specified the criteria for selection of numbers to be called, and controlled and managed the data that resulted from the calls including call detail records and customer details that include name, address, age, health history, occupation, income range, and other demographic and personal information.

**d. Selectquote's Telemarketing Business**

47. Selectquote's business involves telemarketing for "lead generation," which entails calling consumers to gather information about them and to qualify them as possible purchasers of various products.

48. Selectquote creates, edits and approves scripts and wording used in its Calls to Plaintiff and the Class Members.

49. Selectquote's Form 10-K filed with the U.S. Securities and Exchange Commission for the year ending June 30, 2023 states: "We are a leading technology-enabled, direct-to-consumer ("DTC") distribution platform for insurance products and healthcare services. . . . for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans . . . MA and MS plans accounted for 89%, 82%, and 78% of our approved Senior policies for the years ended June 30, 2023, 2022, and 2021, respectively . . ." https://s23.q4cdn.com/545595037/files/doc_financials/2023/ar/slqt_2023_10k.pdf (Last viewed July 15, 2024.)

50. Selectquote is not an insurance company and does not issue insurance policies. (". . . because we are not the issuer of the insurance policy to the consumer, we bear no underwriting risks." Id. at 4.) However, Selectquote promotes insurance products, qualifies leads, and transfers the leads to persons who close the sales, throughout the United States and in Maryland. ("We are a licensed insurance producer in all 50 U.S. states and the District of Columbia. Id. at 15) See also, Exhibits D, F.

51. Plaintiff has never given express prior written consent to Selectquote or to anyone else for the initial call of July 13, 2023 described above, or for any automated calls from Selectquote or its affiliates, or for any calls that contain automated voicing or use false caller ID information.

**e. "Doe Calls"**

52. Plaintiff has received dozens of unsolicited automated calls using artificial or pre-recorded voicing, promoting insurance, similar in format and content to the calls described above, without Plaintiff's prior express written permission during the calls during this suit. These calls violate the DNC list, use falsified or "spoofed" caller ID information and fail to provide complete and accurate identification of the persons and entities that cause them. ("Doe Calls") Defendants Doe 1 – 20 caused these calls.

53. Defendants Doe 1-20 are persons or entities who regularly conduct business in Maryland, direct the solicitation of business to individuals in Maryland, and purposefully avail themselves of the laws of Maryland. The Doe defendants purposely conceal and falsify their identities to evade liability under the telemarketing laws. The full legal names of the Doe Defendants will be provided via amendment when their identities have been disclosed through discovery.

**CAMPAIGNS; DATA; ASCERTAINABILITY**

54. Defendants use "campaigns" in which automated calls are placed to thousands of phone numbers based on scripts, lists and calling plans that generate data held or saved by Defendants or their agents.

55. Defendants' campaigns are identified by numbers or codes by which one campaign can be distinguished from another. Each campaign has a start and end time, data defining the numbers to be called, existing lead data, scripts to be used, specifics of the calling plan, and more information that allows identification of each campaign.

56. Defendants use vendors, contractors and subcontractors in some of their campaigns, but retain control over key features relevant to this action.

57. Each campaign results in data showing the outcome of the calls, the date and time of each attempted call, whether the call resulted in a successful connection, the duration of connected and answered calls, whether the call was transferred to a live human, and more details.

58. Assignment of a particular number to a cellular telephone can be ascertained via records of telephone carriers.

59. Qualified experts and technicians can ascertain the Classes using the data described above and automated procedures.

**TELEMARKETING LAW**

60. The U.S. Supreme Court has observed, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020); and that Congress enacted the TCPA in 1991 because it found "[m]any consumers are outraged over the proliferation of intrusive, nuisance [telemarketing] calls to their homes," which they "rightly regarded…as 'an invasion of

privacy.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (quoting the TCPA §2, 105 Stat. at 2394 (bracketed alterations in original)); see *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264–65 (11th Cir. 2019).

61. The TCPA was enacted in response to Americans' growing frustration with repeated telemarketing calls.[2] *Krakauer v. Dish Network, LLC*, 925 F.3d 643, at 663 (4th Cir. 2019). Among other proscribed practices, the TCPA prohibits "mak[ing] any call... using any automatic telephone dialing system or an artificial or prerecorded voice... to any telephone number assigned to a... cellular telephone service" without "prior express consent of the called party." 47 U.S.C. § 227(b) (1)(A) (iii). If an "automatic telephone dialing system" or "artificial or prerecorded voice" is being used for "any telephone call that includes or introduces an advertisement or constitutes telemarketing," the caller must have the "prior express written consent of the called party." 47 C.F.R. § 64.1200(a)(2) (emphasis added). *Bradley v. Dentalplans.com*, Civil 20-1094-BAH, 7 (D. Md. Jun. 6, 2024), 2024 WL 2865075.

62. Thousands of consumers have complained to federal and state government agencies, and to callers, that unsolicited telemarketing communications, including calls, faxes and texts, interrupt their work and private activity, intrude upon their time and privacy, and consume their resources.

63. Section 227(b)(1)(A)(iii) of the TCPA prohibits the use of autodialers to make any call to a wireless number absent an emergency, or absent express the prior written consent of

---

[2] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA). The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201*et seq.*

the called party.

64. The State of Maryland adopts federal statutes in prohibiting certain telemarketing practices:

A person may not violate:

(1) The Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101 through 6108, as implemented by the Federal Trade Commission in the Telemarketing Sales Rule (16 C.F.R. Part 310); or

(2) The Telephone Consumer Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart L).

Maryland Commercial Code §14-3201.

Maryland has created a private cause of action for violations of §14-3201:

(a) A violation of this subtitle is an unfair or deceptive trade practice within the meaning of Title 13 of this article and is subject to the enforcement and penalty provisions contained in Title 13 of this article.

(b) In addition to the remedies provided in §13-408 of this article, an individual who is affected by a violation of this subtitle may bring an action against a person that violates this subtitle to recover:

(1) Reasonable attorney's fees; and

(2) Damages in the amount of the greater of:

(i) $500 for each violation; or

(ii) Actual damages sustained as a result of the violation.

(c) For purposes of this section, each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation.

Maryland Commercial Code §14-3202.

65. The Telemarketing Sales Rule, referenced in 14-3201(1), supra, provides in relevant part:

§ 310.4 Abusive telemarketing acts or practices.

Case 8:24-cv-01676-AQKG Document 150 Filed 01/25/25 Page 86 of 446

(a) *Abusive conduct generally*. It is an abusive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in the following conduct: . . .

(8) Failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call . . .

16 CFR § 310.4

66. Section §13-408 of the Commercial Law Article of the Maryland Code (referenced above in §14-3202(b)) provides for a private cause of action:

> (a) In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.
>
> (b) Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.

Id. [Emphasis added.]

**ARTIFICIAL AND PRE-RECORDED VOICING**

67. Congress found that calls using automated dialing and calls using artificial or prerecorded voicing are a greater nuisance and invasion of privacy than calls individually initiated and voiced by humans in real time due to the massive quantities of calls possible via such automation.

68. Congress vested the Federal Communications Commission with authority to issue regulations implementing the TCPA.

69. The FCC has recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[3]

70. The receipt of an unsolicited call in violation of the TCPA is sufficient to confer standing not only for do-not-call list violations, *Krakauer* at 653, but also for unsolicited call violations generally. *Bradley*, slip opinion at 8. "The statute requires that an individual receive a call on his own... number.... There is nothing ethereal or abstract about it.... Since that harm is both particular to each person and imposes a concrete burden on his privacy, it is sufficient to confer standing." Id.

**PRIOR EXPRESS WRITTEN CONSENT**

71. The FCC defines prior express written consent as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8).

72. Under the TCPA, prior consent is an affirmative defense for which the defendant bears the burden of proof. *Bradley*, at 10.

73. Telemarketing calls under the TCPA require a higher standard of consent, "prior express written consent," than non-telemarketing calls. Id. at 11; 47 C.F.R. § 64.1200(a)(2). The latter merely need "prior express consent." 47 C.F.R. § 64.1200(a)(1).

---

[3] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003)

74. The "prior express written consent" required for telemarketing calls must also be "clear and conspicuous." 47 C.F.R. § 64.1200(f)(9)(i);

75. Under the TCPA, "[t]he term telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(13). Telemarketing includes "winback" calls to renew an expired or terminated customer account, and such calls require prior express written consent. *Bradley* at 11.

76. A voice recording is insufficient to provide the disclosure component of the consent required for telemarketing calls. Id. at 19.

**VICARIOUS LIABILITY; APPARENT AUTHORITY**

77. The FCC issued a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of . . . section 227(b) . . . that are committed by third-party telemarketers."[4] This vicarious liability may apply if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 F.C.C.R. at 6586 (¶ 34).

---

[4] In the Matter of The Joint Petition Filed by DISH Network, LLC, the United States of America, and the States of California, Illinois, North Carolina, and Ohio for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules, et al., CG Docket No. 11-50, 28 F.C.C.R. 6574, 6574 (¶ 1) (May 9, 2013) ("May 2013 FCC Ruling"). Regarding vicarious liability the FCC stated in part,

> . . . The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller

78. The FCC has rejected the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.*at n.107.

79. The May 2013 FCC Ruling further clarifies a seller's liability via apparent authority:

80. Apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including access to detailed information

81. Defendants are responsible for ensuring that their calling vendors comply with the TCPA, even if Defendants did not directly make the calls.

82. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See* FCC Declaratory Ruling, Memorandum and Order, 10 FCC Rcd. 12391, 12397 (¶ 13) (1995).

83. The FCC expects that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information. " May 2013 FCC Ruling, *supra*, at 6592-93 (¶ 46). Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

---

knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 F.C.C.R. at 6592 (¶ 46).

## DO NOT CALL REGISTRY

84. The National Do Not Call Registry ("Registry"), which is managed by the Federal Trade Commission, allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations on those numbers. See 47 C.F.R. § 64.1200(c)(2).

85. A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

86. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provide a private right of action against those making such calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

## CLASS ALLEGATIONS

87. Defendants made Calls to persons throughout the United States that were substantially similar to the Calls placed to Plaintiff.

88. The Calls to the Class Members were placed to cellular telephones by an "automatic telephone dialing system" for non-emergency purposes and in the absence of the recipients' prior express written consent, in violation of 47 U.S.C. § 227(b)(1)(A).

89. The Calls to the Class Members were made in disregard of do-no-call lists (*see* 47 U.S.C. §227(c)(5) and 47 C.F.R. §64.1200(c)(2)), using artificial or pre-recorded voicing (*see* 47 C.F.R. § 64.1200(a)(2)), without the recipients' prior express written consent (id.), using false caller identification information, in violation of the Telephone Consumer Protection Act, 47

Case 8:24-cv-01667-KG Document 124 Filed 11/21/25 Page 91 of 446

U.S.C. § 227 et seq. ("TCPA") and its regulations, and in violation of consumer protection laws in Maryland and in all 50 states.

90. Defendants have the burden of proving any prior express written consent by Plaintiff and Class Members within the meaning of the statute.

91. The Calls went to cellular telephones throughout the United States.

92. Defendants acted carelessly and negligently in causing the Calls to Class Members.

93. Plaintiff alleges in the alternative that Defendants acted willfully and knowingly in causing the calls to be initiated as described above, and in ignoring the Registry.

94. Defendants knew that the calls were in violation of the TCPA and accepted benefits, including sales, that resulted from the Calls, thereby ratifying and assuming responsibility for the Calls.

95. Defendants have been previously sued for robocalls in violation of the TCPA and state law, have participated in proceedings with the FCC regarding the TCPA, and are fully aware of the statutory requirements as alleged above.

96. During the months preceding the calls to Plaintiff, Defendants directed, controlled, designed and implemented the telemarketing campaigns that included the calls to Plaintiff. Defendants specified, created, edited and implemented the scripts to be used in the calls, specified the criteria for selection of numbers to be called, and controlled and managed the data that resulted from the calls including call detail records and customer details that include name, address, age, health history, occupation, income range, and other demographic and personal information.

97. Defendant QuinStreet describes its exposure to TCPA claims and its call center activity in part as follows:

> . . . in connection with our owned and our third-party publishers' telemarketing campaigns to generate traffic for our clients, we are subject to various state and federal laws regulating telemarketing communications (including SMS or text messaging), including the federal Telephone Consumer Protection Act (the "TCPA"), which requires prior express written consent for certain types of telemarketing calls. Our efforts to comply with the TCPA have not had a material impact on traffic conversion rates. However, depending on future traffic and product mix, it could potentially have a material effect on our revenue and profitability, including increasing our and our clients' exposure to enforcement actions and litigation. The TCPA regulations have resulted in an increase in individual and class action litigation against marketing companies for alleged TCPA violations. TCPA violations can result in significant financial penalties, including penalties or criminal fines imposed by the Federal Communications Commission (the "FCC") or fines of up to $1,500 per violation imposed through private litigation or by state authorities. . . . a significant amount of revenue comes from calls made by our internal call centers as well as, in some cases, by third-party publishers' call centers. We also purchase a portion of inquiry data from third-party publishers . . .

QuinStreet, Inc. 10-K for Fiscal Year Ended June 30, 2023 at 15.
https://investor.quinstreet.com/sec-filings/sec-filing/10-k/0000950170-23-043659
last viewed August 17, 2024.

**THE DO-NOT-CALL CLASS**

98. The Do-Not-Call Class ("DNC Class") consists of all persons within the United States who had not given express prior written consent, to whom a defendant caused the transmission of at least two Calls, at least one of which was on or after July 16, 2024, and whose number, at the time of the call, had been registered on the National Do-Not-Call Registry for at least 30 days prior to the call.

99. The members of the DNC Class number in the thousands.

**THE PRE-RECORDED VOICE CLASS**

100. The Pre-recorded Voice Class consists of all persons in the United States to whom a Defendant caused the transmission of at least one Call on or after July 16, 2020 using an artificial or pre-recorded voice, without prior express written consent from the recipient.

101. The members of the Pre-recorded Voice Class number in the thousands.

**THE MARYLAND CLASS**

102. The Maryland Class consists of all persons in Maryland to whom a Defendant caused the transmission of at least one Call on or after July 16, 2020 using a pre-recorded voice, without prior express written consent from the recipient, or without providing accurate caller ID information including the name of the caller and the originating number of the call.

103. The members of the Maryland Class number in the thousands.

**ADDITIONAL CLASS ALLEGATIONS**

104. Excluded from the classes are Defendants and their affiliated entities, Defendants' agents and employees, any judge to whom this action is assigned and any member of such judge's staff and immediate family.

105. Plaintiff and all members of the classes have been harmed by the acts of Defendants because their privacy has been violated, they were subject to annoying and harassing calls that constitute a nuisance, and many were charged for incoming calls.

106. The joinder of all class members is impracticable due to the size and relatively modest value of each individual claim.

107. The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of nearly identical suits.

108. The classes are ascertainable through records in the possession of Defendants and their agents and affiliates, and in the possession of contractors and the communications carriers who carried the transmissions. QuinStreet has confirmed that it consulted transmission records regarding Plaintiff's claims.

109. There are well-defined, nearly identical questions of law and fact affecting all of the parties.

110. The questions of law and fact involving the class claims predominate over questions which may affect individual Class members.

111. The common questions of law and fact include, but are not limited to, the following:

a. Whether Defendants used an automatic telephone dialing system in making non-emergency calls to Class members' cell phones;

b. Whether Defendants used an artificial or prerecorded voice in their non-emergency calls to Class members' cell phones;

c. Whether Defendants engaged in telemarketing activities without first obtaining prior express written consent (i.e., written consent that is clearly and unmistakably stated);

d. Whether Defendants can meet their burden of showing they obtained prior express written consent (i.e., written consent that is clearly and unmistakably stated), to make such calls;

e. Whether Defendants' conduct was knowing and/or willful;

f. Whether Defendants are liable for statutory damages; and

g. Whether Defendants should be enjoined from engaging in such conduct in the future.

112. Plaintiff's claims are typical of the claims of the Class Members.

113. Plaintiff will fairly and adequately represent the interests of the Classes.

114. Plaintiff has no interests which are antagonistic to any member of the Classes.

115. Plaintiff has retained counsel experienced in handling class action claims involving violations of the TCPA and state statutes as they pertain to robocalls.

116. A class action is the superior method for the fair and efficient adjudication of this controversy.

117. Class-wide relief is essential to compel the defendants to comply with the TCPA.

118. The Class members' interest in pursuing individual claims against Defendants is slight because the statutory damages for an individual action are relatively small, relative to the time and expense required for such litigation. Any such individual actions are not likely to deter Defendants from engaging in the same behavior in the future.

119. The class claims will be manageable; the calls were automated, involving data for their transmission and data reflecting their results and outcomes; the Class members did not provide the prior express written consent required under the statute to authorize such calls to their cellular telephones; the classes are ascertainable via data in the possession or control of defendants and their contractors, subcontractors, carriers and service providers; Defendants have been reminded of their obligation, imposed by law, to preserve data relevant to this action.

120. The data produced in similar class actions over telemarketing have been ably managed by experts and technicians and the same approach will apply here.

121. Defendants have acted on grounds generally applicable to the Classes , thereby making final injunctive relief with respect to the Class as a whole appropriate.

122. On information and belief, Plaintiff alleges that the TCPA and state law violations complained of herein are likely to continue in the future if injunctive relief is not entered.

123. Plaintiff seeks class relief in the form of damages under FRCP 23(b)(3) and injunctive relief under FRCP 23(b)(2).

124. The TCPA provides for damages of the greater of $500 per violation or actual damages; and empowers the Court to award up to treble damages if the violative conduct was knowing or willful. 47 U.S.C. § 227(b)(3)(B).

**COUNT I – DO NOT CALL VIOLATIONS**

125. The allegations above are hereby incorporated by reference.

126. Defendants violated the TCPA, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d) by causing the transmission of telephone calls advertising insurance products to Plaintiff and the members of the DNC Class, more than once within a 12-month period, despite the fact that those recipients' numbers were on the Registry.

127. Defendants negligently and carelessly failed to check the DNC Registry, and negligently and carelessly failed to delete from their calling plans and lists the numbers of Plaintiff and the DNC Class members.

128. Plaintiff alleges in the alternative that Defendants' failure to check the DNC Registry and its conduct in causing the Calls to be made to Plaintiff and the members of the DNC Class was knowing and willful.

129. The DNC Class is ascertainable via automated means using call data records and related data from Defendants, vendors, carriers, service providers and contractors engaged in the

planning, preparation and transmission of the Calls, and via the DNC database maintained by the FTC.

**COUNT II –PRE-RECORDED VOICE VIOLATIONS**

130. The allegations above are hereby incorporated by reference.

131. Defendants caused the Calls to Plaintiff and the members of the Pre-recorded Voice Class without prior express written permission, in violation of 47 U.S.C. § 227(b)(1)(A).

132. Defendants' failure to obtain prior express written permission for the Calls was careless and negligent.

133. Plaintiff alleges in the alternative that Defendants' conduct in failing to obtain prior express written permission for the Calls, and its conduct in causing the Calls, was knowing or willful.

134. The Pre-recorded Voice Class is ascertainable via automated means using call data records and related data from Defendants, vendors, carriers, service providers and contractors engaged in the planning, preparation and transmission of the Calls.

**COUNT III – MARYLAND CLASS**

135. The allegations above are hereby incorporated by reference.

136. Defendants violated Maryland Commercial Code §14-3201 by violating the TCPA in at least the following ways:

a. Failure to obtain the required consent for the Calls;

b. Sending the Calls to numbers on the Registry;

c. Failure to use accurate caller ID information including the name of the caller and the number from which the call was sent.

137. Defendant's failures alleged above in this count were careless and negligent.

138. Plaintiff alleges in the alternative that Defendant's failures alleged above in this count were knowing or willful.

139. The Maryland Class is ascertainable via automated means using call data records and related data from Defendants, vendors, carriers, service providers and contractors engaged in the planning, preparation and transmission of the Calls, and via the DNC database maintained by the FTC.

**COUNT IV – INJUNCTIVE RELIEF**

140. The allegations above are hereby incorporated by reference.

141. Plaintiff avers that the conduct alleged above in violation of the TCPA and state law is likely to continue, causing intrusion, interruption and outrage among the public, as recognized by Congress as a compelling basis for injunctive relief under the TCPA and its regulations. Defendants have continued their unlawful conduct despite prior lawsuits. Absent injunctive relief, the conduct is likely to continue, causing intrusion, invasion of privacy, deception, interruption of personal time, and other loss. Plaintiff therefore requests injunctive relief pursuant to FRCP 23(b)(2).

142. Plaintiff requests an order prohibiting Defendants and their affiliates and agents from a) causing the transmission of telemarketing calls to telephone numbers that are registered on the National Do Not Call Registry maintained by the Federal Trade Commission; b) causing the transmission of telemarketing calls using a pre-recorded voice without the prior express written consent of the intended recipient of the call; and c) causing the transmission of telemarketing calls without disclosing to the recipient of the call the true identity of the organization making the call and the telephone number from which the call was originated.

## CONSOLIDATED PRAYER FOR RELIEF

143. Plaintiff, individually and on behalf of the Classes, prays for the following relief:

a. Certification of the proposed Classes;

b. Appointment of Plaintiff as representative of the Classes;

c. Appointment of the undersigned counsel as counsel for the Classes;

d. An order pursuant to FRCP 23(b)(2), and 47 U.S.C. § 227(c)(5)(A) enjoining Defendants and their affiliates, agents, and anyone acting on Defendant' behalf from making telemarketing calls to numbers on the National Do Not Call Registry absent an emergency circumstance; enjoining Defendants from making telemarketing calls using artificial or pre-recorded voicing; and enjoining Defendants from using false caller ID information in telemarketing calls;

e. Statutory damages under FRCP 23(b)(3) and 47 U.S.C. § 227(b)(3)(B) consisting of $500 per each violation that was not knowing or willful and $1,500 for each violation that was knowing or willful;

f. Statutory damages and all other relief available under Maryland Commercial Code §14-3201 and §14-3202;

g. Such other and further relief as the Court deems necessary, just, and proper.

____________/s/____________________
Stephen H. Ring
STEPHEN H. RING, PC
401 North Washington Street, Suite 500
Rockville, Maryland 20850
(301) 563-9249
USDC-MD Attorney No. 00405
shr@ringlaw.us
Attorney for Plaintiff and the Proposed Classes

**JURY DEMAND**

Plaintiff requests a trial by jury as to all issues so triable.

___________/s/____________________
Stephen H. Ring

**CERTIFICATE OF SERVICE**

I certify that copies of this document and its attachments were sent on the date stamped on them by the Court, to the following:

Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Email: ikasdan@kelleydrye.com

James B. Saylor (*pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Email: jsaylor@kelleydrye.com

Michael D. Alltmont, Esquire
Sessions, Israel & Shartle, LLC
3838 N. Causeway Blvd., Te. 2800
Metairie, LA 7002
malltmont@sessions.legal

Baabak Zarrabian
Jordan Coyne, LLP
10201 Fairfax Blvd., Ste. 520
Fairfax, VA 22030
b.zarrabian@jocs-law.com

___________/s/____________________
Stephen H. Ring

# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION - GREENBELT

| | |
|---|---|
| Stanley Shapiro, *on behalf of himself and all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>QuinStreet, Inc.,<br><br>Defendant. | Case No. 8:24-cv-01667<br><br>Assigned to Hon. Lydia Kay Griggsby |

**DECLARATION OF TYLER ORRELL**

Pursuant to 28 U.S.C. § 1746, I Tyler Orrell, declare and state as follows:

1. I am the Vice president, Contact Center Operations, at QuinStreet, Inc. ("QuinStreet"). I am over eighteen and competent to testify to the matters set forth herein. I am authorized to make this declaration on behalf of QuinStreet. I make this declaration based on my personal knowledge, QuinStreet's reasonable investigation to date, upon which I relied, and review of records maintained by QuinStreet in the ordinary course of business.

2. I have access to, and am familiar with, QuinStreet's systems, platforms, and databases used for logging, tracking, and storing records of outbound telephone calls made by QuinStreet.

3. At the request of counsel, QuinStreet conducted an exhaustive search of QuinStreet's systems and repositories for records of prior express invitation or permission to be contacted at, and any outbound calls or texts placed by QuinStreet to, Plaintiff's number ending in -1979 ("Plaintiff's Number").

4. As set forth in QuinStreet's responses to Plaintiff's Interrogatory Nos. 2 and 9, QuinStreet's exhaustive search found a single record of prior express invitation or permission to

be contacted at Plaintiff's Number concerning auto insurance, dated July 6, 2023, and a single outbound call placed by QuinStreet to Plaintiff's Number in response to that inquiry, which also occurred on July 6, 2023. This search also revealed two inbound calls placed by Plaintiff's Number to QuinStreet.

5. Based on QuinStreet's exhaustive search, QuinStreet confirmed that the July 6, 2023 call is the only outbound call to Plaintiff's Number that exists in QuinStreet's records.

6. It is my understanding that QuinStreet has produced all responsive information within its possession, custody, or control regarding QuinStreet's record of prior express invitation or permission to contact Plaintiff's Number, call records reflecting the single call placed on July 6, 2023, a recording of the July 6, 2023 call (demonstrating that Plaintiff spoke with a live agent and that no prerecorded voice was used), as well as records concerning QuinStreet's policies and training for compliance with the Telephone Consumer Protection Act and scripts available to the call center agent that spoke with Plaintiff on July 6, 2023.

7. It is my understanding that, in addition to records concerning calls to Plaintiff's Number, Plaintiff has requested QuinStreet identify and produce all records containing data related to "Calls" to the following putative classes:

a. The Do-Not-Call Class: "[A]ll persons within the United States who had not given express prior written consent, to whom a defendant caused the transmission of at least two Calls, at least one of which was on or after July 16, 2024, and whose number, at the time of the call, had been registered on the National Do-Not-Call Registry for at least 30 days prior to the call."

b. The Pre-recorded Voice Class: "[A]ll persons in the United States to whom a Defendant caused the transmission of at least one Call on or after July 16,

2020 using an artificial or pre-recorded voice, without prior express written consent from the recipient."

c. The Maryland Class: "[A]ll persons in Maryland to whom a Defendant caused the transmission of at least one Call on or after July 16, 2020 using a pre-recorded voice, without prior express written consent from the recipient, or without providing accurate caller ID information including the name of the caller and the originating number of the call."

8. It is my understanding that for purposes of Plaintiff's discovery requests, "Calls" are defined as "any electronic communication sent to a telephone number to qualify potential customers for purchases of insurance products."

9. Plaintiff seeks all records relating to the Calls, the origin of the Calls, use of prerecorded and artificial voice or false caller identification for the Calls, scripts used during the Calls, software and technology used to plan or initiate the Calls, and QuinStreet's policies and procedures for TCPA compliance for the Calls. Plaintiff requests this information and documents from April 24, 2020 to the present. Plaintiff also seeks testimony regarding this information and documents from a corporate designee.

10. The information and documents sought by Plaintiff would require QuinStreet to search for and collect information and documents relating to *millions* of calls over a more than five-year period. QuinStreet then would have to review these millions of records to determine whether the "Calls" fall within the putative class definitions, which is unlikely because as a matter of policy, QuinStreet only places calls regarding insurance products to phone numbers that have provided prior express invitation or permission to be contacted. There is no way for QuinStreet to quickly or easily determine which calls fall within the putative class definitions.

11. While it is impossible to estimate the precise burden associated with this task, the investigation, collection, review, and production of the broad categories of information and documents sought by Plaintiff's discovery requests would take a significant amount of time, divert substantial resources from QuinStreet, and come at significant cost.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 10, 2025 at Portland, Oregon.

DocuSigned by:
Tyler Orrell
857B261C628349D...

Tyler Orrell

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION - GREENBELT

| | |
|---|---|
| Stanley Shapiro, *on behalf of himself and all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>QuinStreet, Inc.,<br><br>Defendant. | Case No. 8:24-cv-01667<br><br>**Assigned to Hon. Lydia Kay Griggsby** |

**DECLARATION OF JAMES B. SAYLOR IN SUPPORT OF DEFENDANT QUINSTREET, INC.'S MOTION FOR PROTECTIVE ORDER**

Pursuant to 28 U.S.C. § 1746, James B. Saylor, declares and states as follows:

1. I am a partner with the law firm Kelley Drye & Warren LLP, counsel for Defendant QuinStreet, Inc. ("QuinStreet") in this action.

2. I submit this Declaration in support of QuinStreet's Motion for a Protective Order.

3. On October 17, 2024, before the service of any discovery requests, QuinStreet produced the following documents to Plaintiff: (1) a record reflecting QuinStreet's prior express invitation or permission to contact Plaintiff's number, arising from a July 6, 2023 online request for information regarding auto insurance on July 6, 2023; (2) a call log, showing that QuinStreet's records reflect that QuinStreet placed a single call to Plaintiff's number, on July 6, 2023; and (3) a call recording of the July 6, 2023 call, showing that Plaintiff spoke with a live agent, not an artificial or prerecorded voice.

4. On November 8, 2024, QuinStreet reiterated to Plaintiff that it searched all of its records and produced everything concerning calls made by, or on behalf of, QuinStreet to Plaintiff's phone number and that the calls alleged in the Second Amended Complaint (other than the July 6, 2023 call) were not attributable to QuinStreet. Attached hereto as **Exhibit B** is a true

and correct copy of an email chain between counsel for QuinStreet and counsel for Plaintiff dated November 8, 2024.

5. Plaintiff served his First Set of Interrogatories and Requests for Production on May 20, 2025, a true and correct copy of which are attached hereto as **Exhibit A**.

6. On June 24, 2025, QuinStreet served its objections and responses to the Interrogatories and Requests for Production. Attached hereto as **Exhibit C** is a true and accurate copy of QuinStreet's Responses and Objections to Plaintiff's First Set of Document Requests. QuinStreet later supplemented its responses to Interrogatories on August 25, 2025. Attached hereto as **Exhibit D** is a true and accurate copy of QuinStreet's Amended Responses and Objections to Plaintiff's First Set of Interrogatories, which includes the original responses and objections served on June 24, 2025.[1]

7. In addition to the record of prior express invitation or permission, call log, and call recording described in Paragraph 3 above, QuinStreet produced all documents and information that could be located after a reasonable search relevant to Plaintiff's individual claim in response to Plaintiff's discovery requests. This includes, but is not limited to: (1) sworn interrogatory responses confirming that QuinStreet placed just a single call to Plaintiff's number, by a live agent; (2) sworn interrogatory responses concerning the contact center and person that spoke with Plaintiff on the July 6, 2023 call; (3) sworn interrogatory responses concerning the software used to place the call to Plaintiff; (4) sworn interrogatory responses concerning the source of QuinStreet's record of prior express invitation or permission to call Plaintiff's number and the number from which Plaintiff was called; (5) documents concerning TCPA compliance policies and

---

[1] Exhibit D contains redactions of confidential information of both Plaintiff and QuinStreet. This confidential information is not germane to the points raised in QuinStreet's Motion for a Protective Order, but should the Court wish to view the unredacted copies, QuinStreet will submit them under seal, pursuant to the Court's authorization to do so.

training materials for the relevant time period and contact center; (6) scripts that were available to the relevant contact center during the relevant time period; and, (7) QuinStreet's contract with the publisher from which it obtained Plaintiff's number.

8. On July 21, 2025, Plaintiff served a Rule 30(b)(6) Deposition Notice on QuinStreet (the "Notice"). Attached hereto as **Exhibit E** is a true and correct copy of the Notice.

9. On August 8, 2025, QuinStreet served objections and responses to the Notice. Attached hereto as **Exhibit F** is a true and correct copy of QuinStreet's objections and responses to the Notice.

10. The parties met and conferred over issues regarding the overbroad scope of Plaintiff's discovery requests, and continued to meet and confer over them following the service of the Notice. Over the course of those meet and confers, QuinStreet requested that Plaintiff's Counsel articulate how discovery into calls made to persons *other than Plaintiff* would change the facts that merited summary judgment on Plaintiff's individual claim. Plaintiff's Counsel could not articulate any way how class discovery would affect his individual claim, yet persisted in demanding class discovery and refused to limit his questions during the offered date for QuinStreet's Rule 30(b)(6) deposition to the facts underlying Plaintiff's individual claims. Attached hereto as **Exhibit G** is an excerpt of the email chain between counsel for QuinStreet and counsel for Plaintiff dated September 4, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 10, 2025 at New York, New York.

James B. Saylor

# EXHIBIT 11

## REDACTED VERSION

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION - GREENBELT

| | |
|---|---|
| Stanley Shapiro, *on behalf of himself and all others similarly situated*,<br>Plaintiff,<br><br>v.<br><br>QuinStreet, Inc., *et al.*,<br><br>Defendants. | Case No. 8:24-cv-01667<br><br>Assigned to Hon. Lydia Kay Griggsby |

**DEFENDANT QUINSTREET, INC.'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland, Defendant QuinStreet, Inc., ("QuinStreet") by and through its undersigned attorneys, hereby provides its responses and objections to the Plaintiff's First Set of Interrogatories to QuinStreet (the "Interrogatories").

**PRELIMINARY STATEMENT AND PRESERVATION OF RIGHTS**

QuinStreet's responses are made without waiver of the following rights, but on the contrary, are intended to reserve and do reserve the following:

1. QuinStreet states that it is responding to the Interrogatories as it interprets and understands them. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from the understanding of QuinStreet, QuinStreet reserves its right to further supplement its objections and/or responses herein.

2. QuinStreet states that it makes these responses solely for the purpose of, and in relation to, this Action (defined below). Each response herein is made subject to all appropriate objections (including, but not limited to, objections concerning authenticity, foundation, competency, relevance, materiality, propriety, privilege, and admissibility) that would require the

exclusion of any information or thing at any subsequent proceeding in, or trial of, this or any other action. QuinStreet reserves the right to object on any ground to the introduction into evidence of any information produced in response to the Interrogatories.

3. If QuinStreet discloses privileged information in response to the Interrogatories, the disclosure is inadvertent and does not constitute a waiver of any applicable privilege.

4. That QuinStreet responded to an Interrogatory is not intended to, nor shall it be construed as an admission by QuinStreet of any fact(s) set forth in or assumed by any Interrogatory.

5. QuinStreet reserves the right to make additional objections or seek protective orders.

6. QuinStreet reserves the right to amend or further supplement these responses in the event that any information is inadvertently omitted or subsequently identified during the course of QuinStreet's ongoing discovery efforts.

**DEFINITIONS**

QuinStreet's responses below are further made subject to the following definitions:

1. "Action" means the lawsuit pending in the United States District Court for the District of Maryland, captioned as *Shapiro v. QuinStreet, Inc.*, No. 8:24-cv-01667.

2. "Second Amended Complaint" means the Second Amended Class Action Complaint filed on October 25, 2024 in the Action.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1**:

Identify each person who provided information used in the preparation of your discovery responses and specify the general category of information provided by each such person.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it calls for any information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity by seeking information regarding communications with counsel.

Subject to and without waiving the foregoing objections, QuinStreet identifies the following person who provided information to assist in the preparation of QuinStreet's responses and objections to the Interrogatories: Tyler Orrell (Vice President, Contact Center Operations, at QuinStreet, Inc.).

**INTERROGATORY NO. 2**:

Identify all persons including individuals and entities who made Calls to Plaintiff during the Relevant Time Period. Include in your answer all "publishers" in the "QS Network" who made Calls. (See: " t) 'QS Network' means collectively websites, call centers and email service providers owned by QS, its corporate affiliates and QS network of third party publishers." ( https://www.quinstreet.com/client-terms; Exhibit A at docket no. 54-1.)

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it is compound and incorrectly assumes that QuinStreet made more than one call to Plaintiff. QuinStreet objects to the extent this Interrogatory seeks information regarding calls allegedly made by QuinStreet to anyone other than Plaintiff during the Relevant Time Period. QuinStreet further objects to this Interrogatory on the basis that its reference to "(See: "t)" and use of the term "publishers"—which is undefined—are incomprehensible, vague, and ambiguous.

Subject to and without waiving the foregoing objections, QuinStreet responds that QuinStreet called Plaintiff one time, on July 6, 2023, as shown in the previously produced call log, produced as QUINSTREET00006. That single call was placed by an individual named [redacted], who works at a call center managed by QuinStreet—[redacted]—which uses QuinStreet's software to place calls. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**<u>8/25/2025 AMENDED RESPONSE</u>**:

QuinStreet objects to this Interrogatory to the extent that it is compound and incorrectly assumes that QuinStreet made more than one call to Plaintiff. QuinStreet objects to the extent this Interrogatory seeks information regarding calls allegedly made by QuinStreet to anyone other than Plaintiff during the Relevant Time Period. QuinStreet further objects to this Interrogatory on the basis that its reference to "(See: "t)" and use of the term "publishers"—which is undefined—are incomprehensible, vague, and ambiguous.

Subject to and without waiving the foregoing objections, QuinStreet responds that QuinStreet called Plaintiff one time, on July 6, 2023, as shown in the previously produced call log, produced as QUINSTREET00006. That single call was placed by an individual named [redacted], who works at a call center managed by QuinStreet—[redacted]—which uses QuinStreet's software to place calls. QuinStreet further responds that its person of contact at Salesgen is [redacted] and his email address is [redacted]. Based on an Internet search, [redacted] has an office located at [redacted]. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**<u>INTERROGATORY NO. 3</u>**:

Identify all persons including "publishers" in the "QS Network" who made Calls to individuals in Maryland during the Relevant Time Period.

**<u>RESPONSE</u>**:

QuinStreet objects to this Interrogatory to the extent that the term "publishers" and "QS Network" are not defined and, thus, vague and ambiguous. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to its response to Interrogatory No. 2. No "publisher" in the "QS Network" placed any calls to Plaintiff on behalf of QuinStreet. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**<u>INTERROGATORY NO. 4</u>**:

Identify all software used to plan, prepare or execute Calls during the Relevant Time Period, including Calls to Plaintiff and Calls to the Putative Class Members, and provide the full name of the software, the version number, manufacturer, serial number, product key, license number, license identification, and any other unique identifiers.

**<u>RESPONSE</u>**:

QuinStreet objects to this Interrogatory on the basis that it is compound. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As

QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because Plaintiff's claims do not concern the software used to place calls by QuinStreet or on QuinStreet's behalf to Plaintiff's phone number. QuinStreet further objects on the basis that this Interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, QuinStreet responds that based on its reasonable investigation to date, the single call to Plaintiff's phone number was placed using [redacted]. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**<u>8/25/2025 AMENDED RESPONSE</u>**:

QuinStreet objects to this Interrogatory on the basis that it is compound. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because Plaintiff's claims do not concern the software used to place calls by QuinStreet or on QuinStreet's behalf to Plaintiff's phone number. QuinStreet further objects on the basis that this Interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case,

because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, QuinStreet responds that based on its reasonable investigation to date, the single call to Plaintiff's phone number was placed using [redacted]. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 5**:

State whether You or your publishers use CallHub or any similar software in campaigns that included Calls to Plaintiff or the Putative Class Members.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, QuinStreet responds that based on its reasonable investigation to date, QuinStreet does not use CallHub. QuinStreet refers Plaintiff to its response to Interrogatory No. 4. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**<u>INTERROGATORY NO. 6</u>**:

Identify all sources of the telephone phone numbers to which the Calls were sent.

**<u>RESPONSE</u>**:

QuinStreet objects to this Interrogatory on the basis that it is incomprehensible. Plaintiff's use of the terms "sources" and "telephone phone numbers" is vague, ambiguous, and confusing. QuinStreet further objects on the basis that it is overbroad and unduly burdensome, because it seeks information regarding Calls not made to Plaintiff during the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet responds that it obtained the lead for Plaintiff's phone number from [redacted]. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**<u>8/25/2025 AMENDED RESPONSE</u>**:

QuinStreet objects to this Interrogatory on the basis that it is incomprehensible. Plaintiff's use of the terms "sources" and "telephone phone numbers" is vague, ambiguous, and confusing. QuinStreet further objects on the basis that it is overbroad and unduly burdensome, because it seeks information regarding Calls not made to Plaintiff during the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet responds that it obtained the lead for Plaintiff's phone number from NewLevelMedia. QuinStreet further responds that its contact at [redacted] is [redacted] and his email address is [redacted], and the address it has for [redacted] is [redacted]. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 7**:

Identify all common carriers, vendors, sub-vendors and third parties whose services were utilized in the sending or initiation of the Calls, and describe those services.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it is compound. QuinStreet further objects on the basis that it is overbroad and unduly burdensome, because it seeks information regarding Calls not made to Plaintiff during the Relevant Time Period. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to its responses to Interrogatory Nos. 2 and 4.

**8/25/2025 AMENDED RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it is compound. QuinStreet further objects on the basis that it is overbroad and unduly burdensome, because it seeks information regarding Calls not made to Plaintiff during the Relevant Time Period. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, QuinStreet responds that its telephone carriers are Lumen, AT&T, and XCast. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 8**:

Identify each of the individuals who spoke with Plaintiff in the Calls.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it assumes QuinStreet made more than one call to Plaintiff. QuinStreet further objects to this Interrogatory on the basis that it seeks information outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to its response to Interrogatory No. 2. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 9**:

If you contend that Plaintiff provided consent to receive Calls, state all facts in support of that contention and give the date and means by which the alleged consent was given.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information outside of the Relevant Time Period and calls not made by or on behalf of QuinStreet. QuinStreet further objects to this Interrogatory to the extent that it assumes QuinStreet made more than one call to Plaintiff.

Subject to and without waiving the foregoing objections, QuinStreet responds that it received prior express invitation or permission to call the number [redacted]1979 on or about July

6, 2023, from what it understood to be the user, owner, subscriber, or other person associated with the number [redacted]1979 from information entered into https://www.dailyinsurancedeals.com. QuinStreet placed the call identified in Interrogatory Nos. 2, 3 and 8, on July 6, 2023. At the time, QuinStreet had no information to suggest that anyone other than the user, owner, subscriber, or other person associated with the number [redacted]1979 provided that prior express invitation or permission to be called. Further, pursuant to Fed. R. Civ. P. 33(d), QuinStreet refers Plaintiff to the document previously produced as QUINSTREET00001–00004. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 10**:

Identify all communications between you and any third party, other than your counsel, regarding this lawsuit.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity by seeking information regarding communications directed by counsel.

Subject to and without waiving the foregoing objections, QuinStreet responds that it does not have any responsive, non-privileged communications to identify at this time. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 11**:

Identify by make, model, structure, and location the system(s), platform(s), and equipment used by you, or any vendor, to contact or communicate with Plaintiff.

**<u>RESPONSE</u>**:

QuinStreet objects to this Interrogatory as duplicative of Interrogatory No. 4. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right. QuinStreet further objects to this Interrogatory to the extent it seeks information outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to its response to Interrogatory No. 4. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**<u>8/25/2025 AMENDED RESPONSE</u>**:

QuinStreet objects to this Interrogatory as duplicative of Interrogatory No. 4. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right. QuinStreet further objects to this Interrogatory to the extent it seeks information outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to its response to Interrogatory No. 4. QuinStreet further responds that it has servers in two data centers in San Francisco and Las Vegas. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 12**:

Identify any person (whether employed by you or not) whom you have disciplined, reprimanded, or taken similar action against for allowing or making allegedly unlawful or unauthorized outbound calls. In your answer, please identify all persons involved in any investigation, describe the reasons for your disciplinary action or reprimand, and describe the action taken against the person.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it is compound. QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding calls not made to Plaintiff, not made during the Relevant Time Period, and not at issue in this Action.

Subject to and without waiving the foregoing objections, QuinStreet responds that it has not disciplined, reprimanded, or taken similar action against any person or entity for the single call previously described in QuinStreet's responses to Interrogatory Nos. 2, 3, and 8, and as previously produced in QUINSTREET00006. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 13**:

Identify all policies, protocols and procedures implemented by you during the Relevant Time Period to encourage, guide or control compliance with the TCPA, its regulations, or similar state statutes.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it calls for any information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity by seeking information regarding communications with counsel, and it seeks information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, pursuant to Federal Rule of Civil Procedure 33(d), QuinStreet will produce relevant, non-privileged documents reflecting policies, protocols, and procedures for TCPA compliance. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 14**:

Identify all documents that comprise or contain scripts or any written material to be read or used by individuals who speak to prospective leads during the Calls.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information outside of the Relevant Time Period and for calls not made to Plaintiff. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, to the extent it seeks discovery on a class-wide basis. As QuinStreet has

previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim.

Subject to and without waiving the foregoing objections, pursuant to Fed. R. of Civ. P. 33(d), Defendants will produce any relevant, non-privileged documents reflecting a "script" for the single call placed to Plaintiff. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 15**:

Identify all records containing data pertaining to the outcome of the Calls, including the date, time and duration of the Call, the originating telephone number, the telephone number to which the Call was placed, the characters in the caller ID displayed to the recipient, the name(s) of the individual caller(s), the identities of the individuals who spoke to the recipient of the Call, and any other call detail information. Include in your answer full identification of the individuals and vendors who have possession or control of the responsive data and information.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is compound. QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it seeks information outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, pursuant to Fed. R. Civ. P. 33(d) and limited only to Plaintiff's individual allegations, QuinStreet refers Plaintiff to QUINSTREET00006 showing that QuinStreet called Plaintiff, once, on July 6, 2023. QuinStreet

further refers Plaintiff to QUINSTREET00005, which is the audio the recording of that single call. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 16**:

Identify all voice files used for any pre-recorded or machine-generated audio content used in the Calls.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it calls for information not proportional to the needs of the Action, as Plaintiff himself concedes in paragraph 23 of the Second Amended Complaint that a human spoke with him on the July 6, 2023 call. QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it seeks information outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, pursuant to Fed. R. Civ. P. 33(d), QuinStreet refers Plaintiff to QUINSTREET00005, which is the call recording of the only call that QuinStreet placed to Plaintiff. As reflected in that call recording, Plaintiff spoke with a live human being. No pre-recorded or machine-generated audio was used during that call. QuinStreet further refers Plaintiff to the paragraph 23 of the Second Amended Complaint. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 17**:

Identify all lawsuits filed in state court during the Relevant Time Period alleging that You have violated the TCPA or state statutes regulating telemarketing, and in your response identify for each case the court, parties, and case number.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it seeks public information that is thus equally available to Plaintiff. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information beyond the scope of this Action.

Subject to and without waiving the foregoing objections, and pursuant to QuinStreet's reasonable investigation, the following lawsuit alleging violation of the TCPA was filed in state court: *Graham v. QuinStreet, LLC,* No. J2-cv-22-003497 in the Justice of the Peace, Pct. 2, Travis County, Texas (filed on July 29, 2022) (Small Claims). Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

Dated: August 25, 2025

**KELLEY DRYE & WARREN LLP**

*/s/ Ira T. Kasdan*
Ira T. Kasdan (Bar # 26942)
**KELLEY DRYE & WARREN LLP**
3050 K Street, NW
Washington, DC 20007
Tel: (202) 342-8864
Fax: (202) 342-8451
Email: ikasdan@kelleydrye.com

James B. Saylor (*pro hac vice*)
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel.: (212) 808-5052
Fax: (212) 808-7897
Email: jsaylor@kelleydrye.com

Whitney A. Smith (*pro hac vice*)
**KELLEY DRYE & WARREN LLP**
One Jefferson Road
Parsippany, NJ 07054
Tel.: (973) 503-5923
Fax: (973) 503-5950
Email: wsmith@kelleydye.com

*Counsel for Defendant, QuinStreet, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2025, a copy of the foregoing was served by electronic mail to Plaintiff's counsel.

*/s/ Ira T. Kasdan*
Ira T. Kasdan

# EXHIBIT 12

# VERIFICATION

I, Tyler Orrell, Vice President, Contact Center Operations, at QuinStreet, Inc. ("QuinStreet"), hereby certify that I am authorized by QuinStreet to verify the foregoing Amended Responses and Objections to Plaintiff's First Set of Interrogatories ("Interrogatories"). I have read the foregoing Amended Responses and Objections that were prepared with the assistance of counsel, and based upon QuinStreet's reasonable investigation to date, upon which I relied, and subject to inadvertent or undiscovered errors, I verify that the information contained in response to the foregoing Interrogatories is true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 25, 2025

DocuSigned by:
Tyler Orrell
857B261C626349D...

Tyler Orrell
On behalf of:
QuinStreet, Inc.

# EXHIBIT 13

## REDACTED VERSION

Planet Depos
We Make It Happen™

CONTAINS CONFIDENTIAL INFORMATION

# Transcript of Tyler Joseph Orrell, as Designated Representative

**Date:** September 25, 2025
**Case:** Shapiro -v- QuinStreet, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT FOR MARYLAND

SOUTHERN DIVISION

- - - - - - - - - - - - - - -x

STANLEY SHAPIRO on behalf :
of himself and other :
similarly situated, : Case No.
Plaintiff, : 8:24-CV-01667 LKG
v. :
QUINSTREET, INC., ET AL., :
Defendants. : FULL VERSION

- - - - - - - - - - - - - - -x

CONTAINS CONFIDENTIAL INFORMATION

Deposition of QUINSTREET, INC.

By and through its Designated Representative

TYLER JOSEPH ORRELL

Conducted Virtually

Thursday, September 25, 2025

12:02 p.m. EST

Job No.: 601939

Pages: 1 - 113

Reported By: Paul P. Smakula

Deposition of TYLER JOSEPH ORRELL, conducted virtually:

Pursuant to notice, before Paul P. Smakula, Notary Public in and for the State of Maryland.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

STEPHEN H. RING, P.C., ESQUIRE
LAW OFFICES OF STEPHEN H. RING, P.C.
401 North Washington Street
Suite 500
Rockville, Maryland 20850
(301) 563-9249

ON BEHALF OF DEFENDANTS:

JAMES SAYLOR, ESQUIRE
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
(212) 808-5052

ALSO PRESENT:

Justin Ramirez-Hale, Remote Technician

C O N T E N T S


| EXAMINATION OF TYLER JOSEPH ORRELL | PAGE |
|---|---|
| By Mr. Ring | 6 |


E X H I B I T S

(Attached to transcript.)


| QUINSTREET DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 1 | Amended Deposition Notice | 9 |
| Exhibit 2 | Objections to Notice | 9 |
| Exhibit 3 | Amended Answers to Interrogatories with Redactions | 11 |
| Exhibit 4 | Answers to Interrogatories Without Redactions | 11 |
| Exhibit 5 | Jornaya Document | 54 |
| Exhibit 6 | Phone Call Record | 66 |
| Exhibit 7 | Do Not Call Policy | 81 |
| Exhibit 8 | Quick Escalation Process | 84 |
| Exhibit 9 | 2021 Do Not Call Telemarketing Log Training Course | 88 |
| Exhibit 10 | Call Center Rep Document | 93 |
| Exhibit 12 | Insurance Guidelines | 97 |

| | | |
|---|---|---|
| Exhibit 13 | QuinStreet Client Terms | 102 |
| Exhibit 14 | Publisher Service Orders | 103 |
| Exhibit 15 | QuinStreet Website | 105 |
| Exhibit 16 | Search Results | 105 |
| Exhibit 17 | 2023 10-K | 107 |
| Exhibit 18 | List of Subsidiaries | 109 |

P R O C E E D I N G S

TYLER JOSEPH ORRELL,

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. RING:

Q Good morning, Mr. Orrell. My name is Stephen Ring. I'm the attorney representing the plaintiff in this case, Stanley Shapiro.

I would ask you first, please state your full name.

A Tyler Joseph Orrell.

Q Where do you work?

A QuinStreet.

Q And when you say QuinStreet, you mean QuinStreet, comma, Inc., an entity?

A Yes, I do.

Q Okay. And what is your position there?

A Vice president of contact center operations.

Q How long have you held that position?

A I've been in the vice president role for about three years.

Q And have you had other roles or positions at QuinStreet?

A Yes. I've been with QuinStreet about 12 years now.

Q And your other positions include what?

A Similar roles, different levels.

Q What is -- what does that mean, contact center operations?

A Contact centers overseeing aspects of the QuinStreet contact centers.

Q And what do you mean by QuinStreet contact centers?

A Contact centers are where calls come in and calls go out to consumers or from consumers handled by agents who transact on those requests by the customer.

Q Is there a difference between consumers and firm consumers? Did I hear --

MR. SAYLOR: Objection; ambiguous.

Q Okay. Did I hear you describe two different kinds of consumers? I thought you said consumers and firm consumers?

Oh, from consumers, is that what you said?
A Yeah. I'm sorry, I wasn't clear, maybe. From consumers.
Q What is meant by the term consumer?
A Consumer, customer, someone interested in products related to what QuinStreet is offering.
Q Okay. What does QuinStreet offer? What types of things?
MR. SAYLOR: Objection; form.
Q Do you understand my question?
A Can you be more specific? What type of products they offer?
Q Yeah. You referred to customers who would be interested in what QuinStreet offers, so I'm asking what you meant by what QuinStreet offers?
A For the contact center specifically, QuinStreet offers products like auto insurance, home insurance, information, and then we provide that information to our clients who are transacting that business for the customer or the consumer.
Q When you say clients, what do you mean by

that?

A Would be companies that QuinStreet works with that the customer -- let's say in this case it's auto insurance, it's providing auto insurance quotes to those customers.

Q I'd like to use our exhibits now. Let's turn to Exhibit 1, that's the amended deposition notice. Our technician is going to help us with that, I think.

Mr. Orrell, on the screen we now have a notice of deposition with my handwritten notations saying amended as to date and location and further marks on it. I just want to ask if you've seen this before?

A I believe I've seen this, yes.

Q And you are hear to testify in response to this notice; correct?

MR. SAYLOR: Objection; form.

Q Can you answer my question, please?

A I believe so, yes.

Q Let's use Exhibit 2. Let's show that on the screen as well.

MR. RING: James, I'm showing oppositions or your objections to the notice.

Q So, this is a 24-page document. We're not going to belabor it. I just want counsel to know, and I'll have the record show now that QuinStreet has objected to the scope of the deposition, I recognize that. And counsel have disagreed on the permissible scope, and we have briefed that and there are motions or a motion pending, at least one. I think another one is served but not filed, that's mine, to compel.

So, we have a disagreement, but I just want to record to show that we recognize there is a disagreement and I intend to go ahead and inquire to the extent possible today. And it would be my hope that we can then resume to complete the deposition without too much turmoil in the future.

So, I ask the witness, have you seen the document now on the screen, Exhibit 2, defendant QuinStreet's responses and objections to my notice of deposition?

A Yes, I believe I have seen that.

Q Okay. Let's go to Exhibit 3, please.

MR. RING: While that's being brought up, James, I intend to use Exhibit 3, as that is going to be QuinStreet's amended answers to interrogatories with redactions.

And then I'll use Exhibit 4 as QuinStreet's amended answers to interrogatories without redactions. I'm giving you a heads-up in case you want to do something to protect the record in terms of confidentiality.

MR. SAYLOR: Thank you, Steve. And I would just note for the record that let's just have a blanket confidentiality protection over the deposition transcript until we've had a chance to review it and de-designate. I think that's the most efficient way to go about -- to go about that. I think there are very -- I think there are very limited --

MR. RING: Agreed.

MR. SAYLOR: -- I think there are very limited subjects here that are confidential, but

we can address that more precisely at a later date rather than during today's deposition.

MR. RING: I agree with that approach. And of course, both sides reserve all rights, I reserve my right to challenge confidentiality if needed.

MR. SAYLOR: Of course.

Q So, looking now at Exhibit 3, Mr. Orrell. This is a set of amended responses and objections to plaintiff's first set of interrogatories. If we can go to the bottom page, the final page.

Mr. Orrell, do you recall signing one version of this amended set of answers to interrogatories?

A Yes, I believe -- yeah, I believe so. I can't say exactly which one, but I do recall this.

Q Okay. Understanding that these get signed sometimes in stages, I believe what we really need to get to is Exhibit 4. So let's jump to Exhibit 4 now.

And if we could look at the signature page for Exhibit 4, which I believe will be the second

to the last page. The verification. So, calling your attention to this verification page.

Is that your signature, Mr. Orrell?

A Yes, it is.

Q Okay. So, if we could now go up to the response to interrogatory two.

Actually, if you could give me the control bar, or the controls, I could scroll. So, I'm scrolling. Bear with me.

In the response to interrogatory two, the amended response, which shows up on page 4 of the exhibit, refer you to the section where I think -- if you can see my cursor, it says, that single call was placed by.

Are you with me, Mr. Orrell?

A Yes.

Q Okay. So, I'm going to refer to the call that's addressed in this paragraph as the July 6th, 2023, call or simply the July 6th call; fair enough?

A Fair.

Q Okay. So, it says that the single call

was placed by an individual named [redacted].
How do you know that fact?
MR. SAYLOR: Objection; form.
Q How does QuinStreet know that the single call was placed by the individual named [redacted]?
MR. SAYLOR: Objection; form. And I'll just object because I'm not sure this is within the scope of the topics that you've noticed.
But Mr. Orrell, you can answer if you know.
A The question is how would QuinStreet know that the call was made by [redacted]; is that right?
Q Yes.
A [redacted]'s call would have been placed because of the reporting transaction for that call in our coms system.
Q Let me understand.
It would have been tracked in your phone system; is that what you're saying?
A That's true, yes.

Q Okay.
A Every call gets logged.
Q Right. And that log, which we're going to mark in a minute, but the log system, describe that for me. How does that work?
A The log system? Can you be more specific about what you're looking -- the log system? I'm not sure -- I need to make sure I understand that to answer that correctly.
Q Well, how do you know that [redacted] made the call?
MR. SAYLOR: Objection; asked and answered. Objection to form.
Q Can you answer?
A The call would have been in our phone system and would have been stored in our data warehouse related to that phone call with all the specific information relative to that phone call, including the agent that was assigned on that phone call.
Q Okay. When you say phone system, what do you mean?

MR. SAYLOR: Objection; form.
Q Can you answer?
A QuinStreet uses a phone system called [redacted].
Q And does that apply to just outbound calls or more than that?
A It's the phone system that QuinStreet uses for outbound calls, like you said, as well as any calls inbound to agents in the contact center.
Q You referred to a data warehouse.
What is that?
A The data warehouse, it's where information is stored that is relative to electronic recording of things like phone calls. I'm not an expert in what data warehouses are or how they operate, but it's a repository of information that is used to store that type of information.
Q And that's -- the data warehouse stores information from the [redacted] phone system; is that correct?
A Yes, that's right.
Q Does it store information other than the

[redacted] data?

MR. SAYLOR: Objection; form.

Q Can you answer?

A To my understanding, yes, it has information relative to [redacted] system. You know, and other types of information that might be related to the customers' information lead, information such as name or email address or phone number, things like that, just storing information.

Q Is the data warehouse a single physical building or set of computer servers or something else?

A You know, from my understanding, it's -- I don't know exactly how -- how large it is or where it is or what it consists of, but it consists likely of servers in a data center that retains information relative to QuinStreet for this case, calls and information related to -- I'm not exactly sure how those work.

Q And based on your knowledge, when you say data center, is that a single location or are

there multiple facilities scattered about the state, the country, or the world to store the data?

MR. SAYLOR: Objection; form.

You can go ahead.

A My understanding, which I don't know exactly how many or where, my understanding there is a single, potentially, but I don't know if there's more than one data center. I just know I've heard that term, and I know where the servers are stored and maintained.

Q Who would have better knowledge of the workings of the data warehouse?

MR. SAYLOR: Objection; form. I'm going to object to the extent this is outside the scope of the noticed topics and QuinStreet's objections thereto.

But you can answer, Tyler.

A [redacted].

Q Did you say owns and manages?

A When I say owns, I mean they're responsible for.

Q Do you know who's in charge of the infrastructure team you just referred to?

MR. SAYLOR: Same objections.

A I don't know specifically who would be in charge of that.

Q Who do you report to at QuinStreet?

A I report to [redacted].

Q You're going to have to spell that, I think, please?

A I don't think I could spell it, to be honest with you.

Q I'm guessing [redacted] might be [redacted], does that sound right?

A That sounds right.

Q And [redacted], [redacted], perhaps -- [redacted]; is that correct, do you think?

A Probably not, but I could say probably get you the name. We could probably get you the correct spelling. He goes by [redacted].

Q What's his position?
A He is [redacted], I believe is his title, [redacted].
Q Does the data warehouse that you referred to early contain data pertaining to calls placed by third-party call centers?
A Third-party call centers, yes, it would be there. But it's related to -- QuinStreet's data center, they are third party call center would be connected to that just because they're making the call connected to the phone system.
Q [redacted], is it a soft G or hard G?
A Steve, I don't know.
Q Okay. Have you ever met [redacted]?
A I have not met [redacted].
Q Have you ever spoken with her?
A I have not spoken with her.
Q And she was obviously working at the call center in 2023.
Do you know if she still works there?
A I don't know if she still works there.
Q And where is that particular call center

that she was working at on July 6th, 2023?

A That call center is in [redacted].

Q Can you spell the name of the city, please?

A Sure. [redacted].

Q And is there a particular name or identification for the call center?

A The call center is [redacted]

Q And is [redacted] -- I do see that, QuinStreet, [redacted]. I'm a little confused.

Does that mean there are three entities that jointly own it or is there a subsidiary relationship? How does that work?

MR. SAYLOR: Objection; form; misstates the content of the interrogatory.

Q Well, we all have it on the screen.

So, Mr. Orrell, please enlighten me.

How does one interpret QuinStreet, [redacted]?

Is that one entity or three?

A [redacted] are the same entity, they're a BPO, which is business process operation, they do contact center. And QuinStreet contracts with them to essentially staff our contact center for phone calls. So, they're a contact center that QuinStreet hires to hire staff to make phone calls or receive phone calls.

Q Did [redacted] receive compensation directly from QuinStreet?

MR. SAYLOR: Objection; form; and it's outside the scope of the deposition notice.

You can answer, Tyler, if you know.

A [redacted]

Q Who pays her?

MR. SAYLOR: Same objection.

Q Who paid her on July 6th, 2023, for her work -- or for her work that was performed on that date?

MR. SAYLOR: Objection; form; and outside of the scope of the deposition notice.

You can answer, Tyler, if you know.

A [redacted]

Q And does QuinStreet own any ownership interest in [redacted]?

A No.

Q So, what is the relationship between QuinStreet and [redacted]? Is it a subcontractor? A vendor? Or what?

MR. SAYLOR: Objection; asked and answered.

Q I don't think we got this detail.

So, if you can answer, Mr. Orrell?

A [redacted] is a BPO that QuinStreet contracts with to rent seats basically for calling for the call center.

Q What do you mean rent seats?

A Rent seats means they offer call center reps, and QuinStreet works directly with [redacted] to pay [redacted] for those individuals' time.

Q Does QuinStreet have any other call centers in [redacted] besides the one you've identified?

A QuinStreet itself, from my understanding, does not have call centers in [redacted] specifically, no.

Q Does QuinStreet contract with call centers other than the [redacted] one you've identified anywhere in the world?

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.

You can answer to the extent you know, Tyler.

A QuinStreet does contract with other contact centers in [redacted] and other business teams, business units not related to insurance. And QuinStreet also -- in [redacted]

Q All right. Does QuinStreet contract with call centers overseas that are not in [redacted]?

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know, Tyler.

A Outside of [redacted], no.

Q Let's go through the answer a little further where it says QuinStreet further responds that its person of contact at [redacted] is [redacted], and then it states his email address.

Have you ever met or spoken with [redacted]?

A Yes, absolutely.

Q And what is his position at [redacted]?

A He is operations leader, I believe, related to [redacted] and our point of contact there.

Q Is he physically in [redacted]? Does he reside in [redacted]?

A No, not to my knowledge.

Q Where does he reside? Not street address, just state, city, if you know?

A I believe he's in -- he's in the U.S. He's in [redacted], I believe, [redacted]. I'm not close enough to know specifics about that.

Q And when you say that you know him or communicate with him, tell me how often you normally speak with him. Weekly? Monthly? Or otherwise?

A I speak with him probably on average monthly.

Q Does he have supervisory control over the operations at the [redacted] call center in [redacted]?

MR. SAYLOR: Objection; form.

A Steve, would you mind clarifying what you mean by that?

Q Yeah. Let me ask broadly.

What is his connection with the sales -- excuse me, the -- yeah, [redacted] call center that you've described in [redacted]?

A He oversees the -- he oversees the operations of that contact center.

Q Does he physically go to [redacted] in pursuit of his duties?

A I believe he does, yes.

Q Has he communicated to you that he has

been there or he's going to go and has been and he has information that confirms that he went to [redacted]?

A Yes. I know for sure that he said that and he's been there.

Q Okay.

A He said that. I don't know physically that he's -- or personally that he's truly there. I know that he's said that to me.

Q Does he have any responsibility for any of QuinStreet's call centers other than the one in [redacted]?

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.

You can answer, Tyler.

A Not to my knowledge, Steve.

Q Going on through the answer, it says: Based on an Internet search, [redacted] has an office located at an address in [redacted].

Now, I think -- I don't know if that was

blacked out in the redacted version, but so be it, we're -- we have an arrangement for discussing things now, I think, for this deposition.

My question to you is: Have you been to the [redacted] office in [redacted]?

A No, I have not.

Q And [redacted], who is based in [redacted], does he physically go to the [redacted] office of [redacted], to your knowledge?

MR. SAYLOR: Objection; form; relevance; outside the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know, Tyler.

A I don't know if he goes there. We never talked about that with him.

Q Do you know operates or who's in charge of that office for [redacted] in [redacted]?

MR. SAYLOR: Same objections.

Q I'm sorry, I couldn't hear.

A I assume it would be him. I don't know.

Q Do you know where [redacted]'s principal office is located?

A The principal office, I would assume, is [redacted] in the [redacted] office. I've not been there. I don't know if it's their principal office or not.

Q Bear with me.

What was the purpose of [redacted]'s call?

MR. SAYLOR: Objection; form.

Q Can you answer?

A I have heard the call in the past, but I want to make sure I 100 percent know the specifics of what you're asking about. But do we have the call or do you want to listen to the call?

Q We're not going to play it right now, but let me ask if you know whether her call was part of a campaign?

MR. SAYLOR: Objection; form.

Just to be clear, I can hear you pausing. Whenever I interpose my objections unless I come out and instruct you not to answer, you can just go ahead and answer as soon as I've lodged my objection.

THE WITNESS: Okay. I wasn't sure.

A [redacted]'s call was part of -- you say campaign. Campaign is a term used in [redacted] as part of their system. [redacted] So, yes, part of a campaign, but that's a vernacular that's specific to [redacted] and how they set up the infrastructure of their system, just for clarity.

Q Was [redacted] reading from or relying on a script for her call on July 6th?

A Yes, she was. All of our reps have a specific script, same script that they use to have discussions with our consumers, potential clients, customers.

Q Are the scripts particularized to a certain set of calls or a certain set of products?

MR. SAYLOR: Objection; form.

A Yeah.

Q You can answer.

A Yes, they are. So, auto would be

different than home, which would be different than life. They have different specific information that we're verifying with the customer.

Q And when [redacted] made this call, understanding that she was associated with the call center in [redacted], was she physically within their facility, to your knowledge?

A Yes, she would be. All of the call center agents are in the same office in [redacted] only.

Q And if she was making a call for a particular set of products, was she the only person in the call center using the same -- that script to promote those products or were others in the same call center doing the same thing?

MR. SAYLOR: Objection; form.

A There would be many other agents talking to many other customers doing the same thing for auto insurance.

Q And would they be using the same script?

MR. SAYLOR: Objection; form.

A Yes, they would be using the same script.

They would be using the same script, to clarify, for auto insurance.

Q How did [redacted] get Mr. Shapiro's telephone number, the one that ends in 1979? The 1-9-7-9?

MR. SAYLOR: Objection to form; misstates the evidence in the record.

THE WITNESS: Can I answer that?

MR. SAYLOR: Yes.

A She wouldn't get the number. She was logged into the phone system, and the phone call was done by the phone system and it would connect [redacted] and your client together, or any other customer together. Agent doesn't, [redacted] included, do anything relative to that phone number or call a phone number.

Q And when you say the term the phone system, are you referring to the something that is physically located in [redacted] or physically located in the United States or located somewhere else?

A Physically located in the United States. That's a phone system I -- that's interchanged

with [redacted] sorry. I can say [redacted] or I can say phone system. They're the same.

Q But the answer is the location would be in the United States; is that correct?

A Yes, that's right. United States.

Q So, there are servers connected to or running the [redacted] phone system and they're located in the United States that generate the call that [redacted] then followed through with; is that correct?

MR. SAYLOR: Objection; form.

A That's true.

Q Okay. Other than [redacted], is there any other record of [redacted]'s call on July 6th?

MR. SAYLOR: Objection; form.

A Meaning -- of the call itself, you mean?

Q Yes.

A No, not to my knowledge at all. No, there shouldn't be.

Q Which telephone -- telecommunication, rather, carrier served that call on July 6th?

A Carrier?

MR. SAYLOR: I'll let you answer in a second, Tyler, but I just want to object. I believe it's outside the scope of the noticed topics or QuinStreet's thereto.

But if you know the answer.

A I'd say I don't know specifically which carrier delivered the call. QuinStreet works with, from my understanding, multiple carriers that deliver phone calls off our network.

Q Bear with me.

I understand from your answers to interrogatories that QuinStreet uses carriers named [redacted].

I'm going to ask, are those the carriers that serve the calls coming out of [redacted] call center?

A Yes. To clarify, they're not serving calls out of [redacted]. They're serving calls out of the [redacted] platform in the U.S., to be clear.

Q How is it possible to determine which of the carriers served a particular call, and

specifically the call of July 6th, 2023?

MR. SAYLOR: Objection; outside the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know.

A Say that question one more.

Q How is it possible to determine which of the carriers -- which carrier, period, which carrier delivered or handled or processed the call from [redacted] on July 6th, 2023?

A I'm sure it's possible and relative to just requesting that, but I don't know specifically how that would happen, how that would work. That would be some department within QuinStreet relative to that manages those pieces.

Q Do you know which department that would be?

A That would likely be the infrastructure team within QuinStreet that oversees the phone platform.

Q Who handles that department?

MR. SAYLOR: Objection; this is all beyond

the noticed topics or QuinStreet's objections thereto.

But, Tyler, you can answer if you know.

A I'm not 100 percent sure. I believe it's potentially a person named [redacted], I believe. I couldn't spell his last name.

MR. RING: And I have a representation that that information will be provided, Counsel?

MR. SAYLOR: That information being?

MR. RING: The head of the infrastructure department that would oversee or have access to the information about which of the carriers handled the call of July 6th, 2023.

MR. SAYLOR: Following the deposition, we can discuss, and I can investigate with our client, whether they're able to identify the specific carrier that served the call dated July 6th, 2023, to plaintiff's number.

MR. RING: Okay. It should be transparent, but I do want to subpoena call records that would be comparable -- that we can compare against the information provided by

QuinStreet. That would be the carrier's records of outbound calls. So, I need to know who to subpoena, and I also need to know who to go to at QuinStreet for more information. That's my position.

MR. SAYLOR: I don't think it's necessary to state positions on the record, but since you have, I will state my position that it is completely irrelevant and duplicative and unnecessary, harassing, burdensome discovery. But we can discuss it after today's deposition.

MR. RING: Thank you.

Q How many calls per day did [redacted] make in her effort to contact prospects for auto insurance in July of 2023?

MR. SAYLOR: Objection; form; beyond the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know, Tyler.

A Yeah, I don't know specifically what that would be -- how many that would be.

Q Who would have better knowledge of that?

MR. SAYLOR: Same objections.

A Who would have better knowledge? The system that we're recording that information in, data warehouse. I just don't know how many calls that she made that day off the top of my head.

MR. RING: James, you can have a standing objection. I know you need to make a record, but I don't want to go too long. So, do what you need to, but I will not raise failure to object specifically to scope issues during this deposition. I will not challenge you. You've reserved your record as far as I'm concerned. I don't know if that helps or not.

MR. SAYLOR: I'll do my best. I just want to make the record clear as between testimony that Mr. Orrell is offering on behalf of the company versus testimony which he may just be offering based on his own personal knowledge. So, thank you, I appreciate that, and I'll keep it in mind, but I can't promise that I won't speak up.

MR. RING: I understand. We're always taught to make a record, so I understand. You

just alerted me, I may be needing to clarify my questions on personal knowledge versus corporate, so let's see how that goes moving forward.

Q Is there a name for the campaign that included the call by [redacted] on July 6th?

MR. SAYLOR: Objection; asked and answered.

Q I don't know if you said you don't know or if there was a name? I'm sorry, can you answer that?

A Yeah. When I was talking about when you asked about what is a campaign, that was related to [redacted]. That's the name of the campaign. And again, it's just a naming convention within the phone system, the [redacted] phone system.

Q So, is [redacted] a single campaign that had a start at a time and an end date or is it something that gets played over and over again?

MR. SAYLOR: Objection; form.

A The campaign is -- can you clarify that, please?

Q So, let's say I want to do a call campaign, it's going to be called Halloween, it will start October 15th, it'll end October 31st, and then it's done. The next time I want to do some calls, we're going to call it Thanksgiving because it's a later time, or do you use Halloween over and over and over again with the same name?

A I understand now.

The [redacted] campaign is a campaign where consumer record leads are submitted into the phone system in realtime and they're called upon when the customer submitted that lead within let's say 30 seconds to 2 minutes they're called then, but they're not reused or anything of that nature.

Q And who would have better knowledge of the mechanics [redacted] or any other campaign promoting insurance at QuinStreet?

MR. SAYLOR: Objection; form; misstates testimony.

A Better knowledge meaning what?

Q More detail about how the campaigns operate?

A I would be very knowledgeable about that.

Q Okay. On July 6th, 2023, did [redacted] make calls under any campaign other than [redacted]?

MR. SAYLOR: Objection to the scope.

I'll keep it short.

MR. RING: You're covered.

MR. SAYLOR: You can answer.

A I don't know specifically. If she was assigned to [redacted], then that's likely the campaign that she would be making calls in, but it is possible that she would be moved to another campaign for calling if there was a need.

Q When you say moved to another campaign, does that mean she physically gets up and moves somewhere or there's just a digital reassignment?

MR. SAYLOR: Objection; scope.

A Digital reassignment, basically, you know, not physical at all.

Q Can [redacted] do her job from home or from some location other than the call center?

A No. QuinStreet doesn't allow the BPO to have staff remote or hybrid or anything. They're

doing calls specifically only from their office location.

Q You may be aware that the caller ID that showed up on Mr. Shapiro's caller ID display on July 6th when [redacted]'s call arrived was other than -- well, was a number that had a 301 area code.

Do you know how that occurs? What generates the caller ID is what I'm asking?

A So, there's two parts answer to that. One is when QuinStreet makes a phone call to a customer, the phone system displays a -- as part of that displays a local number relative to that individual's area code; however, QuinStreet also brands the phone call with our DBA, doing business as name, which would be insure.com, to alert the customer as to who is contacting them.

So, they see on their device based on the carrier, you know, putting -- on their device they see the insure.com brand and the reason for the call, auto insurance, as well as the phone number on the device, as that's required, who's calling them. And that would also reside in their recent

-- on their phone.

Q I'm confused. How does the number 301 -- and I'll read the whole thing, [redacted]-3445 -- how does that get generated as the caller ID for somebody who is calling from [redacted] using servers located in the United States but not in Maryland?

MR. SAYLOR: Objection; form; misstates testimony.

Q Well, educate me. I don't understand how the 301 number gets generated.

A Yeah. So, as part of the [redacted] phone system, when a call is made to a customer in that area code, example 301, the phone system -- regardless of where the person is, in [redacted] or in the U.S. or whatnot, that customer -- that phone number is sent from the phone system [redacted] as the calling number, which is a local number tied to that, similar to what the -- where the customer's local number is. And then at the same time that call is branded -- called branding, showing the name of who's

calling.
Q Got it.
A So, you can make -- QuinStreet is not -- shows DBA insure.com.
Q I understand.
A And so that phone number is on that.
Q Going back to the number itself, the one that ends in 3445, does that phone number -- if we dial it right now, is that going to reach QuinStreet or [redacted] or anybody associated with QuinStreet?
A That number will go back to the call center, which would be [redacted] call center or that we use in [redacted]. The reason why that's the case is in the case that a customer doesn't answer but wants to call back, it goes back to the individual call center into the right campaign and for tracking of that customer inquiry. So, it's designed to have a redial if the customer calls back and goes back -- it won't go back to the same agent, unlikely, but it will go back into the call center to be handled.

Q So, I'm dialling it now. It comes up as Brandywine, Maryland.
Is it, in fact, in Brandywine, Maryland?
MR. SAYLOR: Objection; we can't see what Mr. Ring is doing off the screen or what calls he is making. I would just -- I guess object to form on that basis.
MR. RING: I understand.
Q Well, anybody can do the same exercise. If you dial [redacted]-3445, you're going to -- if it works like my phone, you're going to reach Brandywine, Maryland.
Did the call, in fact, originate from Brandywine, Maryland?
A The call --
MR. SAYLOR: Objection; form; asked and answered.
Q You can answer.
A The call originates from the phone system that's in the U.S. in, I believe, California. And that phone -- that set of phone numbers in 2023 could be different than the phone numbers today

[redacted]

Q Okay. I'm going to scroll down on the screen here to interrogatory six. And the supplemental or amended response second paragraph says subject to -- okay.

Next sentence, QuinStreet responds that it obtained the lead for plaintiff's phone number from [redacted] QuinStreet further responds that its contact at [redacted] is [redacted], giving an email address and a street address in [redacted].

Do you know [redacted]

A I do not know [redacted]

Q Does anybody at QuinStreet know [redacted]

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know, Tyler.

A I don't have knowledge that anybody knows [redacted] personally.

Q Is [redacted], a real person? Is that a real name of a real person?

MR. SAYLOR: Objection; form; assumes facts not in evidence; beyond the scope of the noticed topics or QuinStreet's objections thereto.

Q Your answer?

A I don't know if [redacted] is a real person. I assume so, but I can't honestly say if he's a real person.

Q And as we look at his email address, [redacted], I ask you, do you know the URL -- excuse me, the domain name [redacted]?

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know, Tyler.
A I don't know that answer. I'm not familiar with it. I don't know that domain name.
Q I understand. I need to know if the corporate -- if QuinStreet knows of or has any dealings with [redacted] or anybody at that domain name -- using that domain name?
MR. SAYLOR: Same objections.
Q Same answer, I assume?
A Same answer. I would assume at a company level someone has interactions with that individual if he's the contact for [redacted] publisher, then yes, I would assume someone does.
Q How does QuinStreet know that [redacted] was the source of the lead for plaintiff's phone number?
MR. SAYLOR: Objection; form; misstates evidence in the record.
A Does QuinStreet know -- [redacted] would -- someone has to be the contact at [redacted] [redacted], so that's where I would assume that's where [redacted] would be -- would come into play, whoever he

is, and would be the contact for [redacted] at his email address [redacted]

Q Is [redacted] a list broker?

MR. SAYLOR: Objection; form.

A Define list broker.

Q Someone who sells lists of potential contacts?

MR. SAYLOR: Objection; form.

A I'm not sure. If he's a publisher, then [redacted] would provide customer requests in [redacted] campaign that we described were customers who were submitting requests for auto insurance information --

Q (Inaudible.)

A -- whether --

Q I didn't mean to cut you off. Go ahead.

A Into our [redacted] campaign at that time, not in terms of -- my understanding, would that not be in terms of a list as you're describing it.

Q You used the term publisher.

What do you mean by that?

A Publisher is a term for company like [redacted]

[redacted] who works with QuinStreet that QuinStreet acquires leads from that are interested in their -- in QuinStreet's clients' products like auto insurance.

Q How does [redacted] acquire contacts?

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.

But you can answer if you know, Tyler.

A I don't specifically know how they do that. It's very likely they have a URL that has a page that customers go to to fill out auto insurance request information. And when they submit that record to get information about auto insurance quotes, that's what QuinStreet would contract with with [redacted].

Q Does QuinStreet have a contract with [redacted]?

A I would assume they do knowing that to work with QuinStreet as a publisher, you have to have a publisher contract to do so. I have not physically seen that.

Q Does QuinStreet have a process to vet or check on the reliability of publishers before they sign a contract with them?

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know, Tyler.

A I would assume so, yes. I don't know specifically the actions taken on that. They likely do intake questions, vetting the publisher, things of that nature relative to what their past dealings are. I don't know specifically, no.

Q How can I get a copy of any contract that exists between QuinStreet and [redacted], including any digital contract, but with signing, with signatures applied?

MR. SAYLOR: Objection; this is beyond the scope of the noticed topics or QuinStreet's objections thereto.

And, Mr. Ring, I believe you're trying to mislead the witness. That contract has been produced.

MR. RING: You gave a form contract. I have no contract that's signed by any publisher, to my knowledge. Tell me if I'm wrong.

MR. SAYLOR: You're wrong. It is produced -- and I'll tell you the Bates number right now.

MR. RING: And there's a signature on it?

MR. SAYLOR: Yes, sir. QuinStreet 27.

MR. RING: Bear with me.

Technician, I need to confirm that my screen is private?

PLANET DEPOS TECHNICIAN: Yes, sir.

MR. SAYLOR: We've been going an hour. Would this be a good time for a five-minute break?

MR. RING: Does anyone need a meal break? I'm good with a ten-minute break. What do you guys want to do?

MR. SAYLOR: I don't think we have to have this conversation on the record.

MR. RING: Let's go off the record.

(Off the record from 1:07 p.m. to 1:21 p.m.)

BY MR. RING:

Q Mr. Orrell, during the break I took a look at the document that Mr. Saylor referred me to. It is indeed a contract that looks like it's a contract between QuinStreet and [redacted]. I have it marked, and I'm going to use it in a minute. I'm not going to put it in front of you right now. We'll get to it in just a minute.

I do want to ask, if you know, does QuinStreet know if [redacted] or [redacted] has any connection with myinsuranceleads.com?

MR. SAYLOR: Objection; outside the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know, Tyler.

A I am not sure if QuinStreet knows that.

Q Do you know of the domain name myinsuranceleads.com?

MR. SAYLOR: Same objections.

A I'm not familiar with it.

Q So, you don't know if it's owned or controlled by QuinStreet?

MR. SAYLOR: Same objections.

A I don't know personally if it's owned or controlled by QuinStreet, no.

Q Okay. I'd like to turn to Exhibit 5, please. If we could pull that up.

So, Mr. Orrell, we're looking at Exhibit 5 on the screen. The word that pops in front of us is Jornaya, J-O-R-N-A-Y-A.

From QuinStreet's point of view, what is Jornaya?

A Jornaya is a company that QuinStreet works with. Jornaya provides services that record the websites that a user is on that when -- that's related to a lead or a customer that QuinStreet has -- where a customer submitted a lead to QuinStreet so that in the future you can go back in and you can do a playback on that lead or customer journey on that URL our page.

Q Does QuinStreet have any ownership interest in Jornaya?

A Not to my knowledge.

Q Are any of QuinStreet's officers, directors, or managers involved in the management

of Jornaya?

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know.

A Not to my knowledge.

Q How does Jornaya get access to record the activity on a website?

MR. SAYLOR: Same objections.

A I don't know specifically how they do that.

Q If we scroll down, I'm on the third page, I guess, of the exhibit. Across the top it says universal lead with an identifying number all the way across.

Do you know what that means?

A Yeah. My assumption on that would be that is the unique identifier of that specific Jornaya lead for certain query purposes.

Q So, the Jornaya lead, is that something different than QuinStreet's lead?

MR. SAYLOR: Objection; form.

A Likely, yes. That's more related to if you wanted to look this specific recording up, you would put in that lead ID and that would come up.

Q So, that appears to be an internal Jornaya generated identifier, not something that pertains to your or QuinStreet's databases or some other file; am I correct?

MR. SAYLOR: Objection; form.

A That's my understanding.

Q I see the event date is 7/06/2023, and the event time as 1:10 a.m. Eastern Daylight Time, and then it shows an IP address, 173.79.79207, if I'm reading those tiny figures correctly?

MR. SAYLOR: I want to object to the extent I believe you misread the event time.

MR. RING: 09:01:10 a.m. EDT; correct?

MR. SAYLOR: Correct. I thought you said 1:10 a.m.

MR. RING: And I might have. I'll go to the eye doctor soon, but I think I got it now.

Q I'm going to represent that the IP address shown is not my client's IP address on his

devices.

So, Mr. Orrell, do you know where that IP address comes from?

MR. SAYLOR: Objection; stating facts not in evidence. Objection; beyond the scope of the noticed topics.

To the extent you know, Tyler.

A I don't know that.

Q Does QuinStreet rely upon Jornaya in this case in determining whether there was prior consent to any calls?

MR. SAYLOR: Objection; form.

A QuinStreet wouldn't rely upon the Jornaya report to determine if there was any calls on this, if that's what you asked.

Q My question is whether this is supposed to show prior consent from my client to the call of July 6th, 2023.

Can you answer that?

A It does show that.

Q How do you know?

A It shows that that's the labeled

disclosure statement that was there, but QuinStreet does not rely upon that for -- to my understanding of the consent.

Q QuinStreet does or does not rely upon this document for showing of consent? I'm confused.

A It shows the consent that was submitted, but it's not relying upon that for consent purposes.

Q Do we know or does QuinStreet know who the individual is that was clicking through and being recorded by Jornaya according to this record?

MR. SAYLOR: Objection; form; beyond the scope of the noticed topics.

You can answer if you know.

A I don't know how -- you said QuinStreet would know? How QuinStreet would know on that form?

Q I'm asking that question, yes.

A No, I wouldn't. Off that detail right there on that screen, I don't know.

Q Okay. Do you know where Jornaya got the IP address that starts with the 173.79 as shown in

this record in this exhibit?

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.

You can answer if you know.

A I don't know where they would have gotten that.

Q Scrolling down further, we have three columns. Contributed data is one column. The second column says data provided by the Jornaya client.

Let me ask you if you know, if QuinStreet knows what is the data provided by the Jornaya client in this record?

A Data provided by the Jornaya client appears to be the name of Stanley Shapiro, phone number, email address, state, and ZIP Code.

Q All right. And was that data provided by QuinStreet to Jornaya?

MR. SAYLOR: Objection; form.

A That wouldn't be my understanding. My understanding of that would be the record from the

URL that was being recorded -- that Jornaya is recording and then provided on this report. That would be my understanding of what that is.

Q So, again, at the top of that second column where it says data provided by the Jornaya client, what is your understanding as to who the Jornaya client was in this case?

MR. SAYLOR: Objection; form.

A My assumption would be the Jornaya client is something related to Jornaya system or that was on the URL that recorded. I don't know specifically what the Jornaya client means specifically, that term.

Q Okay. So when we go down further for the playback link, which I'm not going to play it right this minute, but have you viewed it, the playback?

A Yes. I believe I have, yes.

Q And would you -- I don't know if we do live action in a video -- or, excuse me, in a deposition.

Do you recall that it shows that the

playback is for a click through process at myinsuranceleads.com?

A What do you mean by -- can you clarify what you mean by click through process? I'm not sure.

Q I'm stumbling because I don't know the technical terms for it, but let me just see if this will let us do a live demo.

I just want to say, the term myinsuranceleads.com appears to be part of the record, and the Jornaya report has this link that takes one to a slow but moving -- it's not emotionally moving, but there's an in action video that shows somebody clicking on some fields and inserting some data, and it purports to be a recording at a website called or tied to myinsuranceleads.com?

MR. SAYLOR: Objection; misstates the evidence.

Q All right. Dailyinsurancedeals.com. I'm reading the wrong note that I wrote to myself, excuse me.

So, my question now is: Do you know who owns dailyinsurancedeals.com?
A I don't know who owns dailyinsurancedeals.com. I can't see the URL that's associated to this record. It's not tied to or part of the Jornaya playback.
Q I'm sorry, on the screen, can you see what I see, your vehicle year and dailyinsurancedeals.com at the top?
A I can see that. I just can't see the actual domain address associated to this page in front of me. It's not on there.
Q Does QuinStreet own the URL dailyinsurancedeals.com?
MR. SAYLOR: Objection; form; misstates evidence in the record.
A Not to my knowledge.
Q Does QuinStreet own hundreds of URLs?
MR. SAYLOR: Objection; form; ambiguous; outside the scope of the notice and QuinStreet's objections thereto.
You can answer if you know, Tyler.

A I don't know how many URLs that QuinStreet owns.

Q Does QuinStreet own dozens of insurance related URLs?

MR. SAYLOR: Same objections.

A I'm not exactly sure how many, but likely.

Q Does QuinStreet maintain dozens of websites that promote insurance sales?

MR. SAYLOR: Same objections.

A I'm not 100 percent sure on that.

Q Who would have better knowledge of that?

MR. SAYLOR: Same objections.

A Honestly, I don't know who manages that.

Q And when QuinStreet contends that Mr. Shapiro or any other customer gave prior consent, are they relying on the entry of some data on one of their websites as evidence of that consent?

MR. SAYLOR: Same objections.

A I don't know what they're relying on specifically.

Q Has [redacted] falsely entered data on a

website to create the impression of consent to a customer or prospect receiving calls from QuinStreet?

MR. SAYLOR: Objection; form; outside the scope misstates testimony; and calls for speculation.

A I don't know. I wouldn't know that.

Q We can leave this exhibit. I'd like to go to exhibit -- let's stay on the same exhibit, I'm sorry.

Does QuinStreet have a record on Stanley Shapiro showing his correct street address?

MR. SAYLOR: Objection; form; misstates testimony.

Q You can answer.

A Do they have his correct street address? I don't know if they would or not. They would have the address that was entered into this record.

Q I'd like to be able to scroll. Let's go to Exhibit 5A, please.

Mr. Orrell, are you familiar with the

Icann lookup tool? Spelled I-C-A-N-N.
MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto.
Q You can answer.
A I'm not familiar with it.
Q I'll represent that I used this to look up the URL shown there and that it comes up with an address, physical location in Virginia?
MR. SAYLOR: I just want to clarify for the record that the IP address appears to be related to Verizon. It could be a mobile address. And QuinStreet objects to the authenticity of this record or any questions regarding -- or conclusions regarding supposed facts contained in this exhibit.
MR. RING: Understood.
Q I'll move to the next exhibit. And now I have the -- I think it's 5B that I added.
MR. SAYLOR: I'll note for the record that Verizon, their business address for the mobile carrier is in Ashburn, Virginia.

MR. RING: Understood.

This is simply my acknowledging what Mr. Saylor said earlier, that there was a contract between QuinStreet and a QuinStreet publisher called [redacted]. And it is signed by [redacted], campaign manager, and by [redacted] of QuinStreet, and dated January 13th of 2022.

So, that was in response to my line of questions where I didn't think I had it, and it is here indeed. Thank you. That's all I have on that exhibit.

Exhibit 6, please.

Q Mr. Orrell, I'm going to zoom in a little bit on this exhibit.

First of all, do you recognize it?

A I do.

Q What do you understand it to be?

A This is a record of phone calls related to this with information specific to each of those calls.

Q Does this pertain to the phone call of July 6th, 2023, by [redacted] that we've been talking

about?
A Yeah, it appears to be.
Q By what mechanism is this record generated? By [redacted] or something else?
A Yeah. This is the data contained inside [redacted], and then it looks like it's exported to Excel for viewing.
Q If we look at the upper left where it says call ID, what does that signify?
A The call ID is specific to that particular call so that you can -- so that call can be pulled and reviewed or data tracked on that specific call only.
Q Okay. And as we look down the page, there is a call ID ending in 0706, and again, in the second row and again in the third row.
Is this the same call ID three times?
A No, that appears to be three call IDs.
Q They're separate in the middle? I didn't go all the way through.
The digits are the same. 2007 is the same, after that you get an eight, and I guess

it's the fifth digit it starts to vary; am I right?

A It appears so.

Q Okay. So, they are indeed unique identifiers.

All right. So, if we look at the next column, EXT system identifier, what's that mean?

A [redacted]. So, different than a call, but that just contains information that you're looking at to the right there.

Q Okay.

A So it's unique.

Q And if we look at the initiated date, it gives the date and the time reference; is that correct?

A It does.

Q It shows 6:12:20 a.m. as the initiated time; right?

A Yes.

Q Okay. Call direction, it's either inbound or outbound, I assume; is that correct?
A That's correct.
Q Here it's outbound.
Call duration, is that in seconds?
A That is in seconds.
Q And the remote number, that would be the destination, the number called; is that correct?
A That's right.
Q I'm using different terms. You tell me if they're not clear. I call it destination or intended destination or target --
A Customer number.
Q Okay. Local number, that's blank.
Why is that blank?
A I don't know specifically why that would be blank on that record.
Q If we go to the second row, the number -- the local number is not blank.
Do you know whose number that is, the 855 number?
A Those are inbound calls. So, that 855

number is a redial number to the call center, 7755. And then the second one is another redial number from the customer to the call center, 3445.

Q Is the 855 number -- what department or division of QuinStreet does that go to, if any?

A That goes to the call center. It's a redial number that our reps give to our customers.

Q Okay. Next column is called H, it says reason, and it says success.

What are the options to fill in that column?

A There's success, reason is high level what happened with that call. So, success means it was successful. There can be a failure, so it wasn't successful. Those two reasons.

Q Success is not a matter of whether a sale was made, it's a matter of whether the call was connected; is that correct?

A No.

MR. SAYLOR: Objection; form.

A Not related to the connection of the call, but related to how we defined what happened with

the call with the customer at the end of the call. Like, that was successful versus that was not -- that was good; that was not good.

Q What makes it good?

A Column I is what makes it good. They were transferred to a client.

Q What client?

A The client is the transferred party, which would -- I'm trying to remember off the top of my head who it was, maybe [redacted], it's a client. That's what it means. So customer said, yes, I want to be transferred there.

Q So, the customer is Mr. Shapiro at the other end of the telephone, and the client is, what, an insurance agent or broker or what?

A It could be both. It could it be agent, broker, carrier.

Q Could it be another intermediary of some sort?

MR. SAYLOR: Objection; form.

A Intermediary is? Help me with that.

Q Okay. I'm struggling to know.

Is it necessarily the case that [redacted] or her twin, coworker, whatever, to have success, she would have to pass off the call to someone who is ready, able, and willing to sell an insurance policy or just somebody who's building a list?

MR. SAYLOR: Objection; form.

Q What defines success?

MR. SAYLOR: Objection; form.

A Success for the call center and how we define it in finished code is the customer -- the agents say, I have this client, let's call it [redacted], and the customer says, yes, I'd like to talk to them. They connect the two parties together, and that call was transferred. And then that's what we call a transfer success, which is a finished code.

Q Finished code, C-O-D-E, that's what you're saying?

A C-O-D-E.

Q What is [redacted]?

MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections

thereto.

You can answer if you know.

A I don't know specifically what [redacted] is.

Q So, regarding this specific call on July 6th, 2023, how is it possible to determine where [redacted] was trying to forward the call? [redacted] or somebody else? How do you know?

A I would know that from the record that shows who the transferred party was, and that's [redacted], relative to this -- to the call itself.

Q Is that going to show up in this record or some other record? Any record at all?

MR. SAYLOR: Objection; form.

A Yes. That would show up in data warehouse relative to this specific call ID. More listening to the call or watching the call, which I saw. You can see it was transferred to that company.

Q Okay. Let's go down, the column I. That's the finished code column that you've referred to. It says transfer success, dash,

second attempt.

Where's the first attempt shown?

MR. SAYLOR: Objection; form.

A The first attempt when you listen to the phone call, you can hear that the first transferred client -- transferring client wasn't available, and so the agent said that, told the client -- told the customer that wasn't available. So, that's just a way that the call center tracks what the agent did with the customer.

So, the process is to try the first attempt it. If they don't work, they're not available, it rings or busy signal, offer the second option, and then we track it as a second attempt. So, it's really just the representative doing their correct process. And then we track it that way to make sure it was done correctly.

Q I'm looking now at column J. It says call event log.

Can you describe what's contained in that column?

A Yeah. So, do you want to go through each

line?

Q Let's start. We won't do them all. Get us warmed up here.

A Okay. So, at 6:12:20, that call initiated. So, it's initializing, that's the system doing the work, 6:12, 6:12, there's three rows there. It's dialling that customer number out of the [redacted] campaign, which is -- we just got the record. And then it's proceeding to move through its process. And then it is attaching that, it's ringing, it looks like it's ringing between 6:12:22 to 29. At 29 it's connecting the call to [redacted]. And then --

Q Let me understand.

[redacted]

A [redacted] So, it's just an industry term for this phone system. It's really just a phone term that is in [redacted].

Q So, let me understand.

So, far this is -- this activity or these steps, these are automated; am I correct?

MR. SAYLOR: Objection; form.
Q You can answer.
A The system's processing the call, yeah. No one's doing -- you're not picking up a handset and dialling it. The system's processing it.
Q All right. So, it says initializing, in the first line.
It's initializing a call by somehow electronically entering a phone number; am I correct?
MR. SAYLOR: Objection; form; beyond the scope of the noticed topics and objections thereto.
A Specifically initializing what [redacted] is doing on that -- I'm not 100 percent sure. I'm not sure what it's actually doing. I know it's starting the process of calling the customer.
Q How does the system decide which phone number to dial at any particular time?
A The system is receiving the customer inquiry in realtime in that moment, and then that call is being placed to that customer based on

that request.
Q Is there a queue of numbers that are waiting to be called somewhere?
MR. SAYLOR: Objection; form; outside the scope of the noticed topics and QuinStreet's objections thereto.
You can answer if you know.
A Not a queue, just in order of when they were received.
Q So, we got down to 6:12:29 ACD interaction assigned to [redacted].
That's [redacted]; correct?
A That's right.
Q And then it says -- go ahead and explain the next couple lines, if you would?
A Yeah. So, then it's basically connecting the call, so the call has been connected, and it's alerting, meaning it's -- it knows [redacted] is available and it knows that the customer is connected, so now it's offering and sending and connecting the call between 6:12:29 and 6:12:30. So, 6:12:30 the call was connected to the

customer.
Q And when did she start talking?
A It should be right then. As soon as the call is connected to the customer, the introduction is made from the phone from the script.
Q So, there was, is it 10 seconds from the time you're initializing to the time she's actually on the call; am I right?
MR. SAYLOR: Objection; form; misstates the testimony.
Q Correct me if I'm wrong.
A From initializing, but not from when the customer was connected.
Q Okay. So, when is the customer connected?
MR. SAYLOR: Objection; form; beyond the scope of the noticed topics.
You can answer if you know.
MR. RING: You can have a standing objection.
A It's hard to say on this exactly when they were connected. I can't tell you specifically

when it was connected. 6:12:29 appears to be the connect time.

Q Okay. I do see one entry at 6:31:24, call answered.

Does that indicate that's when Mr. Shapiro or somebody at the other end spoke or picked up?

MR. SAYLOR: Objection; form.

A That's a different call. That's the inbound call that Mr. Shapiro made back to the call center on the 855 number.

Q I see. Okay. So, then we go down to the third row.

And how was that initiated? Was that automated? Was that [redacted] doing something or what?

MR. SAYLOR: Objection; misstates the record.

A That is an inbound call by Mr. Shapiro or the calling party to the call center on the 301 number.

Q I see. So, if we go back to the first call, what was the total duration of that first

call?

A Total duration of the first call from which point?

Q Call duration is shown at 653 seconds; right? And when does that start and end? What marks the beginning of it?

A That's specific to when the call was connected, I believe, but I can't say 100 percent on this report what it is. So, it could be 6:12:29, and it could be 6:12:20.

Q We can do the math over here, count the seconds and compare it to 653. All right. Let me look at this carefully.

Column B, extension identifier is null for rows two and three because they're inbound; is that right?

A Yeah, that's right. It's not a unique record, it's tied to the original record.

Q All right. We're done with this exhibit.

That's number six. Let's go to seven.

I simply want to have this identified.

Mr. Orrell, is this an accurate copy of

the do not call policy of QuinStreet?
A This is an accurate copy of the do not call policy -- yeah. July of '23, yes. That's right.
Q This is the policy that was in effect as of July 6th, 2023; is that correct?
A That's right.
Q Is it still correct today, the same document?
A I believe it is the same. I'm not 100 percent sure if we've made any small changes or not.
Q Let me refer you to the paragraph where my cursor is located where it says telephone calls to consumers who have provided QuinStreet with prior express written consent are permitted unless they have asked to be included on the internal do not call list.
Has Mr. Shapiro asked to be included on QuinStreet's internal do not call list?
A Based on the calls that I've heard, I did not hear that he was asking to be placed on the

internal do not call list.

Q Does [redacted] have a means by which it can check against QuinStreet's internal do not call list before starting a call?

MR. SAYLOR: Objection; form.

A There's a process to check if that call has been placed on an internal do not call list before calling.

Q There is a process to do so?

A Yes.

Q What is the process?

A As a part of a new lead with consent, the customer's calling in with consent if that lead is not -- if that record is newer than the prior internal do not call list that is still checked. But if the customer requests to be placed on the do not call list, no subsequent calls will be made to that customer at that time.

Q Is the process of checking against the internal do not call list initiated by a human or by a machine?

MR. SAYLOR: Objection; form.

A Definitely in the system to be checked.

Q So, the initiation of the process is done by the system itself; is that right?

MR. SAYLOR: Objection; form.

A That's right.

Q Would it be the case then that all outbound calls from the calling center where [redacted] was working would be checked against QuinStreet's internal do not call list before they are sent out?

MR. SAYLOR: Objection; form.

A That would be the case.

Q What records confirm whether a particular number is vetted, checked against the internal do not call list?

MR. SAYLOR: Objection; form and relevance.

Is there any allegations in this case regarding internal do not call lists?

MR. RING: I'm not being deposed.

MR. SAYLOR: You can answer, Tyler.

A Can you restate it for me, please?

Q Yeah.
What record exists of the process of checking a particular number against the internal do not call list before the outbound call is initiated?
MR. SAYLOR: Objection; beyond the scope of the noticed topics or QuinStreet's objections thereto; object to relevance; object to form.
You can answer, Tyler, if you know.
A I don't know the specific process or the record of that.
Q Who would know?
A That would be --
MR. SAYLOR: Same objections.
A I don't know who that would be specifically. We would pull that exact information.
Q All right. Let's go to the next exhibit. Let me refer you to Exhibit 8, Mr. Orrell.
Are you familiar with this document?
A Yes, I am.
Q What is the purpose of this document?

A This is a quick escalation process if a -- for the reps on the phones for specific things relative to their day-to-day jobs, whether they -- you know, let's say a general threat, like it says, or a supervisor request or a DNC process that's -- it's a quick sheet for them to review if needed.

Q So, what does this mean, general legal threat or irate customer? When does that arise?

MR. SAYLOR: Objection; form; vague.

A When does it arise for the representative?

Q Yes.

A I mean, it can -- not all customers are happy people, and they sometimes get upset, you know, for whatever reasons. They're not nice or polite to our agents.

Q These are customers who asked for the call and consented to the call; am I right?

MR. SAYLOR: Objection; form.

A Yes, typically.

Q And yet they're irate sometimes when the call comes; is that right?

MR. SAYLOR: Objection; form.

A I couldn't speculate on why they would be not a happy person or irate looking for auto insurance, but it happens.

Q Does QuinStreet ever question the authenticity of the consent record that they receive before calling a particular phone number that supposedly belongs to a willing or interested customer?

MR. SAYLOR: Objection; form; beyond the scope of the noticed topics or QuinStreet's objections thereto. Objection; calls for speculation.

You can answer if you know, Tyler.

A Not that I'm aware. I don't know.

Q Are you aware of any application, app, or script that automates the process of filling interested consumer information in an insurance advertising website resulting in a list of supposed consenting consumers who are not, in fact, consenting?

MR. SAYLOR: Objection; beyond the scope

of the noticed topics; compound; form; calls for speculation.
Q Can you answer?
A I don't know of those systems, perhaps, to answer that.
Q Is this Exhibit 8 is a current statement of the escalations quick sheet?
A I don't know 100 percent if it is, if anything's been changed on it since this was pulled the time of 2023 or now. It's likely very, very similar.
Q So, QuinStreet has something called an escalation submission page referred to in Item 1 where I'm hovering; correct?
A Yeah.
Q Item 4 on the right side says, take a screenshot and post it in your tech issues and resolution page on workplace.
What is the tech issues and resolution page?
MR. SAYLOR: Objection; beyond the scope of the noticed topics.

A I'm not 100 percent sure what that tech issues and resolution or what that's referring to. This is a cheat sheet or a quick sheet for reps to make sure if they have issues or technical issues that they can get them resolved with their -- our technical team or whatnot. Let's say they get a blue screen or they get an issue on their system.

Q Where are the records of escalations stored?

MR. SAYLOR: Objection; beyond the scope of the noticed topics.

A I'm not sure where those are stored, actually.

Q I mean by escalations, anything that would be covered by this escalation quick sheet?

MR. SAYLOR: Objection; form; beyond the scope.

A There's -- again, I'm not sure. There's multiple things on this sheet that are stored.

Q Okay. Let's go to the next exhibit.

Can you identify Exhibit 9?

A This is do not call telemarketing log

training course from 2021.

Q Is this a summary of the course? The whole course? Or what?

A I believe this is the whole course document.

Q If you scroll to the bottom. I'm going to quickly zoom down here.

A That would be right.

Q Seventeen pages worth. And then the employee at the end.

Who signs this? Employee certification, they certify that they took the course; is that right?

A That's correct.

Q And is this required of all agents who call for QuinStreet?

A Yes. It's required for all agents that are employed for QuinStreet.

Q How about third-party call centers, do they have to take this course too?

A Primarily for the agents making phone calls, whether in third party or not. So, anyone

making phone calls for QuinStreet takes this course. We take it annually, and they take it when they're newly hired.

Q And that applies to all agents making calls for QuinStreet whether they're third party or your own QuinStreet call centers; am I right?

A That would be the case, yes.

Q So, there must be hundreds or even thousands of these agents and their signed acknowledgments for those courses; am I right?

MR. SAYLOR: Objection; form.

A I can't speak to the number of those, but yeah, there would be -- over the time, there would be many of these started.

Q So, in 2025, how many calling agents are there who act for QuinStreet, both in QuinStreet's call centers and third-party call centers?

MR. SAYLOR: Objection; form; compound; beyond the scope of the noticed topics.

You can answer if you know, Tyler.

A Yeah. I don't know the specific number.

Q How about a ballpark number? Is it over

3,000?

MR. SAYLOR: Same objections.

A Not over 3,000, no.

Q Is it over 2,000?

MR. SAYLOR: Same objections.

A No, not over 2,000.

Q Is it over 1,000?

MR. SAYLOR: Same objections.

A Much less than that, I would assume.

Q Is it over 500?

MR. SAYLOR: Same objections.

A Very likely in those ranges, yes.

Q 500 individuals who would be making the calls, is that what you're talking about?

MR. SAYLOR: Objection; form; outside the scope.

A No. I can't say exactly how many are making the calls like that. But no, it's not 500 making the calls. Your question was related to QuinStreet generally making calls.

Is it specific to auto insurance?

Q Not limited to auto insurance.

MR. SAYLOR: Objection; beyond the scope.
A I don't know.
Q Okay. Who would have better knowledge of that?
MR. SAYLOR: Same objection.
A I don't know specifically who would have better knowledge of that, of the total number across all of QuinStreet.
Q Let's go to the next exhibit, please.
MR. SAYLOR: Tyler, are you doing okay? Do you need a break? It's been about an hour.
THE WITNESS: Yeah. We can do five. Sure.
MR. SAYLOR: If that's okay with you.
MR. RING: That's fine.
MR. SAYLOR: Take five.
MR. RING: Take five.
(Off the record from 2:21 p.m. to 2:28 p.m.)
BY MR. RING:
Q Mr. Orrell, we're back from a short break. I want to turn now to the next exhibit. I think

it was we were just pulling up number 10; is that right?

MR. SAYLOR: Is that a question for the witness?

MR. RING: I want the technician to pull up number 10.

Q Mr. Orrell, do you recognize this document?

A Yeah, I do.

Q All right. Is this something that your -- that QuinStreet's -- let me get a term right.

[redacted]'s name -- the title of her position was what?

A She would be a call center representative.

Q Call center rep?

A Yes.

Q CCR?

A Yeah.

Q A short name? You go around calling people call center reps all day long, you must have a short name for it?

A Reps, agents, interchangeable.

Q If we understand when I say agent, I mean in [redacted]'s capacity as a calling agent, okay?

A Okay.

Q What, if any, connection does a calling agent have with this document, this legal FAQs quick sheet?

MR. SAYLOR: Objection to form.

Q Is a reference kept handy for them? Something they're required to study? Is it part of a course? How does it fit in?

A Quick sheet is a summary of information that would have been contained on that 17-page document that went through. They could access that if they need to be refreshed on the most important things for them working with a customer.

Q Okay. And if we refer to the middle of this where we have the red highlight and then blue highlight columns and six or eight lines below each one, stop calling me, I'm sick of receiving these calls, etcetera. I want to ask you this question.

What records would show the instances --

excuse me -- the instances where a person called by an agent expresses that they don't want to be called as typified here in these two columns?

MR. SAYLOR: Objection.

Q Where are the records for that?

MR. SAYLOR: Objection; beyond the scope of the noticed topics.

You can answer if you know, Tyler.

A I don't know but the records would mean specifically. I don't know what you mean.

Q You don't know what I mean?

A I don't know what you're referring to.

Q Okay. Here are examples of do not call requests. It says, stop calling me. I'm sick of receiving these calls. Do not contact me. I don't consent for you to contact me.

My question to you is: Are agents required to keep records of such requests from called consumers?

MR. SAYLOR: Objection; form.

Q It's a yes or no.

A Yes. The agents are not required to keep

records of those. The system keeps a record of those for us.

Q How does the system keep those records?

A That's based on the agent. If the customers -- example, stop calling me, they would put a -- they would disposition that as do not call. And then that's what the agent would do. Similar to the transfer success second attempt.

Q I'm sorry, where is the second attempt referred to?

A You were looking at it in the [redacted].

Q So, when you say the agent would disposition the call, what does that mean, to disposition?

A At the end of the phone call with the connected customer, the agent marks the call -- the outcome of the call, essentially. It's defining what happened in the call. So, it could be do not call, it could be success, it could be not interested. And that's a reporting -- it's a way for the call center to report on what happened with each of the calls.

Q And is the term disposition a term of art
that you use in the business or is that just you
characterizing it informally?
A I assume it would be just an industry wide
standard of tracking the phone call, what happened
to it, my guess.
Q All right. We can move to the next
exhibit, please. I see this as a duplicate. I
think it is.
Let's be sure. Bear with me. I'm going
to scroll through and see if it's the same one we
marked as 5B. It appears to be, so we don't need
to use this. 11 is a dupe of 5B.
Number 12, please.
Mr. Orrell, are you familiar with
Exhibit 12?
A I am.
Q I'd call your attention to the second page
where it says, campaign overview, [redacted].
What was that campaign or what is it?
A That's the campaign that is calls made

regarding auto insurance and home insurance requests.

Q [redacted]

A [redacted]

Q [redacted]

MR. SAYLOR: [redacted]

A [redacted]

Q Let's talk about 2023.

July of '23, was the [redacted] in existence at that time?

A It appears it was.

Q Was [redacted]'s call on July 6th of '23 part of a blended campaign?

MR. SAYLOR: Objection; form.

A Her -- not sure what campaign she was in.

[redacted]

Q [redacted]

MR. SAYLOR: Objection; misstates the testimony.

A I'm not sure exactly at that time, to be honest.

Q Okay. What records would tell us that?

A I'm not 100 percent sure where. This is a setup issue that is tracked or maybe not tracked. It's really an efficiency related situation, not anything to do with the system itself. It's in [redacted] or was in [redacted], but I don't know the tracking of it.

Q Now, QuinStreet uses the term third-party

call center.
What is meant by that?
MR. SAYLOR: Objection; form.
A Third-party call center is like [redacted], which is a BPO that QuinStreet contracts with as a vendor to provide call center services, like I described with [redacted] previously.
Q And how many third-party call centers like [redacted] as BPOs has QuinStreet contracted with since July 6th of 2023?
MR. SAYLOR: Objection; beyond the scope of the noticed topics; asked and answered.
You can answer if you know.
A [redacted] is the -- in 2023?
Q Since from July 6th, 2023, to the present?
MR. SAYLOR: Same objections.
A [redacted]
Q I'm sorry, did you finish your answer?
A I did.
Q [redacted]
MR. SAYLOR: Objection; form.

A In comparison to today, yes.

Q I am not sure I got a clear answer.

[redacted]

MR. SAYLOR: Objection; form; outside scope.

A I don't know specifically the total amount that they've -- QuinStreet has contacted. I only know about insurance.

Q So, your answer would be [redacted] if we confine the question to call centers making calls for promotion of insurance related products; is that true?

MR. SAYLOR: Objection; form; outside scope.

You can answer if you know.

A [redacted]

Q [redacted]

but that would be if we expanded it outside of insurance; is that true?

A [redacted]

Q I can go to the next exhibit, please. We're on Exhibit 13.

Is this familiar to you, Mr. Orrell?

A I believe so. I can't say 100 percent. Client terms, so I'm assuming it's related to clients that QuinStreet works with, agreement for clients that QuinStreet works with.

Q And if we -- you tell me how much time you need, but I just want to ask you if you believe that the definitions shown in this exhibit are accurate today in terms of what QuinStreet means when it uses these words?

MR. SAYLOR: Objection; outside the scope of the noticed topics; vague; ambiguous.

You can answer.

Q I can scroll if you would like. I can zoom as well.

A I don't know.

Q You don't know?
A I don't know.
Q Who would have better knowledge of that?
MR. SAYLOR: Same objections.
A I'm not sure who would have best knowledge relative to these terms.
Q Okay. Let's go to the next exhibit.
Are you familiar with Exhibit 14?
A Not 100 percent sure, no. Publisher service order, again, I think this is relative to on-boarding new publishers would be my assumption on this document.
Q How many publishers does QuinStreet have at present time?
MR. SAYLOR: Beyond the scope of the noticed topics.
Answer if you know.
A I don't know. I don't know how many publishers QuinStreet works with specifically.
Q Who would have better knowledge?
MR. SAYLOR: Same objection.
A Again, I don't know specifically who would

know that exact information.

Q And is it fair to say that publishers, some of them anyway, some publishers create websites that promote insurance?

MR. SAYLOR: Objection; beyond the scope of the noticed topics; form; calls for speculation.

You can answer if you know.

A I don't know exactly how the publishers go about doing what they're doing.

Q Do publishers gather personal data on prospective customers and then forward that data to QuinStreet?

MR. SAYLOR: Same objections.

A I don't know how they do that.

Q Do publishers operate call centers?

MR. SAYLOR: Same objections.

A I couldn't say particularly about publishers operating call centers, no.

Q Does QuinStreet buy data on prospective customers from publishers?

MR. SAYLOR: Objection; form; beyond the

scope of the noticed topics.
A I don't know how QuinStreet operates in terms of buying or how they do that.
Q Let's go to Exhibit 15, please.
Is Exhibit 15 an accurate copy of some pages from QuinStreet's website?
MR. SAYLOR: Objection; beyond the scope of the noticed topics.
A I don't know if it's an accurate copy. It looks like the website QuinStreet.com.
Q And as of today, does QuinStreet provide the services that are summarized on the pages now showing as the second page of the exhibit?
MR. SAYLOR: Objection; beyond the scope of the noticed topics.
A I'm not 100 percent sure on what exactly all categories that QuinStreet is providing services on outside of the page we're looking at.
Q Go to page 16, please.
I just want to represent this Exhibit 16 shows a search. It's on a government website in [redacted] for [redacted] which shows no

matching results found.

Do you know how I can search for [redacted] in [redacted] and find a verification of street address, government registration, other government regulatory information concerning this entity?

MR. SAYLOR: Objection; beyond the scope of the noticed topics. And, again, we provided this information to you. Run a contact information to you Mr. Ring.

MR. RING: Yeah, but it doesn't show up. I suspect we need some verification. And I think I'm entitled to inquire as to whether this is a real entity, whether it's licensed to do business, what it does exactly in [redacted].

MR. SAYLOR: How is that relevant to your claims and defenses at all? You have not subpoenaed this party after receiving that contact information.

But I'll allow you to answer the questions, but it's outside of the noticed topics. I'll note any objection for the record. I'll note

my objection to the authenticity of whatever this document purports to be.

Q Okay. So, Mr. Orrell, can you answer?

A No, I don't have any idea.

Q Okay.

MR. RING: I have a response to counsel, but we're not going to do it here.

Q Let's move to the next exhibit, 17.

I'll just represent for the record, this is a copy of a form 10-K for QuinStreet, Inc. for it's fiscal year ending in 2023, I think it's June of '23, but I really want to go to a specific point. And I have it marked as exhibit -- page 15. Bear with me.

First I'll ask you, Mr. Orrell, are you familiar with this document at all?

MR. SAYLOR: Beyond the scope of the noticed topics; objection.

A This specific form, no, I haven't reviewed that.

Q Okay. I want to refer you to -- and I'll zoom in here to the highlighted language -- pretty

faint, but it is highlighted. It says, here we are on page 15, that's the page that is printed on the 10-K, not the PDF page number. It says, additionally, we generate inquiries from users that provide a phone number, and a significant amount of revenue comes from calls made by our internal call centers as well as, in some cases, a third-party publisher's call centers. We also -- I want to focus on this, actually. We also purchase a portion of inquiry data from third-party publishers and cannot guarantee that these third parties will comply with applicable laws and regulations.

So, my question now is: From whom does QuinStreet purchase -- from which third-party publishers does QuinStreet purchase this data that is referred to in the 10-K that I just quoted?

MR. SAYLOR: Objection; beyond the scope of the noticed topics; vague and ambiguous.

What calls are you referring to, Mr. Ring?

MR. RING: I'm referring to your client's language.

Q It says, we also purchase a portion of inquiry data from third party publishers, and cannot guarantee that these third parties will comply with applicable laws and regulations.

My question is: Who are those third-party publishers?

MR. SAYLOR: Objection; beyond the scope of the noticed topics. Objection to form.

You can answer if you know, Tyler.

A I don't know.

Q Who would have better knowledge of that?

MR. SAYLOR: Same objections.

A I don't know who would have better knowledge or would know that.

Q Okay. Next exhibit, 18, please.

I'll represent, this is part of the 10-K. It's what's called Exhibit 21.1, list of subsidiaries. This is for the 2023 filing.

Have you seen this before, Mr. Orrell?

A I've not seen this document, no.

Q I'll zoom in. And I'm asking you now if you can tell whether any of the entities shown on

this exhibit were in any way involved in operating, managing, directing, or controlling a call center that's sent out calls for insurance purposes, sales of insurance, from July 6th, 2023, to the present?

MR. SAYLOR: Objection; beyond the scope of the noticed topics. Objection; compound. Objection generally to form.

You can answer if you know, Tyler.

A I don't know.

Q Who would have better knowledge?

MR. SAYLOR: Same objections.

A I don't know who would have better knowledge of that. I don't know that.

MR. RING: Thank you. Mr. Orrell, thank you for your patience and your testimony today. Those are all the questions I have. Counsel may have questions.

MR. SAYLOR: No questions from my side.

Thank you, Tyler.

THE WITNESS: You're welcome.

MR. RING: Exhibits will be attached. I

need just digital. I don't need hard copy.

THE REPORTER: Counsel, did you want to order a copy?

MR. SAYLOR: We'll take a rough. And we'll order the transcript, of course.

(Off the record at 2:59 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, TYLER JOSEPH ORRELL, do hereby acknowledge that I have read and examined the foregoing testimony and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.

____________________________ ____________________________

(SIGNATURE) (DATE)

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, PAUL P. SMAKULA, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 25th day of September, 2025.

My commission expires: June 18, 2027.



______________________________

NOTARY PUBLIC IN AND FOR

THE STATE OF MARYLAND

# EXHIBIT 14

QuinStreet






Exhibit #
Orrell 15
9/25/2025 - JRH
exhibitsticker.com

JR-249

Exhibit C to Complaint

## Insurance

We match consumers to carriers and agents in auto, home, health, life, and other insurance verticals

## Personal Loans

We match consumers to personal loan lenders to help them consolidate credit card debt, and for

## Credit Cards

We match consumers to the issuers and credit cards that can meet their needs

## Banking

We match consumers to various savings and investment vehicles including CDs, money market accounts, and financial advisors, among others

## Home Services

We match consumers to providers of home services in both large and small markets across America

PROGRESSIVE

AMERICAN EXPRESS

BARCLAYS

esu

## OUR PRODUCTS

# Great Results are Our Real Product

We match online consumers to product and service providers. We help product or service providers reach "Research and Compare" customer prospects in the world's largest channel.

Visitors and clients can engage in the format they prefer, including clicks, leads or inquiries, calls, applications, appointments, or actual sales.



## Clicks



## Inquiries



## Calls

ABOUT QUINSTREET

## Powering Performance Marketplaces In Digital Media




QuinStreet is a pioneer in powering decentralized online **marketplaces that match searchers and "research and compare" consumers with brands**. We run these virtual and private-label marketplaces in one of the nation's largest media networks.

Our industry leading segmentation and AI-driven matching **technologies help consumers find better solutions and brands faster**. They allow brands to target and reach in-market customer prospects with pinpoint segment-by-segment accuracy, and to pay only for performance results.

*Our campaign-results-driven matching decision engines and optimization algorithms are built from over 20 years and billions of dollars of online media experience.*

We believe in:

- The direct measurability of digital media.
- Performance marketing. (We pioneered it.)
- The advantages of technology.

We bring all of this together to deliver truly great results for consumers and brands in the world's biggest channel.

## Foster City, CA

**HEADQUARTERS**
950 Tower Lane
Suite 1200
Foster City, CA 94404

## Beaverton, OR

8305 Creekside
Suite C
Beaverton, OR 97008

## Plantation, FL

12331 SW 3rd Street
Suite 700
Plantation, FL 33325

# Ready to start a conversation? Contact us today

©2024 QuinStreet, Inc. All Rights Reserved. Privacy Notice | Terms of Use | Client Terms | Client Privacy And Data Security Annex | Publisher Terms | Publisher Service Orders | Publisher Privacy And Data Security Annex | Do Not Sell or Share My Personal Information | Accessibility Statement

# EXHIBIT 15

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended June 30, 2023**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-34628**

# QuinStreet, Inc.

**(Exact name of registrant as specified in its charter)**

| Delaware | 77-0512121 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**950 Tower Lane, 6th Floor**
**Foster City, California 94404**
**(Address of principal executive offices, including zip code)**

**(650) 587-7700**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, par value $0.001 per share | QNST | The Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. Yes ☒ No ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive o□cers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of December 31, 2022, the aggregate market value of the voting stock held by non-affiliates of the registrant, based on the closing sale price of the Company's common stock as reported by the Nasdaq Global Select Market on such date, was $735,915,628. For purposes of calculating the aggregate market value of shares held by non-affiliates, we have assumed that all outstanding shares are held by non-affiliates, except for shares owned by each of our executive officers, directors and 5% or greater stockholders. In the case of 5% or greater stockholders, we have not deemed such stockholders to be affiliates unless there are facts and circumstances indicating that such stockholders exercise any control over our company. The determination of executive officer or affiliate status is not a conclusive determination for other purposes.

Number of shares of common stock outstanding as of August 14, 2023: 54,586,546

**Documents Incorporated by Reference:**

Portions of the registrant's definitive proxy statement relating to its 2023 annual stockholders' meeting are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.



Exhibit #
Orrell 17
9/25/2025 - JRH
exhibitsticker.com

**QUINSTREET, INC.**

**FOR THE FISCAL YEAR ENDED JUNE 30, 2023**

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| | **PART I.** | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 31 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 32 |
| Item 4. | Mine Safety Disclosures | 32 |
| | **PART II.** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 33 |
| Item 6. | Selected Consolidated Financial Data | 35 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 50 |
| Item 8. | Financial Statements and Supplementary Data | 52 |
| Item 9. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 85 |
| Item 9A. | Controls and Procedures | 85 |
| Item 9B. | Other Information | 86 |
| | **PART III.** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 87 |
| Item 11. | Executive Compensation | 87 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 87 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 87 |
| Item 14. | Principal Accounting Fees and Services | 87 |
| | **PART IV.** | |
| Item 15. | Exhibits, Financial Statement Schedules | 88 |
| Item 16. | Form 10-K Summary | 92 |
| | Signatures | 93 |

[This page intentionally left blank.]

## PART I

## CAUTIONARY NOTE ON FORWARD-LOOKING STATEMENTS

This report contains forward-looking statements. All statements other than statements of historical facts, including statements regarding our future financial condition, business strategy and plans and objectives of management for future operations, are forward-looking statements. Terminology such as "believe," "may," "might," "objective," "estimate," "continue," "anticipate," "intend," "should," "plan," "expect," "predict," "potential," or the negative of these terms or other similar expressions is intended to identify forward-looking statements. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements are subject to a number of known and unknown risks and uncertainties that could cause our actual results to differ materially from those expressed or implied in our forward-looking statements. Such risks and uncertainties include, among others, those listed in Part 1, Item 1A. "Risk Factors" of this Annual Report on Form 10-K and elsewhere in this report, such as but not limited to:

- our still developing industry and relatively new business model and products such as QuinStreet Rating Platform ("QRP") product for insurance agents;
- changes in the general economic conditions and market dynamics in the United States, or in the specific markets in which we currently do business, including as a result of the COVID-19 pandemic;
- changes in the regulatory enforcement or legislative environment;
- our dependence on the availability and affordability of quality media from third-party publishers and strategic partners;
- our dependence on Internet search companies to attract Internet visitors;
- the impact of broad-based pandemics or public health crises, such as COVID-19;
- our ability to accurately forecast our results of operations and appropriately plan our expenses;
- our ability to compete in our industry;
- our ability to manage cyber security risks and costs associated with maintaining a robust security infrastructure;
- our ability to continually optimize our websites to allow Internet visitors to access our websites through mobile devices;
- our ability to develop new services, enhancements and features to meet new demands from our clients;
- our ability to implement our enhanced products across our business and achieve client adoptions of such products;
- our ability to successfully complete acquisitions and other business development transactions including our ability to enter into, and manage the relationship and risks associated with, strategic partnerships; and
- the occurrence of, and our ability to successfully challenge, regulatory audits, investigations or allegations of noncompliance with laws.

Except as required by law, we undertake no obligation to update publicly any forward-looking statements for any reason to conform these statements to actual results or to changes in our expectations. Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements, and we qualify all of our forward-looking statements by these cautionary statements.

**Item 1.** ***Business***

## Our Company

We are a leader in performance marketplaces and technologies for the financial services and home services industries. Our approach to proprietary performance marketing technologies allows clients to engage high-intent digital media or traffic from a wide range of device types (e.g., mobile, desktop, tablet), in multiple formats or types of media (e.g., search engines, large and small media properties or websites, email), and in a wide range of cost-per-action, or CPA, forms. These forms of contact are the primary "products" we sell to our clients, and include qualified clicks, leads, calls, applications and customers. We specialize in customer acquisition for clients in high value, information-intensive markets, or "verticals," including financial services and home services. Our clients include some of the world's largest companies and brands in those markets. The majority of our operations and revenue are in North America.

We generate revenue by delivering measurable online marketing results to our clients. The benefits to our clients include cost-effective and measurable customer acquisition costs, as well as management of highly targeted but also highly fragmented online media sources and access to our world-class proprietary technologies. We are predominantly paid on a negotiated or market-driven "per click," "per lead," or other "per action" basis that aligns with the customer acquisition cost targets of our clients. We bear the cost of paying Internet search companies, third-party media sources, strategic partners and other online media sources to generate qualified clicks, leads, calls, applications or customers for our clients.

Our competitive advantages include our media buying power, proprietary technologies, extensive data and experience in performance marketing, and significant online media market share in the markets or verticals we serve. Our advantage in online media buying is key to our business model and comes from our ability to effectively segment and match high-intent, unbranded media or traffic – one of the largest sources of traffic for customer acquisition – to as many as hundreds of clients or client offerings and, in most cases, to match those visitors to multiple clients, which also satisfies the visitor's desire to choose among alternatives and to shop multiple offerings. Together, the ability to match more visitors in any given flow of traffic or media to a client offering, and to do so multiple times, adds up to a significant media buying advantage compared to individual clients or other buyers for these types of media.

Our proprietary technologies have been developed over the past 24 years to allow us to best segment and match media or traffic, to deliver optimized results for our clients and to operate our high volume and highly complex channel cost-efficiently.

Our extensive data and experience in performance marketing reflect the execution, knowledge and learning from billions of dollars of media spend on these campaigns over time. This is a steep and expensive learning curve. These learnings address millions of permutations of media sources, mix and order of creative and content merchandising, and approaches to the matching and segmentation of Internet visitors to optimize their experience and the results for clients. Together, these learnings allow us to run thousands of campaigns simultaneously and cost-effectively for our clients at acceptable media costs and margins to us.

Because of our deep expertise and capabilities in running financially successful performance marketing programs, we are able to effectively compete for sources and partners of high-intent, unbranded media, and our market share in our client verticals of this media is significant. Our media sources include owned-and-operated organic or search engine optimization ("SEO") websites, targeted search engine marketing ("SEM") or pay-per-click ("PPC") campaigns, social media and mobile programs, internal email databases, call center operations, partnerships with large and small online media companies, and more. Our collective media presence results in engagement with a significant share of online visitors in those markets or verticals, which leads us to be included in client online media buys.

We were incorporated in California on April 16, 1999 and reincorporated in Delaware on December 31, 2009. We have been a pioneer in the development and application of measurable marketing on the Internet. Clients pay us for the actual opt-in actions by visitors or customers that result from our marketing activities on their behalf, versus traditional impression-based advertising and marketing models in which an advertiser pays for a broad audience's exposure to an advertisement.

## Market Opportunity

### *Change in marketing strategy and approach*

We believe that marketing approaches are changing as budgets shift from offline, analog advertising media to digital advertising media such as Internet marketing. These changing approaches require a shift to fundamentally new competencies, including:

***From qualitative, impression-driven marketing to analytic, data-driven marketing***

Growth in Internet marketing enables a more data-driven approach to advertising. The measurability of online marketing allows marketers to collect a significant amount of detailed data on the performance of their marketing campaigns, including the effectiveness of ad format and placement and user responses. This data can then be analyzed and used to improve marketing campaign performance and cost-effectiveness on substantially shorter cycle times than with traditional offline media.

***From account management-based client relationships to results-based client relationships***

Marketers are becoming increasingly focused on strategies that deliver specific, measurable results. For example, marketers are attempting to better understand how their marketing spending produces measurable objectives such as meeting their target marketing cost per new customer. As marketers adopt more results-based approaches, the basis of client relationships with their marketing services providers is shifting from being more account management-based to being more results-oriented.

***From marketing messages pushed on audiences to marketing messages pulled by self-directed audiences***

Traditional marketing messages such as television and radio advertisements are broadcast to a broad audience. The Internet enables more self-directed and targeted marketing. For example, when Internet visitors click on PPC search advertisements, they are expressing an interest in and proactively engaging with information about a product or service related to that advertisement. The growth of self-directed marketing, primarily through online channels, allows marketers to present more targeted and potentially more relevant marketing messages to potential customers who have taken the first step in the buying process, which can in turn increase the effectiveness of marketers' spending.

***From marketing spending focused on large media buys to marketing spending optimized for fragmented media***

We believe that media is becoming increasingly fragmented and that marketing strategies are changing to adapt to this trend. There are millions of Internet websites, tens of thousands of which have significant numbers of visitors. While this fragmentation can create challenges for marketers, it also allows for improved audience segmentation and the delivery of highly targeted marketing messages, but innovative technologies and approaches are necessary to effectively manage marketing given the increasing complexity resulting from more media fragmentation.

***Increasing complexity of online marketing***

Online marketing is a dynamic and increasingly complex advertising medium. There are numerous online channels for marketers to reach potential customers, including search engines, Internet portals, vertical content websites, affiliate networks, display and contextual ad networks, email, video advertising, and social media. We refer to these and other marketing channels as media. Each of these channels may involve multiple ad formats and different pricing models, amplifying the complexity of online marketing. We believe that this complexity increases the demand for our vertical marketing and media services due to our capabilities and to our experience managing and optimizing online marketing programs across multiple channels. Also, marketers and agencies often lack our ability to aggregate offerings from multiple clients in the same industry vertical, an approach that allows us to cover a wide selection of visitor segments and provide more potential matches to visitor needs. This approach can allow us to convert more Internet visitors into qualified clicks, leads, calls, applications, or customers from targeted media sources, giving us an advantage when buying or monetizing that media.

**Our Business Model**

We deliver measurable and cost-effective marketing results to our clients, typically in the form of qualified inquiries such as clicks, leads, calls, applications, or customers. Clicks, leads, calls, and applications can then convert into a customer or sale for clients at a rate that results in an acceptable marketing cost to them. We are typically paid by clients when we deliver qualified inquiries in the form of clicks, leads, calls, applications, or customers, as defined by our agreements with them. References to the delivery of customers means a sale or completed customer transaction (e.g., funded loans, bound insurance policies or customer appointments with clients). Because we bear the costs of media, our programs must result in attractive marketing costs to our clients at media costs and margins that provide sound financial outcomes for us. To deliver clicks, leads, calls, applications, and customers to our clients, generally we:

- own or access targeted media through business arrangements (e.g., revenue sharing arrangements with online publisher partners, large and small) or by purchasing media (e.g., clicks from major search engines);
- run advertisements or other forms of marketing messages and programs in that media that result in consumer or visitor responses, typically in the form of clicks (by a consumer to further qualification or matching steps, or to online client applications or offerings), leads (e.g., consumer contact information), calls (from a consumer or to a consumer by our owned and operated or contracted call centers or by that of our clients or their agents), applications (e.g., for enrollment or a financial product), or customers (e.g., funded personal loans);
- continuously seek to display clients and client offerings to visitors or consumers that result in the maximum number of consumers finding solutions that can meet their needs and to which they will take action to respond, resulting in media buying efficiency (e.g., by segmenting media or traffic so that the most appropriate clients or client offerings can be displayed or "matched" to each segment based on fit, response rates or conversion rates); and
- through technology and analytics, seek to optimize combination of objectives to satisfy the maximum number of shopping or researching visitors or consumers, deliver on client marketing objectives, effectively compete for online media, and generate a sound financial outcome for us.

Media cost, or the cost to attract targeted Internet visitors, is the largest cost input to producing the measurable marketing results we deliver to clients. Balancing our clients' customer acquisition cost and conversion objectives — or the rate at which the clicks, leads, calls, or applications that we deliver to them convert into customers — with our media costs and yield objectives, represents the primary challenge in our business model. We have been able to effectively balance these competing demands by focusing on our media sources and creative capabilities, developing proprietary technologies and optimization capabilities, and working to constantly improve segmentation and matching of visitors to clients through the application of our extensive data and experience in performance marketing. We also seek to mitigate media cost risk by working with third-party publishers and media owners predominantly on a revenue-share basis, which makes these costs variable and provides for risk management. Media purchased on a revenue-share basis has represented the majority of our media costs and of the Internet visitors we convert into qualified clicks, leads, calls, applications, or customers for clients, contributing significantly to our ability to maintain profitability.

***Media and Internet visitor mix***

We are a client-driven organization. We seek to be one of the largest providers of measurable marketing results on the Internet in the client industry verticals we serve by meeting the needs of clients for results, reliability and volume. Meeting those client needs requires that we maintain a diversified and flexible mix of Internet visitor sources due to the dynamic nature of online media. Our media mix changes with changes in Internet visitor usage patterns. We adapt to those changes on an ongoing basis, and also proactively adjust our mix of vertical media sources to respond to client- or vertical-specific circumstances and to achieve our financial objectives. Generally, our Internet visitor sources include:

- websites owned and operated by us, with content and offerings that are relevant to our clients' target customers;
- visitors acquired from PPC advertisements purchased on major search engines and sent to our websites;
- third-party media sources (including strategic partners) with whom we have a relationship and whose content or traffic is relevant to our clients' target customers;
- email lists owned by us or by third-parties; and
- advertisements run through online advertising networks, directly with major websites or portals, social media networks, or mobile networks.

**Our Strategy**

Our goal is to continue to be one of the largest and most successful performance marketing companies on the Internet, and eventually in other digitized media forms. We believe that we are in the early stages of a very large and long-term market opportunity. Our strategy for pursuing this opportunity includes the following key components:

- focus on generating sustainable revenues by providing measurable value to our clients;
- build QuinStreet and our industry sustainably by behaving ethically in all we do and by providing quality content and website experiences to Internet visitors;
- remain vertically focused, choosing to grow through depth, expertise and coverage in our current client verticals; enter new client verticals selectively over time, organically and through acquisitions;
- build a world class organization, with best-in-class capabilities for delivering measurable marketing results to clients and high yields or returns on media costs;
- develop and evolve the best products, technologies and platform for managing successful performance marketing campaigns on the Internet; focus on technologies that enhance media yield, improve client results and achieve scale efficiencies;
- build and apply unique data advantages from running some of the largest campaigns over long periods of time in our client verticals, including the steep learning curves of what campaigns work best to optimize each media type and each client's results;
- build and partner with vertical content websites that attract high intent visitors in the client and media verticals we serve; and
- be a client-driven organization and develop a broad set of media sources and capabilities to reliably meet client needs.

**Clients**

In fiscal years 2023, 2022 and 2021, we had one client, The Progressive Corporation, that accounted for 20%, 17% and 23% of net revenue. No other client accounted for 10% or more of net revenue in fiscal years 2023, 2022 and 2021. Our top 20 clients accounted for 52%, 51% and 58% of net revenue in fiscal years 2023, 2022 and 2021. Since our service was first offered in 2001, we have developed a broad client base with many multi-year relationships. We enter into Internet marketing contracts with our clients, most of which are cancelable with little or no prior notice. In addition, these contracts do not contain penalty provisions for cancellation before the end of the contract term.

**Sales and Marketing**

We have an internal sales team that consists of employees focused on signing new clients and account managers who maintain and seek to increase our business with existing clients. Our sales people and account managers are each focused on a particular client vertical so that they develop an expertise in the marketing needs of our clients in that particular vertical.

**Technology and Infrastructure**

We have developed a suite of technologies to manage, improve and measure the results of the marketing programs we offer our clients. We use a combination of proprietary and third-party software as well as hardware from established technology vendors. We use specialized software for client management, building and managing websites, acquiring and managing media, managing our third-party media sources, and using data and optimization tools to best match Internet visitors to our marketing clients. We have invested significantly in these technologies and plan to continue to do so to meet the demands of our clients and Internet visitors, to increase the scalability of our operations, and enhance management information systems and analytics in our operations. Our development teams work closely with our marketing and operating teams to develop applications and systems that can be used across our business. In fiscal years 2023, 2022 and 2021, we spent $28.9 million, $21.9 million and $19.3 million on product development.

Our primary data center is at a third-party co-location center in San Francisco, California. All of the critical components of the system are redundant, and we have a backup data center in Las Vegas, Nevada. We have implemented these backup systems and redundancies to minimize the risk associated with earthquakes, fire, power loss, telecommunications failure, and other events beyond our control.

**Intellectual Property**

We rely on a combination of patent, trade secret, trademark and copyright laws in the United States and other jurisdictions together with confidentiality agreements and technical measures to protect the confidentiality of our proprietary rights. To protect our trade secrets, we control access to our proprietary systems and technology and enter into confidentiality and invention assignment agreements with our employees and consultants and confidentiality agreements with other third-parties. QuinStreet is a registered trademark in the United States and other jurisdictions. We also have registered and unregistered trademarks for the names of many of our websites, and we own the domain registrations for many of our website domains.

**Our Competitors**

Our primary competition falls into two categories: advertising and direct marketing services agencies, and online marketing and media companies. We compete for business on the basis of a number of factors including return on marketing expenditures, price, access to targeted media, ability to deliver large volumes or precise types of customer prospects, and reliability.

***Advertising and direct marketing services agencies***

Online and offline advertising and direct marketing services agencies control the majority of the large client marketing spending for which we primarily compete. So, while they are sometimes our competitors, agencies are also often our clients. We compete with agencies to attract marketing budget or spending from offline forms to the Internet or, once designated to be spent online, to be spent with us versus the agency or by the agency with others. When spending online, agencies spend with us and with portals, other websites and ad networks.

***Online marketing and media companies***

We compete with other Internet marketing and media companies, in many forms, for online marketing budgets. Most of these competitors compete with us in one client vertical. Examples include LendingTree and MediaAlpha in the financial services client vertical. Some of our competition also comes from agencies or clients spending directly with larger websites or portals, including Google, Yahoo! and Microsoft.

**Government Regulation**

We provide services through a number of different online and offline channels. As a result, we are subject to many federal and state laws and regulations, including restrictions on the use of unsolicited commercial email, such as the CAN-SPAM Act and state email marketing laws, and restrictions on the use of marketing activities conducted by telephone, including the Telemarketing Sales Rule and the Telephone Consumer Protection Act. Our business is also subject to federal and state laws and regulations regarding unsolicited commercial email, telemarketing, user privacy, search engines, Internet tracking technologies, direct marketing, data security, data privacy, pricing, sweepstakes, promotions, intellectual property ownership and infringement, trade secrets, export of encryption technology, acceptable content and quality of goods, and taxation, among others.

In addition, we provide services to a number of our clients that operate in highly regulated industries. In our financial services client vertical, our websites and marketing services are subject to various federal, state and local laws, including state licensing laws, federal and state laws prohibiting unfair acts and practices, and federal and state advertising laws. In addition, we are a licensed insurance agent in all fifty states. The costs of compliance with these regulations and new laws may increase in the future and any failure on our part to comply with such laws may subject us to significant liabilities.

**Human Capital Resources**

Our business success depends on our people. We are committed to the development, attraction and retention of our employees. We are dedicated to our core principles and values which include: leading and taking ownership of results and growth, embracing new ideas and approaches as opportunities to improve our performance, striving to better understand and anticipate the needs of all stakeholders, and holding ourselves to high standards of performance and excellence. We strive to invest in professional learning and personal development opportunities that would develop talent and support personal, career and leadership growth. We hold ourselves accountable and we are committed to pay equity and parity. Our compensation philosophy is designed with both short- and long-term incentives. We prioritize the health, safety and wellness of our employees and strive to create an environment where our employees are productive and also physically and mentally healthy, safe and well. The health of our workforce remains our top priority while we work to ensure a safe work environment in our offices around the world.

As of June 30, 2023, we had 937 employees, which consisted of 270 employees in product development, 51 in sales and marketing, 45 in general and administration and 571 in operations. None of our employees are represented by a labor union.

***Diversity***

We are committed to fostering, cultivating and preserving a culture of diversity and inclusion. We not only embrace diversity but also seek to build a culture that attracts, retains, and develops a diverse set of employees. We have demonstrated this commitment by: (1) adding Diversity as one of our core values, (2) producing our first gender and race demographic report, and (3) matching employee contributions to approved national associations and organizations ranging from legal advocacy to domestic support. We have also formed a Culture Committee to create inclusive and diverse events.

***Employee Compensation***

We provide comprehensive and competitive compensation packages to attract, reward and retain talented employees. Our employees' total compensation package includes market-competitive salary, bonuses or sales incentives, and equity awards, including restricted stock units and an employee stock purchase plan. We strive to be as transparent as possible about our compensation principles. We hold ourselves accountable and we are committed to pay equity and parity. Our compensation philosophy is designed with both short- and long-term incentives.

***Development and Learning***

We invest in the professional development and growth of all our employees and are strongly committed to our responsibility of providing development and growth opportunities to our employees through greater emphasis on internal mobility and fair and equitable talent practices.

**Available Information**

We file reports with the Securities and Exchange Commission ("SEC"), including annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and other filings required by the SEC. We make these reports and filings available free of charge on our website via the investor relations page on www.quinstreet.com as soon as reasonably practicable after such material is electronically filed with or furnished to the SEC. We also webcast our earnings calls and certain events we host with members of the investment community on our investor relations page at http://investor.quinstreet.com. The content of our website is not intended to be incorporated by reference into this report or in any other report or document we file, and any reference to this website and others included in this report is intended to be an inactive textual reference only.

The public may read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains an Internet site (http://www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC.

**Item 1A.** ***Risk Factors***

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below and the other information in this periodic report. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business. If any of the following risks actually occur, our business, financial condition or results of operations could be adversely affected. In those cases, the trading price of our common stock could decline and you may lose all or part of your investment.*

**Summary of Risks Associated with Our Business**

The following is a summary of the principal factors that make an investment in our common stock speculative or risky. These risks, and others, are described in further detail below this summary.

- We operate in an industry that is still developing and have a relatively new business model that is continually evolving, which makes it difficult to evaluate our business and prospects.
- A reduction in online marketing spend by our clients, a loss of clients or lower advertising yields may seriously harm our business, financial condition, and results of operations. In addition, a substantial portion of our revenue is generated from a

limited number of clients and, if we lose a major client, our revenue will decrease and our business and prospects may be harmed.

- We depend on third-party media sources, including strategic partners, for a significant portion of our visitors. Any decline in the supply of media available through these third-party publishers' websites (including via regulatory action specific to those websites or to third-party media sources generally), or increase in the price of this media, could cause our revenue to decline or our cost to reach visitors to increase.
- We are exposed to data privacy and security risks, particularly given that we gather, transmit, store and otherwise process personal information. If we fail to maintain adequate safeguards to protect the security, confidentiality and integrity of personal information, including any failure to develop, implement and support our technology infrastructure and assessment processes, we may be in breach of our commitments to our clients and consumers. Unauthorized or accidental access to or disclosure or use of confidential or proprietary data (including personal information) in our network systems, including via ransomware attacks, may cause us to incur significant expenses and may negatively affect our reputation and business.
- We depend upon Internet search companies to direct a significant portion of visitors to our owned and operated and our third-party publishers' websites. Changes in search engine algorithms have in the past harmed, and may in the future harm, the websites' placements in both paid and organic search result listings, which may reduce the number of visitors to our owned and operated and our third-party publishers' websites and as a result, cause our revenue to decline.
- Negative changes in economic conditions and the regulatory environment have had in the past, and may in the future have, a material and adverse impact on our revenue, business and growth.
- Adverse developments affecting the financial services industry, such as actual events or concerns involving liquidity, defaults or non-performance by financial institutions or transactional counterparties, could adversely affect our business, financial condition and results of operations.
- If we fail to continually enhance and adapt our products asend services to keep pace with rapidly changing technologies and industry standards, we may not remain competitive and could lose clients or advertising inventory.
- Our results of operations have fluctuated in the past and may do so in the future, which makes our results of operations difficult to predict and could cause our results of operations to fall short of analysts' and investors' expectations.
- Limitations restricting our ability to market to users or collect and use data derived from user activities by technologies, service providers or otherwise could significantly diminish the value of our services and have an adverse effect on our ability to generate revenue.
- If we do not adequately protect our intellectual property rights, our competitive position and business may suffer.
- We are subject to risks with respect to counterparties, and failure of such counterparties to meet their obligations could cause us to suffer losses or negatively impact our results of operations and cash flows.
- We face risks and uncertainties related to the COVID-19 pandemic and its aftermath, which could significantly disrupt our operations and have a material adverse impact on our business, financial condition, operating results and cash flows. These risks and uncertainties could pertain to other viruses, pandemics or other such unforeseen and broad-based public health crises.

**Risks Related to Our Business and Industry**

***We operate in an industry that is still developing and have a relatively new business model that is continually evolving, which makes it difficult to evaluate our business and prospects.***

We derive all of our revenue from the sale of online marketing and media services, which is still a developing industry that has undergone rapid and dramatic changes in its relatively short history and which is characterized by rapidly-changing Internet media and advertising technology, evolving industry standards, regulatory uncertainty, and changing visitor and client demands. In addition, our business model and product offerings continue to evolve. We believe that our implementation of our enhanced products and media strategies across our business is in a relatively early stage. As a result, we face risks and uncertainties such as but not limited to:

- our still developing industry and relatively new business model and products such as our QRP product for insurance agents;
- changes in the general economic conditions and market dynamics in the United States, or in the specific markets in which we currently do business, including as a result of the COVID-19 pandemic and Russian-Ukraine military conflict;

implement adequate preventative measures and, in some cases, we may not be able to immediately detect a security breach, cyber-attack or other similar incident. In the past, we have experienced security incidents involving access to our databases. Although to our knowledge no sensitive financial or personal information has been compromised and no statutory breach notification has been required, any future security incidents could result in the compromise of such data and subject us to liability or remediation expense or result in cancellation of client contracts. Any actual or alleged security breach, cyber-attack or other similar incident may also result in a misappropriation of our confidential or proprietary information (including personal information) or that of our users, clients and third-party publishers, which could result in legal and financial liability, regulatory intervention, and harm to our reputation. Any compromise of our security could limit the adoption of our products and services and have an adverse effect on our business.

We also face risks associated with security breaches, cyber-attacks and other similar incidents affecting third parties conducting business over the Internet. Consumers generally are concerned with data privacy and security on the Internet, and any publicized data privacy or security problems could negatively affect consumers' willingness to provide private information on the Internet generally, including through our services. Some of our business is conducted through third parties, which may gather, transmit, store and otherwise process information (including confidential, proprietary and personal information) about our users and marketing and media partners, through our infrastructure or through other systems. While we perform data privacy and security assessments on such third parties, it is important to note that if any such third party fails to adopt or adhere to adequate security procedures, or if despite such procedures its networks or systems are breached, information relating to our users and marketing and media partners may be lost or improperly accessed, used or disclosed. A security breach, cyber-attack or other similar incident experienced by any such third party could be perceived by consumers as a security breach of our systems and in any event could result in negative publicity, damage our reputation, expose us to risk of loss or litigation and possible liability and subject us to regulatory penalties and sanctions. In addition, such third-parties may not comply with applicable disclosure or contractual requirements, which could expose us to liability.

Security concerns relating to our technological infrastructure, data privacy concerns relating to our data collection and processing practices and any perceived or public disclosure of any actual unauthorized or accidental access to or disclosure or use of personal information, whether through breach of our network or that of third parties with which we engage, by an unauthorized party or due to employee theft, misuse, or error, could harm our reputation, impair our ability to attract website visitors and to attract and retain our clients, result in a loss of confidence in the security of our products and services, or subject us to claims or litigation arising from damages suffered by consumers, and thereby harm our business and results of operations. In recent years, several major companies have experienced high-profile security breaches, cyber-attacks and other similar incidents that exposed their customers' personal information. In addition, we could incur significant costs for which our insurance policies may not adequately cover us and may be required to expend significant resources in protecting against cyber-attacks, security breaches and other similar incidents and to comply with the multitude of state, federal and foreign laws and regulations regarding data privacy, security and data breach notification obligations. We may need to increase our security-related expenditures to maintain or increase our systems' security or to address problems caused and liabilities incurred by security breaches, cyber-attacks and other similar incidents.

***We depend upon Internet search companies to direct a significant portion of visitors to our owned and operated and our third-party publishers' websites. Changes in search engine algorithms have in the past harmed, and may in the future harm, the websites' placements in both paid and organic search result listings, which may reduce the number of visitors to our owned and operated and our third-party publishers' websites and as a result, cause our revenue to decline.***

Our success depends on our ability to attract online visitors to our owned and operated and our third-party publishers' websites and convert them into customers for our clients in a cost-effective manner. We depend on Internet search companies to direct a substantial share of visitors to our owned and operated and our third-party publishers' websites. Search companies offer two types of search results: organic and paid listings. Organic listings are displayed based solely on formulas designed by the search companies. Paid listings are displayed based on a combination of the advertiser's bid price for particular keywords and the search engines' assessment of the website's relevance and quality. If one or more of the search engines or other online sources on which we rely for purchased listings modifies or terminates its relationship with us, our expenses could rise, we could lose consumers, and traffic to our websites could decrease. Changes in how search engines elect to operate, including with respect to the breadth of keyword matching, could also have an adverse impact on our campaigns. Any of the foregoing could have a material adverse effect on our business, financial condition and results of operations.

Our ability to maintain or grow the number of visitors to our owned and operated and our third-party publishers' websites from search companies is not entirely within our control. Search companies frequently revise their algorithms and changes in their algorithms have in the past caused, and could in the future cause, our owned and operated and our third-party publishers' websites to receive less favorable placements. We have experienced fluctuations in organic rankings for a number of our owned and operated and our third-party publishers' websites and some of our paid listing campaigns have also been harmed by search engine algorithmic changes. Search companies could determine that our or our third-party publishers' websites' content is either not relevant or is of poor quality.

In addition, we may fail to optimally manage our paid listings, or our proprietary bid management technologies may fail. To attract and retain visitors, we use search engine optimization ("SEO") which involves developing content to optimize ranking in search engine results. Our ability to successfully manage SEO efforts across our owned and operated websites and our third-party publishers' websites depends on our timely and effective modification of SEO practices implemented in response to periodic changes in search engine algorithms and methodologies and changes in search query trends. If we fail to successfully manage our SEO strategy, our owned and operated and our third-party publishers' websites may receive less favorable placement in organic or paid listings, which would reduce the number of visitors to our sites, decrease conversion rates and repeat business and have a detrimental effect on our ability to generate revenue. If visits to our owned and operated and our third-party publishers' websites decrease, we may need to use more costly sources to replace lost visitors, and such increased expense could adversely affect our business and profitability. Even if we succeed in driving traffic to our owned and operated websites, our third-party publishers' websites and our clients' websites, we may not be able to effectively monetize this traffic or otherwise retain users. Our failure to do so could result in lower advertising revenue from our owned and operated websites as well as third-party publishers' websites, which would have an adverse effect on our business, financial condition and results of operations.

In addition, if there are changes in the usage and functioning of search engines or decreases in consumer use of search engines, for example, as a result of the continued development of artificial intelligence technology, this could negatively impact our owned and operated and our third-party publishers' websites.

***Negative changes in the economic conditions and the regulatory environment have had in the past, and may in the future have, a material and adverse impact on our revenue, business and growth.***

Adverse macroeconomic conditions could cause decreases or delays in spending by our clients in response to consumer demand and could harm our ability to generate revenue and our results of operations. Changes in the macroeconomic or market conditions and changes in the regulatory environment have in the past affected, and may continue to negatively affect, our clients' businesses, marketing practices and budgets and, therefore, impact our business, financial condition, operating results and cash flows.

Worldwide economic conditions remain uncertain due to various global disruptions, including geopolitical events, such as war, the threat of war (including collateral damage from cyberwarfare), or terrorist activity; natural disasters; power shortages or outages; major public health issues, including pandemics; and significant local, national, or global events capturing the attention of a large part of the population, which could prevent or hinder our, or third-party publishers' or our clients' ability to do business, increase our costs, and negatively affect our stock price. Adverse consequences resulting from increasing economic or political conflicts between the United States and China, Russia's invasion of Ukraine and the subsequent economic sanctions imposed by the U.S., NATO and other countries, and various other market issues may have broader implications on economies outside the region, including increased instability in the worldwide financial markets and economy, increases in inflation, recessionary economic cycles, and enhanced volatility in foreign currency exchange rates. These uncertainties may cause our clients or potential clients to delay or reduce spending, which could negatively impact our revenue and operating results and make it difficult for us to accurately plan future business activities.

We, our third-party publishers', and our clients' businesses operate in highly regulated industries, subject to many laws and regulatory requirements, including federal, state, and local laws and regulations regarding unsolicited commercial email, telemarketing, search engines, Internet tracking technologies, direct marketing, data privacy and security, pricing, sweepstakes, promotions, intellectual property ownership and infringement, trade secrets, export of encryption technology, acceptable content and quality of goods, and taxation, among others. Each of our financial services and other client verticals is also subject to various laws and regulations, and our marketing activities on behalf of our clients are regulated. Many of these laws and regulations are frequently changing and can be subject to vagaries of interpretation and emphasis, and the extent and evolution of future government regulation is uncertain. Keeping our business in compliance with or bringing our business into compliance with new laws and regulations, therefore, may be costly, affect our revenue and harm our financial results.

For example, we believe increased regulation may continue to occur in the area of data privacy and security, and laws and regulations applying to the solicitation, collection, retention, deletion, sharing, use and other processing of personal information. At the U.S. federal level, we are subject to the laws and regulations promulgated under the authority of the Federal Trade Commission, which regulates unfair or deceptive acts or practices (including with respect to data privacy and security). At the state level, we are subject to the California Consumer Privacy Act of 2018, as amended by the California Privacy Rights Act of 2020 (collectively, the "CCPA"). The CCPA requires covered businesses to, among other things, provide disclosures to California residents about their data collection, use, sharing and processing practices and, with limited business exceptions, the CCPA affords such individuals various rights with respect to their personal information, including to request deletion of personal information collected about them and to opt-out of certain personal information selling and sharing practices. A number of other states have enacted, or are considering enacting, comprehensive data privacy laws. In addition, laws in all 50 U.S. states require businesses to provide notice under certain circumstances to consumers whose personal information has been disclosed as a result of a data breach. Further, foreign laws and regulations such as the EU General

Data Protection Regulation (the "EU GDPR"), and the version thereof implemented into the laws of the United Kingdom following Brexit (the "UK GDPR"), may apply to our business and marketing activities that are offered to European Union and United Kingdom users. The EU GDPR and UK GDPR include a range of compliance obligations and penalties for non-compliance are significant. Although the substantive requirements of the UK GDPR are largely aligned with those of the EU GDPR, exposing us to burdens and risks comparable to the EU GDPR, that may change over time. Existing and new data privacy and security laws and regulations could affect, and may result in expenditures to ensure, our ability to store, use, share and otherwise process personal information in accordance with applicable laws and regulations. We also are, and in the future may become, subject to various other obligations relating to data privacy and security, including industry standards, external and internal policies, contracts and other obligations. Violations or alleged violations of laws and regulations, or any such obligations, by us, our third-party publishers, our clients or our third-party service providers on which we rely to process personal information on our behalf, could result in enforcement actions, litigation, damages, fines, criminal prosecution, unfavorable publicity, and restrictions on our ability to operate, any of which could have a material adverse effect on our business, financial condition, and results of operations. In addition, new laws or regulations (including amendments thereof or changes in enforcement of existing laws or regulations applicable to us or our clients) could affect the activities or strategies of us or our clients and, therefore, lead to reductions in their level of business with us or otherwise impact our business.

Additionally, in connection with our owned and our third-party publishers' telemarketing campaigns to generate traffic for our clients, we are subject to various state and federal laws regulating telemarketing communications (including SMS or text messaging), including the federal Telephone Consumer Protection Act (the "TCPA"), which requires prior express written consent for certain types of telemarketing calls. Our efforts to comply with the TCPA have not had a material impact on traffic conversion rates. However, depending on future traffic and product mix, it could potentially have a material effect on our revenue and profitability, including increasing our and our clients' exposure to enforcement actions and litigation. The TCPA regulations have resulted in an increase in individual and class action litigation against marketing companies for alleged TCPA violations. TCPA violations can result in significant financial penalties, including penalties or criminal fines imposed by the Federal Communications Commission (the "FCC") or fines of up to $1,500 per violation imposed through private litigation or by state authorities. Additionally, we generate inquiries from users that provide a phone number, and a significant amount of revenue comes from calls made by our internal call centers as well as, in some cases, by third-party publishers' call centers. We also purchase a portion of inquiry data from third-party publishers and cannot guarantee that these third-parties will comply with applicable laws and regulations. Any failure by us or the third-party publishers on which we rely for telemarketing, email marketing, and other performance marketing activities to adhere to or successfully implement appropriate processes and procedures in response to existing laws and regulations and changing regulatory requirements could result in legal and monetary liability, significant fines and penalties, or damage to our reputation in the marketplace, any of which could have a material adverse effect on our business, financial condition, and results of operations. Furthermore, our clients may make business decisions based on their own experiences with the TCPA regardless of our products and the changes we implemented to comply with the new regulations. These decisions may negatively affect our revenue or profitability.

Changes in regulations, or the regulatory environment, applicable to us or our media sources, third party publishers or clients could also have a material adverse effect on our business. For example, in March of 2023, the FCC issued a Report and Order and Further Notice of Public Rulemaking regarding Targeting and Eliminating Unlawful Text Messages. The proposed rules, among other things, would amend TCPA consent requirements to ban the practice of allowing a single consumer consent to be grounds for multiple marketers to deliver calls and text messages. If adopted, the proposed rules could have a material adverse impact on our media sources and our clients, especially smaller businesses, as these media sources and clients may not be able to continue to participate in, or may substantially reduce their participation in, the online advertising channel due to increased costs, technological compliance challenges and additional legal risks, including potential liabilities or claims relating to compliance. Decreased participation in online advertising by our media sources or clients as a result of the proposed rules could have a material adverse impact on our business, results of operation and financial condition, as it may reduce the availability to us of qualified inquiries. Moreover, our business could be materially and adversely affected directly by the FCC's proposed rules, as we also generate a substantial portion of our revenue from our own operation of websites to generate qualified inquiries. As of the date of this report, the FCC's proposed rules have been released for public comment only and have not been formally adopted. The final provisions and the timeline for its adoption are subject to changes and uncertainties. The final version of the FCC's proposed rules, if adopted, could contain additional provisions resulting in additional material adverse impacts on our business, including to our revenue and profitability. Additionally, compliance with the FCC's proposed rules, if adopted, and other future changes in laws may increase our compliance costs, and any failure by us or our media sources or clients to comply with such laws may subject us to significant liabilities.

In connection with our owned and our third-party publishers' email campaigns to generate traffic for our clients, we are subject to various state and federal laws regulating commercial email communications, including the federal CAN-SPAM Act. For example, in 2012, several of our clients were named defendants in a California Anti-Spam lawsuit relating to commercial emails which allegedly originated from us and our third-party publishers. While the matter was ultimately resolved in our clients' favor, we were nonetheless obligated to indemnify certain of our clients for the fees incurred in the defense of such matter. Further, foreign laws and regulations, such as the Canadian Anti-Spam Law, may also apply to our business activities to the extent we are doing business with or marketing to consumers in foreign jurisdictions. If we or any of our third-party publishers fail to comply with any provisions of these laws or

***Many people are using mobile devices to access the Internet. If we fail to optimize our websites for mobile access with respect to user interfaces, we may not remain competitive and could lose clients or visitors to our websites.***

The number of people who access the Internet through mobile devices such as smart phones and tablets has continued to increase dramatically in the past several years. Our online marketing services and content were originally designed for desktop or laptop computers. The shift from desktop or laptop computers to mobile devices could potentially deteriorate the user experience for mobile visitors to our websites and may make it more difficult for mobile visitors to respond to our offerings. For example, a user's experience on a mobile device with respect to user interfaces such as an online marketing website and content originally designed for desktop or laptop computers will be suboptimal unless such website and content are designed to accommodate and improve mobile access to ensure a positive user experience. It also requires us to develop new product offerings specifically designed for mobile devices, such as social media advertising opportunities. If we fail to optimize our websites cost effectively and improve the monetization capabilities of our mobile marketing services, we may not remain competitive, which may negatively affect our business and results of operations.

***Third-party publishers, strategic partners, vendors or their respective affiliates may engage in unauthorized or unlawful acts that could subject us to significant liability or cause us to lose clients and revenue.***

We generate a significant portion of our web visitors from online media that we source directly from our third-party publishers' and strategic partners' owned and operated websites, as well as indirectly from the affiliates of our third-party publishers and strategic partners. We also rely on third-party call centers and email marketers. Some of these third-parties, strategic partners, vendors and their respective affiliates are authorized to use our clients' brands, subject to contractual restrictions. Any activity by third-party publishers, strategic partners, vendors or their respective affiliates which violates the marketing guidelines of our clients or that clients view as potentially damaging to their brands (e.g., search engine bidding on client trademarks), whether or not permitted by our contracts with our clients, could harm our relationship with the client and cause the client to terminate its relationship with us, resulting in a loss of revenue. Moreover, because we do not have a direct contractual relationship with the affiliates of our third-party publishers and strategic partners, we may not be able to monitor the compliance activity of such affiliates. If we are unable to cause our third-party publishers and strategic partners to monitor and enforce our clients' contractual restrictions on such affiliates, our clients may terminate their relationships with us or decrease their marketing budgets with us. In addition, we may also face liability for any failure of our third-party publishers, strategic partners, vendors or their respective affiliates to comply with regulatory requirements, as further described in the risk factor beginning, "Negative changes in the economic conditions and the regulatory environment have had in the past, and may in the future have, a material and adverse impact on our revenue, business and growth."

The law is unsettled on the extent of liability that an advertiser in our position has for the activities of third-party publishers, strategic partners or vendors. In addition, certain of our contracts impose liability on us, including indemnification obligations, for the acts of our third-party publishers, strategic partners or vendors. We could be subject to costly litigation and, if we are unsuccessful in defending ourselves, we could incur damages for the unauthorized or unlawful acts of third-party publishers, strategic partners or vendors.

***If we are unable to collect our receivables from our clients, our results of operations and cash flows could be adversely affected.***

We expect to obtain payment from our clients for work performed and maintain an allowance against receivables for potential losses on client accounts. Actual losses on client receivables could differ from those that we currently anticipate and, as a result, we might need to adjust our allowances. We may not accurately assess the creditworthiness of our clients. Macroeconomic conditions, such as any evolving industry standards, economic downturns, changing regulatory conditions and changing visitor and client demands, could also result in financial difficulties for our clients, including insolvency or bankruptcy. As a result, this could cause clients to delay payments to us, request modifications to their payment arrangements that could extend the timing of cash receipts or default on their payment obligations to us. For example, in the third quarter of fiscal year 2019, we recorded a one-time charge of $8.7 million for bad debt expense related to a large former education client, which arose in part due to the U.S. Department of Education restricting one of its for-profit schools from participating in Title IV programs. If we experience an increase in the time to bill and collect for our services, our results of operations and cash flows could be adversely affected.

Our acquisitions or investments could also result in dilutive issuances of our equity securities, the incurrence of debt or deferred purchase price obligations, contingent liabilities, amortization expense, impairment of goodwill or restructuring charges, any of which could harm our financial condition or results. For example, under our acquisition agreement with MBT, the purchase consideration included $4.0 million in post-closing payments and an estimated fair value of contingent consideration of $1.5 million of which the contingent consideration was paid off in the third quarter of fiscal year 2020. Under our acquisition agreement with CCM, the purchase consideration included $7.5 million in post-closing payments and an estimated fair value of contingent consideration of $3.6 million. Under our acquisition agreement with AmOne, the purchase consideration included $8.0 million in post-closing payments. Under our acquisition agreement with Modernize, the purchase consideration included $27.5 million in post-closing payments. Under our acquisition agreement with Mayo Labs, the purchase consideration included $2.0 million in post-closing payments. Under our acquisition agreement with FCE, the purchase consideration included $4.0 million in post-closing payments and contingent consideration of up to an additional $9.0 million. Also, the anticipated benefit of many of our strategic transactions, including anticipated synergies, may not materialize. Employee retention may be adversely impacted as the result of acquisitions, and our ability to manage across multiple remote locations and business cultures could adversely affect the realization of anticipated benefits. In connection with a disposition of assets or a business, we may also agree to provide indemnification for certain potential liabilities or retain certain liabilities or obligations, which may adversely impact our financial condition or results.

***We rely on call centers, Internet and data center providers, and other third-parties for key aspects of the process of providing services to our clients, and any failure or interruption in the services and products provided by these third-parties could harm our business.***

We rely on internal and third-party call centers as well as third-party vendors, data centers and Internet providers. Notwithstanding disaster recovery and business continuity plans and precautions instituted to protect our clients and us from events that could interrupt delivery of services, there is no guarantee that such interruptions would not result in a prolonged interruption in our ability to provide services to our clients. Any temporary or permanent interruption in the services provided by our call centers or third-party providers could significantly harm our business.

In addition, any financial or other difficulties our third-party providers face may have negative effects on our business, the nature and extent of which we cannot predict. Other than our data privacy and security assessment processes, we exercise little control over our third-party vendors, which increases our vulnerability to problems with the services they provide. We license technology and related databases from third-parties to facilitate analysis and storage of data and delivery of offerings. We have experienced interruptions and delays in service and availability for data centers, bandwidth and other technologies in the past, and may experience more in the future. Any errors, failures, interruptions or delays experienced in connection with these third-party technologies and services could adversely affect our business and could expose us to liabilities to third-parties.

***Our quarterly revenue and results of operations may fluctuate significantly from quarter to quarter due to fluctuations in advertising spending, including seasonal and cyclical effects.***

In addition to other factors that cause our results of operations to fluctuate, results are also subject to significant seasonal fluctuation. In particular, our quarters ending December 31 (our second fiscal quarter) are typically characterized by seasonal weakness. During that quarter, there is generally lower availability of media during the holiday period on a cost-effective basis and some of our clients have lower budgets. In our quarters ending March 31 (our third fiscal quarter), this trend generally reverses with better media availability and often new budgets at the beginning of the year for our clients with fiscal years ending December 31. Moreover, our lending clients' businesses are subject to seasonality. For example, our clients that offer home services products are historically subject to seasonal trends. These trends reflect the general patterns of the home services industry, which typically peak in the spring and summer seasons. Other factors affecting our clients' businesses include macro factors such as credit availability, the strength of the economy and employment. Any of the foregoing seasonal or cyclical trends, or the combination of them, may negatively impact our quarterly revenue and results of operations.

Furthermore, advertising spend on the Internet, similar to traditional media, tends to be cyclical and discretionary as a result of factors beyond our control, including budgetary constraints and buying patterns of clients, as well as economic conditions affecting the Internet and media industry. For example, weather and other events have in the past led to short-term increases in insurance industry client loss ratios and damage or interruption in our clients' operations, either of which can lead to decreased client spend on online performance marketing. In addition, inherent industry specific risks (e.g., insurance industry loss ratios and cutbacks) and poor macroeconomic conditions such as high interest rates, inflationary environments as well as other short-term events could decrease our clients' advertising spending and thereby have a material adverse effect on our business, financial condition, operating results and cash flows.

Furthermore, actions by service providers could restrict our ability to deliver Internet-based advertising. For example, if email service providers ("ESPs") categorize our emails as "promotional," then these emails may be directed to an alternate and less readily accessible section of a consumer's inbox. In the event ESPs materially limit or halt the delivery of our emails, or if we fail to deliver emails to consumers in a manner compatible with ESPs' email handling or authentication technologies, our ability to contact consumers through email could be significantly restricted. In addition, if we are placed on "spam" lists or lists of entities that have been involved in sending unwanted, unsolicited emails, or if internet service providers prioritize or provide superior access to our competitors' content, our business and results of operations may be adversely affected.

Interruptions, failures or defects in our data collection systems, as well as data privacy and security concerns and regulatory changes or enforcement actions affecting our or our data partners' ability to collect user data, could also limit our ability to analyze data from, and thereby optimize, our clients' marketing campaigns. If our access to data is limited in the future, we may be unable to provide effective technologies and services to clients and we may lose clients and revenue.

**Risks Related to Our Intellectual Property**

***If we do not adequately protect our intellectual property rights, our competitive position and business may suffer.***

Our ability to compete effectively depends upon our proprietary systems and technology. We rely on patent, trade secret, trademark and copyright law, confidentiality agreements and technical measures to protect our proprietary rights. We enter into confidentiality agreements with our employees, consultants, independent contractors, advisors, client vendors and publishers. These agreements may not effectively prevent unauthorized disclosure of confidential information or unauthorized parties from copying aspects of our services or obtaining and using our proprietary information. For example, past or current employees, contractors or agents may reveal confidential or proprietary information. Further, these agreements may not provide an adequate remedy in the event of unauthorized disclosures or uses, and we cannot assure you that our rights under such agreements will be enforceable. Effective patent, trade secret, copyright and trademark protection may not be available in all countries where we currently operate or in which we may operate in the future. Some of our systems and technologies are not covered by any copyright, patent or patent application. We cannot guarantee that: (i) our intellectual property rights will provide competitive advantages to us; (ii) our ability to assert our intellectual property rights against potential competitors or to settle current or future disputes will be effective; (iii) our intellectual property rights will be enforced in jurisdictions where competition may be intense or where legal protection may be weak; (iv) any of the patent, trademark, copyright, trade secret or other intellectual property rights that we presently employ in our business will not lapse or be invalidated, circumvented, challenged, or abandoned; (v) competitors will not design around our protected systems and technology; or (vi) that we will not lose the ability to assert our intellectual property rights against others.

We have from time to time become aware of third-parties who we believe may have infringed our intellectual property rights. Such infringement or infringement of which we are not yet aware could reduce our competitive advantages and cause us to lose clients, third-party publishers or could otherwise harm our business. Policing unauthorized use of our proprietary rights can be difficult and costly. Litigation, while it may be necessary to enforce or protect our intellectual property rights, could result in substantial costs and diversion of resources and management attention and could adversely affect our business, even if we are successful defending such litigation on the merits. In addition, others may independently discover trade secrets and proprietary information, and in such cases we could not assert any trade secret rights against such parties.

***Third-parties may sue us for intellectual property infringement, which, even if unsuccessful, could require us to expend significant costs to defend or settle.***

We cannot be certain that our internally developed or acquired systems and technologies do not and will not infringe the intellectual property rights of others. In addition, we license content, software and other intellectual property rights from third-parties and may be subject to claims of infringement if such parties do not possess the necessary intellectual property rights to the products they license to us.

In addition, we have in the past, and may in the future, be subject to legal proceedings and claims that we have infringed the patents or other intellectual property rights of third-parties. These claims sometimes involve patent holding companies or other adverse patent owners who have no relevant product revenue and against whom our own intellectual property rights, if any, may therefore provide little or no deterrence. For example, in December 2012, Internet Patents Corporation ("IPC") filed a patent infringement lawsuit against us in the Northern District of California alleging that some of our websites infringe a patent held by IPC. IPC is a non-practicing entity that relies on asserting its patents as its primary source of revenue. In addition, third-parties have asserted and may in the future assert intellectual property infringement claims against our clients, and we have agreed in certain circumstances to indemnify and defend against such claims. Any intellectual property-related infringement claims, whether or not meritorious and regardless of the outcome of the litigation, could result in costly litigation, could divert management resources and attention and could cause us to change our business practices. Should we be found liable for infringement, we may be required to enter into licensing agreements, if available on acceptable terms or at all, pay substantial damages, or limit or curtail our systems and technologies. Moreover, we may need to redesign some of our systems and technologies to avoid future infringement liability. Any of the foregoing could prevent us from competing effectively and increase our costs.

Additionally, the laws relating to use of trademarks on the Internet are unsettled, particularly as they apply to search engine functionality. For example, other Internet marketing and search companies have been sued for trademark infringement and other intellectual property-related claims for displaying ads or search results in response to user queries that include trademarked terms. The outcomes of these lawsuits have differed from jurisdiction to jurisdiction. We may be subject to trademark infringement, unfair competition, misappropriation or other intellectual property-related claims which could be costly to defend and result in substantial damages or otherwise limit or curtail our activities, and therefore adversely affect our business or prospects.

***As a creator and a distributor of Internet content, we face potential liability and expenses for legal claims based on the nature and content of the materials that we create or distribute, including materials provided by our clients. If we are required to pay damages or expenses in connection with these legal claims, our results of operations and business may be harmed.***

We display original content and third-party content on our websites and in our marketing messages. In addition, our clients provide us with advertising creative and financial information (e.g., insurance premium or credit card interest rates) that we display on our owned and operated websites and our third-party publishers' websites. As a result, we face potential liability based on a variety of claims, including defamation, negligence, deceptive advertising, copyright or trademark infringement. We are also exposed to risk that content provided by third-parties or clients is inaccurate or misleading, and for material posted to our websites by users and other third-parties. These claims, whether brought in the United States or abroad, could divert our management's time and attention away from our business and result in significant costs to investigate, defend, and respond to investigative demands, regardless of the merit of these claims. In addition, if we become subject to these types of claims and are not successful in our defense, we may be forced to pay substantial damages.

**Risks Related to the Ownership of Our Common Stock**

***Our stock price has been volatile and may continue to fluctuate significantly in the future, which may lead to you not being able to resell shares of our common stock at or above the price you paid, delisting, securities litigation or hostile or otherwise unfavorable takeover offers.***

The trading price of our common stock has been volatile since our initial public offering and may continue to be subject to wide fluctuations in response to various factors, some of which are beyond our control. These factors include those discussed in this "Risk Factors" section of this report and other factors such as:

- our ability to grow our revenues and adjusted EBITDA margin and to manage any such growth effectively;
- changes in earnings estimates or recommendations by securities analysts;
- announcements about our revenue, earnings or other financial results, including outlook, that are not in line with analyst expectations;
- negative publicity about us, our industry, our clients or our clients' industries;
- an economic recession in the United States or other countries;
- geopolitical and predominantly domestic as well as potentially international economic conditions in addition to public health crises such as the COVID-19 pandemic and geopolitical conflicts such as the Russia-Ukraine military conflict and resulting economic sanctions;

Any damage to our reputation, including from publicity from legal proceedings against us or companies that work within our industry, governmental proceedings, users impersonating or scraping our websites, unfavorable media coverage, consumer class action litigation, or the disclosure of security breaches, cyber-attacks or other similar incidents, could adversely affect our business, financial condition and results of operations.

***We may need additional capital in the future to meet our financial obligations and to pursue our business objectives. Additional capital may not be available or may not be available on favorable terms and our business and financial condition could therefore be adversely affected.***

While we anticipate that our existing cash and cash equivalents and cash we expect to generate from future operations will be sufficient to fund our operations for at least the next 12 months, we may need to raise additional capital, including debt capital, to fund operations in the future or to finance acquisitions. If we seek to raise additional capital in order to meet various objectives, including developing future technologies and services, increasing working capital, acquiring businesses, and responding to competitive pressures, capital may not be available on favorable terms or may not be available at all. Lack of sufficient capital resources could significantly limit our ability to take advantage of business and strategic opportunities. Any additional capital raised through the sale of equity or debt securities with an equity component would dilute our stock ownership. If adequate additional funds are not available, we may be required to delay, reduce the scope of, or eliminate material parts of our business strategy, including potential additional acquisitions or development of new technologies.

***We may face additional risks in conducting business in international markets.***

We have entered into and exited certain international markets and may enter into international markets in the future, including through acquisitions. We have limited experience in marketing, selling and supporting our services outside of the United States, and we may not be successful in introducing or marketing our services abroad.

There are risks and challenges inherent in conducting business in international markets, such as:

- adapting our technologies and services to foreign clients' preferences and customs;
- successfully navigating foreign laws and regulations, including marketing, data privacy and security, employment and labor regulations;
- changes in foreign political and economic conditions, including as a result of the Russia-Ukraine military conflict;
- tariffs and other trade barriers, fluctuations in currency exchange rates and potentially adverse tax consequences;
- language barriers or cultural differences;
- reduced or limited protection for intellectual property rights in foreign jurisdictions;
- difficulties and costs in staffing, managing or overseeing foreign operations;
- education of potential clients who may not be familiar with online marketing;
- challenges in collecting accounts receivables;
- monitoring and complying with economic sanctions, including those resulting from the Russia-Ukraine military conflict; and
- successfully interpreting and complying with the U.S. Foreign Corrupt Practices Act and similar foreign anti-bribery laws, particularly when operating in countries with varying degrees of governmental corruption.

If we are unable to successfully expand and market our services abroad, our business and future growth may be harmed, and we may incur costs that may not lead to future revenue.

**Item 1B.** ***Unresolved Staff Comments***

None.

**Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations***

*You should read the following discussion and analysis of our financial condition and results of operations in conjunction with the consolidated financial statements and the notes thereto included elsewhere in this report. The following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this report, particularly in the sections titled "Cautionary Note on Forward-Looking Statements" and "Risk Factors."*

**Management Overview**

We are a leader in performance marketplaces and technologies for the financial services and home services industries. We specialize in customer acquisition for clients in high value, information-intensive markets or "verticals," including financial services and home services. Our clients include some of the world's largest companies and brands in those markets. The majority of our operations and revenue are in North America.

We deliver measurable and cost-effective marketing results to our clients, typically in the form of qualified inquiries such as clicks, leads, calls, applications, or customers. Clicks, leads, calls, and applications can then convert into a customer or sale for clients at a rate that results in an acceptable marketing cost to them. We are typically paid by clients when we deliver qualified inquiries in the form of clicks, leads, calls, applications, or customers, as defined by our agreements with them. References to the delivery of customers means a sale or completed customer transaction (e.g., funded loans, bound insurance policies or customer appointments with clients). Because we bear the costs of media, our programs must result in attractive marketing costs to our clients at media costs and margins that provide sound financial outcomes for us. To deliver clicks, leads, calls, applications, and customers to our clients, generally we:

- own or access targeted media through business arrangements (e.g., revenue sharing arrangements with online publisher partners, large and small) or by purchasing media (e.g., clicks from major search engines);
- run advertisements or other forms of marketing messages and programs in that media that result in consumer or visitor responses, typically in the form of clicks (by a consumer to further qualification or matching steps, or to online client applications or offerings), leads (e.g., consumer contact information), calls (from a consumer or to a consumer by our owned and operated or contracted call centers or by that of our clients or their agents), applications (e.g., for enrollment or a financial product), or customers (e.g., funded personal loans);
- continuously seek to display clients and client offerings to visitors or consumers that result in the maximum number of consumers finding solutions that can meet their needs and to which they will take action to respond, resulting in media buying efficiency (e.g., by segmenting media or traffic so that the most appropriate clients or client offerings can be displayed or "matched" to each segment based on fit, response rates or conversion rates); and
- through technology and analytics, seek to optimize combination of objectives to satisfy the maximum number of shopping or researching visitors or consumers, deliver on client marketing objectives, effectively compete for online media, and generate a sound financial outcome for us.

Our primary financial objective has been and remains creating revenue growth from sustainable sources, at target levels of profitability. Our primary financial objective is not to maximize short-term profits, but rather to achieve target levels of profitability while investing in various growth initiatives, as we continue to believe we are in the early stages of a large, long-term market opportunity.

Our business derives its net revenue primarily from fees earned through the delivery of qualified inquiries such as clicks, leads, calls, applications, or customers. Through a vertical focus, targeted media presence and our technology platform, we are able to deliver targeted, measurable marketing results to our clients.

Our financial services client vertical represented 66%, 72% and 74% of net revenue in fiscal years 2023, 2022 and 2021. Our home services client vertical represented 33%, 27% and 23% of net revenue in fiscal years 2023, 2022 and 2021. Other revenue, which primarily includes our performance marketing agency and technology services, represented 1% of net revenue in fiscal years 2023, 2022 and 2021. In addition, revenue recognized from our divested former education client vertical represented 0%, 0% and 2% of net revenue for fiscal years 2023, 2022 and 2021. See Note 7, *Divestitures,* to our consolidated financial statements for more information related to the divestiture. We generated the majority of our revenue from sales to clients in the United States.

**Trends Affecting our Business**

***Client Verticals***

Our financial services client vertical has been challenged by a number of factors in the past, including the limited availability of high quality media at acceptable margins caused by the acquisition of media sources by competitors, increased competition for high quality media and changes in search engine algorithms. These factors may impact our business in the future again. To offset this impact, we have enhanced our product set to provide greater segmentation, matching, transparency and right pricing of media that have enabled better monetization to provide greater access to high quality media sources. Moreover, we have entered into strategic partnerships and acquisitions to increase and diversify our access to quality media and client budgets.

In addition, within our financial services client vertical, we derive a significant amount of revenue from auto insurance carriers and the financial results depend on the performance of the auto insurance industry. For example, weather-related and supply chain events have led to increases in insurance industry loss ratios, which decreased our clients' advertising spending and thereby had a material adverse effect on our business.

On July 1, 2020, we completed the acquisition of Modernize, a leading home improvement performance marketing company, to broaden our customer and media relationships in the home services client vertical. Our home services client vertical has been expanding over the past several years, primarily driven by successful execution of growth initiatives and synergies with the Modernize acquisition.

Our business also benefits from more spending by clients in digital media and performance marketing as digital marketing continues to evolve.

***Acquisitions***

Acquisitions have historically been, and continue to be, an important element of our overall corporate strategy and use of capital. We have completed several strategic acquisitions in the past, including the acquisitions of Modernize, Mayo Labs and FCE completed in fiscal year 2021, and the acquisitions of AmOne, CCM, and MBT completed in fiscal year 2019. For detailed information regarding our acquisitions, refer to Note 6, *Acquisitions* to our consolidated financial statements.

***Development, Acquisition and Retention of High Quality Targeted Media***

One of the primary challenges of our business is finding or creating media that is high quality and targeted enough to attract prospects for our clients at costs that provide a sound financial outcome for us. In order to grow our business, we must be able to find, develop, or acquire and retain quality targeted media on a cost-effective basis. Consolidation of media sources, changes in search engine algorithms and increased competition for available media has, during some periods, limited and may continue to limit our ability to generate revenue at acceptable margins. To offset this impact, we have developed new sources of media, including entering into strategic partnerships with other marketing and media companies and acquisitions. Such partnerships include takeovers of performance marketing functions for large web media properties; backend monetization of unmatched traffic for clients with large media buys; and white label products for other performance marketing companies. We have also focused on growing our revenue from call center, email, mobile and social media traffic sources.

***Seasonality***

Our results are subject to significant fluctuation as a result of seasonality. In particular, our quarters ending December 31 (our second fiscal quarter) are typically characterized by seasonal weakness. In our second fiscal quarters, there is generally lower availability of media during the holiday period on a cost-effective basis and some of our clients have lower budgets. In our quarters ending March 31 (our third fiscal quarter), this trend generally reverses with better media availability and often new budgets at the beginning of the year for our clients with fiscal years ending December 31.

Our results are also subject to fluctuation as a result of seasonality in our clients' business. For example, revenue in our home services client vertical is subject to cyclical and seasonal trends, as the consumer demand for home services typically rises during the spring and summer seasons and declines during the fall and winter seasons. Other factors affecting our clients' businesses include macro factors such as credit availability in the market, interest rates, the strength of the economy and employment.

*Net Revenue*

Net revenue was approximately flat in fiscal year 2023 compared to fiscal year 2022. Revenue from our financial services client vertical decreased by $37.4 million, or 9%, due to a decrease in revenue in our insurance business associated with decreased spending by certain insurance carriers to address profitability concerns caused by higher incident rates, inflation, and higher costs to repair and replace vehicles. This was offset by an increase in revenue in our credit cards, personal loans and banking businesses due to increased media and client budgets. Revenue from our home services client vertical increased by $34.3 million, or 22%, primarily as a result of increased client budgets and successful execution of growth initiatives. Other revenue, which primarily includes performance marketing agency and technology services, contributed $7.8 million of revenue for fiscal year 2023, as compared to $6.2 million of revenue for fiscal year 2022.

Net revenue increased by $3.6 million, or 1%, in fiscal year 2022 compared to fiscal year 2021. Revenue from our home services client vertical increased by $24.3 million, or 18%, primarily as a result of increased client budgets and the successful integration of the Modernize acquisition. Revenue from our financial services client vertical decreased by $9.7 million, or 2%, primarily due to a decrease in revenue in our insurance business associated with decreased spending by insurance carriers to address profitability concerns caused by higher incident rates, weather-related catastrophes, inflation, and higher costs to repair and replace vehicles. This is offset by an increase in revenue in our credit-driven businesses due to some economic recovery from the impact of the COVID-19 pandemic. Other revenue, which primarily includes performance marketing agency and technology services, contributed $6.2 million of revenue for fiscal year 2022, as compared to $5.5 million of revenue for fiscal year 2021. The divestiture of our former education client vertical, completed in fiscal year 2021, resulted in a decrease in revenue by $11.6 million for fiscal year 2022, as compared to fiscal year 2021.

*Cost of Revenue and Gross Profit Margin*

Cost of revenue increased by $3.7 million, or 1%, in fiscal year 2023 compared to fiscal year 2022. This was primarily driven by increased personnel costs of $16.4 million and increased amortization of intangible assets of $2.0 million, offset by decreased media and marketing costs of $15.9 million. The increase in personnel costs was mainly due to higher headcount, the impact of our annual salary increases, increased incentive compensation and increased stock-based compensation expense. The decrease in media and marketing costs was associated with higher mix of revenue derived from businesses with better media efficiency. Gross profit margin, which is the difference between net revenue and cost of revenue as a percentage of net revenue, was 8% in fiscal year 2023 compared to 9% in fiscal year 2022. The decrease in gross profit margin was primarily attributable to increased personnel costs as a percentage of revenue as we continue to invest in long-term growth initiatives and capabilities.

Cost of revenue increased by $20.4 million, or 4%, in fiscal year 2022 compared to fiscal year 2021. This was primarily driven by increased media and marketing costs of $15.4 million, increased personnel costs of $3.3 million and increased amortization of intangible assets of $0.5 million. The increase in media and marketing costs was associated with higher revenue volumes. The increase in personnel costs was mainly attributable to a higher headcount. The increase in amortization expense was primarily due to the acquisitions of intangible assets in fiscal year 2022. Gross profit margin was 9% in fiscal year 2022 compared to 12% in fiscal year 2021. The decrease in gross profit margin was primarily attributable to increased media and marketing costs as a percentage of revenue.

***Operating Expenses***

| | Fiscal Year Ended June 30, | | | 2023 - 2022 | 2022 - 2021 |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | % Change | % Change |
| | | (In thousands) | | | |
| Product development | $ 28,893 | $ 21,906 | $ 19,344 | 32% | 13% |
| Sales and marketing | 12,542 | 11,042 | 10,991 | 14% | —% |
| General and administrative | 27,904 | 25,501 | 26,270 | 9% | (3%) |
| Operating expenses | $ 69,339 | $ 58,449 | $ 56,605 | 19% | 3% |

*Product Development Expenses*

Product development expenses increased by $7.0 million, or 32%, in fiscal year 2023 compared to fiscal year 2022. This was primarily due to increased personnel costs of $6.4 million as a result of higher headcount and the impact of our annual salary increases as we continue to invest in long-term growth initiatives and capabilities, and increased professional services costs of $0.6 million.

**QUINSTREET, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | Fiscal Year Ended June 30, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| **Cash Flows from Operating Activities** | | | |
| Net (loss) income | $ (68,866) | $ (5,248) | $ 23,555 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 19,155 | 16,961 | 16,201 |
| Provision for (benefit from) sales returns and doubtful accounts receivable | 2,745 | 581 | (341) |
| Stock-based compensation | 18,786 | 18,506 | 19,633 |
| Change in the fair value of contingent consideration | — | (926) | — |
| Non-cash lease expense | (1,081) | (1,043) | (816) |
| Deferred income taxes | 47,214 | (791) | 5,408 |
| Gain on divestitures of businesses, net | — | — | (16,615) |
| Other adjustments, net | (149) | 482 | 741 |
| Changes in assets and liabilities: | | | |
| Accounts receivable | 10,936 | 5,543 | (20,063) |
| Prepaid expenses and other assets | (4,802) | 3,003 | 5,955 |
| Other assets, noncurrent | 124 | (788) | (173) |
| Accounts payable | (4,770) | (2,885) | 6,558 |
| Accrued liabilities | (7,122) | (5,031) | 10,612 |
| Deferred revenue | (332) | 308 | (40) |
| Net cash provided by operating activities | 11,838 | 28,672 | 50,615 |
| **Cash Flows from Investing Activities** | | | |
| Capital expenditures | (3,062) | (2,842) | (1,969) |
| Business acquisitions, net of cash acquired | — | (1,797) | (49,304) |
| Internal software development costs | (11,942) | (4,672) | (3,131) |
| Proceeds from divestitures of businesses, net of cash divested | — | — | 21,947 |
| Purchases of equity investment | — | — | (4,000) |
| Other investing activities | (121) | 86 | — |
| Net cash used in investing activities | (15,125) | (9,225) | (36,457) |
| **Cash Flows from Financing Activities** | | | |
| Proceeds from exercise of stock options and issuance of common stock under employee stock purchase plan | 3,219 | 1,854 | 4,357 |
| Payment of withholding taxes related to release of restricted stock, net of share settlement | (5,389) | (7,342) | (7,980) |
| Post-closing payments and contingent consideration related to acquisitions | (11,643) | (12,559) | (7,689) |
| Repurchase of common stock | (5,646) | (15,268) | — |
| Net cash used in financing activities | (19,459) | (33,315) | (11,312) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | (15) | (12) | (36) |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (22,761) | (13,880) | 2,810 |
| Cash, cash equivalents and restricted cash at beginning of period | 96,453 | 110,333 | 107,523 |
| Cash, cash equivalents and restricted cash at end of period | $ 73,692 | $ 96,453 | $ 110,333 |
| **Reconciliation of cash, cash equivalents, and restricted cash to the consolidated balance sheets** | | | |
| Cash and cash equivalents | $ 73,677 | $ 96,439 | $ 110,318 |
| Restricted cash included in other assets, noncurrent | 15 | 14 | 15 |
| **Total cash, cash equivalents and restricted cash** | $ 73,692 | $ 96,453 | $ 110,333 |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Cash paid for income taxes | 372 | 396 | 293 |
| **Supplemental Disclosure of Noncash Investing and Financing Activities** | | | |
| Post-closing payments unpaid at acquisition date (See Note 6) | — | 2,785 | 32,192 |
| Contingent consideration unpaid at acquisition date (See Note 6) | — | — | 2,926 |
| Retirement of treasury stock (See Note 13) | (4,053) | (16,950) | — |
| Purchases of property and equipment included in accrued liabilities | 1,228 | 613 | 275 |

See notes to consolidated financial statements

## 3. Revenue

### *Disaggregation of Revenue*

The following table presents the Company's net revenue disaggregated by vertical (in thousands):

| | Fiscal Year Ended June 30, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Net revenue: | | | |
| Financial Services | $ 379,723 | $ 417,110 | $ 426,819 |
| Home Services | 193,133 | 158,805 | 134,538 |
| Other Revenue | 7,768 | 6,184 | 5,543 |
| Divested Business [(1)] | — | — | 11,587 |
| Total net revenue | $ 580,624 | $ 582,099 | $ 578,487 |

(1) Represents revenue recognized from the former education client vertical divested in fiscal year 2021. See Note 7, *Divestitures*, for more information.

### *Contract Balances*

The following table provides information about contract liabilities from the Company's contracts with its clients (in thousands):

| | June 30, | |
|---|---|---|
| | 2023 | 2022 |
| Deferred revenue | $ 9 | $ 341 |
| Client deposits | 1,213 | 1,163 |
| Total | $ 1,222 | $ 1,504 |

The Company's contract liabilities result from payments received in advance of revenue recognition and advance consideration received from clients, which precede the Company's satisfaction of the associated performance obligation. The changes in the liability balances during fiscal year 2023 related to advance consideration received from clients of $8.5 million, offset by revenue recognized of $8.8 million.

**15. Segment Information**

Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The Company's chief operating decision maker, its chief executive officer, reviews financial information presented on a consolidated basis, and no expense or operating income is evaluated at a segment level. Given the consolidated level of review by the Company's chief executive officer, the Company operates as one reportable segment.

The following tables set forth net revenue and long-lived assets by geographic area (in thousands):

| | Fiscal Year Ended June 30, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Net revenue: | | | |
| United States | $ 570,703 | $ 559,984 | $ 566,589 |
| International | 9,921 | 22,115 | 11,898 |
| Total net revenue | $ 580,624 | $ 582,099 | $ 578,487 |

| | June 30, | |
|---|---|---|
| | 2023 | 2022 |
| Property and equipment, net: | | |
| United States | $ 16,475 | $ 9,095 |
| International | 274 | 216 |
| Total property and equipment, net | $ 16,749 | $ 9,311 |

| | June 30, | |
|---|---|---|
| | 2023 | 2022 |
| Other intangible assets, net: | | |
| United States | $ 38,700 | $ 49,696 |
| International | — | — |
| Total other intangible assets, net | $ 38,700 | $ 49,696 |

All other schedules are omitted because they are not required or the required information is shown in the financial statements or notes thereto.

(b) Exhibits

| Exhibit Number | Description of Exhibit | Form | File Number | Exhibit | Filing Date |
|---|---|---|---|---|---|
| 2.1 | Stock Purchase Agreement, dated November 5, 2010, by and among QuinStreet, Inc., Car Insurance.com, Inc., Car Insurance Agency, Inc., Car Insurance Holdings, Inc., CarInsurance.com, Inc., Lloyd Register IV, Lloyd Register III, David Fitzgerald, Timothy Register, Randy Horowitz and Erick Pace. | 8-K | 001-34628 | 2.1 | November 8, 2010 |
| 3.1 | Amended and Restated Certificate of Incorporation. | S-1/A | 333-163228 | 3.2 | December 22, 2009 |
| 3.2 | Bylaws. | S-1/A | 333-163228 | 3.4 | December 22, 2009 |
| 4.1 | Form of QuinStreet, Inc.'s Common Stock Certificate. | S-1/A | 333-163228 | 4.1 | January 14, 2010 |
| 10.1+ | QuinStreet, Inc. 2008 Equity Incentive Plan. | S-1 | 333-163228 | 10.1 | November 19, 2009 |
| 10.2+ | Forms of Option Agreement and Option Grant Notice under 2008 Equity Incentive Plan (for non-executive officer employees). | S-1 | 333-163228 | 10.2 | November 19, 2009 |
| 10.3+ | Forms of Option Agreement and Option Grant Notice under 2008 Equity Incentive Plan (for executive officers). | S-1 | 333-163228 | 10.3 | November 19, 2009 |
| 10.4+ | Forms of Option Agreement and Option Grant Notice under 2008 Equity Incentive Plan (for non-employee directors). | S-1 | 333-163228 | 10.4 | November 19, 2009 |
| 10.5+ | QuinStreet, Inc. 2010 Equity Incentive Plan. | S-8 | 333-165534 | 99.9 | March 17, 2010 |
| 10.6+ | Forms of Option Agreement and Option Grant Notice under 2010 Equity Incentive Plan (for non-executive officer employees). | S-8 | 333-165534 | 99.10 | March 17, 2010 |
| 10.7+ | Forms of Option Agreement and Option Grant Notice under 2010 Equity Incentive Plan (for executive officers). | S-8 | 333-165534 | 99.11 | March 17, 2010 |
| 10.8+ | Forms of Senior Management Restricted Stock Unit (RSU) Grant Notice and Agreement under 2010 Equity Incentive Plan (for executive officers). | 10-K | 001-34628 | 10.8 | August 23, 2012 |
| 10.9+ | Forms of Restricted Stock Unit (RSU) Grant Notice and Agreement under 2010 Equity Incentive Plan (for non-executive officer employees). | 10-K | 001-34628 | 10.9 | August 23, 2012 |
| 10.10+ | Form of Restricted Stock Unit Agreement under 2010 Equity Incentive Plan (for non-employee directors). | 10-K | 001-34628 | 10.10 | August 20, 2013 |
| 10.11+ | QuinStreet, Inc. 2010 Non-Employee Directors' Stock Award Plan. | S-8 | 333-165534 | 99.12 | March 17, 2010 |
| 10.12+ | Forms of Option Agreement and Option Grant Notice for Initial Grants under the 2010 Non-Employee Directors' Stock Award Plan. | S-8 | 333-165534 | 99.13 | March 17, 2010 |
| 10.13+ | Forms of Option Agreement and Option Grant Notice for Annual Grants under the 2010 Non-Employee Directors' Stock Award Plan. | S-8 | 333-165534 | 99.14 | March 17, 2010 |

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on August 21, 2023.

QuinStreet, Inc.

By: /s/ Douglas Valenti
Douglas Valenti
Chairman and Chief Executive Officer

## POWER OF ATTORNEY

**KNOW ALL PERSONS BY THESE PRESENTS**, that each person whose signature appears below constitutes and appoints Douglas Valenti and Gregory Wong, and each of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution and re-substitution, for him in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission hereby ratifying and confirming that each of said attorneys-in-fact and agents, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Douglas Valenti<br>Douglas Valenti | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | August 21, 2023 |
| /s/ Gregory Wong<br>Gregory Wong | Chief Financial Officer (Principal Financial and Accounting Officer) | August 21, 2023 |
| /s/ Asmau Ahmed<br>Asmau Ahmed | Director | August 21, 2023 |
| /s/ Anna Fieler<br>Anna Fieler | Director | August 21, 2023 |
| /s/ Matthew Glickman<br>Matthew Glickman | Director | August 21, 2023 |
| /s/ Stuart Huizinga<br>Stuart Huizinga | Director | August 21, 2023 |
| /s/ David Pauldine<br>David Pauldine | Director | August 21, 2023 |
| /s/ Andrew Sheehan<br>Andrew Sheehan | Director | August 21, 2023 |
| /s/ James Simons<br>James Simons | Director | August 21, 2023 |
| /s/ Hillary Smith<br>Hillary Smith | Director | August 21, 2023 |

# EXHIBIT 16

**From:** Saylor, James
**Sent:** Friday, November 8, 2024 12:23 PM
**To:** 'Stephen Ring' <shr@ringlaw.us>
**Subject:** RE: Shapiro v. QuinStreet, Inc. (D. Md.)

Mr. Ring,

I can speak any time this afternoon. What times work for you?

I will reiterate that QuinStreet has performed a thorough search of its records, and has now produced to you everything it has concerning calls made by or on behalf of QuinStreet to Plaintiff's phone number. That search identified a single call, dated July 6, 2023. QuinStreet has produced to you the source of the lead (a webform filled out July 6, 2023), QuinStreet's call log (reflecting the single outbound call, and two inbound calls from your client), and the associated call recording for the single outbound call QuinStreet made to Plaintiff's number. No other calls were made by or on QuinStreet's behalf to Plaintiff's phone number.

Can you please explain the basis for your "belie[f] there are multiple calls" from QuinStreet to Plaintiff's phone number? Your suggestion below that your belief is based on the "similarity of the calls" does not make sense where you allege that SelectQuote made the very same calls to Plaintiff's number. (Compare SAC Paragraph 26 and 44.)

Please provide the full telephone number that called your client at each of the following dates and times alleged in the Complaint and the basis for your allegation that they were placed by or on behalf of QuinStreet:

- July 5, 2023, 4:22pm
- July 31, 2023, 6:36pm
- January 18, 2024, 3:34pm
- June 6, 2024, 4:25pm
- July 22, 2024, 2:22pm

Once again, QuinStreet investigated and confirmed no calls were made by or on QuinStreet's behalf to Plaintiff's number on these dates, or any other date, other than the single call discussed above. There is no more discovery to provide. QuinStreet has provided you with everything. Further pursuit of this case against QuinStreet is a waste of your resources, my client's, and the Court's.

Look forward to talking with you this afternoon.

Regards,

**JAMES SAYLOR**
Partner

**Kelley Drye & Warren LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-5052
Cell: (203) 589-9509
jsaylor@kelleydrye.com

# EXHIBIT 17

**From:** Saylor, James
**Sent:** Friday, December 6, 2024 4:46 PM
**To:** shr@ringlaw.us
**Cc:** Kasdan, Ira; Smith, Whitney M.; Santolli, Brianna J.; Clark, Emily
**Subject:** RE: Shapiro v. QuinStreet, Inc. (D. Md.)

Stephen,

Please include my colleagues copied here on correspondence.

Until your settlement with SelectQuote is finalized and they are dismissed from the case, I do not think we can agree to a schedule without their involvement. Further, our understanding of the Local Rules is that the Judge typically sets a scheduling order without input from the parties (subject to the ability of parties to request modification of any deadlines as unreasonable), and that discovery does not commence until that time. The Judge may be waiting for the pleadings to be closed to do that.

Putting aside those complications, the schedule you have proposed could provide a sufficient amount of time for fact discovery if all we are talking about is your client's individual claim (it is certainly not long enough for class discovery, and provides no schedule for class certification briefing). We do not believe any expert evidence is necessary for your client's individual claim. We suggest, and would propose to the Court, that discovery be bifurcated pending the resolution of QuinStreet's forthcoming motion for summary judgment on Plaintiff's individual claim. If you agree, we will prepare a proposal to submit to the Court following SelectQuote's dismissal from the case.

Further, following our last discussion, I have confirmed with QuinStreet that all calls made on QuinStreet's behalf are made by logging on to QuinStreet's systems. There are no other databases to search for additional calls to your client. As we have already confirmed through production of QuinStreet's records, QuinStreet made a single call to Plaintiff's number, and that call was made by a live agent. The claims alleged in the Second Amended Complaint therefore have no merit and should be voluntarily dismissed with prejudice.

Finally, I ask that you respond to my question from November 8: Please provide the full telephone number that called your client at each of the following dates and times alleged in the Complaint and the basis for your allegation that they were placed by or on behalf of QuinStreet:

- July 5, 2023, 4:22pm
- July 31, 2023, 6:36pm
- January 18, 2024, 3:34pm
- June 6, 2024, 4:25pm
- July 22, 2024, 2:22pm

Regards,

**JAMES SAYLOR**

**Kelley Drye & Warren LLP**
Tel: (212) 808-5052
Cell: (203) 589-9509

# EXHIBIT 18

**From:** Saylor, James <JSaylor@KelleyDrye.com>
**Sent:** Friday, March 7, 2025 8:10 AM
**To:** Stephen Ring <shr@ringlaw.us>
**Cc:** Kasdan, Ira <IKasdan@KelleyDrye.com>; Smith, Whitney M. <WSmith@KelleyDrye.com>; Santolli, Brianna J. <BSantolli@KelleyDrye.com>; Clark, Emily <EClark@KelleyDrye.com>
**Subject:** Re: Shapiro v. QuinStreet, Inc. (D. Md.)

Stephen,

Our understanding of the Local Rules is that the Judge typically sets a scheduling order without input from the parties (subject to the ability of parties to request modification of any deadlines as unreasonable), and that discovery does not commence until that time. *See* Local Rule 103.9(b); Local Rule 104.4. Now that SelectQuote is out of the case, it is possible we will receive a scheduling order from the Court in the next few weeks. However, we are amenable to having a call to discuss the case. We are available on March 12 before noon and after 3pm (Eastern time).

In advance of the call, I ask that you again reflect on the discovery we have provided, confirming that QuinStreet placed a single call to your client's number, and our request that you therefore dismiss this case as your client has no claim. Please also provide a response to our question, which we originally asked on November 8and, again, on December 6:

Please provide the full telephone number that called your client at each of the following dates and times alleged in the Complaint and the basis for your allegation that they were placed by or on behalf of QuinStreet:

- July 5, 2023, 4:22pm
- July 31, 2023, 6:36pm
- January 18, 2024, 3:34pm
- June 6, 2024, 4:25pm
- July 22, 2024, 2:22pm

We look forward to discussing next week.

Thanks,

**JAMES SAYLOR**

**Kelley Drye & Warren LLP**
Tel: (212) 808-5052
Cell: (203) 589-9509

# EXHIBIT 19

## REDACTED VERSION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION - GREENBELT

| | |
|---|---|
| Stanley Shapiro, *on behalf of himself and all others similarly situated*,<br>Plaintiff,<br><br>v.<br><br>QuinStreet, Inc., *et al.*,<br><br>Defendants. | Case No. 8:24-cv-01667<br><br>Assigned to Hon. Lydia Kay Griggsby |

**DEFENDANT QUINSTREET, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland, Defendant QuinStreet, Inc., ("QuinStreet") by and through its undersigned attorneys, hereby provides its responses and objections to the Plaintiff's First Set of Interrogatories to QuinStreet (the "Interrogatories").

**PRELIMINARY STATEMENT AND PRESERVATION OF RIGHTS**

QuinStreet's responses are made without waiver of the following rights, but on the contrary, are intended to reserve and do reserve the following:

1. QuinStreet states that it is responding to the Interrogatories as it interprets and understands them. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from the understanding of QuinStreet, QuinStreet reserves its right to further supplement its objections and/or responses herein.

2. QuinStreet states that it makes these responses solely for the purpose of, and in relation to, this Action (defined below). Each response herein is made subject to all appropriate objections (including, but not limited to, objections concerning authenticity, foundation, competency, relevance, materiality, propriety, privilege, and admissibility) that would require the

exclusion of any information or thing at any subsequent proceeding in, or trial of, this or any other action. QuinStreet reserves the right to object on any ground to the introduction into evidence of any information produced in response to the Interrogatories.

3. If QuinStreet discloses privileged information in response to the Interrogatories, the disclosure is inadvertent and does not constitute a waiver of any applicable privilege.

4. That QuinStreet responded to an Interrogatory is not intended to, nor shall it be construed as an admission by QuinStreet of any fact(s) set forth in or assumed by any Interrogatory.

5. QuinStreet reserves the right to make additional objections or seek protective orders.

6. QuinStreet reserves the right to amend or further supplement these responses in the event that any information is inadvertently omitted or subsequently identified during the course of QuinStreet's ongoing discovery efforts.

**DEFINITIONS**

QuinStreet's responses below are further made subject to the following definitions:

1. "Action" means the lawsuit pending in the United States District Court for the District of Maryland, captioned as *Shapiro v. QuinStreet, Inc.*, No. 8:24-cv-01667.

2. "Second Amended Complaint" means the Second Amended Class Action Complaint filed on October 25, 2024 in the Action.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1**:

Identify each person who provided information used in the preparation of your discovery responses and specify the general category of information provided by each such person.

**<u>RESPONSE</u>**:

QuinStreet objects to this Interrogatory to the extent that it calls for any information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity by seeking information regarding communications with counsel.

Subject to and without waiving the foregoing objections, QuinStreet identifies the following person who provided information to assist in the preparation of QuinStreet's responses and objections to the Interrogatories: Tyler Orrell (Vice President, Contact Center Operations, at QuinStreet, Inc.).

**<u>INTERROGATORY NO. 2</u>**:

Identify all persons including individuals and entities who made Calls to Plaintiff during the Relevant Time Period. Include in your answer all "publishers" in the "QS Network" who made Calls. (See: " t) 'QS Network' means collectively websites, call centers and email service providers owned by QS, its corporate affiliates and QS network of third party publishers." ( https://www.quinstreet.com/client-terms; Exhibit A at docket no. 54-1.)

**<u>RESPONSE</u>**:

QuinStreet objects to this Interrogatory to the extent that it is compound and incorrectly assumes that QuinStreet made more than one call to Plaintiff. QuinStreet objects to the extent this Interrogatory seeks information regarding calls allegedly made by QuinStreet to anyone other than Plaintiff during the Relevant Time Period. QuinStreet further objects to this Interrogatory on the basis that its reference to "(See: "t)" and use of the term "publishers"—which is undefined—are incomprehensible, vague, and ambiguous.

Subject to and without waiving the foregoing objections, QuinStreet responds that QuinStreet called Plaintiff one time, on July 6, 2023, as shown in the previously produced call log, produced as QUINSTREET00006. That single call was placed by an individual named [redacted], who works at a call center managed by QuinStreet—[redacted]—which uses QuinStreet's software to place calls. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 3**:

Identify all persons including "publishers" in the "QS Network" who made Calls to individuals in Maryland during the Relevant Time Period.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that the term "publishers" and "QS Network" are not defined and, thus, vague and ambiguous. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to its response to Interrogatory No. 2. No "publisher" in the "QS Network" placed any calls to Plaintiff on behalf of QuinStreet. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 4**:

Identify all software used to plan, prepare or execute Calls during the Relevant Time Period, including Calls to Plaintiff and Calls to the Putative Class Members, and provide the full

name of the software, the version number, manufacturer, serial number, product key, license number, license identification, and any other unique identifiers.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is compound. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because Plaintiff's claims do not concern the software used to place calls by QuinStreet or on QuinStreet's behalf to Plaintiff's phone number. QuinStreet further objects on the basis that this Interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, QuinStreet responds that based on its reasonable investigation to date, the single call to Plaintiff's phone number was placed using [redacted]. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 5**:

State whether You or your publishers use CallHub or any similar software in campaigns that included Calls to Plaintiff or the Putative Class Members.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, QuinStreet responds that based on its reasonable investigation to date, QuinStreet does not use CallHub. QuinStreet refers Plaintiff to its response to Interrogatory No. 4. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 6**:

Identify all sources of the telephone phone numbers to which the Calls were sent.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is incomprehensible. Plaintiff's use of the terms "sources" and "telephone phone numbers" is vague, ambiguous, and confusing. QuinStreet further objects on the basis that it is overbroad and unduly burdensome, because it seeks information regarding Calls not made to Plaintiff during the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet responds that it obtained the lead for Plaintiff's phone number from [redacted]. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 7**:

Identify all common carriers, vendors, sub-vendors and third parties whose services were utilized in the sending or initiation of the Calls, and describe those services.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it is compound. QuinStreet further objects on the basis that it is overbroad and unduly burdensome, because it seeks information regarding Calls not made to Plaintiff during the Relevant Time Period. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to its responses to Interrogatory Nos. 2 and 4.

**INTERROGATORY NO. 8**:

Identify each of the individuals who spoke with Plaintiff in the Calls.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it assumes QuinStreet made more than one call to Plaintiff. QuinStreet further objects to this Interrogatory on the basis that it seeks information outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to its response to Interrogatory No. 2. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 9**:

If you contend that Plaintiff provided consent to receive Calls, state all facts in support of that contention and give the date and means by which the alleged consent was given.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information outside of the Relevant Time Period and calls not made by or on behalf of QuinStreet. QuinStreet further objects to this Interrogatory to the extent that it assumes QuinStreet made more than one call to Plaintiff.

Subject to and without waiving the foregoing objections, QuinStreet responds that it received prior express invitation or permission to call the number (301) 580-1979 on or about July 6, 2023, from what it understood to be the user, owner, subscriber, or other person associated with the number [redacted]-1979 from information entered into https://www.dailyinsurancedeals.com. QuinStreet placed the call identified in Interrogatory Nos. 2, 3 and 8, on July 6, 2023. At the time, QuinStreet had no information to suggest that anyone other than the user, owner, subscriber, or other person associated with the number [redacted]-1979 provided that prior express invitation or permission to be called. Further, pursuant to Fed. R. Civ. P. 33(d), QuinStreet refers Plaintiff to the document previously produced as QUINSTREET00001–00004. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 10**:

Identify all communications between you and any third party, other than your counsel, regarding this lawsuit.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity by seeking information regarding communications directed by counsel.

Subject to and without waiving the foregoing objections, QuinStreet responds that it does not have any responsive, non-privileged communications to identify at this time. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 11**:

Identify by make, model, structure, and location the system(s), platform(s), and equipment used by you, or any vendor, to contact or communicate with Plaintiff.

**RESPONSE**:

QuinStreet objects to this Interrogatory as duplicative of Interrogatory No. 4. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right. QuinStreet further objects to this Interrogatory to the extent it seeks information outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to its response to Interrogatory No. 4. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 12**:

Identify any person (whether employed by you or not) whom you have disciplined, reprimanded, or taken similar action against for allowing or making allegedly unlawful or unauthorized outbound calls. In your answer, please identify all persons involved in any investigation, describe the reasons for your disciplinary action or reprimand, and describe the action taken against the person.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it is compound. QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information regarding calls not made to Plaintiff, not made during the Relevant Time Period, and not at issue in this Action.

Subject to and without waiving the foregoing objections, QuinStreet responds that it has not disciplined, reprimanded, or taken similar action against any person or entity for the single call previously described in QuinStreet's responses to Interrogatory Nos. 2, 3, and 8, and as previously produced in QUINSTREET00006. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 13**:

Identify all policies, protocols and procedures implemented by you during the Relevant Time Period to encourage, guide or control compliance with the TCPA, its regulations, or similar state statutes.

**RESPONSE**:

QuinStreet objects to this Interrogatory to the extent that it calls for any information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity by seeking information regarding communications with counsel, and it seeks information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

Subject to and without waiving the foregoing objections, pursuant to Federal Rule of Civil Procedure 33(d), QuinStreet will produce relevant, non-privileged documents reflecting policies, protocols, and procedures for TCPA compliance. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 14**:

Identify all documents that comprise or contain scripts or any written material to be read or used by individuals who speak to prospective leads during the Calls.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information outside of the Relevant Time Period and for calls not made to Plaintiff. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, to the extent it seeks discovery on a class-wide basis. As QuinStreet has

previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim.

Subject to and without waiving the foregoing objections, pursuant to Fed. R. of Civ. P. 33(d), Defendants will produce any relevant, non-privileged documents reflecting a "script" for the single call placed to Plaintiff. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 15**:

Identify all records containing data pertaining to the outcome of the Calls, including the date, time and duration of the Call, the originating telephone number, the telephone number to which the Call was placed, the characters in the caller ID displayed to the recipient, the name(s) of the individual caller(s), the identities of the individuals who spoke to the recipient of the Call, and any other call detail information. Include in your answer full identification of the individuals and vendors who have possession or control of the responsive data and information.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is compound. QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it seeks information outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, pursuant to Fed. R. Civ. P. 33(d) and limited only to Plaintiff's individual allegations, QuinStreet refers Plaintiff to QUINSTREET00006 showing that QuinStreet called Plaintiff, once, on July 6, 2023. QuinStreet

further refers Plaintiff to QUINSTREET00005, which is the audio the recording of that single call. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**INTERROGATORY NO. 16**:

Identify all voice files used for any pre-recorded or machine-generated audio content used in the Calls.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it calls for information not proportional to the needs of the Action, as Plaintiff himself concedes in paragraph 23 of the Second Amended Complaint that a human spoke with him on the July 6, 2023 call. QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Interrogatory on the basis that it seeks information outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, pursuant to Fed. R. Civ. P. 33(d), QuinStreet refers Plaintiff to QUINSTREET00005, which is the call recording of the only call that QuinStreet placed to Plaintiff. As reflected in that call recording, Plaintiff spoke with a live human being. No pre-recorded or machine-generated audio was used during that call. QuinStreet further refers Plaintiff to the paragraph 23 of the Second Amended Complaint. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

**<u>INTERROGATORY NO. 17</u>**:

Identify all lawsuits filed in state court during the Relevant Time Period alleging that You have violated the TCPA or state statutes regulating telemarketing, and in your response identify for each case the court, parties, and case number.

**<u>RESPONSE</u>**:

QuinStreet objects to this Interrogatory to the extent that it seeks public information that is thus equally available to Plaintiff. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks information beyond the scope of this Action.

Subject to and without waiving the foregoing objections, and pursuant to QuinStreet's reasonable investigation, the following lawsuit alleging violation of the TCPA was filed in state court: *Graham v. QuinStreet, LLC*, No. J2-cv-22-003497 in the Justice of the Peace, Pct. 2, Travis County, Texas (filed on July 29, 2022) (Small Claims). Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to amend/supplement this response.

Dated: June 24, 2025

**KELLEY DRYE & WARREN LLP**

*/s/ Ira T. Kasdan*
Ira T. Kasdan (Bar # 26942)
**KELLEY DRYE & WARREN LLP**
3050 K Street, NW
Washington, DC 20007
Tel: (202) 342-8864
Fax: (202) 342-8451
Email: ikasdan@kelleydrye.com

James B. Saylor (*pro hac vice*)
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel.: (212) 808-5052
Fax: (212) 808-7897
Email: jsaylor@kelleydrye.com

Whitney A. Smith (*pro hac vice*)
**KELLEY DRYE & WARREN LLP**
One Jefferson Road
Parsippany, NJ 07054
Tel.: (973) 503-5923
Fax: (973) 503-5950
Email: wsmith@kelleydyre.com

*Counsel for Defendant, QuinStreet, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2025, a copy of the foregoing was served by electronic mail to Plaintiff's counsel.

*/s/ Ira T. Kasdan*
Ira T. Kasdan

# VERIFICATION

I, Tyler Orrell, Vice President, Contact Center Operations, at QuinStreet, Inc. ("QuinStreet"), hereby certify that I am authorized by QuinStreet to verify the foregoing Responses and Objections to Plaintiff's First Set of Interrogatories ("Interrogatories"). I have read the foregoing Responses and Objections that were prepared with the assistance of counsel, and based upon QuinStreet's reasonable investigation to date, upon which I relied, and subject to inadvertent or undiscovered errors, I verify that the information contained in response to the foregoing Interrogatories is true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:
Tyler Orrell
857B261C628349D

Dated: June 18, 2025

Tyler Orrell
On behalf of:
QuinStreet, Inc.

# EXHIBIT 20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION - GREENBELT

| | |
|---|---|
| Stanley Shapiro, *on behalf of himself and all others similarly situated*,<br>Plaintiff,<br><br>v.<br><br>QuinStreet, Inc., *et al*.,<br><br>Defendants. | Case No. 8:24-cv-01667<br><br>Assigned to Hon. Lydia Kay Griggsby |

**DEFENDANT QUINSTREET, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF DOCUMENT REQUESTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland, Defendant QuinStreet, Inc., ("QuinStreet") by and through its undersigned attorneys, hereby provides its responses and objections to Plaintiff's First Set of Document Requests to QuinStreet (the "Requests").

**PRELIMINARY STATEMENT AND PRESERVATION OF RIGHTS**

QuinStreet's responses are made without waiver of the following rights, but on the contrary, are intended to reserve and do reserve the following:

1. QuinStreet states that it is responding to the Requests as it interprets and understands them. If Plaintiff subsequently asserts an interpretation of any Request that differs from the understanding of QuinStreet, QuinStreet reserves its right to further supplement its objections and/or responses herein.

2. QuinStreet states that it makes these responses solely for the purpose of, and in relation to, this Action (defined below). Each response herein is made subject to all appropriate objections (including, but not limited to, objections concerning authenticity, foundation, competency, relevance, materiality, propriety, privilege, and admissibility) that would require the

exclusion of any information or thing at any subsequent proceeding in, or trial of, this or any other action. QuinStreet reserves the right to object on any ground to the introduction into evidence of any information produced in response to the Requests.

3. If QuinStreet discloses privileged information in response to the Requests, the disclosure is inadvertent and does not constitute a waiver of any applicable privilege.

4. The fact that QuinStreet responded to a Request is not intended to, nor shall it be construed as an admission by QuinStreet of any fact(s) set forth in or assumed by any Request.

5. QuinStreet reserves the right to make additional objections or seek protective orders.

6. QuinStreet reserves the right to amend or further supplement these responses in the event that any information is omitted or subsequently identified during the course of QuinStreet's ongoing discovery efforts.

## DEFINITIONS

QuinStreet's responses below are further made subject to the following definitions:

1. "Action" means the lawsuit pending in the United States District Court for the District of Maryland, captioned as *Shapiro v. QuinStreet, Inc.*, No. 8:24-cv-01667.

2. "Second Amended Complaint" means the Second Amended Class Action Complaint filed on October 25, 2024 in the Action.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1**:

All non-attorney-client-privileged documents identified in or used to research or draft responses to interrogatories in this case.

**RESPONSE**:

QuinStreet objects to this Request to the extent that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks "all" documents, including those containing information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right, as well as attorney work product or information protected by attorney-client privilege.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to QUINSTREET00001–06. QuinStreet further responds that it will make a reasonable search for and produce any additional responsive documents. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 2**:

All documents that refer or pertain to Plaintiff, including, but not limited to, all documents evidencing your relationship with Plaintiff and your investigation into Calls made to Plaintiff.

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks all documents referring to Plaintiff outside of the Relevant Time Period and unrelated to the subject matter of this Action. QuinStreet further objects to this Interrogatory to the extent it assumes that QuinStreet made more than one call to Plaintiff.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to QUINSTREET00001–06. QuinStreet further responds that it will make a reasonable search for and produce any additional responsive documents. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 3**:

All documents searched or reviewed by You or by anyone acting at your direction or on your behalf to find records of any Calls made to Plaintiff or to Putative Class Members.

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is duplicative of Request Nos. 1 and 2. QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to QUINSTREET00001–06. QuinStreet further responds that it will make a reasonable search for and produce any additional responsive documents relating to Plaintiff. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 4**:

All documents relating to any alleged failure by You or by anyone who participated in generating or tracking the Calls, including any vendor and any "publisher" in the QS Network, to abide by your Policies that apply to the preparation, sending or tracking of Calls.

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is compound, confusing, and ambiguous. QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents relating to calls not made by QuinStreet, not made to Plaintiff, and made outside of the Relevant Time Period. QuinStreet further objects to the extent this Request seeks discovery on a class-wide basis. As

QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet also objects to this Request to the extent that the term "publisher" and "QS Network" are not defined and, thus, vague and ambiguous.

Subject to and without waiving the foregoing objections, QuinStreet responds that it does not have any documents responsive to this Request. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 5**:

All documents that comprise, contain or pertain to complaints and all do-not-call requests from recipients of Calls during the Relevant Time Period; all responses to such complaints or DNC requests; and any communications regarding those complaints and DNC requests.

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is compound. QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents relating to calls not made by QuinStreet and not made to Plaintiff.

Subject to and without waiving the foregoing objections, QuinStreet does not have any responsive documents to this Request. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 6**:

All documents that comprise or pertain to agreements between and among You, Your agents, publishers in the QS Network and anyone else that pertain to the acquisition or use of lists that have included Plaintiff's telephone number and/or any other contact information pertaining to Plaintiff.

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is compound. QuinStreet also objects to this Request to the extent that the term "publisher" and "QS Network" are not defined and, thus, vague and ambiguous. QuinStreet further objects to this Request as overbroad and not proportional to the needs of the case, because it seeks documents outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet will make a reasonable search for and produce any documents responsive to this Request. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 7**:

All documents that comprise or pertain to agreements between and among You, Your agents, publishers in the QS Network and anyone else that pertain to the acquisition or use of lists that included telephone numbers of Putative Class Members and/or any other contact information pertaining to them.

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is compound. QuinStreet also objects to this Request to the extent that the term "publisher" and "QS Network" are not defined and, thus, vague and ambiguous. QuinStreet further objects to this Request as overbroad and not proportional to the needs of the case, because it seeks documents outside of the Relevant Time Period.

QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim.

**REQUEST NO. 8**:

All documents that comprise or pertain to communications or agreements between and among You, Your agents, publishers in the QS Network and anyone else that pertain to the acquisition or use of lists that included telephone numbers and any other contact information pertaining to Putative Class Members alleged in the most recently filed class action complaint.

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is compound. QuinStreet objects to this Request as duplicative of Request Nos. 6 and 7. QuinStreet also objects to this Request to the extent that the term "publisher" and "QS Network" are not defined and, thus, vague and ambiguous. QuinStreet further objects to this Request as overbroad and not proportional to the needs of the case, because it seeks documents outside of the Relevant Time Period. QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim.

Subject to and without waiving the foregoing objections, QuinStreet refers to its responses and objections to Request Nos. 6 and 7. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**<u>REQUEST NO. 9</u>**:

All documents that contain or comprise lists or data files that were used in making Calls to Plaintiff or the Putative Class Members.

**<u>RESPONSE</u>**:

QuinStreet objects to this Request as duplicative of Request Nos. 6, 7, and 8. QuinStreet further objects to this Request as overbroad and not proportional to the needs of the case, because it seeks documents outside of the Relevant Time Period. QuinStreet objects to this Request to the extent it assumes that QuinStreet made more than one call to Plaintiff. QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim.

Subject to and without waiving the foregoing objections, QuinStreet refers to its responses and objections to Request Nos. 6, 7, and 8. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**<u>REQUEST NO. 10</u>**:

All communications within Your company and with and among your affiliates and agents, regarding any vendor that provided you with Plaintiff's telephone number or contact information.

**<u>RESPONSE</u>**:

QuinStreet objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents unrelated to Plaintiff or the call that QuinStreet made to Plaintiff.

Subject to and without waiving the foregoing objections, QuinStreet responds that it will make a reasonable search for and produce any responsive communications relating to Plaintiff between QuinStreet and the third party that provided QuinStreet with Plaintiff's phone number. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 11**:

All contracts or documents representing agreements with any vendor or third party that initiated or carried out the Calls to Plaintiff.

**RESPONSE**:

QuinStreet objects to this Request as duplicative of Request Nos. 6, 7, 8, 9, and 10. QuinStreet further objects to this Request to the extent it assumes that more than one call was made by or on behalf of QuinStreet. QuinStreet further objects to this Request as overbroad, because it seeks documents outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet responds that it does not have any responsive documents, because as QuinStreet has already informed Plaintiff, QuinStreet—not a third party—made one call to Plaintiff on July 6, 2023. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 12**:

All documents that comprise or pertain to software applications used by You, Your agents, publishers in the QS Network and anyone else, used for the generation and/or tracking of Calls to Plaintiff and to Putative Class Members.

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is compound. QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. This Request is further overbroad, unduly burdensome, and not proportional to the needs of the case, because Plaintiff's claims do not concern the software used to place or track calls by QuinStreet or on QuinStreet's behalf to Plaintiff's phone number, and because it seeks documents regarding equipment that was used for calls not at issue in this case, as well as information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right.

**REQUEST NO. 13**:

All communications with any vendor or third party that initiated, carried out or tracked the Calls to Plaintiff and to Putative Class Members.

**RESPONSE**:

QuinStreet objects to this Request as duplicative of Request No. 11. QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff cannot state an individual claim. QuinStreet further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents relating to calls not made by or on behalf of QuinStreet and outside of the Relevant Time Period. QuinStreet

also objects to this Request to the extent it assumes that QuinStreet made more than one call to Plaintiff.

Subject to and without waiving the foregoing objections, QuinStreet refers to its responses and objections to Request No. 11. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 14**:

Sufficient documents to identify all insurance policies that may provide coverage for the claims asserted in this suit and all communications with the carriers on such policies, regardless of any exclusions or denials of coverage.

**RESPONSE**:

QuinStreet objects to this Request to the extent that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks communications with insurance carriers, which are irrelevant to Plaintiff's claims.

Subject to and without waiving the foregoing objections, QuinStreet responds that it does not have any documents responsive to this Request. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 15**:

All documents that contain indemnification provisions under which a third party may be responsible for satisfying all or part of a judgment that may be entered against You, your agents or your publishers in this action, and all communications with those third parties.

**<u>RESPONSE</u>**:

QuinStreet objects to this Request on the basis that it is compound. QuinStreet further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents relating to third parties.

Subject to and without waiving the foregoing objections, QuinStreet responds that it does not have any documents responsive to this Request. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**<u>REQUEST NO. 16</u>**:

All documents related to policies and protocols for compliance with the TCPA or the FCC's regulations thereunder and all documents necessary to construct a timeline of when each policy was in force. This request specifically includes, but is not limited to, policies related to the following:

a) compliance with the TCPA, including, but not limited to, the rules, regulations, opinions, advisories, comments, or filings of the Federal Communications Commission that relate to the TCPA or 47 C.F.R. § 64.1200;

b) obtaining or verifying prior express consent;

c) compliance with E-SIGN Act, 15 U.S.C. §§ 7001 *et seq.*

**<u>RESPONSE</u>**:

QuinStreet objects to this Request on the basis that it is compound. QuinStreet further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case, because it requests "all" documents related to policies and procedures and documents outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet will make a reasonable search for and produce any policies and procedures in effect during the Relevant Time Period related to compliance with the TCPA. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 17**:

All documents containing or pertaining to call detail records (CDRs) for each outbound Call on any lead generation or customer acquisition campaigns that included Plaintiff's telephone number. This includes, but is not limited to, documents containing the following information:

- the date, time and duration of the Call;
- the originating telephone number;
- the telephone number called;
- the caller ID displayed;
- any recorded or artificial audio message used;
- the content delivered, stated or recited in the Call;
- the result, whether connected or not;
- identifying information for the recipient; and
- any other information stored in the call detail records

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is compound. QuinStreet further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents relating to calls not made by or on behalf of QuinStreet and outside of the Relevant Time Period.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to QUINSTREET00001–06. QuinStreet further responds that it will make a reasonable search for and produce any additional responsive documents relating to the call made by QuinStreet to Plaintiff on July 6, 2023. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 18**:

All documents containing or pertaining to call detail records (CDR's) for each outbound Call on any lead generation or customer acquisition campaigns that included the telephone numbers of Putative Class Members This includes, but is not limited to, documents containing the following information:

- the date, time and duration of the Call; • the originating telephone number;
- the telephone number called;
- the caller ID displayed;
- any recorded or artificial audio message used;
- the content delivered, stated or recited in the Call;
- the result, whether connected or not;
- identifying information for the recipient; and
- any other information stored in the call detail records.

**RESPONSE**:

QuinStreet objects to this Request on the basis that it is compound. QuinStreet further objects to this Request on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. As QuinStreet has previously informed Plaintiff, it will not provide discovery on a class-wide basis, because Plaintiff

cannot state an individual claim. QuinStreet further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents relating to calls not made by or on behalf of QuinStreet and outside of the Relevant Time Period.

**REQUEST NO. 19**:

All communications with any third party concerning this litigation other than your attorney.

**RESPONSE**:

QuinStreet objects to this Request to the extent that it is irrelevant, overbroad, and unduly burdensome because it seeks irrelevant information beyond the scope of the subject matter of the Action. QuinStreet further objects to this Request as it is irrelevant, overbroad, and unduly burdensome because it seeks "all documents." This Request seeks information that is sensitive, proprietary, trade secret information, or protected by any applicable privacy right and otherwise seeks attorney work product or information protected by attorney-client privilege.

Subject to and without waiving the foregoing objections, QuinStreet responds that it does not have any responsive documents. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

**REQUEST NO. 20**:

All documents pertaining to any policies and protocols undertaken by You and your publishers to comply with the Federal Communication Commission's Eighth Report and Order, FCC 24-120, released November 22, 2024, regarding STIR/SHAKEN Caller ID Authentication.

**RESPONSE**:

QuinStreet objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks documents in the possession of third parties and not in the possession of QuinStreet.

Subject to and without waiving the foregoing objections, QuinStreet responds that it will make a reasonable search for and produce any responsive documents relating to QuinStreet. Discovery and QuinStreet's investigation are ongoing, and QuinStreet reserves the right to supplement/amend this response.

Dated: June 24, 2025

**KELLEY DRYE & WARREN LLP**

*_/s/ Ira T. Kasdan_*
Ira T. Kasdan (Bar # 26942)
**KELLEY DRYE & WARREN LLP**
3050 K Street, NW
Washington, DC 20007
Tel: (202) 342-8864
Fax: (202) 342-8451
Email: ikasdan@kelleydrye.com

James B. Saylor (*pro hac vice*)
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel.: (212) 808-5052
Fax: (212) 808-7897
Email: jsaylor@kelleydrye.com

Whitney A. Smith (*pro hac vice*)
**KELLEY DRYE & WARREN LLP**
One Jefferson Road
Parsippany, NJ 07054
Tel.: (973) 503-5923
Fax: (973) 503-5950
Email: wsmith@kelleydyre.com

*Counsel for Defendant, QuinStreet, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2025, a copy of the foregoing was served by electronic mail to Plaintiff's counsel.

*/s/ Ira T. Kasdan*
Ira T. Kasdan

# VERIFICATION

I, Tyler Orrell, Vice President, Contact Center Operations, at QuinStreet, Inc. ("QuinStreet"), hereby certify that I am authorized by QuinStreet to verify the foregoing Responses and Objections to Plaintiff's First Set of Requests for Production ("Requests"). I have read the foregoing Responses and Objections that were prepared with the assistance of counsel, and based upon QuinStreet's reasonable investigation to date, upon which I relied, and subject to inadvertent or undiscovered errors, I verify that the information contained in response to the foregoing Requests is true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 18, 2025

DocuSigned by:
Tyler Orrell
857B261C628349D

Tyler Orrell
On behalf of:
QuinStreet, Inc.

# EXHIBIT 21

## REDACTED VERSION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION - GREENBELT

| | |
|---|---|
| Stanley Shapiro, *on behalf of himself and all others similarly situated,*<br>Plaintiff,<br><br>v.<br><br>QuinStreet, Inc.,<br><br>Defendants. | Case No. 8:24-cv-01667<br><br>Assigned to Hon. Lydia Kay Griggsby |

**DEFENDANT QUINSTREET, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland, Defendant QuinStreet, Inc., ("QuinStreet") by and through its undersigned attorneys, hereby provides its responses and objections to the Plaintiff's Second Set of Interrogatories to QuinStreet (the "Interrogatories").

**PRELIMINARY STATEMENT AND PRESERVATION OF RIGHTS**

QuinStreet's responses are made without waiver of the following rights, but on the contrary, are intended to reserve and do reserve the following:

1. QuinStreet states that it is responding to the Interrogatories as it interprets and understands them. If Plaintiff subsequently asserts an interpretation of any Interrogatory that differs from the understanding of QuinStreet, QuinStreet reserves its right to further supplement its objections and/or responses herein.

2. Consistent with the Federal Rules, QuinStreet is responding to the Interrogatories based on responsive, non-privileged information within its possession, custody or control, and will not undertake any effort to obtain documents or information from any third-party.

3. QuinStreet states that it makes these responses solely for the purpose of, and in relation to, this Action (defined below). Each response herein is made subject to all appropriate objections (including, but not limited to, objections concerning authenticity, foundation, competency, relevance, materiality, propriety, privilege, and admissibility) that would require the exclusion of any information or thing at any subsequent proceeding in, or trial of, this or any other action. QuinStreet reserves the right to object on any ground to the introduction into evidence of any information produced in response to the Interrogatories.

4. If QuinStreet discloses privileged information in response to the Interrogatories, the disclosure is inadvertent and does not constitute a waiver of any applicable privilege.

5. That QuinStreet responded to an Interrogatory is not intended to, nor shall it be construed as, an admission by QuinStreet of any fact(s) set forth in or assumed by any Interrogatory.

6. QuinStreet reserves the right to make additional objections or seek protective orders.

7. QuinStreet objects to the Interrogatories to the extent they seek information concerning calls placed by QuinStreet to parties other than Plaintiff (i.e. “class discovery”), as QuinStreet has moved for a protective order. *See* Dkt. 84.

8. QuinStreet reserves the right to amend or further supplement these responses in the event that any information is inadvertently omitted or subsequently identified.

**DEFINITIONS**

QuinStreet’s responses below are further made subject to the following definitions:

1. “Action” means the lawsuit pending in the United States District Court for the District of Maryland, captioned as *Shapiro v. QuinStreet, Inc.*, No. 8:24-cv-01667.

2. "Second Amended Complaint" means the Second Amended Class Action Complaint filed on October 25, 2024 in the Action.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 18**:

Provide and identify all caller ID numbers used in the Calls.

**RESPONSE**:

QuinStreet objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery concerning calls allegedly made by QuinStreet to persons other than Plaintiff during the Relevant Time Period, and would require the identification of "caller ID numbers" used in *millions* of calls over a more than five-year period. QuinStreet further objects to this Interrogatory to the extent it seeks information subject to QuinStreet's pending motion for a protective order (Dkt. 84). QuinStreet further objects to this Interrogatory because the definition of "caller ID" applies an incorrect understanding of the term "campaign." As explained in the deposition of Tyler Orrell, a "campaign" is "just a naming convention within the phone system" QuinStreet uses to place calls, not a "campaign" as defined by Plaintiff's definition No. 25. QuinStreet further objects to this Interrogatory as compound as a result of the multiple subparts in the definition of "caller ID." QuinStreet further objects to this Interrogatory because the definition of "caller ID" includes "calls alleged in the latest complaint," which includes calls allegedly placed by third parties unrelated to QuinStreet. QuinStreet further objects to this Interrogatory because the "caller ID information" for the single July 6, 2023 call QuinStreet placed to Plaintiff is in Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing objections, QuinStreet refers to its response to Interrogatory Nos. 2, 3, 8 and 9, which identifies the single call QuinStreet placed to Plaintiff's

phone number ending in -1979 on July 6, 2023, at 9:12 a.m. Eastern Time. The phone system used by QuinStreet to place the July 6, 2023 call displayed a local number relative to the Plaintiff's area code, 301-579-3445, as well as a QuinStreet "doing business as" name, such as Insure.com, to the recipient's caller ID. QuinStreet's understanding is that the formatting of this information may differ depending on the carrier and device used by the Plaintiff. The July 6, 2023 call was placed through one of QuinStreet's phone carriers, [redacted]. QuinStreet refers Plaintiff to the caller ID information displayed on his cellular phone.

**INTERROGATORY NO. 19**:

Provide and identify the caller ID numbers used in the Calls, including all calls made by Defendant or any service provider acting in association with QuinStreet, promoting sales of insurance products, to persons in Maryland during the Relevant Time Period, and provide the dates and times at which those caller ID's were used.

**RESPONSE**:

QuinStreet objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery concerning calls allegedly made by QuinStreet to persons other than Plaintiff during the Relevant Time Period, and would require the identification of "caller ID numbers" used in *millions* of calls over a more than five-year period and the specific dates and times at which those caller ID's were used. QuinStreet further objects to this Interrogatory to the extent it seeks information subject to QuinStreet's pending motion for a protective order (Dkt. 84). QuinStreet further objects to this Interrogatory because the definition of "caller ID" applies an incorrect understanding of the term "campaign." As explained in the deposition of Tyler Orrell, a "campaign" is "just a naming convention within the phone system" QuinStreet uses to place calls, not a "campaign" as defined by Plaintiff's

definition No. 25. QuinStreet further objects to this Interrogatory as compound as a result of the multiple subparts in the definition of "caller ID." QuinStreet further objects to this Interrogatory because the definition of "caller ID" includes "calls alleged in the latest complaint," which includes calls allegedly placed by third parties unrelated to QuinStreet. QuinStreet further objects to this Interrogatory because the "caller ID information" for the single July 6, 2023 call QuinStreet placed to Plaintiff is in Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing objections, QuinStreet refers to its response to Interrogatory Nos. 2, 3, 8 and 9, which identifies the single call QuinStreet placed to Plaintiff's phone number ending in -1979 on July 6, 2023, at 9:12 a.m. Eastern Time. The phone system used by QuinStreet to place the July 6, 2023 call displayed a local number relative to the Plaintiff's area code, 301-579-3445, as well as a QuinStreet "doing business as" name, such as Insure.com, to the recipient's caller ID. QuinStreet's understanding is that the formatting of this information may differ depending on the carrier and device used by the Plaintiff. The July 6, 2023 call was placed through one of QuinStreet's phone carriers, [redacted]. QuinStreet refers Plaintiff to the caller ID information displayed on his cellular phone.

**INTERROGATORY NO. 20**:

Provide and identify all caller ID numbers used in the Calls, including all calls made by Defendant or any service provider acting in association with QuinStreet, promoting sales of insurance products, to persons in the United States during the Relevant Time Period, and provide the dates and times at which those caller ID's were used.

**RESPONSE**:

QuinStreet objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery concerning calls allegedly

made by QuinStreet to persons other than Plaintiff during the Relevant Time Period, and would require the identification of "caller ID numbers" used in *millions* of calls over a more than five-year period and the specific dates and times at which those caller ID's were used. QuinStreet further objects to this Interrogatory to the extent it seeks information subject to QuinStreet's pending motion for a protective order (Dkt. 84). QuinStreet further objects to this Interrogatory because the definition of "caller ID" applies an incorrect understanding of the term "campaign." As explained in the deposition of Tyler Orrell, a "campaign" is "just a naming convention within the phone system" QuinStreet uses to place calls, not a "campaign" as defined by Plaintiff's definition No. 25. QuinStreet further objects to this Interrogatory as compound as a result of the multiple subparts in the definition of "caller ID." QuinStreet further objects to this Interrogatory because the definition of "caller ID" includes "calls alleged in the latest complaint," which includes calls allegedly placed by third parties unrelated to QuinStreet. QuinStreet further objects to this Interrogatory because the "caller ID information" for the single July 6, 2023 call QuinStreet placed to Plaintiff is in Plaintiff's possession, custody, or control. QuinStreet notes that this Interrogatory is numbered 19, as is the previous Interrogatory, so QuinStreet will treat Plaintiff's Second Set of Interrogatories as encompassing Plaintiff's Interrogatories numbered 18 through 23.

Subject to and without waiving the foregoing objections, QuinStreet refers to its response to Interrogatory Nos. 2, 3, 8 and 9, which identifies the single call QuinStreet placed to Plaintiff's phone number ending in -1979 on July 6, 2023, at 9:12 a.m. Eastern Time. The phone system used by QuinStreet to place the July 6, 2023 call displayed a local number relative to the Plaintiff's area code, 301-579-3445, as well as a QuinStreet "doing business as" name, such as Insure.com, to the recipient's caller ID. QuinStreet's understanding is that the formatting of this information may differ depending on the carrier and device used by the Plaintiff. The July 6, 2023 call was placed

through one of QuinStreet's phone carriers, [redacted]. QuinStreet refers Plaintiff to the caller ID information displayed on his cellular phone.

**INTERROGATORY NO. 21**:

Identify the data files in which call detail records have been saved for all Calls alleged in the latest complaint, and for each data file identify the server on which it resides and identify the custodian(s) of that server.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is compound. QuinStreet further objects to this Interrogatory on the basis that it is vague and ambiguous. QuinStreet further objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis. QuinStreet further objects to this Interrogatory to the extent it seeks information subject to QuinStreet's pending motion for a protective order (Dkt. 84). QuinStreet objects to this Topic as improper discovery on discovery without identification of any failure to preserve or spoliation by QuinStreet. QuinStreet further objects to this Topic as improperly framed to imply wrongdoing or spoliation without any factual basis or evidence to support such an accusation. This language is inherently prejudicial, argumentative, and appears designed to harass.

Subject to and without waiving the foregoing objections, QuinStreet responds that it is preserving all records related to this Action. QuinStreet further responds that its call records, including for the July 6, 2023 call placed to Plaintiff, are preserved in the following databases utilized by QuinStreet: [redacted]. Physical servers for these databases are located in [redacted] and [redacted]. QuinStreet is the custodian of these databases. QuinStreet has searched all databases

where call detail records relating to calls placed to Plaintiff's phone number ending in -1979 could be located, and has produced all call detail records associated with the single call discovered by that search.

**INTERROGATORY NO. 22**:

Identify all documents and records of any type that contain any record that pertains or relates to any effort by QuinStreet during the Relevant Time Period to scrub or check telephone numbers against the federal Do Not Call Registry before calls to those numbers were initiated.

**RESPONSE**:

QuinStreet objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery on a class-wide basis, and because it would require the examination of the records of consent for potentially *millions* of calls over a more than five-year period. QuinStreet further objects to this Interrogatory to the extent it seeks information subject to QuinStreet's pending motion for a protective order (Dkt. 84).

Subject to and without waiving the foregoing objections, QuinStreet responds that telemarketing calls to numbers on the National Do Not Call Registry only potentially violate the TCPA if they are made without prior express consent (or prior express invitation or permission). Here, QuinStreet received a record of prior express invitation or permission to call Plaintiff's number ending in -1979 on or about July 6, 2023. QuinStreet then placed a single call to Plaintiff on July 6, 2023 at 9:12 am Eastern Time.

**INTERROGATORY NO. 23**:

Identify all providers of business process outsourcing (or "BPO's") as that term was described in the deposition of QuinStreet in this suit on September 25, 2025) used by Defendant

in campaigns that involved telemarketing for the purpose of promoting insurance products during the Relevant Time Period, and describe each such campaign giving the types of insurance and dates of each campaign.

**RESPONSE**:

QuinStreet objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case, because it seeks discovery concerning calls allegedly made by QuinStreet to persons other than Plaintiff during the Relevant Time Period, and would require the identification of "BPOs" for *millions* of calls over a more than five-year period, and the specific information concerning the "campaign," "types of insurance" offered, and dates of each "campaign" for which that BPO was engaged. QuinStreet further objects to this Interrogatory to the extent it seeks information subject to QuinStreet's pending motion for a protective order (Dkt. 84). QuinStreet further objects to this Interrogatory because it applies an incorrect understanding of the term "campaign." As explained in the deposition of Tyler Orrell, a "campaign" is "just a naming convention within the phone system" QuinStreet uses to place calls, not a "campaign" as defined by Plaintiff's definition No. 25. QuinStreet further objects to this Interrogatory as compound.

Subject to and without waiving the foregoing objections, QuinStreet refers Plaintiff to the deposition testimony referenced in the Interrogatory, which explains that a "BPO" or "business process operation," is a contact center engaged by QuinStreet to provide staff that can field calls placed by QuinStreet (or inbound calls, such as Plaintiff's return call to 301-579-3445). QuinStreet identifies [redacted] as the BPO engaged by QuinStreet to field calls placed by QuinStreet concerning insurance products offered by its clients during the relevant time period.

Dated: October 17, 2025

**KELLEY DRYE & WARREN LLP**

*<u>/s/ Ira T. Kasdan</u>*
Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Tel: (202) 342-8864
Fax: (202) 342-8451
Email: ikasdan@kelleydrye.com

James B. Saylor (*pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel.: (212) 808-5052
Fax: (212) 808-7897
Email: jsaylor@kelleydrye.com

Whitney A. Smith (*pro hac vice*)
One Jefferson Road
Parsippany, NJ 07054
Tel.: (973) 503-5923
Fax: (973) 503-5950
Email: wsmith@kelleydyre.com

*Counsel for Defendant QuinStreet, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2025, a copy of the foregoing was served by electronic mail to Plaintiff's counsel.

*/s/ Ira T. Kasdan*
Ira T. Kasdan

# VERIFICATION

I, Tyler Orrell, Vice President, Contact Center Operations, at QuinStreet, Inc. ("QuinStreet"), hereby certify that I am authorized by QuinStreet to verify the foregoing Responses and Objections to Plaintiff's Second Set of Interrogatories ("Interrogatories"). I have read the foregoing Responses and Objections that were prepared with the assistance of counsel, and based upon QuinStreet's reasonable investigation to date, upon which I relied, and subject to inadvertent or undiscovered errors, I verify that the information contained in response to the foregoing Interrogatories is true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 17, 2025

DocuSigned by:
Tyler Orrell
857B261C628349D...

Tyler Orrell
On behalf of:
QuinStreet, Inc.

# EXHIBIT 22

## REDACTED VERSION

JORNAYA

CONFIDENTIAL & PROPRIETARY

INFORMATIONAL PURPOSES ONLY. LIMITED DISTRIBUTION FOR INTENDED PARTIES ONLY

© All rights reserved. All aspects of the service and information provided by Lead Intelligence, Inc. d/b/a Jornaya ("Jornaya") hereunder - including, e.g., the Jornaya Web site, 3rd Party TCPA Guardian, 1st Party Privacy Guardian, Visual Playback, and the processes used by Jornaya in providing the service - are the exclusive property of Jornaya and its licensors. Jornaya's Visual Playback and the data made available through its use, including but not limited to this document, are subject to confidentiality obligations at all times. By accessing and using theservice and information provided hereunder, you represent and warrant that (a) you have the authority to act on behalf of a valid subscriber to the service, (b) you shall use the service and information in compliance with the terms and conditions on which it is provided, (c) you shall use any data made available through the use of the service for its intended purposes only, and (d) you shall not further distribute any of the service or information provided hereunder to external parties without Jornaya's express prior written approval.

JORNAYA

# Guardian TCPA Report

**Prepared for Quinstreet - Auto Insurance**

**What is a lead?**

A lead occurs when a consumer visits a website and fills out a form, entering their personal information. A lead can also happen when a consumer interacts with a call center representative and confirms or provides certain information which are documented by the call center. Companies utilize lead forms on their own websites or in their call centers to collect data from consumers who have interest in being contacted about their products and services. Companies also purchase "3rd party data leads", where 3rd party lead sellers collect a consumer's data through a lead form on their owned and operated websites or their call centers, which they then sell to companies as a sales lead: a potential customer who has indicated interest in the company's products or services. In some cases, the 3rd party lead seller may collect a consumer's data, sell it to another 3rd party entity (known as an aggregator), who then sells that data to companies as a sales lead.

**Who is Jornaya?**

Jornaya provides a neutral, 3rd party technology-based platform that tracks the origin and history of a lead event and the consumer actions that occurred at that event. Jornaya's technology witnesses more than one hundred million lead events each month - tracking the actions that occur when a consumer fills out a lead form - or interacts with a call center representative to complete a lead form.

Jornaya's Guardian services document the specific disclosure that was present on a lead form during a lead event and what type of consent was obtained, if any. Guardian services are intended solely and exclusively to provide companies with factual information about the environment that the consumer experienced.

Companies that purchase 3rd party data leads, or generate their own data leads on their website forms or in their call centers, use Guardian services to provide neutral verification and assurance that the activities regarding the collection of the consumer's consent to be contacted meet their requirements. Guardian services do not capture and store personally identifiable consumer data and Jornaya does not buy or sell leads; we help to verify what happened at the lead event.

**How does Jornaya help keep companies TCPA Compliant?**

As a neutral, 3rd party witness to the events that take place on the website or a call center. Guardian provides facts on what happened during a consumer's visit to the website or interaction with a call center representative. Guardian helps companies to verify:

- Was a TCPA disclosure displayed or provided to the consumer?
- If so, did the disclosure meet the company's visibility and verification requirements? Was it large enough, and with enough color contrast? Or was it hidden and obscured, not meeting the company's requirements? If a call center, was it clearly stated by the call center representative?
- Did the disclosure language match the company's compliance standards?
- Did the consumer consent to the TCPA disclosure that was displayed or provided?

JORNAYA

| Lead Event Information: | |
|---|---|
| Universal LeadiD | FAA590BE-4D79-008D-B93B-E98FCF0DB36A |
| Event Date | 07/06/2023 |
| Event Time | 09:01:10 AM EDT |
| IP Address | [redacted] |

| Disclosure Information: | |
|---|---|
| Query Date | 07/06/2023 |
| Query Time | 09:05:35 AM EDT |
| Labeled TCPA Disclosure Statement captured at the lead event: | BY CLICKING "GET MY QUOTES" BUTTON ABOVE AND SUBMITTING MY ELECTRONIC SIGNATURE, I REPRESENT THAT I AM 18+ YEARS OF AGE AND HAVE READ AND AGREE TO THE THIS WEBSITE'S PRIVACY POLICY AND TERMS & CONDITIONS. BY CLICKING THE "GET MY QUOTES" BUTTON, I HEREBY GIVE PRIOR EXPRESS WRITTEN CONSENT TO RECEIVE MARKETING COMMUNICATIONS REGARDING INSURANCE PRODUCTS AND SERVICES VIA AUTOMATIC TELEPHONE DIALING SYSTEM, INCLUDING CALLS AND/OR SMS/MMS TEXTS, AND/OR PRE-RECORDED CALLS AND/OR ARTIFICIAL VOICE MESSAGES [AND/OR SMS/MMS] FROM DAILYINSURANCEDEALS.COM AND ONE OR MORE OF IT'S MARKETING PARTNERS AT THE PHONE NUMBER AND/OR E-MAIL ADDRESS THAT I PROVIDED ABOVE, INCLUDING WIRELESS NUMBERS, IF APPLICABLE, EVEN IF I HAVE PREVIOUSLY REGISTERED THE PROVIDED NUMBER ON ANY FEDERAL, [OR] STATE, OR COMPANY DO NOT CALL REGISTRY. SMS/MMS AND DATA MESSAGING RATES MAY APPLY. THIS CONSENT IS NOT REQUIRED AS A CONDITION TO PURCHASE SERVICES OR PRODUCTS, AND I MAY REVOKE MY CONSENT AT ANY TIME. |

JORNAYA

| Contributed Data | Data Provided by the Jornaya Client ("Contributed Data") for Verification | Verified by the Jornaya Service |
|---|---|---|
| First Name | Stanly | Yes |
| Last Name | Shapiro | Yes |
| Phone 1 | [redacted]1979 | Yes |
| Email | [redacted]@gmail.com | Yes |
| Address 1 | [redacted] | Yes |
| City | [redacted] | Yes |
| State | MD | Yes |
| Zip | [redacted] | Yes |

This table is a summary of the fields and associated values provided by a Jornaya client for verification by Guardian. Guardian captures data associated with the interactions the consumer took with each listed field and if applicable, the data the consumer entered into those fields, and encrypts the captured data entered by the consumer using a secure one-way hashing methodology. When a client purchases a lead from a lead seller with a unique Universal LeadiD associated with that lead, and proactively provides certain data associated with the lead ("Contributed Data") for which verification is requested, Guardian is able to verify if that Contributed Data matched to the encrypted, hashed value of the data that Guardian captured from the original lead event. This provides a client with verification that certain Contributed Data values were entered by the consumer at the original lead event. Data can be verified in the following ways: a match to data entered in form fields, a match to a pre-populated value, and/or a match observed in the parameters of the URL.

**Visual Playback Link:**

https://vp.leadid.com/playback/FAA590BE-4D79-008D-B93B-E98FCF0DB36A/1688648735.6963?key=1688648475997

# EXHIBIT 23

## REDACTED VERSION

# File Produced Natively

| CALL_ID | EXT_SYSTEM_IDENTIFIER | INITIATED_DATE | CALL_DIRECTION | CALL_DURATION | REMOTE_NUMBER | LOCAL_NUMBER | REASON | FINISH_CODE | CALL_EVENT_LOG |
|---|---|---|---|---|---|---|---|---|---|
| 200787448040230706 | 67744788834 | 7/6/2023 6:12:20 AM | OUTBOUND | 653 | [redacted]1979 | - | SUCCESS | TRANSFER SUCCESS - SECOND ATTEMPT | 06:12:20: Initializing<br>06:12:20: Entered Workgroup AUTO_REALTIME<br>06:12:20: Dialing<br>06:12:22: Proceeding<br>06:12:29: ACD interaction assigned to [redacted]<br>06:12:29: ACD - Alerting: [redacted]<br>06:12:29: Sent to user [redacted]<br>06:12:29: Offering<br>06:12:29: Alerting<br>06:12:30: Sent to station SGEN-[redacted]<br>06:12:30: Connected<br>06:12:30: ACD interaction connected to [redacted]<br>06:12:30: ACD - Assigned: [redacted]<br>06:16:02: Held<br>06:16:05: ACD - Assigned: [redacted]<br>06:17:49: Held<br>06:17:52: ACD - Assigned: [redacted]<br>06:18:43: Added to conference 2007876576<br>06:23:22: Disconnected [Last Conference Party] |
| 200788074340230706 | [NULL] | 7/6/2023 6:31:24 AM | INBOUND | 5 | [redacted]1979 | 8554307755 | NA | NA | 06:31:24: Initializing<br>06:31:24: Offering<br>06:31:24: ANI: +[redacted]1979<br>06:31:24: DNIS: 300008<br>06:31:24: Call answered<br>06:31:24: Redial Biz AUTOINS_REALTIME<br>06:31:24: Mon - Fri 6:00-6:00<br>06:31:24: IVR<br>06:31:29: Disconnected [Remote Disconnect] |
| 200787968940230706 | [NULL] | 7/6/2023 6:28:23 AM | INBOUND | 8 | [redacted]1979 | 13015793445 | NA | NA | 06:28:23: Initializing<br>06:28:23: Offering<br>06:28:23: ANI: +[redacted]1979<br>06:28:23: DNIS: 3015793445<br>06:28:23: Call answered<br>06:28:23: Redial Biz AUTOINS_REALTIME<br>06:28:23: Mon - Fri 6:00-6:00<br>06:28:23: IVR<br>06:28:31: Disconnected [Remote Disconnect] |

# EXHIBIT 24

## REDACTED VERSION

Transcript of call, converted from audio file via Microsoft Dictate/Transcribe feature and further edited by counsel for QuinStreet, Inc.

**Speaker 1:** Stanley Shapiro

**Speaker 2:** Andrea [redacted]

**Speaker 3:** [redacted] Agent

QUINSTREET00005 call audio.wav

00:00:00

00:00:00

00:00:01Speaker 2

Hi, good day. This is Andrea with insure.com on a recorded line. How are you doing today?

00:00:06Speaker 1

OK.

00:00:08Speaker 2

Oh, that's good to hear. I'm trying to get a hold of Stanley Shapiro.

00:00:13Speaker 1

You've reached him. This is - that's me.

00:00:16Speaker 2

Oh, hi. I'm giving you a call today because you have been online looking for insurance quotes and my job today is to get you in touch with some of our top insurance companies. I'm just going to ask a few questions and let's see what comes up for you, so.

00:00:31Speaker 1
OK.

00:00:32Speaker 2

Alright, thank you.

00:00:33Speaker 1

Now, wait, you're with who, insure.com?

**00:00:36**Speaker 2

Mm-hmm. Yes, sir.

**00:00:38**Speaker 2

QuinStreet with insure.com, sir, but uh, we do carry a lot of insurers insurance company here so we can match with the most competitively priced options so.

**00:00:50**Speaker 1

Oh, this was - - is this in response to a phone call I got yesterday somebody called me up and said that they were um they wanted to see if I was interested in automobile insurance and then they said they could bundle it with housing,

**00:01:06**Speaker 2

Uh-huh.

**00:01:06**Speaker 1

- with health insurance and health.

**00:01:07**Speaker 2

Oh yes, sir.

**00:01:09**Speaker 1

Was that – this - from that call?

**00:01:11**Speaker 2

Ohh yes sir. So we also do bundle home and auto insurance. So do you currently.

**00:01:15**Speaker 2

Own your home.

**00:01:17**Speaker 1

Yes.

**00:01:18**Speaker 2

Ohh OK perfect. And just to make sure, sir, your ZIP code here is [redacted], Maryland, correct.

**00:01:27**Speaker 1

[redacted], Maryland, yeah.

**00:01:29**Speaker 2

Mmhmm. Alright, thank you. Uh, so since you're the home owner, we will also look at the home and auto insurance bundling options. Who do you currently have home insurance with?

**00:01:40**Speaker 1

GEICO

**00:01:44**Speaker 2

OK. Thank you. And are you currently in a single family home?

**00:01:48**Speaker 1

Yes.

**00:01:49**Speaker 2

Alright, let me run a quick search for you and let's see who I can match you with. Hold on one second.

**00:01:55**

[Indistinct chatter in background.]

**00:02:00**Speaker 2

Perfect. Alright, I've got what I need and what I'm going to do now is transfer you over to [redacted]. They are the best available match that we have for you. And also before I transfer you our redial number here is 855-430-7755.

**00:02:18**Speaker 2

So first.

**00:02:18**Speaker 1

Hold on – 8 5 5 4 3 0.

**00:02:22**Speaker 1

7555?

**00:02:24**Speaker 2

Oh 7755

**00:02:27**Speaker 1

OK.

**00:02:28**Speaker 2

Alright

**00:02:29**Speaker 1

That's your number.

**00:02:30**Speaker 2

Mmhm. Yes, sir. If in case you have questions for us, you can just give us a call back. So for now.

**00:02:35**Speaker 1

And you said you're going to transfer me to who?

**00:02:38**Speaker 2

To [redacted] sir.

**00:02:40**Speaker 2

So I'm going to transfer you to the -

**00:02:40**Speaker 1

[redacted].

**00:02:42**Speaker 1

[redacted].

**00:02:44**Speaker 2

Yes Sir.

**00:02:45**Speaker1

OK, what do they do?

**00:02:46**Speaker 2

OK. Oh, they are also one of our top insurance companies here, an insurance company, sir. So OK, one second. Alright. So, sir, since you're looking for a comparison, I also would like to send some additional insurance options to your e-mail. So does that work for you?

**00:03:02**Speaker 1

Yeah, yeah, that's good.

**00:03:04**Speaker 2

Perfect. OK, alright. So I'm going to send it to you right now. That should be under insure.com and it has my name on it.

**00:03:12**Speaker 2

So for now.

**00:03:14**Speaker 2

OK, for now, Sir, let me get us connected to [redacted]. We both may hear some hold music as the connection is made, but I will be on the line with you the whole time.

**00:03:24**Speaker 1

OK. Thanks.

**00:03:25**Speaker2

Also, if there any IVR prompts I will take care of them. Hold on one second.

**00:03:28**Speaker 1

OK.

**00:03:29**Speaker 2

OK.

**00:03:34**

[Beep.] [Automated voice]: I'm sorry, cannot process your call right now.

**00:03:37**Speaker 2

Oh, I do apologize. It looks like [redacted] is not available right now,

**00:03:42**Speaker 1

OK

**00:03:42**Speaker 2

So I do apologize for that. So I would encourage you, sir, to give us a call back by calling our direct line or for now, you can also check the e-mail, sir, that I sent to you so that you can do a comparison first. Alright.

**00:03:53**Speaker2

Alright, so, thank you so much for

**00:03:53**Speaker 1

OK. They'll have. They'll have names. They'll have names of the uh, and you have my e-mail address?

**00:04:01**Speaker 2

Oh, yes, Sir. So that the e-mail that I have here is [redacted], is that correct?

**00:04:07**Speaker 1

Nope. Nope.

**00:04:08**Speaker 2

Oh, what is your e-mail, sir?

**00:04:12**Speaker 1

[redacted]

**0:04:16**Speaker 2

Oh

**00:04:22**Speaker 2

[redacted] . .

**00:04:22**Speaker 1

[redacted]

**00:04:24**Speaker 2

. . . [redacted]

**00:04:27**Speaker 1

[redacted].

**00:04:29**Speaker 1

[redacted]

**00:04:30**Speaker 2

[redacted] Alright. [redacted]

**00:04:36**Speaker 1

Yes.

**00:04:37**Speaker 2

OK - Oh, I still have another option here for you. Hold on one second, sir. So I also have. Yes, sir.

**00:04:45**Speaker 2

So at [redacted] there's another option here for you, maybe some of the agents, they already don't have customer right now. Hold on one second.

**00:04:54**Speaker 1

OK, I'll hold on.

**00:04:56**Speaker2

OK. So, OK, thank you so much for that, Sir. So let's try. I'll be gone for just a second, Sir. Let me get us connected to [redacted] again.

**00:05:05**Speaker 1

OK.

**00:05:06**Speaker 2

So we both may hear some hold music as the connection is made, but

**<u>00:05:08</u>**Speaker 1

That's fine

**<u>00:05:08</u>**Speaker 2

I will be on the line with you the whole time is there? Is there any IVR problems I will take care of them. Hold on one second.

**<u>00:05:13</u>**Speaker 1

OK.

**<u>00:05:15</u>**Speaker 2

Alright, so I already sent you the e-mail, Sir. [Beep sound.]

**<u>00:05:18</u>**Speaker 2

Hold on one second.

**<u>00:05:20</u>**Speaker

[Automated male voice] All calls to assist you will be recorded for quality assurance.

**<u>00:05:21</u>**Speaker 2

Hello, can you hear me?

**<u>00:05:24</u>**

[Music starts, stops in 1 second.]

**<u>00:05:25</u>**Speaker 2

Alright, we should have an agent with us shortly

**<u>00:05:28</u>**Speaker 1

OK.

**<u>00:05:29</u>**Speaker 2

Thank you.

**00:05:32**Speaker 3

Hi, this is Ray with [redacted] it looks like you were connected to me to compare rates on auto insurance today, correct?

**00:05:38**Speaker 2

Oh yes, ma'am. Oh, by the way my name is Andrea with insure.com. I have here Mr. Stanley Shapiro on the line who is looking for a quote and is interested in bundling auto and home insurance. Mr. Stanley, are you still there?

**00:05:51**Speaker 1

Yes, I am.

**00:05:53**Speaker 2

Perfect. I'll leave you two together to run the call and I hope you both have a wonderful day. Thank you. Have a great day.

**00:05:58**Speaker 1

Thank you.

**00:05:59**Speaker 2

You're welcome.

**00:06:00**Speaker 3

Hi, this is Ray with [redacted]. It looks like you were connected to me to compare rates on auto insurance today, correct?

**00:06:07**Speaker 1

Uh, yeah, I'm sorry. I the phone was kind of - -

# EXHIBIT 25

**IN THE UNITED STATES DISTRICT COURT FOR MARYLAND**
**SOUTHERN DIVISION**

**STANLEY SHAPIRO**
on behalf of himself and
others similarly situated

**PLAINTIFF**

v. Case No. 8:24-cv-01667 LKG

**QUINSTREET, INC.**

**DEFENDANT**

**PLAINTIFF'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO QUINSTREET'S DOCUMENT REQUESTS 1, 2, 5, 9, 10, 12, 13, 14, 15, AND 18**

Plaintiff, Stanley Shapiro, through counsel, Stephen H. Ring and Stephen H. Ring, P.C., responds to Defendant QuinStreet's document requests as follows:

Plaintiff incorporates by reference its Introductory Statements and General Objections in his original responses to the document requests. The "Calls" are telemarketing calls by Defendant and its agents and affiliates to Plaintiff and the Class Members advertising or promoting insurance products and services. Without waiving or limiting the foregoing General Objections, Plaintiff specifically responds and further objects to Defendant's Discovery Requests as follows:

**REQUEST NO. 1:**

All Documents identified, referenced, contemplated, or otherwise relied upon in answering QuinStreet's First Set of Interrogatories served upon You.

RESPONSE: Plaintiff will produce the requested documents.

SUPPLEMENTAL RESPONSE: Plaintiff has produced documents P – 0001 through P – 00984, which are responsive to this request.

**REQUEST NO. 2:**

All Documents constituting, concerning, or relating to any Communications, correspondence, contract, interaction, or transaction that You had with QuinStreet or DailyInsuranceDeals.com.

RESPONSE: Plaintiff will produce any responsive documents within his possession or control.

SUPPLEMENTAL RESPONSE: Plaintiff has produced his Verizon telephone bills containing details of calls made to and from his cellular telephone number, including calls from agents of Defendant. (Documents P-000157 to -984.) Defendant has produced approximately 6 pages of unnumbered documents to Plaintiff in discovery that Defendant characterizes as showing communications with Plaintiff made by persons affiliated with Defendant. After a diligent search, Plaintiff is unable to find any additional responsive documents.

**REQUEST NO. 5:**

Monthly statements for the Phone Number from Your wireless service provider from June 1, 2023 to July 31, 2024.

RESPONSE: Plaintiff will produce any responsive documents within his possession or control.

SUPPLEMENTAL RESPONSE: Plaintiff has produced his Verizon telephone bills containing details of calls made to and from his cellular telephone number, including calls from agents of Defendant. (Documents P-000157 to -984.)

**REQUEST NO. 9:**

All Documents concerning or relating to TCPA lawsuits filed or threatened to be filed by You, including but not limited to all documents produced by You or any other party or non-party litigant in such lawsuits.

RESPONSE: Objection. The request is vague, overbroad, unduly burdensome and intrudes on attorney-client privilege and attorney work product. "Threatened to be filed" is especially vague. Production would entail a laborious review of hundreds of pages of documents that include not only the court filings but all materials reviewed or used in preparation and evaluation of the suit, including evaluation of legal theories and the likelihood of success, including research undertaken by Plaintiff and by his counsel. The work required in sorting through the documents is disproportionate to any possible probative value in this case.

SUPPLEMENTAL RESPONSE: Without waiving any objections, Plaintiff has made a diligent search and has retrieved and produced document P-00031 to -50, comprising all of the responsive documents Plaintiff is able to find.

**REQUEST NO. 10:**

All Documents that You reviewed and/or relied upon in connection with filing Your Second Amended Complaint.

SUPPLEMENTAL RESPONSE: Plaintiff has produced documents P-00001 to -00156 in response to this request, representing documents relied upon by Plaintiff and his legal counsel.

**REQUEST NO. 12:**

All Documents concerning and relating to the call alleged in Paragraph 20 of the Second Amended Complaint to have been made to Plaintiff.

RESPONSE: Plaintiff will produce any responsive documents within his possession or control.

SUPPLEMENTAL RESPONSE: See Documents P-000157 to -984 and Defendants' own documents.

**REQUEST NO. 13:**

All Documents concerning and relating to the call alleged in Paragraph 23 of the Second Amended Complaint to have been made to Plaintiff.

RESPONSE: Plaintiff will produce any responsive documents within his possession or control.

SUPPLEMENTAL RESPONSE: See Documents P-0001 to -984.

**REQUEST NO. 14:**

All Documents concerning and relating to the calls alleged in Paragraph 26 of the Second Amended Complaint to have been made to Plaintiff.

RESPONSE: Plaintiff will produce any responsive documents within his possession or control.

SUPPLEMENTAL RESPONSE: See Documents P-0001 to -984

**REQUEST NO. 15:**

All Records of Your web browser history, including any laptop or desktop computer and Your mobile device and/or tablet, from June 1, 2023 to July 31, 2024.

RESPONSE: Objection. The request is vague, overbroad, unduly burdensome and intrudes on attorney-client privilege. It is not clear whether Plaintiff can generate the "Records" requested. The request does not distinguish between personal, confidential, family, medical and other materials that might be confidential, and any other materials. Production would entail a laborious review of the "Records" if they can be accessed at all. The work required in seeking or retrieving the material requested is disproportionate to any possible probative value in this case.

SUPPLEMENTAL RESPONSE:

Plaintiff objects that the records requested are primarily or exclusively under the control of Google/Alphabet and possibly Microsoft, who can be subpoenaed. Without waiving any objections, Plaintiff has made diligent efforts to find the documents requested, relying in part on the following guidance from Google Chrome:

"To retrieve your search history, go to the My Google Activity page (myactivity.google.com) or your Google account settings to view your Web & App Activity, which includes both browsing and Google searches, even if it was deleted from your browser. On an iPhone or Android, you can also open Chrome, go to the menu, and select "History" to view recent pages visited.

Via My Google Activity:

This method allows you to see your search history even if you have deleted it from your Chrome browser's history.

1. **Open your browser**: on your device.
2. **Go to the My Google Activity page**: Type myactivity.google.com into the address bar and press Enter.
3. **Log in**: to the Google account associated with your browser and device.
4. **View your activity**: You will see your search history, which you can scroll through.
5. **Filter by date**: To see older history, click on the "Filter by date & product" option to specify a date range.

Via Chrome on Your Device (For Recent History)

This method shows your recent browsing history within Chrome.

- **On a computer or Android phone:**
  1. **Open the Chrome app** .
  2. **Access the menu**: On a computer, click the More icon (three dots). On an Android device, tap the More icon (three dots) in the top right.
  3. **Tap "History"**: to see the list of recently visited pages.

What to Keep in Mind

- **Time Limits**: Chrome's local history typically only stores pages for the last 90 days.
- **Incognito Mode**: History from private or incognito browsing sessions is not saved.
- **Google Account Requirement**: To use My Google Activity, you must have been signed in to your Google account while browsing for the history to be saved there."

Also:

"To find your Google search history from the past 3 years, go to myactivity.google.com and sign in to the Google Account you used during that time. Once there, use the "Filter by date & product" option to specify the date range and then click "Apply" to view your history."

For Microsoft Edge:

"To get your Edge history for the last three years, you must enable Edge's history sync with your Microsoft account and check the history on another device or through your Microsoft account's activity page before the data is removed from your device, as Edge only locally stores history for up to 90 days by default. If you haven't enabled sync and history has been deleted locally, you'll need to use System Restore to revert your computer's state to a point before the deletion occurred."

Plaintiff followed the steps listed above and was unable to find or retrieve the records requested for the specified period, June 1, 2023 to July 31, 2024. To the best of Plaintiff's knowledge, the "sync" function described above was not enabled during the time requested.

**REQUEST NO. 18:**

All Documents concerning any insurance purchases or requests for information You have made since January 1, 2023.

RESPONSE: Objection. The request is vague, overbroad, unduly burdensome and intrudes on medical and family matters unrelated to this litigation. It is not clear whether Plaintiff can generate or access the materials requested. Defendant has taken the position that it only solicited Plaintiff for a limited scope of insurance, yet the request seeks documents regarding "any insurance purchases or requests . . ." without focusing on any particular type of insurance. The work required in seeking the material requested is disproportionate to any possible probative value in this case.

SUPPLEMENTAL RESPONSE: Without waiving any objections, Plaintiff has made a diligent search and has no documents responsive to this request other than bills and insurance policies with his existing insurance carriers, which are not related to the issues in this litigation.

**CERTIFICATE OF SERVICE**

I certify that copies of this document and its attachments were sent via email on August 25, 2025 to:

Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007

James B. Saylor (pro hac vice)
3 World Trade Center
175 Greenwich Street
New York, NY 10007

____________/s/_____________________
Stephen H. Ring

who made unsolicited calls to Plaintiff, and who made calls with spoofed caller ID's, and will supplement these responses as appropriate.

I declare and affirm under the penalties of perjury that the foregoing statements are true to the best of my knowledge.

Stanley Shapiro

without verification signature

CERTIFICATE OF SERVICE

I certify that copies of this document and its attachments were sent via email on August 25, 2025 to:

Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Email: ikasdan@kelleydrye.com

James B. Saylor (pro hac vice)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
jsaylor@kelleydrye.com

/s/
Stephen H. Ring

Verification by Stanley Shapiro provided to defendants' counsel via email on September 15, 2025.

Stephen H Ring 9/15/25

# EXHIBIT 26

## REDACTED VERSION

PO BOX 489
NEWARK, NJ 07101-0489

STANLEY STANLEY
[redacted]

**Dear Valued Customer,**

Thank you for contacting us. Enclosed you will find the bill reprint that you requested. Please contact our Customer Service department at 1-800-922-0204 with any further questions.

Sincerely,
Verizon Wireless

verizon✓

**Account:** [redacted]
**Invoice:** [redacted]
**Billing period:** Jun 26 - Jul 25, 2023

CDLR7001 1154 5026 125 34 20250723 PG 332 OF 415 0-0
55970532.1
00000494

# Talk activity (cont.)

**Stanley Shapiro**
[redacted]-1979
**GALAXY S21 5G**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Jul 5 | [redacted] | | [redacted] | | 1 | -- | -- | -- |
| Jul 5 | | | | | 1 | -- | -- | -- |
| Jul 5 | | | | | 2 | -- | -- | -- |
| Jul 5 | | | | | 2 | -- | -- | -- |
| Jul 5 | | | | | 3 | -- | -- | -- |
| Jul 5 | | | | | 1 | -- | -- | -- |
| Jul 5 | | | | | 2 | -- | -- | -- |
| Jul 5 | | | | | 2 | -- | -- | -- |
| Jul 5 | | | | | 2 | -- | -- | -- |
| Jul 5 | | | | | 2 | -- | -- | -- |
| Jul 5 | | | | | 1 | -- | -- | -- |
| Jul 5 | | | | | 5 | -- | -- | -- |
| Jul 5 | | | | | 2 | -- | -- | -- |
| Jul 5 | | | | | 1 | -- | -- | -- |
| Jul 5 | | | | | 19 | -- | -- | -- |
| Jul 5 | | | | | 1 | -- | -- | -- |
| Jul 5 | | | | | 1 | -- | -- | -- |
| Jul 5 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 2 | -- | -- | -- |
| Jul 6 | | | | | 5 | -- | -- | -- |
| Jul 6 | 9:12 AM | 301-579-3445 | Brookevill, MD | Incoming, CL | 12 | -- | -- | -- |
| Jul 6 | 9:28 AM | 301-579-3445 | Brookevill, MD | Brandywine, MD | 1 | -- | -- | -- |
| Jul 6 | [redacted] | | [redacted] | | 1 | -- | -- | -- |
| Jul 6 | | | | | 2 | -- | -- | -- |
| Jul 6 | | | | | 3 | -- | -- | -- |
| Jul 6 | | | | | 13 | -- | -- | -- |
| Jul 6 | | | | | 2 | -- | -- | -- |
| Jul 6 | | | | | 2 | -- | -- | -- |
| Jul 6 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 23 | -- | -- | -- |
| Jul 6 | | | | | 27 | -- | -- | -- |
| Jul 6 | | | | | 3 | -- | -- | -- |
| Jul 6 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 2 | -- | -- | -- |
| Jul 6 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 5 | -- | -- | -- |
| Jul 6 | | | | | 25 | -- | -- | -- |
| Jul 6 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 2 | -- | -- | -- |
| Jul 6 | | | | | 1 | -- | -- | -- |
| Jul 6 | | | | | 4 | -- | -- | -- |

verizon

Account: [redacted]
Invoice [redacted]
Billing period: Jun 26 - Jul 25, 2023

## Talk activity (cont.)

**Stanley Shapiro**
[redacted]-1979
GALAXY S21 5G

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Jul 6 | 3:52 PM | [redacted] | | | 3 | -- | -- | -- |
| Jul 6 | 3:56 PM | | | | 3 | -- | -- | -- |
| Jul 6 | 4:07 PM | | | | 2 | -- | -- | -- |
| Jul 6 | 4:48 PM | | | | 1 | -- | -- | -- |
| Jul 6 | 4:49 PM | | | | 5 | -- | -- | -- |
| Jul 6 | 5:11 PM | | | | 1 | -- | -- | -- |
| Jul 6 | 5:13 PM | | | | 1 | -- | -- | -- |
| Jul 6 | 6:46 PM | | | | 1 | -- | -- | -- |
| Jul 6 | 6:51 PM | | | | 1 | -- | -- | -- |
| Jul 6 | 6:59 PM | | | | 1 | -- | -- | -- |
| Jul 6 | 7:03 PM | | | | 5 | -- | -- | -- |
| Jul 6 | 7:21 PM | | | | 5 | -- | -- | -- |
| Jul 6 | 7:29 PM | | | | 3 | -- | -- | -- |
| Jul 6 | 8:30 PM | | | | 1 | -- | -- | -- |
| Jul 6 | 8:40 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 9:30 AM | | | | 1 | -- | -- | -- |
| Jul 7 | 9:43 AM | | | | 3 | -- | -- | -- |
| Jul 7 | 10:35 AM | | | | 1 | -- | -- | -- |
| Jul 7 | 10:52 AM | | | | 3 | -- | -- | -- |
| Jul 7 | 11:48 AM | | | | 2 | -- | -- | -- |
| Jul 7 | 11:51 AM | | | | 2 | -- | -- | -- |
| Jul 7 | 11:53 AM | | | | 1 | -- | -- | -- |
| Jul 7 | 12:01 PM | | | | 1 | -- | -- | -- |
| Jul 7 | 12:09 PM | | | | 10 | -- | -- | -- |
| Jul 7 | 12:10 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 12:19 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 12:22 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 12:23 PM | | | | 1 | -- | -- | -- |
| Jul 7 | 12:34 PM | | | | 1 | -- | -- | -- |
| Jul 7 | 12:35 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 12:36 PM | | | | 1 | -- | -- | -- |
| Jul 7 | 12:36 PM | | | | 1 | -- | -- | -- |
| Jul 7 | 12:37 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 12:39 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 1:13 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 2:00 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 2:25 PM | | | | 7 | -- | -- | -- |
| Jul 7 | 2:40 PM | | | | 30 | -- | -- | -- |
| Jul 7 | 3:19 PM | | | | 1 | -- | -- | -- |
| Jul 7 | 3:30 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 3:44 PM | | | | 1 | -- | -- | -- |
| Jul 7 | 3:44 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 4:02 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 4:05 PM | | | | 2 | -- | -- | -- |
| Jul 7 | 4:09 PM | | | | 1 | -- | -- | -- |

# EXHIBIT 27

## REDACTED VERSION

Transcript of call, converted from audio file via Microsoft Dictate/Transcribe feature~~,~~ ~~possible~~ and further edit~~s~~ed ~~suggested in [brackets]. Shr August 25, 2025.~~by counsel for QuinStreet, Inc.

**Speaker 1:** Stanley Shapiro

**Speaker 2:** Andrea [redacted]

**Speaker 3:** [redacted] Agent

**QUINSTREET00005 call audio.wav**

00:00:00

00:00:00

**00:00:01**Speaker 2

Hi, good day. This is Andrea with ~~insured.com [“~~insure.com~~”]~~ on a recorded line. How are you doing today?

**00:00:06**Speaker 1

OK.

**00:00:08**Speaker 2

Oh, that's good to hear. I'm trying to get a hold of Stanley Shapiro.

**00:00:13**Speaker 1

~~You raised them. That's that's me. [Potential correction: “You~~You’ve reached him. ~~That’s~~This is - that's me.~~”]~~

**00:00:16**Speaker 2

Oh, hi. I'm giving you a call today because you have been online looking for insurance quotes and my job today is to get you in touch with some of our top insurance companies. I'm just going to ask a few questions and let's see what comes up for you, so.

**00:00:31**Speaker 1
OK.

**00:00:32**Speaker 2

Alright, thank you.

**00:00:33**Speaker 1

~~Now when that you're with with who insured.com? [~~"Now, wait, you're with who, insure~~d~~.com?~~]~~

**00:00:36**Speaker 2

Mm-hmm. Yes~~. ("Yes~~, sir.~~"]~~

**00:00:38**Speaker 2

~~Queen St. [~~QuinStreet~~]~~ with insure.com, ~~S~~sir, but uh, we do carry a lot of insurers insurance company here so we can match with the most competitively priced options so.

**00:00:50**Speaker 1

~~Is this ["Now~~Oh, this was~~, was~~ - - is this~~"]~~ in response to a phone call I got yesterday somebody called me up and said that they were um they wanted to see if I was interested in automobile insurance and then they said they could bundle it with housing,~~ with health insurance and health.~~

**00:01:06**Speaker 2

Uh-huh.

**00:01:06Speaker 1**

- with health insurance and health.

**00:01:07**Speaker 2

Oh yes, ~~S~~sir.

**00:01:09**Speaker 1

~~Was that the plan that call? ["Was that from that call?"]~~

Was that – this - from that call?

**00:01:11**Speaker 2

Ohh yes ~~S~~sir. So we also do bundle home and auto insurance. So do you currently.

**00:01:15**Speaker 2

Own your home.

**00:01:17**Speaker 1

Yes.

**00:01:18**Speaker 2

Ohh OK perfect. And just to make sure, ~~S~~sir, your ZIP code here is [redacted], Maryland, correct.

**00:01:27**Speaker 1

[redacted], Maryland, yeah.

**00:01:29**Speaker 2

Mmhmm. Alright, thank you. Uh, so since you're the home owner, we will also look at the home and auto insurance bundling options. Who do you currently have home insurance with?

**00:01:40**Speaker ~~2~~1

GEICO~~, OK. [GEICO.]~~

**00:01:44**Speaker 2

~~[~~OK~~]~~. Thank you. And are you currently in a single family home?

**00:01:48**Speaker 1

Yes.

**00:01:49**Speaker 2

Alright, let me run a quick search for you and let's see who I can match ~~[~~you~~]~~ with. Hold on one second.

**00:01:55**

[Indistinct chatter in background.]

~~**00:01:57**Speaker~~

~~So. [Background voice, "So']~~

**00:02:00**Speaker 2

[Perfect] All. Alright, I've got what I need and what I'm going to do now is transfer you over to [redacted]. They are the best available match that we have for you. And also before I transfer you or ["our"] redial number here is 855-430-7755.

**00:02:18**Speaker 2

So first.

**00:02:18**Speaker 1

Hold on 855430– 8 5 5 4 3 0.

**00:02:22**Speaker 1

7555. ["That's your number?"]

**00:02:24**Speaker 2

Oh 7755

**00:02:27**Speaker 1

OK.

**00:02:28**Speaker 2

07755 Alright

**00:02:29**Speaker 1

That's your number.

**00:02:30**Speaker 2

, Mmhm. yYes,, Ssir. If in case you have questions for us, you can just give us a call back. So for now.

**00:02:27**Speaker 1

OK.

**00:02:29**Speaker 1

That's your number.

**00:02:35**Speaker 1

And you said you're going to transfer me to who?

**00:02:38**Speaker 2

To [redacted] Ssir.

**00:02:40**Speaker 2

So I'm going to transfer you to the ~~yes.~~-

**00:02:40**Speaker 1

[redacted]

**00:02:42**Speaker 1

[redacted]

**00:02:44**Speaker 2

Yes Sir.

**00:02:45**Speaker1

[redacted] -OK, what do they do?

**00:02:46**Speaker 2

OK. Oh, they are also one of our top insurance companies here, and insurance companiesy, Ssir. So OK, one second. Alright. So, Ssir, since you're looking for a comparison, I also would like to send some additional insurance options to your e-mail. So does that work for you?

**00:03:02**Speaker 1

Yeah, yeah, that's good.

~~**00:03:03**Speaker 1~~

~~Uh-huh.~~

**00:03:04**Speaker 2

Perfect. OK, alright. So I'm going to send it to you right now. That should be under insure.com and it has my name on it.

**00:03:12**Speaker 2

So for now.

**00:03:14**Speaker 2

OK, for now, Sir, let me get us connected to [redacted]. We both may hear some hold music as the connection is made, but I will be on the line with you the whole time.

**00:03:24**Speaker 1

OK. Thanks.

**00:03:25**Speaker2

Also, if there any IVR prompts I will take care of them. Hold on one second.

~~**00:03:24**Speaker 1~~

~~OK. Thanks.~~

**00:03:28**Speaker 1

OK.

**00:03:29**Speaker 2

OK.

**00:03:**~~**33**Speaker 2~~**34**

~~I am.~~

~~**00:03:34**Speaker 2~~

[Beep.] [Automated voice]: ~~"~~I'm sorry, cannot process your call right now.~~"~~

**00:03:37**Speaker 2

Oh, I do apologize. It looks like [redacted] is not available right now,~~ so~~

**00:03:42**Speaker 1

OK

**00:03:42**Speaker 2

So I do apologize for that. So I would encourage you, Ssir, to give us a call back by calling our Ddirect Lline or for now., Yyou can also check the e-mail, Ssir, that I sent to you so that you can do a comparison first. Alright. So OK, thank.

**00:03:4253**Speaker2 1

OK.

Alright, so, thank you so much for

**00:03:53**Speaker 1

OK. They'll have. They'll have names. They'll have names of the. uh, Aand you have my e-mail. address?

**00:03:55**Speaker 2

You so much for you.

**00:04:00**Speaker 1

Address.

**00:04:01**Speaker 2

Oh, yes, Sir. So that the e-mail that I have here is [redacted] is that correct?

**00:04:07**Speaker 1

Nope. Nope.

**00:04:08**Speaker 2

Oh, what is your e-mail, Ssir?

**00:04:12**Speaker 1

[redacted]

**000:04:16**Speaker 2

Hello. ["Oh"]

**00:04:22** Speaker 2

~~10~~ [redacted]

[redacted]

**00:04:22** Speaker 1

[redacted]

**00:04:24** Speaker 2

[redacted]

**00:04:27** Speaker 1

[redacted]

**00:04:29** Speaker 1

[redacted]

**00:04:30** Speaker 2

[redacted]
~~Alright.~~

**00:04:36** Speaker 1

Yes.

**00:04:37** Speaker 2

OK - Oh, I'~~ll~~ still have another option here for you. Hold on one second, sir. So I also have. Yes, ~~S~~sir~~. So and eventually~~.

**00:04:45** Speaker 2

~~Though~~So at [redacted] there's another option here for you, maybe some~~.~~

of ~~**00:04:48** Speaker 2~~

~~Of~~ the agents, they~~'re~~ already don't have customer right now. Hold on one second. ~~OK.~~

**00:04:54** Speaker 1

OK, I'll hold on.

00:04:56Speaker2

OK. So, OK, thank you so much for that, Sir. So let's try. I'll be gone for just a second, Sir. Let me get

us connected to [redacted] again.

00:05:05Speaker 1

OK.

00:05:06Speaker 2

So we mostlyboth may hear some holdings becausehold music as the connection is made., Bbut.

00:0405:5408Speaker 1

OK, I'll hold on.

That's fine

00:05:08Speaker 2

I will be on the line with you the whole time is there? Is there any idea orIVR problems I will take care of them. Hold on one second.

00:05:13Speaker 1

OK.

00:05:15Speaker 2

Alright, so I already sent you the e-mail, Sir. [Beep sound.]

00:05:18Speaker 2

Hold on one second.

00:05:20Speaker

[Automated male voice: "] All calls to assist you will be recorded for quality assurance."]

00:05:21Speaker 2

Hello, can you hear me?

**00:05:24**

[Music starts, stops in 1 second.]

**00:05:25**Speaker 2

Alright, ~~you ["~~we~~"]~~ should have an agent with ~~a Sharpie. ["~~us shortly~~"]~~

**00:05:28**Speaker 1

OK.

**00:05:29**Speaker 2

Thank you.

**00:05:32**Speaker ~~2~~3

~~[female voice]~~ Hi, this is Ray~~.~~ ~~W~~with [redacted] it looks like you were ~~[was]~~ connected to me to compare rates on auto insurance today, correct?

**00:05:38**Speaker 2

Oh yes, ma'am. ~~Uh~~Oh, by they~~y delayed. My~~way my name is Andrea with insure~~d~~.com. I have here~~.~~ Mr. Stanley Shapiro on the line who is

looking for a quote and is interested in bundling auto ~~in~~and home insurance. Mr. Stanley, are you still there?

**00:05:51**Speaker 1

Yes, I am.

**00:05:53**Speaker 2

Perfect. I'll leave you ~~here~~two together to run the ~~code~~call and I hope you both have a wonderful day. Thank you. Have a great day.

**00:05:58**Speaker 1

Thank you.

**00:05:59**Speaker 2

You're welcome.

**00:06:00**Speaker 3

Hi, this is [redacted] It looks like you were connected to me. To to compare rates on auto insurance. today, correct?

**00:06:07**Speaker 1

Uh, yeah, I'm sorry. I the phone was kind. of - -

~~Your transcript is saved. You can close this pane and the document and come back to it later.~~

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 10/20/2025 4:10:42 PM | |
|---|---|
| **Style name:** KDW Default | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Transcript of recorded call w suggested corrections shr v1.pdf | |
| **Modified filename:** Transcript of July 6, 2023 Call.pdf | |
| **Changes:** | |
| Add | 153 |
| ~~Delete~~ | 161 |
| ~~*Move From*~~ | 0 |
| *Move To* | 0 |
| Table Insert | 0 |
| ~~Table Delete~~ | 0 |
| *Table moves to* | 0 |
| ~~*Table moves from*~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 314 |

# EXHIBIT 28

## REDACTED VERSION

**IN THE UNITED STATES DISTRICT COURT FOR MARYLAND**
**SOUTHERN DIVISION**

**STANLEY SHAPIRO**
on behalf of himself and
others similarly situated

**PLAINTIFF**

v. Case No. 8:24-cv-01667 LKG

**QUINSTREET, INC.**

**DEFENDANT**

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO QUINSTREET'S INTERROGATORIES**

Plaintiff, Stanley Shapiro, through counsel, Stephen H. Ring and Stephen H. Ring, P.C., responds to Defendant QuinStreet's interrogatories as follows:

## INTRODUCTORY STATEMENTS AND GENERAL OBJECTIONS

Plaintiff objects to each separate Definition, Instruction, and Discovery Request on the grounds stated below, and incorporates these objections into each response.

A. PLAINTIFF objects to each Definition, Instruction, and Request for Production of Documents to the extent that it seeks documents or information already in the possession, custody, or control of Plaintiff.

B. PLAINTIFF objects to each Definition, Instruction, and Request for Production of Documents to the extent that it seeks documents or information not within PLAINTIFF's possession, custody, or control. PLAINTIFF objects to each Definition, Instruction, and Request for Production of Documents to the extent that it is overbroad[1] or unduly burdensome.[2]

---

[1] As used in these discovery responses, the term "overbroad" means the discovery request is objected to on the ground that it is too broadly worded to reasonably require a response.

[2] The term "unduly burdensome," as used in these discovery responses, means the discovery request is is oppressive and/or would impose undue burden or expense. As courts routinely recognize, there is no duty to preserve, let alone search, review, and produce, "every shred of paper, every e-mail or electronic document" that is arguably within the scope of discovery. *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497 (D. Md. 2010). *See also*

C. PLAINTIFF objects to each Definition, Instruction, and Request for Production of Documents to the extent it imposes extensive and unreasonable investigatory work on the part of PLAINTIFF.

D. PLAINTIFF objects to each Definition, Instruction, and Request for Production of Documents to the extent that it is based upon or seeks legal conclusions.

E. PLAINTIFF objects to each Definition, Instruction, and Request for Production of Documents to the extent that it requires PLAINTIFF to conduct a search of files that do not reasonably relate to the subject matter of the Amended Complaint or seeks information that is irrelevant3 to any party's claim or defense and that is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery in comparison to its likely benefit.

F. PLAINTIFF objects to each Definition, Instruction, and Request for Production of Documents as overbroad and unduly burdensome to the extent it seeks documents and/or information for a time period not relevant to the Amended Complaint or the causes of action therein.

G. PLAINTIFF objects to each Definition, Instruction, and Request for Production of Documents to the extent it seeks to impose any requirement or discovery obligation on PLAINTIFF other
than as set forth in the Maryland Rules of Civil Procedure and in applicable court rulings.

H. PLAINTIFF objects to each Definition, Instruction, and Request for Production of Documents to the extent that it requests documents or information containing confidential, proprietary, private, and/or trade secret information of PLAINTIFF or a third party.

---

*Woods v. Capital One Servs., LLC*, No. 5:09-CV-1445 (NPM/DEP), 2011 WL 2154279, *3 (N.D.N.Y. Apr. 15, 2011) (recognizing that parties should be protected from "having to produce voluminous documents of questionable relevance."); *I-Med Pharma, Inc. v. BioMatrix*, Civ. No. 03-3677 (DRD), 2011 WL 6140658 (D.N.J. Dec. 9, 2011) (affirming ruling that party did not have to review set of millions of electronically stored files); *Thermal Design, Inc. v. Guardian Bldg. Products, Inc.*, No. 08-C0828, 2011 WL 1527025, *1 (E.D. Wis. Apr. 20, 2011) (denying Plaintiff's electronic fishing expedition and noting that Defendant's financial resources are insufficient basis for ordering such discovery); *McBride v. Halliburton Co.*, 272 F.R.D. 235, 240 (D.D.C. 2011) (recognizing with respect to discovery "the court's obligation to balance its utility against its cost.").

[3] The term "irrelevant," as used in these discovery responses, means that the discovery request is objected to on the ground that the information or documents called for are not related to any party's claim or defense.

I. PLAINTIFF objects to each Definition, Instruction, and Request for Production ofDocuments to the extent that it seeks information covered by the attorney-client privilege, the work product doctrine, the common-interest privilege, third-party confidentiality agreements orprotective orders, or any other applicable privilege, immunity or protection, including but not limited to the accountant-client, consulting expert, and investigative privileges. Such privileged information is shielded from discovery and shall not be provided in response to any discovery request. In the event that any information subject to a privilege, immunity or protection is produced or otherwise revealed by PLAINTIFF, its production is inadvertent and does not constitute a waiver ofany privilege, immunity or protection. In the event that PLAINTIFF produces a document that Plaintiff knows or reasonably should know is privileged and was inadvertently produced, Plaintiff must immediately cease further review of the document, and notify PLAINTIFF of its production.

J. PLAINTIFF's objections and responses are made to the best of PLAINTIFF's current knowledge, information, and belief. PLAINTIFF's objections and responses are at all times subject to such additional or different information that discovery, legal research, analysis, and further investigation might disclose, and PLAINTIFF reserves the right to amend, revise, correct, supplement, modify or clarify the responses set forth below, or provide further responses as additional documents are ascertained. PLAINTIFF's responses should be deemed supplemented by documents and/or information that are or become available to the parties as a consequence of discovery in this litigation.

K. Discovery is ongoing. As such, PLAINTIFF's responses shall not be deemed to constitute admissions: (1) that any particular document, thing, or information exists, or is relevant, nonprivileged, or admissible in evidence; or (2) that any statement or characterization in the responses to the Request for Production is accurate or complete.

L. PLAINTIFF's responses are made based upon the typical or usual interpretation of words contained in the Request for Production, unless a specific definition or instruction has been provided. PLAINTIFF's responses shall not be deemed to constitute acceptance of, or agreement with, any explicit or implicit characterization contained in the Request for Production, and PLAINTIFF objects generally to any explicit or implicit characterization contained in the Request for Production that differs from PLAINTIFF's own.

M. PLAINTIFF objects to the phrase "relating to" and the definition of that phrase in Plaintiff's Discovery Request as overbroad and unduly burdensome.

N. PLAINTIFF objects to the definition of "You," "Your," and "Yours," in Defendants' discovery requests because it seeks to require PLAINTIFF to produce information not only in PLAINTIFF's possession, but also in the possession of "its accountants, agents, attorneys, consultants, employees, contractors, assigns, and representatives of any kind." The definition goes beyond PLAINTIFF's obligation under applicable rules and seeks privileged and protected information.

O. PLAINTIFF objects to the Instruction in Defendants' Discovery Requests mislabeled as a "definition" (Definition no. 14), pertaining to privilege because it attempts to impose

requirements on PLAINTIFF beyond PLAINTIFF's obligations under applicable law and rules of procedure. PLAINTIFF will provide the information required under applicable law.

P. Nothing set forth in PLAINTIFF's objections or responses is intended as or should be construed as a waiver of any specific objections set forth.

The "Calls" are telemarketing calls by Defendant and its agents and affiliates to Plaintiff and the Class Members advertising or promoting insurance products and services.

Defendant defines the "Action" in its discovery requests specifically as "Case No. 2:24-cv-14382" which apparently applies to *Luckau v. Sunrun, Inc*. in the U.S. District Court for the Northern District of California, unrelated to the instant case. Plaintiff has no information responsive to requests pertaining to the *Luckau* case, but responds in good faith below, applying the substance of the requests to the instant case.

Without waiving or limiting the foregoing General Objections, PLAINTIFF specifically responds and further objects to Defendant's Discovery Request as follows:

**INTERROGATORY NO. 1:**

Identify all persons that You believe are likely to possess information relating to the Subject Matter of this Action and for each person describe the information You believe they have.

RESPONSE: Plaintiff adopts and incorporates by reference the General Objections above. Defendant's discovery requests refer to the "Action" as "Case No. 2:24-cv-14382. Plaintiff is not aware of any responsive information pertaining to that case.

Without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff, Stanley Shapiro, is one of the persons whose identify is requested, and possesses the information stated in the complaint. Defendant and its agents, related entities, publishers and affiliates, including Journaya, are expected to have, and to have preserved, information and documents pertaining to the preparation and planning of the Calls, records of numbers used in the Calls, records of false caller ID numbers and names used in the Calls, call detail records, internal do-not-call records, protocols and policies regarding telemarketing, and other data pertaining to the outcome of the Calls, and other information and documents "relating to the Subject Matter of this Action." "Persons likely to possess information" as requested may include [redacted], and other entities and individuals associated with QuinStreet. The information held by each individual will be the subject of further discovery, but Plaintiff expects that the persons named above in this response have knowledge of telemarketing activities by or for QuinStreet including those activities alleged

in the latest complaint filed in this suit. Plaintiff expects to obtain additional responsive information during discovery and will supplement this response as required.

**INTERROGATORY NO. 2:**

State whether You have suffered any damages other than statutory damages as a result of any conduct by QuinStreet alleged in the Second Amended Complaint and, if so, state the nature of such damages, the dollar amount, and the basis for Your calculations.

RESPONSE: In addition to statutory damages recognized under applicable law, the Calls have interrupted Plaintiff's privacy, have deceived him into answering under the belief that the calls may be legitimate, have interfered with the legitimate use of his phone, and have caused inconvenience and annoyance.

**INTERROGATORY NO. 3:**

Identify any and all companies that insure You, including but not limited to health insurance and automobile insurance.

RESPONSE: Kaiser Health, Geico automobile, home, and umbrella, Essentia automobile.

**INTERROGATORY NO. 4:**

Identify and describe the methods or manners You used to research, bid, price out, purchase, or hire any and all insurance companies or products, such as health and automobile insurance.

RESPONSE: I remain in contact with GEICO as needed to update coverage, using email and telephone. I do not recall the specific steps I took to "research, bid, price out, purchase, or hire any and all insurance companies or products . . ."

**INTERROGATORY NO. 5:**

Identify each telephone number for which You were or are the user or subscriber and for each telephone number state: (a) the name and address of the subscriber, (b) the name and address of the person or entity that pays the telephone bill, (c) the telephone service provider (e.g., Verizon, AT&T, etc.), (d) the type of subscription plan (e.g., business, family, etc.), (e) whether the telephone number is associated with a landline, cell phone, or other type device, and (f) the name and address of each user of the telephone number.

RESPONSE:

5. [redacted]-1979:

a. Stanley Shapiro, [redacted] MD [redacted]

b. Same

c. Verizon

d. Personal or family

e. Cell phone

f. Same as (a)

**INTERROGATORY NO. 6:**

State whether You placed the Phone Number on the National Do Not Call Registry and, if so, state all dates on which You did so.

RESPONSE: Yes. My cell number has been on the National DNC list continuously for many years, and during the relevant time for this case. I believe it was first registered with the National DNC Registry in or around 2003.

**INTERROGATORY NO. 7:**

State whether You have ever used the Phone Number for any business purposes, including but not limited to providing the Phone Number to any person, entity, or the public for purposes of contacting You regarding any business activities in which You were engaged, and, if so, describe the date, circumstances, and manner of such business uses of the Phone Number.

RESPONSE: I have not published or advertised my cell number to the public as a business number. My cell number has been continuously registered with Verizon in my personal name and not in the name of a business. The majority of my time on the cell phone has been for personal use. I have occasionally used my cell phone to communicate with others regarding my service with the Maryland State Guard or to communicate with my wife and other individuals in the physical therapy business of which my wife is the sole shareholder. I have occasionally provided my cell number to specific individuals who have communicated with me regarding business, investment, banking, tax, financial, home maintenance, medical, automobile and other matters for me personally or for them, and those topics may overlap with and/or include social, recreational and family matters.

**INTERROGATORY NO. 8:**

State whether, between June 1, 2023 to July 31, 2024, You had more than one cell phone or cell phone number and, if so, state each phone number and describe the make and model of each phone, and describe the purposes for which You used each phone and/or phone number.

RESPONSE: I have not had more than one phone number for myself during the time requested. Over the years my account with the carrier has occasionally included phone numbers for members of my family, but I do not know if any of those numbers were on the account during the time interval in the request.

**INTERROGATORY NO. 9:**

Identify any and all electronic devices that You or anyone acting on Your behalf have used to access the internet from June 1, 2023 to July 31, 2024.

RESPONSE: We access the Internet via telephone and via PC's.

**INTERROGATORY NO. 10:**

Describe in detail every instance in which You or anyone acting on Your behalf requested, inquired about, opted in, or consented to receive information about any insurance products from any entity, including but not limited to QuinStreet between June 1, 2023 to July 31, 2024.

RESPONSE: None.

**INTERROGATORY NO. 11:**

Identify all lawsuits in which You have been involved in any capacity and for each state: (a) the case name, (b) the case number, (c) the court in which the case was pending, (d) the nature of the lawsuit, (e) Your involvement in the lawsuit (i.e. plaintiff, defendant, witness, etc.), and (f) the outcome.

RESPONSE: Plaintiff objects on the grounds that the request is overbroad and unduly burdensome. Defendant has equal access to the public records that contain the information sought. Without waiving these objections plaintiff provides the following information for the past 10 years:

In the District Court of Maryland:

D06CV24013639 Stanley Shapiro vs. Quinstreet, Inc., plaintiff, TCPA suit, removed to USDC-MD.

D06CV24013465, Stanley Shapiro vs. Analgesic Healthcare, Inc., plaintiff, TCPA suit, voluntarily dismissed, closed 04/22/2024.

D06CV22008385, Stanley Shapiro vs. Core Home Security, LLCet al.; plaintiff, TCPA claim, settled, closed 02/06/2022.

100199F, federal tax lien, closed 11/23/2016

In the Circuit Court for Montgomery County, Maryland:

398101V, Jay Clogg Realty Group Inc, et al. vs. Metropolitan Life

Insurance Company, et al., TCPA suit, settled, closed 12/02/2014.

**INTERROGATORY NO. 12:**

For each of the following calls alleged in Paragraphs 20, 23, and 26 of the Second Amended Complaint, provide the following information: (a) the phone number that called You; (b) the phone number You received the call on; (c) the duration of the call; (d) the identity of the person(s) and companies that called You; (e) whether You claim the call was made for telemarketing purposes and, if so, the basis for that belief, and (f) the substance of the call.

• July 5, 2023 at 4:22 pm

• July 31, 2023 at 6:36 pm

• January 18, 2024 at 3:34 pm

• June 6, 2024 at 4:25 pm

• July 6, 2024 at 9:12 am

• July 22, 2024 at 2:22 pm

RESPONSE:

For each Call, the number that initiated the call or "called you" was not accurately shown or stated during the call, or was falsified. Each call was received on my cell phone -1979, as alleged in the latest complaint. The durations of the calls should be shown in call detail records for the carriers involved. Plaintiff is attempting to obtain those records from Verizon and will supplement this response to the extent possible.

Each of the calls was made for telemarketing purposes, encouraging, advertising or promoting the purchase of insurance products.

**INTERROGATORY NO. 13:**

Describe in detail the basis for Your allegation that the calls set forth in Interrogatory No. 11 were placed by or on behalf of QuinStreet.

RESPONSE: At least one of the callers stated they were calling for insure.com which is owned by QuinStreet. All of the calls followed the same script and format, going through the same introduction and questions, and all of them used falsified caller ID's, following a strikingly similar pattern. The telemarketing of insurance products in this manner is consistent with the business practices of QuinStreet and its agents, based on QuinStreet's publicly filed documents and based on information gathered by my legal counsel in other litigation.

I declare and affirm under the penalties of perjury that the foregoing statements are true to the best of my knowledge.

Stanley Shapiro

**CERTIFICATE OF SERVICE**

I certify that copies of this document and its attachments were sent via email on June 24, 2025 to the following:

Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Email: ikasdan@kelleydrye.com

James B. Saylor (*pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
jsaylor@kelleydrye.com

____________/s/_____________________
Stephen H. Ring

# EXHIBIT 29

## REDACTED VERSION

**IN THE UNITED STATES DISTRICT COURT FOR MARYLAND
SOUTHERN DIVISION**

**STANLEY SHAPIRO**
on behalf of himself and
others similarly situated

**PLAINTIFF**

v. Case No. 8:24-cv-01667 LKG

**QUINSTREET, INC.**

**DEFENDANT**

**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
QUINSTREET'S INTERROGATORIES 2, 12 AND 13**

Plaintiff, Stanley Shapiro, through counsel, Stephen H. Ring and Stephen H. Ring, P.C., responds to Defendant QuinStreet's interrogatories as follows:

Plaintiff adopts and incorporates by reference all of the Introductory Statements and General Objections from his prior discovery responses. Counsel have made efforts to resolve discovery disputes including alleged omissions by both sides. These efforts have included a telephone conference on July 21, 2025 and emails. Plaintiff anticipates receiving additional documents and information from Defendant via written discovery and via deposition. Plaintiff has served a notice to depose Defendant under Rule 30b6, and awaits dates from Defendant. Plaintiff has produced documents received from Verizon, a non-party. As discovery proceeds Plaintiff anticipates receiving additional information from Defendant and from non-parties that may require further supplementation of Plaintiff's discovery responses.

**INTERROGATORY NO. 2:**

State whether You have suffered any damages other than statutory damages as a result of any conduct by QuinStreet alleged in the Second Amended Complaint and, if so, state the nature of such damages, the dollar amount, and the basis for Your calculations.

RESPONSE: In addition to statutory damages recognized under applicable law, the Calls have interrupted Plaintiff's privacy, have deceived him into answering under the belief that the calls may be legitimate, have interfered with the legitimate use of his phone, and have caused inconvenience and annoyance.

SUPPLEMENTAL RESPONSE: Plaintiff has not assigned a specific dollar value to the interruption of privacy, deception, interference with legitimate use of his phone, or inconvenience and annoyance caused by the Calls. In *Krakauer v. Dish Network, L.L.C.,* 925 F.3d 643 (4th Cir. 2019), the Fourth Circuit held that TCPA plaintiffs need not show any threshold level of injury to have standing, so long as they prove the statutory elements of a TCPA claim; the TCPA creates a simple cause of action that is "conducive to class-wide disposition" without reference to individualized inquiries; and the defendant could be held responsible for the actions of its third-party marketer even if it repeatedly admonished the third party against violating the law and its contracts disclaimed any agency relationship.

**INTERROGATORY NO. 12:**

For each of the following calls alleged in Paragraphs 20, 23, and 26 of the Second Amended Complaint, provide the following information: (a) the phone number that called You; (b) the phone number You received the call on; (c) the duration of the call; (d) the identity of the person(s) and companies that called You; (e) whether You claim the call was made for telemarketing purposes and, if so, the basis for that belief, and (f) the substance of the call.

- July 5, 2023 at 4:22 pm
- July 31, 2023 at 6:36 pm
- January 18, 2024 at 3:34 pm
- June 6, 2024 at 4:25 pm
- July 6, 2024 at 9:12 am

• July 22, 2024 at 2:22 pm

RESPONSE:

For each Call, the number that initiated the call or "called you" was not accurately shown or stated during the call, or was falsified. Each call was received on Plaintiff's cell phone -1979, as alleged in the latest complaint. The durations of the calls are shown in call detail records for the carriers involved, including Verizon. Plaintiff has produced billing records from Verizon and awaits call detail records and related data from the Defendants, as that information has been preserved (so represented by Defendants), and that information is necessary for a full and complete determination of the Defendants' conduct in connection with the Calls.

Each of the Calls was made for telemarketing purposes, encouraging, advertising or promoting the purchase of insurance products.

SUPPLEMENTAL RESPONSE:

• July 5, 2023 at 4:22 pm: duration approximately 5 minutes per Verizon bill; caller ID displayed as: "207-232-3247 Maine;" actual caller identification not given. The callers promoted health insurance. As alleged in ¶22 of the Second Amended Complaint, the call started with an artificial voice, apparent from its flat, inhuman and robotic intonation and pronunciation.

• July 6, 2023 (not 2024) at 9:12 am; duration 12 minutes; caller ID shown as "301-579-3445." Agent Andrea of insure.com spoke with a foreign accent, possibly Filipino, and said she had obtained Plaintiff's contact information from the call of July 5, 2023 on insurance including health insurance, and that her number was "855-430-7755" which connected Plaintiff on callback to "Insurance.com," a QuinStreet enterprise. QuinStreet has confirmed that Andrea works at a call center in the Philippines managed by QuinStreet. This information tied the calls of July 5 and July 6, and the numbers used, to QuinStreet. Plaintiff received additional calls of

nearly identical format and content, including one using a spoofed caller ID of 207-232-3247, on July 7, 2023 at 3:30 pm.

• July 31, 2023 at 6:36 pm, duration 13 minutes, caller ID 301-381-6724. The callers promoted purchase of health insurance, starting with a robotic artificial voice and essentially repeating the content of the calls of July 5 and 6, 2023.

• January 18, 2024 at 3:45 pm (not 3:34 pm), duration 5 minutes, caller ID 212-687-1458. The callers promoted purchase of health insurance, starting with a robotic artificial voice and essentially repeating the content of the calls of July 5 and 6, 2023.

• June 6, 2024 at 4:25 pm. Duration and caller ID per Verizon billing.

• July 22, 2024 at 2:22 pm. Duration and caller ID per Verizon billing.

- Several additional calls that display false caller ID 207-232-3247 or 301-579-3445, shown in Verizon bills produced.

Plaintiff has produced call details via bills from Verizon in documents P-000157 to -984. Discovery is ongoing. Plaintiff will supplement this response as further information is obtained and evaluated.

Plaintiff adopts as part of this response the allegations in paragraphs 28 - 33 of the Second Amended Complaint.

**INTERROGATORY NO. 13:**

Describe in detail the basis for Your allegation that the calls set forth in Interrogatory No. 11 were placed by or on behalf of QuinStreet.

RESPONSE: Andrea stated she was calling for insure.com which is owned by QuinStreet. All of the calls followed the same script and format, going through the same introduction and questions, and all of them used falsified caller ID's, following a strikingly

similar pattern. The telemarketing of insurance products in this manner is consistent with the business practices of QuinStreet and its agents, based on QuinStreet's publicly filed documents and based on information gathered by my legal counsel in other litigation.

SUPPLEMENTAL RESPONSE:

A combination of facts points to the conclusion that the calls were placed by or on behalf of QuinStreet. First, QuinStreet admits in its web pages and SEC 10K filings that it is a major lead generator in the marketing of insurance including health insurance, and that telemarketing is one of the methods used in the process, and that it uses call centers and has multiple affiliated business names. The call of July 5, 2023 at 4:22 pm, giving a false caller ID of "207-232-3247 Maine" promoted purchase of health insurance. Another call to Plaintiff came on July 6, 2023 at 9:12 am showing the caller ID "301-579-3445." The caller, "Andrea," confirmed that she was with insure.com, a QuinStreet enterprise, had obtained Plaintiff's contact information from the call of July 5, 2023, and that she could be reached at "855-430-7755" which belongs to "Insurance.com." These events tied the calls of July 5 and July 6, 2023 to QuinStreet.

In its Answer to Plaintiff's Interrogatory No. 2, QuinStreet indicates that the caller on July 6, 2023 was "Andrea [redacted], who works at a call center managed by QuinStreet—[redacted]—". QuinStreet has failed to produce its call detail records and related data for the Calls to Plaintiff and to the class members, which is a continuing dispute that will likely result in a motion to compel. However, even without that data the information provided is sufficient to tie the calls of July 5 and 6 to QuinStreet, and to attribute to QuinStreet all calls using the same false caller ID's 207-232-3247 and 301-579-3445 stated above. .

Plaintiff is continuing to review the Verizon bills, and discovery is ongoing. Plaintiff will continue to pursue the necessary data pertaining to the actions of those affiliated with QuinStreet

who made unsolicited calls to Plaintiff, and who made calls with spoofed caller ID's, and will supplement these responses as appropriate.

I declare and affirm under the penalties of perjury that the foregoing statements are true to the best of my knowledge.

______________________________
Stanley Shapiro

CERTIFICATE OF SERVICE

I certify that copies of this document and its attachments were sent via email on August 25, 2025 to:

Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Email: ikasdan@kelleydrye.com

James B. Saylor (pro hac vice)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
jsaylor@kelleydrye.com

___________/s/___________________
Stephen H. Ring

who made unsolicited calls to Plaintiff, and who made calls with spoofed caller ID's, and will supplement these responses as appropriate.

I declare and affirm under the penalties of perjury that the foregoing statements are true to the best of my knowledge.

Stanley Shapiro

without verification signature

CERTIFICATE OF SERVICE

I certify that copies of this document and its attachments were sent via email on August 25, 2025 to:

Ira T. Kasdan (Bar # 26942)
3050 K Street, NW
Washington, DC 20007
Email: ikasdan@kelleydrye.com

James B. Saylor (pro hac vice)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
jsaylor@kelleydrye.com

/s/
Stephen H. Ring

Verification by Stanley Shapiro provided to defendants' counsel via email on September 15, 2025.

Stephen H Ring 9/15/25

# EXHIBIT 30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

STANLEY SHAPIRO, )
Plaintiff, )
)
v. ) CASE NUMBER: 8:24-cv-01667-AAQ
)
QUINSTREET, INC., )
Defendant. ) HEARING HELD VIA ZOOM
______________________________)

TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
BEFORE THE HONORABLE AJMEL A. QUERESHI
UNITED STATES MAGISTRATE JUDGE
October 27, 2025

A P P E A R A N C E S

FOR THE PLAINTIFF:

BY: STEPHEN H. RING, ESQUIRE
LAW OFFICES OF STEPHEN H. RING, P.C.
401 North Washington Street, Suite 500
Rockville, Maryland 20850

FOR THE DEFENDANT:

BY: JAMES B. SAYLOR, ESQUIRE
KELLEY DRYE & WARREN, LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007

BY: IRA T. KASDAN, ESQUIRE
KELLEY DRYE & WARREN, LLP
3050 K Street Northwest
Washington, DC 20007

***Proceedings Recorded by FTR GOLD***
Transcript Produced by Computer-Aided Transcription

**P R O C E E D I N G S**

(1:00 p.m.)

**THE COURTROOM DEPUTY:** The matter now pending before the Court is civil case number LKG-24-cr-1667, Shapiro v. QuinStreet, Inc. The matter now comes before the Court on a recorded motions hearing. Starting with the plaintiff, if you could identify yourself for the record, please.

**MR. RING:** Good afternoon, Your Honor. This is Stephen Ring for the plaintiff, Stanley Shapiro.

**THE COURT:** Mr. Ring, it's nice to meet you, sir. Thank you, as always, for your work. I look forward to working with you on this case.

**MR. SAYLOR:** Good afternoon, Your Honor. This is James Saylor from the law firm of Kelley Drye & Warren for the defendant, QuinStreet. I'm joined by my colleague, Ira Kasdan, also of Kelley Drye & Warren for defendant, QuinStreet. Thank you.

**THE COURT:** All right, Mr. Saylor, nice to meet you, sir. Thank you, as always, for your work. I look forward to working with you on this case.

Mr. Kasdan, is that right? Am I pronouncing that correctly?

**MR. KASDAN:** Kasdan, correct.

**THE COURT:** Nice to meet you, sir. Thank you, as always, for your work. I look forward to working with you on

this case.

All right, folks. This is your first time before me in any sort of hearing, so I'll give you some general rules of the road that may be helpful for you.

Number one, don't worry so much about who goes first or who goes second. Everybody gets plenty of time before me. I think much to perhaps Ms. Martinez's chagrin, I let everybody have as much time as they want.

I understand you have two motions pending which have both been referred to me by Judge Griggsby. One is ECF No. 84, the motion for a protective order by QuinStreet; and then number 2 is the motion to compel from the plaintiff at ECF No. 101.

As the plaintiff acknowledged in their letter to the Court requesting the opportunity to brief the motion to compel, there's substantial overlap between what's in the motion for a protective order and the motion to compel. Because the motion for a protective order came first, I'm going to let Mr. Saylor go first, but I promise you before I end any hearing I always make sure that everybody has more than enough time to present any argument that they want. So really from my view it's inconsequential who goes first, but we'll hear from Mr. Saylor first; then we'll hear from Mr. Ring.

Second, I tend to let people know what I reviewed in advance of the hearing today so that gives some people a sense

of how much they need to go over the background and facts of the case. So I have gone over the second amended complaint in this case several times. I've reviewed it, specifically paragraph 26 and paragraph 44 which relate to plaintiff's allegations regarding the calls made by Selectquote and QuinStreet and the dates of those calls allegedly made by Selectquote and QuinStreet. I understand that Selectquote is no longer part of the case and QuinStreet is only in this case right now.

I also, of course, have reviewed the motion for a protective order in this case, as well as all of the exhibits, A through G. I also have reviewed ECF No. 98 which I understand is not before me, but certainly is useful and relevant to what we're talking about today which is the motion for summary judgment. I don't think that I have the actual joint record, but if I do and it's somewhere on the docket or it's been emailed to me, let me know and I'll make sure I look at that as well.

I have reviewed ECF No. 99 and ECF No. 100 which are redacted and unredacted versions of the same document, essentially your joint statement of undisputed facts that relate mainly towards what the records allegedly show regarding calls made by QuinStreet or its representatives to the plaintiff in the case and then calls allegedly made by the plaintiff in return to QuinStreet.

And then finally I've reviewed ECF No. 101, of course, which is the motion to compel and the memorandum in support, several exhibits that the plaintiff provided with that including their affidavit from their expert, the rog responses and requests and the amended rog responses. Those are helpful; thank you.

I've reviewed defendant's opposition to motion to compel, as well as the affidavit from Mr. Saylor. And then I also have reviewed the verification at ECF No. 101-12. And then finally I've reviewed plaintiff's reply in support of the motion to compel.

Finally I should let you know that I have listened to both of your teleconferences with -- I believe they were teleconferences; I couldn't tell. It sounded like a teleconference -- with Judge Griggsby both in relationship to the initial motion to dismiss. I understand to give some insight as to where my mind is at, she didn't rule on the motion to dismiss. The substance of what she had to say in that hearing really related to really a question of futility and whether or not granting leave to plaintiff to amend would be futile. But she explicitly reserved on the question of whether or not a motion to dismiss would be granted or not and she referenced specifically the fraud allegations and whether or not they were sufficient under Rule 8.

I also have listened to your hearing before Judge

Griggsby related to the scheduling order in the case and defendant's request for bifurcation. And it is correct that she did not -- she essentially deferred on the issue and said I'd like to decide that issue in the context of the individual requests that come forward.

So I know you have a motion for summary judgment pending. I certainly will give everybody the opportunity to make any arguments that they want and to make the record to the full extent that they wish. But the bottom line for me right now is what does plaintiff need in terms of discovery to be able to respond to the motion for summary judgment that's been put out there. So if there's additional stuff that the plaintiff needs to respond to the motion for summary judgment which really focuses on just the plaintiff and whether or not he received more than one call, I don't see a lot of fighting in the papers about whether or not that one call was recorded.

And now I've listened to that one call as well and of course I'm not your finder of fact, nor is Judge Griggsby, but it certainly seems like to me that that was not a recording. There was back and forth between the parties or -- sorry, between the plaintiff and the representative of the party. It did not seem like an auto-recorded call.

So really for me, right now having read all of the papers, having listened to all of the hearings, it really is simply a question of what other discovery does plaintiff need

to be able to respond to your motion for summary judgment.

I also understand if you can humor me just a bit longer-- I also understand that plaintiff has produced his Verizon telephone records as well. Of course I haven't seen those records. They're just referred to in defendant's motion for summary judgment. And I understand that there's a 301 number that QuinStreet uses to call or used for that particular call to the plaintiff on July 6th. I have some questions about that, but you both have been very patient. You've listened to me long enough.

Mr. Saylor, I'm happy to hear your responses to any of those points or something entirely different. Or if you do want to cover background, anything you think I've gotten wrong or missed or even if you just want to make the record again I will give you full leave to do whatever you want to do.

**MR. SAYLOR:** Thank you, Your Honor. I think that's a very thorough recitation of the current status of the case. QuinStreet agrees that the power inquiry at this stage is what discovery does plaintiff need to oppose QuinStreet's motion for summary judgment. The class discovery that plaintiff seeks is not relevant to that motion. Essentially on the {audio gap} class discovery and I think it's a common definition, is discovery concerning persons other than the plaintiff. In this case that's calls placed by QuinStreet to other individuals in the state of Maryland and other

individuals throughout the entire United States.

Discovery into those calls is not going to change the simple fact that QuinStreet placed a single call to plaintiff's phone number. I take it from your review of the underlying summary judgment motion that you're familiar with the applicable TCPA or the applicable sections of the Telephone Consumer Protection Act that require there to be more than one call in a 12-month period to state a claim for calls placed without consent, the National Do Not Call Registry.

And the simple fact is QuinStreet has no more discovery to give. QuinStreet has conducted a thorough search of its records. It's verified the results of that search in response to plaintiff's first set of interrogatories where it verified that after searching, it found a single call to plaintiff's phone number made within minutes of a request for information that it received from a third-party publisher.

Plaintiff's counsel and plaintiff take issue with the veracity of that consent. They contend that somebody other than plaintiff filled out the web form. Frankly, that's irrelevant to the resolution of the summary judgment motion.

**THE COURT:** Because you're saying there's only one call period.

**MR. SAYLOR:** Exactly. You only need consent if there's more than one call or if there is a call made with an

artificial prerecorded voice.

The joint statement of undisputed facts, plaintiff doesn't dispute it. In fact, the complaint itself, the second amended complaint itself contends that the July 6, 2023 call between one of QuinStreet's agents and plaintiff was with a human being. So there is no dispute as to whether there was artificial or prerecorded voice used during that July 6, 2023 call.

You know, simply the fact of the matter is there's nothing more for QuinStreet to give with respect to plaintiff's individual claim.

**THE COURT:** Well, I don't disagree with anything you've said so far. I have questions about that last point. So it seems like we're more or less on the same page right now based on everything you've said. So let me ask you some of the questions that jumped to mind for me when I was reviewing all the papers.

The only real question that jumped to mind for me after having reviewed -- again, this is not meant in a critical way in the least. I think I'm a bit of a unicorn in this way in that I like more briefing. If everybody needs the chance to say everything they want to say, that's perfectly fine. The single issue that jumped out to me after reviewing the entirety of everything was this issue about his call records, this being the plaintiff's call records. I do believe that

plaintiff has the right to test the assertion and you've been very clear about this. You've repeatedly said over and over again that you've searched all your records. The search has been voluminous and it's turned up only one outbound call to this phone number with this plaintiff.

We're all on the same page about that, correct?

**MR. SAYLOR:** Correct.

**THE COURT:** Very good. And I think that's important because I think plaintiff has raised some issue, especially in their reply about the nature of your rog responses in whether or not the rog responses were limited to July 6th. But after reading the Tyrell -- I believe it is Mr. Tyrell; is that correct?

**MR. SAYLOR:** It's Mr. Orell. It's Tyler Orell.

**THE COURT:** I jut put it together. So a Game of Thrones reference for you. But Mr. Orell is very clear that his response to the search is not limited just to July 6th, it's queried.

The one question that I do have is when QuinStreet makes calls to individuals in Maryland, do they use any phone number that comes up? And this is from your reply, Mr. Ring. I found this to be somewhat persuasive. Do they use any phone number other than the 301-579 number? Let's start with that.

**MR. SAYLOR:** Sitting here today I can't tell you that the phone number ending in 3445 which is the 301 number

that actually was used to call the plaintiff is the only number that QuinStreet has ever used to to call anybody in the state of Maryland.

**THE COURT:** Let me make it more narrow. Let's say during the four specific months that are identified in paragraphs 26 and 44, I understand your argument, Mr. Saylor, that you feel like you've done a sufficient search. It seems to me that plaintiff does have the right to test the allegations you're making. I don't necessarily think that it's the proper balancing of relevance and burden for an independent expert to go ahead and do an independent review or plaintiff's expert to go and do an independent review of all of your databases to figure out how they work and form whatever theories they want. But it seems to me that absent hearing something about what the burden from this would be, that you could pull the phone numbers that QuinStreet uses to call people in Maryland during the four months identified in the Complaint, provide those phone numbers -- those four days being from paragraph 26 and 44. You could give those numbers to Mr. Ring. He's not going to find any additional plaintiffs from those phone numbers because they're your numbers.

So I've heard your concerns as well, Mr. Saylor, as to you don't want this to become a fishing expedition where he potentially looks for new plaintiffs and adds them in. But you can give those numbers to him and then he can match that

up with the Verizon call records and that would allow him to sufficiently test whether or not any of those numbers show up on his own phone bills. And if they don't, then he's had the opportunity to test the assertions that you're making in your declaration.

Do you understand what I'm asking?

**MR. SAYLOR:** Yeah, I think so, Your Honor. And that sounds rational. I think there's just one -- just to be clear on some of the timing here because the interrogatory that would request such information essentially, tell me every number that you've ever used to call people --

**THE COURT:** And I agree it was overbroad. And that's why I'm sort of doing some of the work to get us to the right place.

**MR. SAYLOR:** I'm sorry for interrupting.

**THE COURT:** No.

**MR. SAYLOR:** But I just want to make the point that that interrogatory was actually not served until after plaintiff moved to compel discovery. So plaintiff's second set of interrogatories were served on October 4th of this year, so just a couple of weeks ago. QuinStreet endeavored to respond to those interrogatories before I filed its motion for summary judgment so there wouldn't be any outstanding questions or outstanding discovery at the time of this motion for summary judgment. So it served verified responses on

October 17th. Those responses are not before Your Honor right now because they were not part of the discovery record.

**THE COURT:** Well, you'll end up right back before me anyway. Because he'll file a Rule 56 affidavit. Again, I've listened to all of your hearings. You're both very -- as Judge Griggsby said, you're both very competent, more than competent. You're both very smart. So he'll file a Rule 56 affidavit saying I haven't gotten the discovery I need to respond to motion for summary judgment.

So I think it really is in all of our best interests if you give him the call records -- the numbers, not the call records -- the numbers that QuinStreet used to call people in Maryland. And this includes, of course, QuinStreet's representatives as well. So that would include insure.com or anybody like insure.com during the months of July of 2023, January of 2024, June of 2024, July of 2024. Give those numbers to Mr. Ring and then you both can match them up against the call records, the Verizon call records for plaintiff's cell phone.

I would expect if you haven't already, Mr. Ring -- again, I know you produced some Verizon records but I don't know if you've produced them for all of these months. Then you should produce his Verizon call records for all of those months and then you essentially look to see if there's any overlap at all whatsoever. And I think that's a non-burdensome way for Mr.

Ring to have the opportunity to test the assertions you're making in a way that appropriately balances relevance and burden in this particular case.

**MR. SAYLOR:** Your Honor, that sounds reasonable to defendant QuinStreet. I have not had the opportunity to inquire with them what exactly that would entail to figure out, but I will make that inquiry to them and if there's any inability of QuinStreet to actually provide that information, Mr. Ring and I can discuss that. I just don't want to make promises that it might not be able to fulfill.

**THE COURT:** Fair enough. The point I would make to your client to the extent that it's helpful is that it's -- again, based on what I know, what I've read and what I've heard from you today, that still is less burdensome than Mr. Ring's alternative proposal which was to have Mr. Wolfson come in and do an independent search of all your databases to figure out whether or not any other calls were there.

**MR. SAYLOR:** Correct. Absolutely understood.

**THE COURT:** And look, and if it leads to something Mr. Ring needs further, like if there's some smoke there then maybe we need to do some further looking, but that seems like an easy way to start.

Mr. Saylor, I understand I've sort of -- this is kind of what discovery hearings would mirror like looking at. That's why I like the briefing. I spent a lot of time I think trying

to go over the briefing, but if there are other points you want to make that you feel like I haven't given you a chance to make, go ahead.

**MR. SAYLOR:** No, I believe that our position is sufficiently set forth in our brief. Of course it doesn't sound like Your Honor is considering sanctions against my client at this time so --

**THE COURT:** No, no.

**MR. SAYLOR:** But we will assuming -- we'll hear from Mr. Ring of course, but if the request as I understand it is for QuinStreet to provide -- and this will probably come in an amended interrogatory response to that second set of interrogatories that we just served about ten days ago. So I'll discuss with QuinStreet serving an amended response that identify the numbers that QuinStreet used to call individuals in the state of Maryland in the month of July 2023, January 2024, June and July of 2024.

**THE COURT:** Correct.

**MR. SAYLOR:** Okay. Then that's it for QuinStreet. I appreciate Your Honor cutting to the chase here.

**THE COURT:** All right.

Mr. Ring, I understand I've probably stolen at least a little bit of your thunder, so I think that if you want to make any other points I'd love to hear your response, of course, to my proposal to Mr. Saylor, but also if you want to

make the record and make arguments about why you're entitled to more than that I'm more than happy to hear it.

**MR. RING:** Thank you very much, Your Honor.

First, thanks for your diligence and I know it takes time to do what you did, to read all this material, a lot of it redundant but thank you for that.

Second, when I clerked a long time ago for a trial judge I learned a rule that's hard to swallow and that is when not to speak. And when you hear an analysis that is in line with most of what you want, don't talk yourself out of a victory.

Notwithstanding that, I do want to add a couple of points. First of all, something is better than nothing and I appreciate that and balancing burdens and time and all of that is well appreciated and understood.

The Verizon billing system that any of us who are customers of Verizon get records calls where we picked up the phone and answered the call. On the receiving end as I understand it, that record does not show calls placed. Calls are placed at the other end obviously and they're done by automated system and they create what's called call detail records. And those are much more detailed than the Verizon billing record on the customer end.

As I understand it, most jurisdictions --

**THE COURT:** How would your plaintiff -- I understand your point, but how would your plaintiff know that calls were

placed to him at these specific times on these specific dates unless either they showed up in his billing records or he picked up the phone himself?

**MR. RING:** Those calls that we have itemized are, indeed, on the --

**THE COURT:** Okay, so we don't -- it's a good point and I'll keep it in the back of my memory, but I think it still makes this -- and I think you agree that this inquiry that we're going to do with defendant is worthwhile because you're saying the calls in paragraph 26 and 44 of the second amended complaint were ones that your client actually picked up the phone as far as you understand it.

**MR. RING:** That's my understanding.

**THE COURT:** Very good. Continue on.

**MR. RING:** Secondly or further, QuinStreet as we've alleged and as the documents show, QuinStreet conducts its telemarketing in several ways. It uses in-house -- so-called in-house callers. It uses contracted services. In this particular -- on the July 6, 2023 call it was a particular vendor making that call.

**THE COURT:** 2024. It would have been July 6, 2024; is that correct? You said 2023.

**MR. RING:** I believe it is '23.

James, am I correct?

**MR. SAYLOR:** Correct; it's 2023.

**THE COURT:** Oh, it's 2023?

**MR. RING:** There may have been a misprint at one point in one of our filings. And if that's the case--

**THE COURT:** I apologize for my error. Please continue.

**MR. RING:** Okay. And that being the case, I want to make sure that what we get here is a comprehensive record and not just a silo. Not just one slice of a larger project and we have sued over insurance-related calls. And we get into the issue of must they be auto insurance? Can they be auto and home? Can they be homeowner alone? Can they include Medicare? Can they include Medicare Part A and B? Or is the allegation I think at broadest is insurance without being funneled into one of those narrow categories.

**THE COURT:** Let's pause there for a second.

So I understood Mr. Orell's affidavit to be saying that it was calls, period, from QuinStreet and its representatives not limited in any sort of way.

Is that correct, Mr. Saylor?

**MR. SAYLOR:** Yes, that's correct.

**THE COURT:** Okay. And my understanding of what they're going to be providing to you, Mr. Ring, with regards to all numbers used is the same, so that we're all working off the same set of data. So we're not saying in the Orell declaration it was all calls and for the purposes of my

direction to you today that it's going to be something more limited. I'm talking about all numbers that QuinStreet or its representatives such as insure.com used to call individuals in Maryland between those particular months. It's a good point.

**MR. RING:** That satisfies my inquiry on that point; thank you.

Bear with me, Your Honor. I want to review my notes and I think they're pretty brief, so I may not have much more to say.

So the upshot if Your Honor were to rule as you just have I think outlined and maybe it gets condensed further, but regardless, what is the next stop here? Is this now giving me the prerogative to proceed with the rest of the depositions, the 30(b)(6) which I say we cut short is only part one of what I expect to be at least two or maybe more parts.

**THE COURT:** Was there anything related to the individual plaintiff? And specifically was there any questions that you wanted to ask the 30(b)(6) representative who I understand you deposed on September 25th that would be needed from your perspective to respond to the motion for summary judgment?

**MR. RING:** That's a large question. There's a lot of consequences to the answer, so I want to be careful. I know that the central and most important part I think is the caller ID information and the search of data.

**THE COURT:** And that more or less is encapsulated in the request, the order I'm giving to Mr. Saylor; is that correct? I understand that you want -- you're not forgoing anything. I understand your request is out there for the putative class. I think the problem is that if you've got a plaintiff who -- if you've got one plaintiff, that one plaintiff is in the trouble of herd on whether or not they're going to survive adequacy or technicality, I have to take that into account when balancing relevance and burden.

**MR. RING:** I understand. So assuming we go forward, assuming then that there is -- there are other calls to my client that are actionable and that's debatable perhaps, but whatever, plausible allegations can be made based on that new information. Assuming that we then proceed with class discovery perhaps.

**THE COURT:** Then you come back to me and I ask for Mr. Saylor's explanation of why -- I mean, you both seem like good folks. I assume that if that happens Mr. Saylor will be troubled because it's contrary to the representations he's made up to this point. And then we're going to need to have, number one, intellectual conversation about why what he has told me and Judge Griggsby up to this point in repeated filings is consistent with what the calls show.

And then I think the answer to that question will determine where we go from there. I'm hesitant to say we will

do full-on class discovery, but certainly broader discovery will be needed.

**MR. RING:** And then, Your Honor, if the response to the request or the order that you might issue saying produce to Mr. Ring all of the caller ID numbers used for that group of callers, for that purpose during that time, et cetera, and the grand total of newly produced numbers, caller ID numbers is one or none, how do I go about -- and I've asked for documentation of what they used. How do I go about verifying that or checking that information? Their self examination says they did nothing wrong ever in terms of the allegations in our complaint. I'm not satisfied with that obviously, so why should I be satisfied with such a hypothetical response that might come?

**THE COURT:** I need some basis to question the veracity of what they're saying. Otherwise, in every single case experts can be brought in to challenge and do independent searches of every assertion that a defendant made in any sort of discovery response. So I need some basis to say look, there's something insufficient in what defendants have done in the way their searches were conducted.

So this was briefly touched upon I think in your reply in support of your motion to compel, but I assume, Mr. Ring, you asked questions during the depositions about how they conducted their searches for the information that they have

provided, for example, in the Orell declaration. You asked those questions?

**MR. RING:** We got close enough to that topic that Mr. Orell said well that would be a question for the infrastructure team, not me. So he was basically unable to answer that and several other categories of information that I thought I would need at this stage.

**THE COURT:** Mr. Saylor, in response to that point he just made are there other discovery responses, whether they're RFPs or interrogatories, that address how the searches were conducted specifically beyond just saying we did a comprehensive search of all the databases that there are?

**MR. SAYLOR:** Yes. In response to the second set of interrogatories which identified all the databases where {audio gap}.

**THE COURT:** All right, now I'm going to need you to be patient with me. Let's walk through them. So I know that we got the rog responses as exhibits to 101, so let's see which is at 101 -- not 101-5.

Do you remember which one it is?

**MR. SAYLOR:** So you're not going to have those in front of you. Those are that second set of interrogatories that Mr. Ring -- excuse me, plaintiffs served on October 5th and we responded to on October 17th. QuinStreet identified the databases where it maintains call detail records and

confirmed that it searched all those databases and found just the one call to plaintiff.

**THE COURT:** Okay.

**MR. SAYLOR:** Just with respect to the witness' inability -- the 30(b)(6) witness' inability to detail exactly what was done to search those databases or exactly which databases were searched, that was not a subject of examination that was noticed.

**THE COURT:** That's the problem.

**MR. SAYLOR:** {Audio gap} prepared on the subject. I mean, certainly from QuinStreet's perspective --

**THE COURT:** But that seems fair. I mean, that was-- Mr. Ring, that was -- other than the caller ID issue that I raised right away with Mr. Saylor, that was the other thing that came to mind in preparation in that it seems fair that you should have the opportunity to figure out how they conducted their searches so you can see if there's any impropriety in how they were done.

Of course there's a limit to that. So I think the right result is -- I don't think it's going to take long. I think you do prep him on that topic and then you bring him back in for an additional hour. And you can ask him whatever questions you want within reason about how the searches were done which includes what databases there are, how the databases function, and what search inquiries were run and

what the possibility of other search inquiries are to ensure that the searches were sufficient.

Mr. Ring, would that satisfy your concerns?

**MR. RING:** If I could come back and do that, take that deposition and ask those questions I think it would, Your Honor.

**THE COURT:** Okay.

**MR. RING:** Very briefly, the supplemental answer gives what I would call generic names for databases. It does not give file names. It does not give specific file names, identification of servers or anything like that kind of detail.

**THE COURT:** I don't think you're wrong and I haven't seen the obvious response so I'm a little bit hamstrung here in my preparation. But I don't know how many search fields there are. So if there are, for example, 100 fields, your representative, Mr. Saylor, doesn't need to be able to say by memory all 100 fields that could be filled out in this database by name, listing, with FPX and/or Excel and the specific names of these databases. He just generally needs to be able to say roughly these are how many databases there are. These are the differences between the databases. These are the examples of types of fields that you can use to run searches. And more or less these were the specific inquiries that were run to come up with the evidence that was the

foundation of the Orell declaration.

And then, Mr. Ring, you probably have a much more intelligent understanding of databases than I do. It's not my area of expertise.

**MR. RING:** I'm taking notes on what you just said.

**THE COURT:** You can ask, for example, why didn't you do this, if it's not clear to you why they ran the data search the way that they did and then the person would be able to answer hopefully we searched it this way because searching it that alternative way that you proposed wouldn't have led to a different result or would have been irrational or illogical for some reason that's beyond my knowledge at this particular moment.

**MR. RING:** And again, we're talking about searches of the databases for use of the caller ID names or beyond that?

**THE COURT:** No, no, no, no. We're only talking about searches of the databases to find the outgoing calls to the plaintiff. So these were done by two different subject matters. One is for the mixing and matching for you to be able to test whether or not the Verizon call records meet the records that Mr. Saylor has. He's going to produce the caller IDs that are used during those specific months that we've identified in paragraphs 26 and 44 that QuinStreet or its representatives used to call individuals in Maryland. Then I

expect you all to work collaboratively to review those records together or separately and then meet and confer afterwards.

And then yes, Mr. Ring, it's fair that you should have an additional hour with a representative from QuinStreet to ask any questions about how searches were done to identify the outgoing calls to the plaintiff.

**MR. RING:** And Your Honor, on that point can I just clarify, we've used three hours on the first session. If you're now addressing another hour, is this part of my seven-hour default time for the total --

**THE COURT:** We'll get to it when we have to. So I need to keep that in mind in the future to grant you leave to go beyond the seven. I'll take it into consideration, but we don't have to decide it right now.

**MR. RING:** Thank you.

**THE COURT:** For the record, I don't mind calls during depositions. I know some magistrate judges do. They don't honestly lead to a whole lot in my experience. I think if folks work collaboratively you won't need to call me and it seems like both of you do work collaboratively despite your disagreements about this case. But if you need to call me to get a sense of whether or not I think something is sufficiently addressed, I'm happy to take your call. You've got to let me know that you're doing the deposition that day so I can make sure I'm not tied up in a settlement conference.

**MR. RING:** Thank you, Your Honor. That's all I have. If the mic is in my hands I think that's all I have to say. Thank you.

**THE COURT:** All right.

Mr. Saylor, anything else?

**MR. SAYLOR:** No. And I appreciate Your Honor's ruling. I guess our only issue is that, again, it was not one of the noticed deposition topics and I have to go back to QuinStreet and figure out who would be -- who the appropriate witness is for that, prepare that witness. To the extent that this can be addressed through an interrogatory response which I think it could be sufficiently addressed with an interrogatory response, of course that would be a less burdensome means to provide the same information.

Certainly if there are questions regarding that, Mr. Ring could I guess issue another 30(b)(6) deposition notice. I guess I'm just kind of looking for an efficient way forward given that that was not one of the items that I anticipated being at issue today or one of the topics in the deposition notice, but I respect Your Honor's ruling and if that's the only --

**THE COURT:** I think this is the risk for you. We could add a bunch of additional steps, but you've also got to really -- and this is to your benefit. You've got a really tight timeline on that motion for summary judgment which has

to be fully briefed before November. If we draw this out where sort of I ask you to provide a rog first, he reviews it, you fight some more, I think you're putting that -- I think it's November 22, but I'll go back and double check it -- but that November 22 reply date in danger because then you're going to have overlap between the briefing for summary judgment and getting this discovery done. And then when he files -- if he files a Rule 56 complaint or affidavit complaining that he hasn't gotten the discovery he needs it's going to jam you up on the deadline.

And so I'm concerned about both of you and your respective positions, but I also am concerned about effective administration of Judge Griggsby's resources. And so I do really think it's in both of your interests. And I think this is why I was hesitant about Mr. Ring's proposal about bringing in an outside expert as well to review your databases. That's going to take time too. I think the two ways I've given you are the quickest ways to get resolution on this. And it benefits you, Mr. Saylor, because then hopefully Mr. Ring based on the responses he gets in response to both of the inquiries that I've ordered, first the caller ID numbers and two, one additional hour of deposition will consider what the responses to those things mean for the resolution of his case, whatever that means.

But if he doesn't, at least you'll be able to point to

this hearing today and say look, Ajmel dragged this out here and he made us do these two additional things and they still led to the same result, the additional discovery. That's what my line of thinking is, but I understand your concern. I just think it will slow things down.

**MR. SAYLOR:** Understood. Thank you, Your Honor.

**THE COURT:** Thank you, sir. Appreciate it.

**MR. RING:** Your Honor, can we get some indication of when the order will issue?

**THE COURT:** Yeah, I'll get the order out today before 5 p.m. and it won't have all of the detail that I laid out for you today, but it will generally say, number one, that the motion for a protective order is granted in part and denied in part and it's denied only with regards to the two things that I've identified today which are one, the production of all numbers that QuinStreet or its representatives used to call plaintiff's number during the specific months identified in paragraphs 26 and 44. It's otherwise granted until Judge Griggsby rules on the motion for summary judgment.

And then with regards to your motion to compel it will just be the flip of that. So it will be granted with regards to that first category and I should have said this before, the second category, again, being one additional hour of deposition time with the corporate representative who will

testify as to the nature, subject matter, and procedures used to conduct the inquiries underlying or leading to the identification of any calls to the plaintiff.

How soon do you think you can get somebody perhaps, Mr. Saylor, or no idea at this moment?

**MR. SAYLOR:** I don't know at this moment. Of course directly after this conference I'll be reaching out to QuinStreet to advise them of Your Honor's rulings and to seek information regarding who the appropriate witness or witnesses would be. I would ask if it turns out that there needs to be more than one witness to testify about one database or the other, that the time still be limited to one hour. I do think that's sufficient time.

**THE COURT:** I think that's fair as long as you all have them ready to go on the same day so you don't slice it up between different days.

**MR. SAYLOR:** Yeah.

**THE COURT:** That's fine. And then the rest of the motion to compel will be denied without prejudice, again, pending Judge Griggsby's ruling on the summary judgment motion.

**MR. SAYLOR:** Thank you, Your Honor.

**THE COURT:** All right, thank you both. I appreciate your hard work. I appreciate your efforts briefing this. I'm going to get my expedited discovery order on file in this

case. And so in the future if additional issues arise you can use the procedure laid out in the expedited discovery order which is essentially my informal briefing process.

All right, Mr. Saylor, anything further in this case at this time?

**MR. SAYLOR:** No. Nothing.

**THE COURT:** Mr. Saylor, nice job today. I appreciate your patience. I appreciate your cooperation and flexibility.

Mr. Ring, anything further at this time?

**MR. RING:** Nothing further from the plaintiff, Your Honor.

**THE COURT:** All right, Mr. Ring, nice to see you today. Nice job today as well. All right, thanks, folks. Appreciate it.

**(Whereupon the proceeding was concluded at 1:47 p.m.)**

**CERTIFICATE OF OFFICIAL REPORTER**

**I, Nadine M. Bachmann, Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that the foregoing is a correct transcript of the audio-recorded proceedings in the above-entitled matter, audio recorded via FTR Gold on October 27, 2025, and transcribed from the audio recording to the best of my ability and that said transcript has been compared with the audio recording.**

**Dated this 20th day of November, 2025.**

**-*S*-**

**NADINE M. BACHMANN RMR, CRR**
**FEDERAL OFFICIAL COURT REPORTER**

## '

'23 [1] - 17:23

## 1

100 [3] - 4:19, 24:16, 24:18
10007 [1] - 1:19
101 [4] - 3:12, 5:1, 22:18, 22:19
101-12 [1] - 5:9
101-5 [1] - 22:19
12-month [1] - 8:8
175 [1] - 1:18
17th [2] - 13:1, 22:24
1:00 [1] - 2:2
1:47 [1] - 31:16

## 2

2 [1] - 3:11
20007 [1] - 1:21
2023 [8] - 9:4, 9:7, 13:15, 15:16, 17:19, 17:22, 17:25, 18:1
2024 [7] - 13:16, 15:17, 17:21
2025 [3] - 1:9, 32:9, 32:13
20850 [1] - 1:15
20th [1] - 32:13
22 [2] - 28:4, 28:5
25th [1] - 19:19
26 [6] - 4:4, 11:6, 11:19, 17:10, 25:24, 29:18
27 [2] - 1:9, 32:9

## 3

3 [1] - 1:18
30(b)(6 [4] - 19:14, 19:18, 23:5, 27:16
301 [2] - 7:6, 10:25
301-579 [1] - 10:23
3050 [1] - 1:21
3445 [1] - 10:25

## 4

401 [1] - 1:14
44 [6] - 4:4, 11:6, 11:19, 17:10, 25:24, 29:18
4th [1] - 12:20

## 5

5 [1] - 29:11
500 [1] - 1:14
56 [3] - 13:4, 13:7, 28:8
5th [1] - 22:23

## 6

6 [4] - 9:4, 9:7, 17:19, 17:21
6th [3] - 7:8, 10:11, 10:17

## 8

8 [1] - 5:24
84 [1] - 3:10
8:24-cv-01667-AAQ [1] - 1:4

## 9

98 [1] - 4:12
99 [1] - 4:19

## A

ability [1] - 32:10
able [8] - 6:10, 7:1, 14:10, 24:17, 24:21, 25:8, 25:21, 28:25
about [27] - 3:5, 4:14, 6:16, 7:8, 9:13, 9:24, 10:2, 10:6, 10:10, 11:15, 15:13, 16:1, 19:2, 20:21, 21:8, 21:9, 21:24, 23:23, 25:14, 25:18, 26:5, 26:21, 28:11, 28:12, 28:15, 30:11
above [1] - 32:8
above-entitled [1] - 32:8
absent [1] - 11:14
absolutely [1] - 14:18
account [1] - 20:9
acknowledged [1] - 3:13
Act [1] - 8:7
actionable [1] - 20:12
actual [1] - 4:15
actually [4] - 11:1, 12:18, 14:8, 17:11
add [2] - 16:11, 27:23
additional [10] - 6:12, 11:20, 23:22, 26:4, 27:23, 28:22, 29:2, 29:3, 29:24, 31:1
address [1] - 22:10
addressed [3] - 26:23, 27:11, 27:12
addressing [1] - 26:9
adds [1] - 11:24
adequacy [1] - 20:8
administration [1] - 28:13
advance [1] - 3:25
advise [1] - 30:8
affidavit [6] - 5:4, 5:8, 13:4, 13:8, 18:16, 28:8
after [6] - 8:15, 9:18, 9:23, 10:11, 12:18, 30:7
afternoon [2] - 2:8, 2:13
afterwards [1] - 26:2
again [10] - 7:14, 9:19, 10:3, 13:4, 13:20, 14:13, 25:14, 27:7, 29:24, 30:19
against [2] - 13:18, 15:6
agents [1] - 9:5
ago [3] - 12:21, 15:13, 16:7
agree [2] - 12:12, 17:8
agrees [1] - 7:18
ahead [2] - 11:11, 15:3
Aided [1] - 1:24
AJMEL [1] - 1:8
Ajmel [1] - 29:1
allegation [1] - 18:13
allegations [5] - 4:5, 5:23, 11:9, 20:13, 21:11
alleged [1] - 17:16
allegedly [3] - 4:6, 4:22, 4:24
allow [1] - 12:1
alone [1] - 18:11
already [1] - 13:20
also [10] - 2:16, 4:10, 4:12, 5:8, 5:25, 7:2, 7:3, 15:25, 27:23, 28:12
alternative [2] - 14:15, 25:10
always [4] - 2:11, 2:19, 2:25, 3:19
am [3] - 2:21, 17:24, 28:12
amend [1] - 5:20
amended [6] - 4:2, 5:5, 9:4, 15:12, 15:14, 17:11
analysis [1] - 16:9
and/or [1] - 24:19
another [2] - 26:9, 27:16
answer [5] - 19:23, 20:24, 22:6, 24:8, 25:9
answered [1] - 16:17
anticipated [1] - 27:18
anybody [2] - 11:2, 13:15
anything [8] - 7:13, 9:12, 19:16, 20:4, 24:11, 27:5, 31:4, 31:10
anyway [1] - 13:4
apologize [1] - 18:4
applicable [2] - 8:6
appreciate [9] - 15:20, 16:13, 27:6, 29:7, 30:23, 30:24, 31:8, 31:15
appreciated [1] - 16:14
appropriate [2] - 27:9, 30:9
appropriately [1] - 14:2
are [26] - 4:19, 5:5, 11:5, 13:1, 15:1, 16:15, 16:19, 16:21, 17:4, 20:11, 20:12, 22:9, 22:12, 22:22, 23:24, 24:1, 24:16, 24:21, 24:22, 25:23, 27:15, 28:18, 29:15
area [1] - 25:4
argument [2] - 3:20, 11:6
arguments [2] - 6:8, 16:1
arise [1] - 31:1
artificial [2] - 9:1, 9:7
ask [9] - 9:15, 19:18, 20:16, 23:22, 24:5, 25:6, 26:4, 28:2, 30:10
asked [3] - 21:8, 21:24, 22:1
asking [1] - 12:6
assertion [2] - 10:1, 21:18
assertions [2] - 12:4, 14:1
assume [2] - 20:18, 21:23
assuming [4] - 15:9, 20:10, 20:11, 20:14
audio [6] - 7:22, 22:15, 32:7, 32:8, 32:9, 32:11
Audio [1] - 23:10
audio-recorded [1] - 32:7
auto [3] - 6:22, 18:10
auto-recorded [1] - 6:22
automated [1] - 16:20
away [1] - 23:14

## B

B [2] - 1:17, 18:12
Bachmann [1] - 32:5
BACHMANN [1] - 32:16
back [8] - 6:20, 13:3, 17:7, 20:16, 23:21, 24:4, 27:8, 28:4
background [2] - 4:1, 7:13
balances [1] - 14:2
balancing [3] - 11:10, 16:13, 20:9
based [4] - 9:15, 14:13, 20:13, 28:20
basically [1] - 22:5
basis [2] - 21:15, 21:19
bear [1] - 19:7
because [12] - 3:17, 8:22, 10:9, 11:21, 12:9, 13:2, 13:4, 17:9, 20:19, 25:9, 28:5, 28:19
become [1] - 11:23
been [10] - 3:10, 4:17, 6:11, 7:9, 10:1, 10:4, 17:21, 18:2, 25:11, 32:11
BEFORE [1] - 1:8
before [13] - 2:3, 2:5, 3:2, 3:6, 3:18, 4:13, 5:25, 12:22, 13:1, 13:3, 28:1, 29:11, 29:23
believe [5] - 5:13, 9:25, 10:12, 15:4, 17:23
benefit [1] - 27:24
benefits [1] - 28:19
best [2] - 13:10, 32:10
better [1] - 16:12
between [8] - 3:15, 6:20, 6:21, 9:5, 19:4, 24:22, 28:6, 30:16
beyond [4] - 22:11, 25:12, 25:15, 26:13
bifurcation [1] - 6:2
billing [3] - 16:15, 16:22, 17:2
bills [1] - 12:3
bit [4] - 7:2, 9:20, 15:23, 24:14
both [14] - 3:9, 5:13,

5:15, 7:9, 13:5, 13:6, 13:7, 13:17, 20:17, 26:20, 28:11, 28:14, 28:20, 30:23
**bottom** [1] - 6:9
**brief** [3] - 3:14, 15:5, 19:8
**briefed** [1] - 28:1
**briefing** [6] - 9:21, 14:25, 15:1, 28:6, 30:24, 31:3
**briefly** [2] - 21:22, 24:8
**bring** [1] - 23:21
**bringing** [1] - 28:15
**broader** [1] - 21:1
**broadest** [1] - 18:13
**brought** [1] - 21:17
**bunch** [1] - 27:23
**burden** [4] - 11:10, 11:15, 14:3, 20:9
**burdens** [1] - 16:13
**burdensome** [3] - 13:25, 14:14, 27:14
**but** [39] - 3:18, 3:21, 4:13, 4:16, 5:21, 6:9, 6:18, 7:9, 10:11, 10:16, 11:14, 11:24, 12:17, 13:21, 14:7, 14:21, 15:1, 15:9, 15:10, 15:25, 16:6, 16:25, 17:7, 19:11, 20:12, 21:1, 21:23, 23:12, 24:15, 26:13, 26:21, 27:20, 27:23, 28:4, 28:12, 28:25, 29:4, 29:12
**BY** [3] - 1:13, 1:17, 1:20

## C

**C** [2] - 1:11, 2:1
**Call** [1] - 8:9
**call** [43] - 6:15, 6:16, 6:17, 6:22, 7:7, 8:3, 8:8, 8:15, 8:23, 8:25, 9:4, 9:8, 9:24, 9:25, 10:4, 11:1, 11:2, 11:17, 12:1, 12:11, 13:11, 13:12, 13:18, 13:23, 15:15, 16:17, 16:20, 17:19, 17:20, 19:3, 22:25, 23:2, 24:9, 25:21, 25:25, 26:19, 26:21, 26:23, 29:17
**called** [2] - 16:20, 17:17
**caller** [7] - 19:25, 21:5, 21:7, 23:13, 25:15, 25:22, 28:21
**callers** [2] - 17:18, 21:6
**calls** [24] - 4:5, 4:6, 4:23, 4:24, 7:24, 8:2, 8:9, 10:20, 14:17, 16:16, 16:18, 16:25, 17:4, 17:10, 18:9, 18:17, 18:25, 20:11, 20:23, 25:18, 26:6, 26:16, 30:3
**came** [2] - 3:17, 23:15
**can** [21] - 7:2, 11:25, 13:17, 14:9, 18:10, 18:11, 18:12, 20:13, 21:17, 23:17, 23:22, 24:23, 25:6, 26:7, 26:25, 27:11, 29:8, 30:4, 31:1
**can't** [1] - 10:24
**careful** [1] - 19:23
**case** [21] - 2:4, 2:12, 2:20, 3:1, 4:2, 4:3, 4:8, 4:11, 4:24, 6:1, 7:17, 7:24, 14:3, 18:3, 18:6, 21:17, 26:21, 28:23, 31:1, 31:4
**CASE** [1] - 1:4
**categories** [2] - 18:14, 22:6
**category** [2] - 29:23, 29:24
**cell** [1] - 13:19
**Center** [1] - 1:18
**central** [1] - 19:24
**certainly** [6] - 4:13, 6:7, 6:19, 21:1, 23:11, 27:15
**CERTIFICATE** [1] - 32:1
**Certified** [1] - 32:6
**certify** [1] - 32:6
**cetera** [1] - 21:6
**chagrin** [1] - 3:7
**challenge** [1] - 21:17
**chance** [2] - 9:21, 15:2
**change** [1] - 8:2
**chase** [1] - 15:20
**check** [1] - 28:4
**checking** [1] - 21:10
**civil** [1] - 2:4
**claim** [2] - 8:8, 9:11
**clarify** [1] - 26:8
**class** [5] - 7:20, 7:22, 20:5, 20:14, 21:1
**clear** [4] - 10:2, 10:16, 12:8, 25:7
**clerked** [1] - 16:7
**client** [4] - 14:12, 15:7, 17:11, 20:12
**close** [1] - 22:3
**collaboratively** [3] - 26:1, 26:19, 26:20
**colleague** [1] - 2:15
**come** [7] - 6:5, 14:15, 15:11, 20:16, 21:14, 24:4, 24:25
**comes** [2] - 2:5, 10:21
**common** [1] - 7:22
**compared** [1] - 32:11
**compel** [10] - 3:12, 3:15, 3:16, 5:2, 5:7, 5:11, 12:19, 21:23, 29:21, 30:19
**competent** [2] - 13:6, 13:7
**complaining** [1] - 28:9
**complaint** [6] - 4:2, 9:3, 9:4, 17:11, 21:12, 28:8
**Complaint** [1] - 11:18
**comprehensive** [2] - 18:7, 22:12
**Computer** [1] - 1:24
**Computer-Aided** [1] - 1:24
**concern** [1] - 29:4
**concerned** [2] - 28:11, 28:12
**concerning** [1] - 7:23
**concerns** [2] - 11:22, 24:3
**concluded** [1] - 31:16
**condensed** [1] - 19:11
**conduct** [1] - 30:2
**conducted** [5] - 8:12, 21:21, 21:25, 22:11, 23:17
**conducts** [1] - 17:16
**confer** [1] - 26:2
**conference** [2] - 26:25, 30:7
**confirmed** [1] - 23:1
**consent** [3] - 8:9, 8:19, 8:24
**consequences** [1] - 19:23
**consider** [1] - 28:22
**consideration** [1] - 26:13
**considering** [1] - 15:6
**consistent** [1] - 20:23
**Consumer** [1] - 8:7
**contend** [1] - 8:19
**contends** [1] - 9:4
**context** [1] - 6:4
**continue** [2] - 17:14, 18:5
**contracted** [1] - 17:18
**contrary** [1] - 20:19
**conversation** [1] - 20:21
**cooperation** [1] - 31:8
**corporate** [1] - 29:25
**correct** [14] - 2:23, 6:2, 10:6, 10:7, 10:13, 14:18, 15:18, 17:22, 17:24, 17:25, 18:19, 18:20, 20:3, 32:7
**correctly** [1] - 2:22
**could** [8] - 2:7, 11:16, 11:19, 24:4, 24:18, 27:12, 27:16, 27:23
**couldn't** [1] - 5:14
**counsel** [1] - 8:18
**couple** [2] - 12:21, 16:11
**course** [11] - 4:10, 5:1, 6:18, 7:4, 13:13, 15:5, 15:10, 15:25, 23:19, 27:13, 30:6
**COURT** [50] - 1:1, 2:10, 2:18, 2:24, 8:22, 9:12, 10:8, 10:15, 11:4, 12:12, 12:16, 13:3, 14:11, 14:19, 15:8, 15:18, 15:21, 16:24, 17:6, 17:14, 17:21, 18:1, 18:4, 18:15, 18:21, 19:16, 20:1, 20:16, 21:15, 22:8, 22:16, 23:3, 23:9, 23:12, 24:7, 24:13, 25:6, 25:17, 26:11, 26:16, 27:4, 27:22, 29:7, 29:10, 30:14, 30:18, 30:23, 31:7, 31:13, 32:16
**Court** [3] - 2:4, 2:5, 3:14
**COURTROOM** [1] - 2:3
**cover** [1] - 7:13
**create** [1] - 16:20
**critical** [1] - 9:19
**CRR** [1] - 32:16
**current** [1] - 7:17
**customer** [1] - 16:22
**customers** [1] - 16:16
**cut** [1] - 19:14
**cutting** [1] - 15:20

## D

**D** [1] - 2:1
**danger** [1] - 28:5
**data** [3] - 18:24, 19:25, 25:7
**database** [2] - 24:19, 30:11
**databases** [18] - 11:13, 14:16, 22:12, 22:14, 22:25, 23:1, 23:6, 23:7, 23:24, 23:25, 24:9, 24:20, 24:21, 24:22, 25:3, 25:15, 25:18, 28:16
**date** [1] - 28:5
**Dated** [1] - 32:13
**dates** [2] - 4:6, 17:1
**day** [3] - 26:24, 30:15, 32:13
**days** [3] - 11:18, 15:13, 30:16
**DC** [1] - 1:21
**deadline** [1] - 28:10
**debatable** [1] - 20:12
**decide** [2] - 6:4, 26:14
**declaration** [4] - 12:5, 18:25, 22:1, 25:1
**default** [1] - 26:10
**defendant** [5] - 2:15, 2:16, 14:5, 17:9, 21:18
**Defendant** [1] - 1:6
**DEFENDANT** [1] - 1:16
**defendant's** [3] - 5:7, 6:2, 7:5
**defendants** [1] - 21:20
**deferred** [1] - 6:3
**definition** [1] - 7:23
**denied** [3] - 29:14, 30:19
**deposed** [1] - 19:19
**deposition** [7] - 24:5, 26:24, 27:8, 27:16, 27:19, 28:22, 29:25
**depositions** [3] - 19:13, 21:24, 26:17
**DEPUTY** [1] - 2:3
**despite** [1] - 26:20
**detail** [5] - 16:20, 22:25, 23:5, 24:12, 29:11
**detailed** [1] - 16:21
**determine** [1] - 20:25
**did** [6] - 6:3, 6:22, 16:5, 21:11, 22:11, 25:8
**didn't** [2] - 5:17, 25:6
**differences** [1] - 24:22
**different** [4] - 7:12, 25:11, 25:19, 30:16
**diligence** [1] - 16:4
**direction** [1] - 19:1

**directly** [1] - 30:7
**disagree** [1] - 9:12
**disagreements** [1] - 26:21
**discovery** [23] - 6:10, 6:25, 7:19, 7:20, 7:22, 7:23, 8:2, 8:11, 12:19, 12:24, 13:2, 13:8, 14:24, 20:15, 21:1, 21:19, 22:9, 28:7, 28:9, 29:3, 30:25, 31:2
**discuss** [2] - 14:9, 15:14
**dismiss** [3] - 5:16, 5:18, 5:22
**dispute** [2] - 9:3, 9:6
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**Do** [1] - 8:9
**do** [32] - 4:16, 7:12, 7:15, 9:25, 10:19, 10:20, 10:22, 11:11, 11:12, 12:6, 14:16, 14:21, 16:5, 16:11, 17:9, 21:1, 21:8, 21:9, 21:17, 22:20, 23:21, 24:4, 25:3, 25:7, 26:17, 26:20, 28:13, 29:2, 30:4, 30:12, 32:6
**docket** [1] - 4:16
**document** [1] - 4:20
**documentation** [1] - 21:9
**documents** [1] - 17:16
**does** [7] - 6:10, 6:25, 7:19, 11:8, 16:18, 24:9, 24:10
**doesn't** [4] - 9:3, 15:5, 24:17, 28:25
**doing** [2] - 12:13, 26:24
**don't** [19] - 3:5, 4:15, 6:15, 9:12, 11:9, 11:23, 12:3, 13:21, 14:9, 16:10, 17:6, 23:20, 24:13, 24:15, 26:14, 26:16, 26:18, 30:6, 30:15
**done** [9] - 11:7, 16:19, 21:20, 23:6, 23:18, 23:24, 25:19, 26:5, 28:7
**double** [1] - 28:4
**down** [1] - 29:5
**dragged** [1] - 29:1
**draw** [1] - 28:1
**DRYE** [2] - 1:17, 1:20
**Drye** [2] - 2:14, 2:16
**during** [9] - 9:7, 11:5, 11:17, 13:15, 21:6, 21:24, 25:23, 26:17, 29:17

## E

**E** [4] - 1:11, 2:1
**easy** [1] - 14:22
**ECF** [7] - 3:10, 3:12, 4:12, 4:19, 5:1, 5:9
**effective** [1] - 28:12
**efficient** [1] - 27:17
**efforts** [1] - 30:24
**either** [1] - 17:2
**else** [1] - 27:5
**emailed** [1] - 4:17
**encapsulated** [1] - 20:1
**end** [5] - 3:19, 13:3, 16:17, 16:19, 16:22
**endeavored** [1] - 12:21
**ending** [1] - 10:25
**enough** [4] - 3:20, 7:10, 14:11, 22:3
**ensure** [1] - 24:1
**entail** [1] - 14:6
**entire** [1] - 8:1
**entirely** [1] - 7:12
**entirety** [1] - 9:24
**entitled** [2] - 16:1, 32:8
**error** [1] - 18:4
**especially** [1] - 10:9
**ESQUIRE** [3] - 1:13, 1:17, 1:20
**essentially** [6] - 4:21, 6:3, 7:21, 12:10, 13:24, 31:3
**et** [1] - 21:6
**even** [1] - 7:14
**ever** [3] - 11:2, 12:11, 21:11
**every** [3] - 12:10, 21:16, 21:18
**everybody** [5] - 3:6, 3:7, 3:19, 6:7, 9:21
**everything** [3] - 9:15, 9:22, 9:24
**evidence** [1] - 24:25
**exactly** [4] - 8:24, 14:6, 23:5, 23:6
**examination** [2] - 21:10, 23:7
**example** [3] - 22:1, 24:16, 25:6
**examples** [1] - 24:23
**Excel** [1] - 24:19
**excuse** [1] - 22:23
**exhibits** [3] - 4:11, 5:3, 22:18
**expect** [3] - 13:20, 19:15, 26:1
**expedited** [2] - 30:25, 31:2
**expedition** [1] - 11:23
**experience** [1] - 26:18
**expert** [4] - 5:4, 11:11, 11:12, 28:16
**expertise** [1] - 25:4
**experts** [1] - 21:17
**explanation** [1] - 20:17
**explicitly** [1] - 5:21
**extent** [3] - 6:9, 14:12, 27:10

## F

**fact** [5] - 6:18, 8:3, 8:11, 9:3, 9:9
**facts** [3] - 4:1, 4:21, 9:2
**fair** [5] - 14:11, 23:12, 23:15, 26:3, 30:14
**familiar** [1] - 8:5
**far** [2] - 9:13, 17:12
**FEDERAL** [1] - 32:16
**feel** [2] - 11:7, 15:2
**fields** [4] - 24:15, 24:16, 24:18, 24:23
**fight** [1] - 28:3
**fighting** [1] - 6:15
**figure** [5] - 11:13, 14:6, 14:17, 23:16, 27:9
**file** [5] - 13:4, 13:7, 24:10, 30:25
**filed** [1] - 12:22
**files** [2] - 28:8
**filings** [2] - 18:3, 20:23
**filled** [2] - 8:20, 24:18
**finally** [3] - 5:1, 5:10, 5:12
**find** [2] - 11:20, 25:18
**finder** [1] - 6:18
**fine** [2] - 9:22, 30:18
**firm** [1] - 2:14
**first** [13] - 3:2, 3:5, 3:17, 3:18, 3:21, 3:22, 8:14, 16:4, 16:12, 26:8, 28:2, 28:21, 29:23
**fishing** [1] - 11:23
**flexibility** [1] - 31:9
**flip** [1] - 29:22
**focuses** [1] - 6:14
**folks** [4] - 3:2, 20:18, 26:19, 31:14
**FOR** [3] - 1:1, 1:12, 1:16
**foregoing** [1] - 32:7
**forgoing** [1] - 20:3
**form** [2] - 8:20, 11:13
**forth** [2] - 6:20, 15:5
**forward** [6] - 2:11, 2:19, 2:25, 6:5, 20:10, 27:17
**found** [3] - 8:15, 10:22, 23:1
**foundation** [1] - 25:1
**four** [3] - 11:5, 11:17, 11:18
**FPX** [1] - 24:19
**frankly** [1] - 8:20
**fraud** [1] - 5:23
**front** [1] - 22:22
**FTR** [2] - 1:24, 32:9
**fulfill** [1] - 14:10
**full** [3] - 6:8, 7:15, 21:1
**full-on** [1] - 21:1
**fully** [1] - 28:1
**function** [1] - 23:25
**funneled** [1] - 18:14
**further** [7] - 14:20, 14:21, 17:15, 19:11, 31:4, 31:10, 31:11
**futile** [1] - 5:21
**futility** [1] - 5:19
**future** [2] - 26:12, 31:1

## G

**G** [2] - 2:1, 4:12
**Game** [1] - 10:15
**gap** [2] - 7:22, 23:10
**gap}** [1] - 22:15
**general** [1] - 3:3
**generally** [2] - 24:20, 29:12
**generic** [1] - 24:9
**get** [11] - 12:13, 16:16, 18:7, 18:9, 26:11, 26:22, 28:18, 29:8, 29:10, 30:4, 30:25
**gets** [3] - 3:6, 19:11, 28:20
**getting** [1] - 28:7
**give** [12] - 3:3, 5:16, 6:7, 7:15, 8:12, 9:10, 11:19, 11:25, 13:11, 13:16, 24:10
**given** [3] - 15:2, 27:18, 28:17
**gives** [2] - 3:25, 24:9
**giving** [2] - 19:12, 20:2
**go** [14] - 3:18, 4:1, 11:11, 11:12, 15:1, 15:3, 20:10, 20:25, 21:8, 21:9, 26:13, 27:8, 28:4, 30:15
**goes** [3] - 3:5, 3:6, 3:21
**going** [16] - 3:18, 8:2, 11:20, 17:9, 18:22, 19:1, 20:8, 20:20, 22:16, 22:21, 23:20, 25:22, 28:6, 28:10, 28:17, 30:25
**Gold** [1] - 32:9
**GOLD** [1] - 1:24
**gone** [1] - 4:2
**good** [7] - 2:8, 2:13, 10:8, 17:6, 17:14, 19:4, 20:18
**got** [7] - 20:5, 20:6, 22:3, 22:18, 26:24, 27:23, 27:24
**gotten** [3] - 7:13, 13:8, 28:9
**grand** [1] - 21:7
**grant** [1] - 26:12
**granted** [4] - 5:22, 29:13, 29:19, 29:22
**granting** [1] - 5:20
**Greenwich** [1] - 1:18
**Griggsby** [7] - 3:10, 5:15, 6:1, 6:18, 13:6, 20:22, 29:19
**Griggsby's** [2] - 28:13, 30:20
**group** [1] - 21:5
**guess** [3] - 27:7, 27:16, 27:17

## H

**H** [2] - 1:13, 1:14
**had** [3] - 5:18, 12:3, 14:5
**hamstrung** [1] - 24:14
**hands** [1] - 27:2
**happens** [1] - 20:18
**happy** [3] - 7:11, 16:2, 26:23
**hard** [2] - 16:8, 30:24
**has** [12] - 3:19, 7:3, 8:11, 8:12, 10:1, 10:3, 10:9, 11:2, 20:21, 25:22, 27:25, 32:11
**hasn't** [1] - 28:9
**haven't** [5] - 7:4, 13:8, 13:20, 15:2, 24:13
**having** [3] - 6:23, 6:24, 9:19
**he'll** [2] - 13:4, 13:7

**he's** [4] - 11:20, 12:3, 20:19, 25:22
**hear** [7] - 3:22, 7:11, 15:9, 15:24, 16:2, 16:9
**heard** [2] - 11:22, 14:14
**HEARING** [2] - 1:6, 1:8
**hearing** [8] - 2:6, 3:3, 3:19, 3:25, 5:19, 5:25, 11:15, 29:1
**hearings** [3] - 6:24, 13:5, 14:24
**HELD** [1] - 1:6
**helpful** [3] - 3:4, 5:6, 14:12
**herd** [1] - 20:7
**here** [7] - 10:24, 12:9, 15:20, 18:7, 19:12, 24:14, 29:1
**hereby** [1] - 32:6
**hesitant** [2] - 20:25, 28:15
**himself** [1] - 17:3
**home** [1] - 18:11
**homeowner** [1] - 18:11
**honestly** [1] - 26:18
**Honor** [19] - 2:8, 2:13, 7:16, 12:7, 13:1, 14:4, 15:6, 15:20, 16:3, 19:7, 19:10, 21:3, 24:6, 26:7, 27:1, 29:6, 29:8, 30:22, 31:12
**Honor's** [3] - 27:6, 27:20, 30:8
**HONORABLE** [1] - 1:8
**hopefully** [2] - 25:9, 28:19
**hour** [7] - 23:22, 26:4, 26:9, 26:10, 28:22, 29:24, 30:12
**hours** [1] - 26:8
**house** [2] - 17:17, 17:18
**human** [1] - 9:6
**humor** [1] - 7:2
**hypothetical** [1] - 21:13

**I**

**I'd** [2] - 6:4, 15:24
**I'll** [8] - 3:3, 4:17, 15:14, 17:7, 26:13, 28:4, 29:10, 30:7
**I've** [16] - 4:3, 5:1, 5:7, 5:10, 6:17, 7:13, 11:22, 13:4, 14:13, 14:23, 15:22, 21:8, 28:17, 28:21, 29:15
**ID** [6] - 19:25, 21:5, 21:7, 23:13, 25:15, 28:21
**idea** [1] - 30:5
**identification** [2] - 24:11, 30:3
**identified** [7] - 11:5, 11:17, 22:14, 22:24, 25:24, 29:15, 29:18
**identify** [3] - 2:7, 15:15, 26:5
**IDs** [1] - 25:23
**illogical** [1] - 25:11
**important** [2] - 10:8, 19:24
**impropriety** [1] - 23:18
**IN** [1] - 1:1
**in-house** [2] - 17:17, 17:18
**inability** [3] - 14:8, 23:5
**Inc** [1] - 2:5
**INC** [1] - 1:5
**include** [3] - 13:14, 18:11, 18:12
**includes** [2] - 13:13, 23:24
**including** [1] - 5:4
**inconsequential** [1] - 3:21
**indeed** [1] - 17:5
**independent** [5] - 11:11, 11:12, 14:16, 21:17
**indication** [1] - 29:8
**individual** [3] - 6:4, 9:11, 19:17
**individuals** [6] - 7:25, 8:1, 10:20, 15:15, 19:3, 25:25
**informal** [1] - 31:3
**information** [10] - 8:16, 12:10, 14:8, 19:25, 20:14, 21:10, 21:25, 22:6, 27:14, 30:9
**infrastructure** [1] - 22:5
**initial** [1] - 5:16
**inquire** [1] - 14:6
**inquiries** [5] - 23:25, 24:1, 24:24, 28:21, 30:2
**inquiry** [4] - 7:18, 14:7, 17:8, 19:5
**insight** [1] - 5:17
**insufficient** [1] - 21:20
**insurance** [3] - 18:9, 18:10, 18:13
**insurance-related** [1] - 18:9
**insure.com** [3] - 13:14, 13:15, 19:3
**intellectual** [1] - 20:21
**intelligent** [1] - 25:3
**interests** [2] - 13:10, 28:14
**interrogatories** [7] - 8:14, 12:20, 12:22, 15:13, 22:10, 22:14, 22:22
**interrogatory** [5] - 12:9, 12:18, 15:12, 27:11, 27:13
**interrupting** [1] - 12:15
**into** [5] - 8:2, 18:9, 18:14, 20:9, 26:13
**Ira** [1] - 2:15
**IRA** [1] - 1:20
**irrational** [1] - 25:11
**irrelevant** [1] - 8:21
**issue** [13] - 6:3, 6:4, 8:18, 9:23, 9:24, 10:9, 18:10, 21:4, 23:13, 27:7, 27:16, 27:19, 29:9
**issues** [1] - 31:1
**itemized** [1] - 17:4
**items** [1] - 27:18
**its** [8] - 4:23, 8:12, 12:22, 17:16, 18:17, 19:2, 25:24, 29:16
**itself** [2] - 9:3, 9:4

**J**

**jam** [1] - 28:10
**JAMES** [1] - 1:17
**James** [2] - 2:14, 17:24
**January** [2] - 13:16, 15:16
**job** [2] - 31:7, 31:14
**joined** [1] - 2:15
**joint** [3] - 4:16, 4:21, 9:2
**judge** [1] - 16:7
**JUDGE** [1] - 1:9
**Judge** [9] - 3:10, 5:15, 5:25, 6:18, 13:6, 20:22, 28:13, 29:19, 30:20
**judges** [1] - 26:17
**judgment** [17] - 4:15, 6:6, 6:11, 6:13, 7:1, 7:6, 7:20, 8:5, 8:21, 12:23, 12:25, 13:9, 19:21, 27:25, 28:7, 29:20, 30:20
**July** [11] - 7:8, 9:4, 9:7, 10:11, 10:17, 13:15, 13:16, 15:16, 15:17, 17:19, 17:21
**jumped** [3] - 9:16, 9:18, 9:23
**June** [2] - 13:16, 15:17
**jurisdictions** [1] - 16:23
**just** [24] - 6:14, 7:2, 7:5, 7:14, 10:17, 12:8, 12:17, 12:21, 14:9, 15:13, 18:8, 19:10, 22:9, 22:11, 23:1, 23:4, 24:20, 25:5, 26:7, 27:17, 29:4, 29:22
**jut** [1] - 10:15

**K**

**K** [1] - 1:21
**Kasdan** [3] - 2:16, 2:21, 2:23
**KASDAN** [2] - 1:20, 2:23
**keep** [2] - 17:7, 26:12
**KELLEY** [2] - 1:17, 1:20
**Kelley** [2] - 2:14, 2:16
**kind** [3] - 14:23, 24:11, 27:17
**know** [16] - 3:24, 4:17, 5:12, 6:6, 9:9, 13:21, 14:13, 16:4, 16:25, 19:24, 22:17, 24:15, 26:17, 26:24, 30:6
**knowledge** [1] - 25:12

**L**

**laid** [2] - 29:11, 31:2
**large** [1] - 19:22
**larger** [1] - 18:8
**last** [1] - 9:13
**LAW** [1] - 1:14
**law** [1] - 2:14
**lead** [1] - 26:18
**leading** [1] - 30:2
**leads** [1] - 14:19
**learned** [1] - 16:8
**least** [4] - 9:20, 15:22, 19:15, 28:25
**leave** [3] - 5:20, 7:15, 26:12
**led** [2] - 25:10, 29:3
**less** [5] - 9:14, 14:14, 20:1, 24:24, 27:13
**let** [8] - 3:7, 3:18, 3:24, 4:17, 5:12, 9:15, 11:4, 26:24
**let's** [5] - 10:23, 11:4, 18:15, 22:17, 22:18
**letter** [1] - 3:13
**like** [17] - 5:14, 6:4, 6:19, 6:22, 9:14, 9:21, 11:7, 13:15, 14:20, 14:21, 14:24, 14:25, 15:2, 15:6, 20:17, 24:11, 26:20
**limit** [1] - 23:19
**limited** [5] - 10:11, 10:17, 18:18, 19:2, 30:12
**line** [3] - 6:9, 16:9, 29:4
**listened** [6] - 5:12, 5:25, 6:17, 6:24, 7:9, 13:5
**listing** [1] - 24:19
**little** [2] - 15:23, 24:14
**LKG-24-cr-1667** [1] - 2:4
**LLP** [2] - 1:17, 1:20
**long** [4] - 7:10, 16:7, 23:20, 30:14
**longer** [2] - 4:8, 7:2
**look** [8] - 2:11, 2:19, 2:25, 4:17, 13:24, 14:19, 21:19, 29:1
**looking** [3] - 14:21, 14:24, 27:17
**looks** [1] - 11:24
**lot** [5] - 6:15, 14:25, 16:5, 19:22, 26:18
**love** [1] - 15:24

**M**

**M** [2] - 32:5, 32:16
**made** [11] - 4:5, 4:6, 4:23, 4:24, 8:16, 8:25, 20:13, 20:20, 21:18, 22:9, 29:2
**MAGISTRATE** [1] - 1:9
**magistrate** [1] - 26:17
**mainly** [1] - 4:22
**maintains** [1] - 22:25
**make** [17] - 3:19, 4:17, 6:7, 6:8, 7:14, 11:4, 12:17, 14:7, 14:9, 14:11, 15:2, 15:3, 15:24, 16:1, 18:7, 26:25
**makes** [2] - 10:19, 17:8

**making** [4] - 11:9, 12:4, 14:2, 17:20
**many** [2] - 24:15, 24:21
**Martinez's** [1] - 3:7
**MARYLAND** [1] - 1:1
**Maryland** [9] - 1:15, 7:25, 10:20, 11:3, 11:17, 13:13, 15:16, 19:4, 25:25
**match** [2] - 11:25, 13:17
**matching** [1] - 25:20
**material** [1] - 16:5
**matter** [5] - 2:3, 2:5, 9:9, 30:1, 32:8
**matters** [1] - 25:20
**may** [3] - 3:4, 18:2, 19:8
**maybe** [3] - 14:21, 19:11, 19:15
**me** [30] - 3:2, 3:6, 3:10, 4:13, 4:17, 6:9, 6:19, 6:23, 7:2, 7:10, 9:15, 9:16, 9:18, 9:23, 11:4, 11:8, 11:14, 12:10, 13:3, 19:7, 19:12, 20:16, 20:22, 22:5, 22:17, 22:23, 26:19, 26:21, 26:24
**mean** [4] - 20:17, 23:11, 23:12, 28:23
**means** [2] - 27:14, 28:24
**meant** [1] - 9:19
**Medicare** [2] - 18:12
**meet** [5] - 2:10, 2:18, 2:24, 25:21, 26:2
**memorandum** [1] - 5:2
**memory** [2] - 17:7, 24:18
**Merit** [1] - 32:5
**mic** [1] - 27:2
**might** [3] - 14:10, 21:4, 21:14
**mind** [6] - 5:17, 9:16, 9:18, 23:15, 26:12, 26:16
**minutes** [1] - 8:16
**mirror** [1] - 14:24
**misprint** [1] - 18:2
**missed** [1] - 7:14
**mixing** [1] - 25:20
**moment** [3] - 25:13, 30:5, 30:6
**month** [1] - 15:16
**months** [8] - 11:5, 11:17, 13:15, 13:22, 13:23, 19:4, 25:23, 29:18
**more** [21] - 3:19, 6:15, 8:8, 8:11, 8:25, 9:10, 9:14, 9:21, 11:4, 13:6, 16:2, 16:21, 19:1, 19:8, 19:15, 20:1, 24:24, 25:2, 28:3, 30:11
**most** [3] - 16:10, 16:23, 19:24
**motion** [34] - 3:11, 3:12, 3:14, 3:16, 3:17, 4:10, 4:14, 5:2, 5:7, 5:11, 5:16, 5:18, 5:22, 6:6, 6:11, 6:13, 7:1, 7:5, 7:19, 7:21, 8:5, 8:21, 12:22, 12:24, 13:9, 19:20, 21:23, 27:25, 29:13, 29:19, 29:21, 30:19, 30:21
**motions** [2] - 2:6, 3:9
**MOTIONS** [1] - 1:8
**moved** [1] - 12:19
**Mr** [54] - 2:10, 2:18, 2:21, 3:18, 3:22, 5:8, 7:11, 10:12, 10:14, 10:16, 10:21, 11:6, 11:20, 11:22, 13:17, 13:20, 13:25, 14:9, 14:14, 14:15, 14:20, 14:23, 15:10, 15:22, 15:25, 18:16, 18:19, 18:22, 20:2, 20:17, 20:18, 21:5, 21:23, 22:4, 22:8, 22:23, 23:13, 23:14, 24:3, 24:17, 25:2, 25:22, 26:3, 27:5, 27:15, 28:15, 28:19, 30:4, 31:4, 31:7, 31:10, 31:13
**MR** [49] - 2:8, 2:13, 2:23, 7:16, 8:24, 10:7, 10:14, 10:24, 12:7, 12:15, 12:17, 14:4, 14:18, 15:4, 15:9, 15:19, 16:3, 17:4, 17:13, 17:15, 17:23, 17:25, 18:2, 18:6, 18:20, 19:5, 19:22, 20:10, 21:3, 22:3, 22:13, 22:21, 23:4, 23:10, 24:4, 24:8, 25:5, 25:14, 26:7, 26:15, 27:1, 27:6, 29:6, 29:8, 30:6, 30:17, 30:22, 31:6, 31:11
**Ms** [1] - 3:7
**much** [8] - 3:5, 3:7, 3:8, 4:1, 16:3, 16:21, 19:8, 25:2
**must** [1] - 18:10
**my** [23] - 2:15, 3:21, 5:17, 15:6, 15:25, 17:7, 17:13, 18:4, 18:21, 18:25, 19:5, 19:7, 20:11, 24:15, 25:3, 25:12, 26:9, 26:18, 27:2, 29:4, 30:25, 31:3, 32:10

## N

**N** [2] - 1:11, 2:1
**NADINE** [1] - 32:16
**Nadine** [1] - 32:5
**name** [1] - 24:19
**names** [5] - 24:9, 24:10, 24:20, 25:15
**narrow** [2] - 11:4, 18:14
**National** [1] - 8:9
**nature** [2] - 10:10, 30:1
**necessarily** [1] - 11:9
**need** [16] - 4:1, 6:10, 6:25, 7:19, 8:24, 13:8, 14:21, 20:20, 21:15, 21:19, 22:7, 22:16, 24:17, 26:12, 26:19, 26:21
**needed** [2] - 19:20, 21:2
**needs** [6] - 6:13, 9:21, 14:20, 24:20, 28:9, 30:10
**new** [2] - 11:24, 20:13
**New** [2] - 1:19
**newly** [1] - 21:7
**next** [1] - 19:12
**nice** [6] - 2:10, 2:18, 2:24, 31:7, 31:13, 31:14
**no** [14] - 4:8, 8:11, 9:6, 12:16, 15:4, 15:8, 25:17, 27:6, 30:5, 31:6
**No** [7] - 3:10, 3:12, 4:12, 4:19, 5:1, 5:9
**non** [1] - 13:25
**non-burdensome** [1] - 13:25
**none** [1] - 21:8
**nor** [1] - 6:18
**North** [1] - 1:14
**Northwest** [1] - 1:21
**Not** [1] - 8:9
**not** [48] - 4:13, 5:20, 5:22, 5:24, 6:3, 6:14, 6:16, 6:18, 6:19, 6:22, 7:21, 8:2, 9:19, 10:11, 10:17, 11:20, 12:2, 12:18, 13:1, 13:2, 13:11, 14:5, 14:10, 14:17, 16:8, 16:18, 18:8, 18:18, 18:24, 19:8, 20:3, 20:7, 21:12, 22:5, 22:19, 22:21, 23:7, 24:10, 25:3, 25:7, 25:21, 26:22, 26:25, 27:7, 27:18
**notes** [2] - 19:7, 25:5
**nothing** [5] - 9:10, 16:12, 21:11, 31:6, 31:11
**notice** [2] - 27:16, 27:20
**noticed** [2] - 23:8, 27:8
**notwithstanding** [1] - 16:11
**November** [4] - 28:1, 28:4, 28:5, 32:13
**now** [12] - 2:3, 2:5, 4:9, 6:9, 6:17, 6:23, 9:14, 13:2, 19:12, 22:16, 26:9, 26:14
**NUMBER** [1] - 1:4
**number** [17] - 2:4, 3:5, 3:11, 7:6, 8:4, 8:16, 10:5, 10:20, 10:23, 10:25, 11:2, 12:11, 20:21, 29:12, 29:17
**numbers** [18] - 11:16, 11:18, 11:19, 11:21, 11:25, 12:2, 13:11, 13:12, 13:17, 15:15, 18:23, 19:2, 21:5, 21:7, 28:21, 29:16

## O

**O** [1] - 2:1
**obvious** [1] - 24:14
**obviously** [2] - 16:19, 21:12
**October** [6] - 1:9, 12:20, 13:1, 22:23, 22:24, 32:9
**OF** [4] - 1:1, 1:8, 1:14, 32:1
**off** [1] - 18:23
**OFFICES** [1] - 1:14
**OFFICIAL** [2] - 32:1, 32:16
**oh** [1] - 18:1
**okay** [6] - 15:19, 17:6, 18:6, 18:21, 23:3, 24:7
**on** [46] - 2:5, 2:12, 2:20, 2:25, 4:16, 5:17, 5:21, 6:3, 6:14, 7:8, 7:21, 9:14, 9:15, 10:6, 12:3, 12:9, 12:20, 12:25, 14:13, 16:17, 16:22, 17:1, 17:5, 17:14, 17:19, 19:5, 19:19, 20:7, 20:13, 21:1, 22:23, 22:24, 23:10, 23:21, 25:5, 26:7, 26:8, 27:25, 28:10, 28:18, 28:20, 29:19, 30:15, 30:20, 30:25, 32:9
**one** [34] - 3:5, 3:10, 6:15, 6:16, 6:17, 8:8, 8:22, 8:25, 9:5, 10:4, 10:19, 12:8, 18:2, 18:3, 18:8, 18:14, 19:14, 20:6, 20:21, 21:8, 22:20, 23:2, 25:20, 27:7, 27:18, 27:19, 28:22, 29:12, 29:15, 29:24, 30:11, 30:12
**ones** [1] - 17:11
**only** [11] - 4:8, 8:22, 8:24, 9:18, 10:4, 11:1, 19:14, 25:17, 27:7, 27:21, 29:14
**opportunity** [6] - 3:14, 6:7, 12:4, 14:1, 14:5, 23:16
**oppose** [1] - 7:19
**opposition** [1] - 5:7
**order** [12] - 3:11, 3:16, 3:17, 4:11, 6:1, 20:2, 21:4, 29:9, 29:10, 29:13, 30:25, 31:2
**ordered** [1] - 28:21
**Orell** [5] - 10:14, 18:24, 22:1, 25:1
**orell** [2] - 10:16, 22:4
**orell's** [1] - 18:16
**other** [17] - 6:25, 7:23, 7:25, 8:19, 10:23, 14:17, 15:1, 15:24, 16:19, 20:11, 22:6, 22:9, 23:13, 23:14, 24:1, 30:12
**otherwise** [2] - 21:16, 29:19
**our** [6] - 13:10, 15:4, 15:5, 18:3, 21:12, 27:7
**out** [18] - 6:12, 8:20,

9:23, 11:13, 14:7, 14:17, 16:10, 20:4, 23:16, 24:18, 27:9, 28:1, 29:1, 29:10, 29:12, 30:7, 30:10, 31:2
**outbound** [1] - 10:4
**outgoing** [2] - 25:18, 26:6
**outlined** [1] - 19:11
**outside** [1] - 28:16
**outstanding** [2] - 12:23, 12:24
**over** [6] - 4:1, 4:2, 10:2, 15:1, 18:9
**overbroad** [1] - 12:12
**overlap** [3] - 3:15, 13:24, 28:6
**own** [1] - 12:3

## P

**P** [3] - 1:11, 2:1
**P.C** [1] - 1:14
**p.m** [3] - 2:2, 29:11, 31:17
**page** [2] - 9:14, 10:6
**papers** [3] - 6:16, 6:24, 9:17
**paragraph** [4] - 4:4, 11:19, 17:10
**paragraphs** [3] - 11:6, 25:24, 29:18
**Part** [1] - 18:12
**part** [7] - 4:8, 13:2, 19:14, 19:24, 26:9, 29:13, 29:14
**particular** [6] - 7:7, 14:3, 17:19, 19:4, 25:12
**parties** [1] - 6:20
**parts** [1] - 19:15
**party** [2] - 6:21, 8:17
**patience** [1] - 31:8
**patient** [2] - 7:9, 22:17
**pause** [1] - 18:15
**pending** [4] - 2:3, 3:9, 6:6, 30:20
**people** [5] - 3:24, 3:25, 11:17, 12:11, 13:12
**perfectly** [1] - 9:22
**perhaps** [4] - 3:7, 20:12, 20:15, 30:4
**period** [3] - 8:8, 8:23, 18:17
**person** [1] - 25:8
**persons** [1] - 7:23
**perspective** [2] - 19:20, 23:11
**persuasive** [1] - 10:22
**phone** [14] - 8:4, 8:16, 10:5, 10:20, 10:22, 10:25, 11:16, 11:18, 11:21, 12:3, 13:19, 16:17, 17:3, 17:12
**picked** [3] - 16:16, 17:3, 17:11
**place** [1] - 12:14
**placed** [6] - 7:24, 8:3, 8:9, 16:18, 16:19, 17:1
**Plaintiff** [1] - 1:3
**plaintiff** [39] - 2:6, 2:9, 3:12, 3:13, 4:24, 4:25, 5:3, 5:20, 6:10, 6:12, 6:14, 6:21, 6:25, 7:3, 7:8, 7:19, 7:20, 7:24, 8:18, 8:20, 9:2, 9:5, 10:1, 10:5, 10:9, 11:1, 11:8, 12:19, 16:24, 16:25, 19:17, 20:6, 20:7, 23:2, 25:19, 26:6, 30:3, 31:11
**PLAINTIFF** [1] - 1:12
**plaintiff's** [12] - 4:4, 5:10, 8:4, 8:14, 8:15, 8:18, 9:11, 9:25, 11:12, 12:19, 13:19, 29:17
**plaintiffs** [3] - 11:20, 11:24, 22:23
**plausible** [1] - 20:13
**please** [2] - 2:7, 18:4
**plenty** [1] - 3:6
**point** [13] - 9:13, 12:17, 14:11, 16:25, 17:6, 18:3, 19:4, 19:5, 20:20, 20:22, 22:8, 26:7, 28:25
**points** [4] - 7:12, 15:1, 15:24, 16:12
**position** [1] - 15:4
**positions** [1] - 28:12
**possibility** [1] - 24:1
**potentially** [1] - 11:24
**power** [1] - 7:18
**prejudice** [1] - 30:19
**prep** [1] - 23:21
**preparation** [2] - 23:15, 24:15
**prepare** [1] - 27:10
**prepared** [1] - 23:10
**prerecorded** [2] - 9:1, 9:7
**prerogative** [1] - 19:13
**present** [1] - 3:20
**pretty** [1] - 19:8
**probably** [3] - 15:11, 15:22, 25:2
**problem** [2] - 20:5, 23:9
**procedure** [1] - 31:2
**procedures** [1] - 30:1
**proceed** [2] - 19:13, 20:14
**proceeding** [1] - 31:16
**Proceedings** [1] - 1:24
**proceedings** [1] - 32:8
**PROCEEDINGS** [1] - 1:8
**process** [1] - 31:3
**produce** [3] - 13:23, 21:4, 25:22
**produced** [4] - 7:3, 13:21, 13:22, 21:7
**Produced** [1] - 1:24
**production** [1] - 29:16
**project** [1] - 18:8
**promise** [1] - 3:18
**promises** [1] - 14:10
**pronouncing** [1] - 2:21
**proper** [1] - 11:10
**proposal** [3] - 14:15, 15:25, 28:15
**proposed** [1] - 25:10
**Protection** [1] - 8:7
**protective** [5] - 3:11, 3:16, 3:17, 4:11, 29:13
**provide** [5] - 11:18, 14:8, 15:11, 27:14, 28:2
**provided** [2] - 5:3, 22:1
**providing** [1] - 18:22
**publisher** [1] - 8:17
**pull** [1] - 11:16
**purpose** [1] - 21:6
**purposes** [1] - 18:25
**put** [2] - 6:11, 10:15
**putative** [1] - 20:5
**putting** [1] - 28:3

## Q

**QUERESHI** [1] - 1:8
**queried** [1] - 10:18
**question** [9] - 5:19, 5:21, 6:25, 9:18, 10:19, 19:22, 20:24, 21:15, 22:4
**questions** [11] - 7:8, 9:13, 9:16, 12:24, 19:18, 21:24, 22:2, 23:23, 24:5, 26:5, 27:15
**quickest** [1] - 28:18
**QuinStreet** [37] - 2:5, 2:15, 2:17, 3:11, 4:6, 4:7, 4:8, 4:23, 4:25, 7:7, 7:18, 7:24, 8:3, 8:11, 8:12, 9:10, 10:19, 11:2, 11:16, 12:21, 13:12, 14:5, 14:8, 15:11, 15:14, 15:15, 15:19, 17:15, 17:16, 18:17, 19:2, 22:24, 25:24, 26:4, 27:9, 29:16, 30:8
**QUINSTREET** [1] - 1:5
**QuinStreet's** [4] - 7:19, 9:5, 13:13, 23:11

## R

**R** [2] - 1:11, 2:1
**raised** [2] - 10:9, 23:14
**ran** [1] - 25:7
**rational** [1] - 12:8
**reaching** [1] - 30:7
**read** [3] - 6:23, 14:13, 16:5
**reading** [1] - 10:12
**ready** [1] - 30:15
**real** [1] - 9:18
**really** [10] - 3:21, 5:19, 6:14, 6:23, 6:24, 13:10, 27:24, 28:14
**Realtime** [1] - 32:6
**reason** [2] - 23:23, 25:12
**reasonable** [1] - 14:4
**received** [2] - 6:15, 8:17
**receiving** [1] - 16:17
**recitation** [1] - 7:17
**record** [10] - 2:7, 4:16, 6:8, 7:14, 13:2, 16:1, 16:18, 16:22, 18:7, 26:16
**Recorded** [1] - 1:24
**recorded** [5] - 2:6, 6:16, 6:22, 32:7, 32:8
**recording** [3] - 6:19, 32:10, 32:11
**records** [21] - 4:22, 7:4, 7:5, 8:13, 9:24, 9:25, 10:3, 12:1, 13:11, 13:12, 13:18, 13:21, 13:23, 16:16, 16:21, 17:2, 22:25, 25:21, 25:22, 26:1
**redacted** [1] - 4:20
**redundant** [1] - 16:6
**reference** [1] - 10:16
**referenced** [1] - 5:23
**referred** [2] - 3:10, 7:5
**regarding** [4] - 4:5, 4:23, 27:15, 30:9
**regardless** [1] - 19:12
**regards** [4] - 18:22, 29:14, 29:21, 29:22
**Registered** [1] - 32:5
**Registry** [1] - 8:10
**relate** [2] - 4:4, 4:22
**related** [4] - 5:19, 6:1, 18:9, 19:16
**relationship** [1] - 5:15
**relevance** [3] - 11:10, 14:2, 20:9
**relevant** [2] - 4:14, 7:21
**remember** [1] - 22:20
**repeated** [1] - 20:22
**repeatedly** [1] - 10:2
**reply** [5] - 5:10, 10:10, 10:21, 21:22, 28:5
**Reporter** [2] - 32:5, 32:6
**REPORTER** [2] - 32:1, 32:16
**representations** [1] - 20:19
**representative** [5] - 6:21, 19:18, 24:17, 26:4, 29:25
**representatives** [6] - 4:23, 13:14, 18:17, 19:3, 25:25, 29:17
**request** [7] - 6:2, 8:16, 12:10, 15:10, 20:2, 20:4, 21:4
**requesting** [1] - 3:14
**requests** [2] - 5:5, 6:5
**require** [1] - 8:7
**reserved** [1] - 5:21
**resolution** [3] - 8:21, 28:18, 28:23
**resources** [1] - 28:13
**respect** [3] - 9:10, 23:4, 27:20
**respective** [1] - 28:12
**respond** [6] - 6:11, 6:13, 7:1, 12:22, 13:9, 19:20
**responded** [1] - 22:24
**response** [14] - 8:13, 10:17, 15:12, 15:14, 15:24, 21:3, 21:13, 21:19, 22:8, 22:13, 24:14, 27:11, 27:13, 28:20
**responses** [11] - 5:4,

5:5, 7:11, 10:10, 10:11, 12:25, 13:1, 22:9, 22:18, 28:20, 28:23
**rest** [2] - 19:13, 30:18
**result** [3] - 23:20, 25:11, 29:3
**results** [1] - 8:13
**return** [1] - 4:25
**review** [6] - 8:4, 11:11, 11:12, 19:7, 26:1, 28:16
**reviewed** [10] - 3:24, 4:3, 4:10, 4:12, 4:19, 5:1, 5:7, 5:9, 5:10, 9:19
**reviewing** [2] - 9:16, 9:23
**reviews** [1] - 28:2
**RFPs** [1] - 22:10
**right** [22] - 2:18, 2:21, 3:2, 4:9, 6:9, 6:23, 9:14, 10:1, 11:8, 12:14, 13:1, 13:3, 15:21, 22:16, 23:14, 23:19, 26:14, 27:4, 30:23, 31:4, 31:13, 31:14
**RING** [24] - 1:13, 1:14, 2:8, 16:3, 17:4, 17:13, 17:15, 17:23, 18:2, 18:6, 19:5, 19:22, 20:10, 21:3, 22:3, 24:4, 24:8, 25:5, 25:14, 26:7, 26:15, 27:1, 29:8, 31:11
**Ring** [1] - 2:9
**ring** [23] - 2:10, 3:23, 10:21, 11:20, 13:17, 13:20, 14:1, 14:9, 14:20, 15:10, 15:22, 18:22, 21:5, 21:23, 22:23, 23:13, 24:3, 25:2, 26:3, 27:15, 28:19, 31:10, 31:13
**ring's** [2] - 14:15, 28:15
**risk** [1] - 27:22
**RMR** [1] - 32:16
**road** [1] - 3:4
**Rockville** [1] - 1:15
**rog** [6] - 5:4, 5:5, 10:10, 10:11, 22:18, 28:2
**roughly** [1] - 24:21
**rule** [3] - 5:17, 16:8, 19:10
**Rule** [4] - 5:24, 13:4, 13:7, 28:8
**rules** [2] - 3:3, 29:19
**ruling** [3] - 27:7, 27:20, 30:20
**rulings** [1] - 30:8
**run** [3] - 23:25, 24:23, 24:25

## S

**S** [3] - 1:11, 2:1, 32:15
**said** [10] - 6:3, 9:13, 9:15, 10:2, 13:6, 17:22, 22:4, 25:5, 29:23, 32:10
**same** [8] - 4:20, 9:14, 10:6, 18:23, 18:24, 27:14, 29:3, 30:15
**sanctions** [1] - 15:6
**satisfied** [2] - 21:12, 21:13
**satisfies** [1] - 19:5
**satisfy** [1] - 24:3
**say** [13] - 5:18, 9:22, 11:4, 19:9, 19:14, 20:25, 21:19, 24:17, 24:21, 27:3, 29:1, 29:12
**saying** [8] - 8:22, 13:8, 17:10, 18:16, 18:24, 21:4, 21:16, 22:11
**SAYLOR** [27] - 1:17, 2:13, 7:16, 8:24, 10:7, 10:14, 10:24, 12:7, 12:15, 12:17, 14:4, 14:18, 15:4, 15:9, 15:19, 17:25, 18:20, 22:13, 22:21, 23:4, 23:10, 27:6, 29:6, 30:6, 30:17, 30:22, 31:6
**Saylor** [22] - 2:14, 2:18, 3:18, 3:22, 5:8, 7:11, 11:6, 11:22, 14:23, 15:25, 18:19, 20:2, 20:18, 22:8, 23:14, 24:17, 25:22, 27:5, 28:19, 30:5, 31:4, 31:7
**Saylor's** [1] - 20:17
**says** [1] - 21:11
**scheduling** [1] - 6:1
**search** [13] - 8:12, 8:13, 10:3, 10:17, 11:7, 14:16, 19:25, 22:12, 23:6, 23:25, 24:1, 24:15, 25:7
**searched** [4] - 10:3, 23:1, 23:7, 25:9
**searches** [11] - 21:18, 21:21, 21:25, 22:10, 23:17, 23:23, 24:2, 24:24, 25:14, 25:18, 26:5
**searching** [2] - 8:15, 25:9
**second** [12] - 3:6, 3:24, 4:2, 9:3, 12:19, 15:12, 16:7, 17:10, 18:15, 22:13, 22:22, 29:24
**secondly** [1] - 17:15
**sections** [1] - 8:6
**see** [5] - 6:15, 13:24, 22:18, 23:17, 31:13
**seek** [1] - 30:8
**seeks** [1] - 7:21
**seem** [2] - 6:22, 20:17
**seems** [8] - 6:19, 9:14, 11:7, 11:14, 14:21, 23:12, 23:15, 26:20
**seen** [2] - 7:4, 24:14
**Selectquote** [3] - 4:5, 4:7
**self** [1] - 21:10
**sense** [2] - 3:25, 26:22
**separately** [1] - 26:2
**September** [1] - 19:19
**served** [5] - 12:18, 12:20, 12:25, 15:13, 22:23
**servers** [1] - 24:11
**services** [1] - 17:18
**serving** [1] - 15:14
**session** [1] - 26:8
**set** [7] - 8:14, 12:20, 15:5, 15:12, 18:24, 22:13, 22:22
**settlement** [1] - 26:25
**seven** [2] - 26:10, 26:13
**seven-hour** [1] - 26:10
**several** [4] - 4:3, 5:3, 17:17, 22:6
**Shapiro** [2] - 2:4, 2:9
**SHAPIRO** [1] - 1:3
**she** [6] - 5:17, 5:18, 5:21, 5:23, 6:3
**short** [1] - 19:14
**should** [6] - 5:12, 13:22, 21:13, 23:16, 26:3, 29:23
**show** [5] - 4:22, 12:2, 16:18, 17:16, 20:23
**showed** [1] - 17:2
**silo** [1] - 18:8
**simple** [2] - 8:3, 8:11
**simply** [2] - 6:25, 9:9
**single** [4] - 8:3, 8:15, 9:23, 21:16
**sir** [4] - 2:10, 2:19, 2:24, 29:7
**sitting** [1] - 10:24
**slice** [2] - 18:8, 30:15
**slow** [1] - 29:5
**smart** [1] - 13:7
**smoke** [1] - 14:20
**so-called** [1] - 17:17
**some** [17] - 3:3, 3:25, 5:16, 7:8, 9:15, 10:9, 12:9, 12:13, 13:21, 14:20, 14:21, 21:15, 21:19, 25:12, 26:17, 28:3, 29:8
**somebody** [2] - 8:19, 30:4
**something** [7] - 7:12, 11:15, 14:19, 16:12, 19:1, 21:20, 26:22
**somewhat** [1] - 10:22
**somewhere** [1] - 4:16
**soon** [1] - 30:4
**sorry** [2] - 6:20, 12:15
**sort** [6] - 3:3, 12:13, 14:23, 18:18, 21:18, 28:2
**sound** [1] - 15:6
**sounded** [1] - 5:14
**sounds** [2] - 12:8, 14:4
**SOUTHERN** [1] - 1:2
**speak** [1] - 16:9
**specific** [8] - 11:5, 17:1, 24:10, 24:20, 24:24, 25:23, 29:18
**specifically** [4] - 4:3, 5:23, 19:17, 22:11
**spent** [1] - 14:25
**stage** [2] - 7:18, 22:7
**STANLEY** [1] - 1:3
**Stanley** [1] - 2:9
**start** [2] - 10:23, 14:22
**starting** [1] - 2:6
**state** [4] - 7:25, 8:8, 11:3, 15:16
**statement** [2] - 4:21, 9:2
**States** [1] - 8:1
**STATES** [2] - 1:1, 1:9
**status** [1] - 7:17
**Stephen** [1] - 2:9
**STEPHEN** [2] - 1:13, 1:14
**steps** [1] - 27:23
**still** [4] - 14:14, 17:8, 29:2, 30:12
**stolen** [1] - 15:22
**stop** [1] - 19:12
**Street** [3] - 1:14, 1:18, 1:21
**stuff** [1] - 6:12
**subject** [4] - 23:7, 23:10, 25:19, 30:1
**substance** [1] - 5:18
**substantial** [1] - 3:15
**such** [3] - 12:10, 19:3, 21:13
**sued** [1] - 18:9
**sufficient** [4] - 5:24, 11:7, 24:2, 30:13
**sufficiently** [4] - 12:2, 15:5, 26:23, 27:12
**Suite** [1] - 1:14
**summary** [17] - 4:15, 6:6, 6:11, 6:13, 7:1, 7:6, 7:20, 8:5, 8:21, 12:23, 12:25, 13:9, 19:21, 27:25, 28:6, 29:20, 30:20
**supplemental** [1] - 24:8
**support** [3] - 5:2, 5:10, 21:23
**sure** [4] - 3:19, 4:17, 18:7, 26:25
**survive** [1] - 20:8
**swallow** [1] - 16:8
**system** [2] - 16:15, 16:20

## T

**T** [1] - 1:20
**take** [8] - 8:4, 8:18, 20:8, 23:20, 24:4, 26:13, 26:23, 28:17
**takes** [1] - 16:4
**taking** [1] - 25:5
**talk** [1] - 16:10
**talking** [4] - 4:14, 19:2, 25:14, 25:17
**TCPA** [1] - 8:6
**team** [1] - 22:5
**technicality** [1] - 20:8
**teleconference** [1] - 5:15
**teleconferences** [2] - 5:13, 5:14
**telemarketing** [1] - 17:17
**telephone** [1] - 7:4
**Telephone** [1] - 8:7
**tell** [3] - 5:14, 10:24, 12:10
**ten** [1] - 15:13
**tend** [1] - 3:24
**terms** [2] - 6:10, 21:11
**test** [6] - 10:1, 11:8, 12:2, 12:4, 14:1, 25:21
**testify** [2] - 30:1, 30:11

**than** [16] - 3:20, 6:15, 7:23, 8:8, 8:20, 8:25, 10:23, 13:6, 14:14, 16:2, 16:12, 16:21, 23:13, 25:3, 30:11
**thank** [16] - 2:11, 2:17, 2:19, 2:24, 5:6, 7:16, 16:3, 16:6, 19:6, 26:15, 27:1, 27:3, 29:6, 29:7, 30:22, 30:23
**thanks** [2] - 16:4, 31:14
**theories** [1] - 11:14
**thing** [1] - 23:14
**things** [4] - 28:23, 29:2, 29:5, 29:15
**think** [43] - 3:7, 4:15, 7:13, 7:16, 7:22, 9:20, 10:8, 10:9, 11:9, 12:7, 12:8, 13:10, 13:25, 14:25, 15:23, 17:7, 17:8, 18:13, 19:8, 19:11, 19:24, 20:5, 20:24, 21:22, 23:19, 23:20, 24:5, 24:13, 26:18, 26:22, 27:2, 27:12, 27:22, 28:3, 28:14, 28:17, 29:5, 30:4, 30:12, 30:14
**thinking** [1] - 29:4
**third** [1] - 8:17
**third-party** [1] - 8:17
**thorough** [2] - 7:17, 8:12
**thought** [1] - 22:7
**three** [1] - 26:8
**Thrones** [1] - 10:16
**through** [3] - 4:12, 22:17, 27:11
**throughout** [1] - 8:1
**thunder** [1] - 15:23
**tied** [1] - 26:25
**tight** [1] - 27:25
**time** [18] - 3:2, 3:6, 3:8, 3:20, 12:24, 14:25, 15:7, 16:4, 16:7, 16:13, 21:6, 26:10, 28:17, 29:25, 30:12, 30:13, 31:5, 31:10
**timeline** [1] - 27:25
**times** [2] - 4:3, 17:1
**timing** [1] - 12:9
**today** [13] - 3:25, 4:14, 10:24, 14:14, 19:1, 27:19, 29:1, 29:10, 29:12, 29:15, 31:7, 31:14
**together** [2] - 10:15, 26:2
**told** [1] - 20:22
**topic** [2] - 22:3, 23:21
**topics** [2] - 27:8, 27:19
**total** [2] - 21:7, 26:10
**touched** [1] - 21:22
**towards** [1] - 4:22
**Trade** [1] - 1:18
**transcribed** [1] - 32:9
**TRANSCRIPT** [1] - 1:8
**Transcript** [1] - 1:24
**transcript** [2] - 32:7, 32:10
**Transcription** [1] - 1:24
**trial** [1] - 16:7
**trouble** [1] - 20:7
**troubled** [1] - 20:19
**trying** [1] - 14:25
**turned** [1] - 10:4
**turns** [1] - 30:10
**two** [7] - 3:9, 19:15, 25:19, 28:17, 28:22, 29:2, 29:14
**Tyler** [1] - 10:14
**types** [1] - 24:23
**Tyrell** [2] - 10:12

**U**

**unable** [1] - 22:5
**under** [1] - 5:24
**underlying** [2] - 8:5, 30:2
**understand** [21] - 3:9, 4:7, 4:13, 5:16, 7:2, 7:3, 7:6, 11:6, 12:6, 14:23, 15:10, 15:22, 16:18, 16:23, 16:24, 17:12, 19:19, 20:3, 20:4, 20:10, 29:4
**understanding** [3] - 17:13, 18:21, 25:3
**understood** [4] - 14:18, 16:14, 18:16, 29:6
**undisputed** [2] - 4:21, 9:2
**unicorn** [1] - 9:20
**UNITED** [2] - 1:1, 1:9
**United** [1] - 8:1
**unless** [1] - 17:2
**unredacted** [1] - 4:20
**until** [2] - 12:18, 29:19
**up** [16] - 10:4, 10:21, 12:1, 12:2, 13:3, 13:17, 16:16, 17:2, 17:3, 17:12, 20:20, 20:22, 24:25, 26:25, 28:10, 30:15
**upon** [1] - 21:22
**upshot** [1] - 19:10
**us** [3] - 12:13, 16:15, 29:2
**use** [5] - 10:20, 10:22, 24:23, 25:15, 31:2
**used** [16] - 7:7, 9:7, 11:1, 11:2, 12:11, 13:12, 15:15, 18:23, 19:3, 21:5, 21:9, 25:23, 25:25, 26:8, 29:17, 30:1
**useful** [1] - 4:13
**uses** [4] - 7:7, 11:16, 17:17, 17:18

**V**

**v** [2] - 1:4, 2:4
**vendor** [1] - 17:20
**veracity** [2] - 8:19, 21:16
**verification** [1] - 5:9
**verified** [3] - 8:13, 8:14, 12:25
**verifying** [1] - 21:9
**Verizon** [9] - 7:3, 12:1, 13:18, 13:21, 13:23, 16:15, 16:16, 16:21, 25:21
**versions** [1] - 4:20
**very** [11] - 7:9, 7:17, 10:2, 10:8, 10:16, 13:5, 13:6, 13:7, 16:3, 17:14, 24:8
**via** [1] - 32:8
**VIA** [1] - 1:6
**victory** [1] - 16:10
**view** [1] - 3:21
**voice** [2] - 9:1, 9:7
**voluminous** [1] - 10:4

**W**

**walk** [1] - 22:17
**wanted** [1] - 19:18
**Warren** [2] - 2:14, 2:16
**WARREN** [2] - 1:17, 1:20
**Washington** [2] - 1:14, 1:21
**way** [11] - 9:19, 9:20, 13:25, 14:2, 14:22, 18:18, 21:21, 25:8, 25:9, 25:10, 27:17
**ways** [3] - 17:17, 28:17, 28:18
**we'll** [4] - 3:22, 15:9, 26:11
**we're** [9] - 4:14, 9:14, 10:6, 17:9, 18:23, 18:24, 20:20, 25:14, 25:17
**web** [1] - 8:20
**weeks** [1] - 12:21
**well** [13] - 4:11, 4:18, 5:8, 6:17, 7:4, 9:12, 11:22, 13:3, 13:14, 16:14, 22:4, 28:16, 31:14
**what's** [2] - 3:15, 16:20
**whatever** [5] - 7:15, 11:14, 20:13, 23:22, 28:24
**whatsoever** [1] - 13:25
**where** [8] - 5:17, 8:14, 11:23, 16:16, 20:25, 22:14, 22:25, 28:2
**Whereupon** [1] - 31:16
**who** [10] - 3:5, 3:6, 3:21, 16:15, 19:19, 20:6, 27:9, 29:25, 30:9
**whole** [1] - 26:18
**why** [9] - 12:13, 14:25, 16:1, 20:17, 20:21, 21:13, 25:6, 25:7, 28:15
**wish** [1] - 6:9
**within** [2] - 8:16, 23:23
**without** [3] - 8:9, 18:13, 30:19
**witness** [4] - 27:10, 30:9, 30:11
**witness'** [2] - 23:4, 23:5
**witnesses** [1] - 30:9
**wolfson** [1] - 14:15
**won't** [2] - 26:19, 29:11
**work** [9] - 2:11, 2:19, 2:25, 11:13, 12:13, 26:1, 26:19, 26:20, 30:24
**working** [4] - 2:12, 2:20, 2:25, 18:23
**World** [1] - 1:18
**worry** [1] - 3:5
**worthwhile** [1] - 17:9
**wouldn't** [2] - 12:23, 25:10
**wrong** [3] - 7:13, 21:11, 24:13

**Y**

**yeah** [3] - 12:7, 29:10, 30:17
**year** [1] - 12:21
**yes** [3] - 18:20, 22:13, 26:3
**York** [2] - 1:19
**you'll** [2] - 13:3, 28:25
**yourself** [2] - 2:7, 16:10

**Z**

**ZOOM** [1] - 1:6

# EXHIBIT 31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| Stanley Shapiro, | * | |
| Plaintiff, | * | |
| | * | |
| v. | | Civil Action No. 8:24-1667-LKG |
| | * | |
| QuinStreet, Inc., et al., | * | |
| Defendants. | * | |
| | * | |

******

**ORDER**

For the reasons stated on the record at ECF No. 102, Defendant QuinStreet, Inc.'s Motion for Protective Order (ECF No. 84), is granted, in part, and denied, in part. To the extent that Defendant is not ordered to produce information below, Defendant's Motion is granted, pending the Court's ruling on Defendant's Motion for Summary Judgement, ECF No. 98, or the production of information which merits further discovery. Likewise, Plaintiff Stanley Shapiro's Motion to Compel (ECF No. 101), is granted, in part, and denied in part. Plaintiff's Motion is denied, subject to the exceptions below, pending the Court's ruling on Defendant's Motion for Summary Judgment or the production of information which merits further discovery. Within twenty-one days, Defendant shall: 1) produce a list of all phone numbers Defendant, and its representatives, used to call potential customers in Maryland during: July of 2023, January of 2024, June of 2024, and July of 2024; and 2) make a corporate representative(s) available for a one-hour deposition addressing solely the scope, methods, and procedures used to search the relevant databases for

outbound calls to Plaintiff's phone number. The parties may jointly seek an extension of the relevant deadlines in this Order.

So ordered.

Date: October 27, 2025

/s/
Ajmel A. Quereshi
United States Magistrate Judge

# EXHIBIT 32

## REDACTED VERSION

**James B. Saylor**

Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007

Tel: (212) 808-5052
Fax: (212) 808-7897
jsaylor@kelleydrye.com

November 7, 2025

**Via Email**

Stephen H. Ring
STEPHEN H. RING, PC
401 North Washington Street, Suite 500
Rockville, Maryland 20850
(301) 563-9249
shr@ringlaw.us

**Re: *Shapiro v. QuinStreet, Inc.*, No. 8:24-cv-01667 (D. Md.)**

Dear Mr. Ring:

Pursuant to Judge Quereshi's Order dated October 27, 2025 (Dkt. 103), please find a list of all phone numbers Defendant QuinStreet, Inc. ("QuinStreet"), and its representatives, used to call potential customers in Maryland during the months of July of 2023, January of 2024, June of 2024, and July of 2024, attached hereto as **Exhibit A**. Please note that this list has been marked as "Confidential" pursuant to the Protective Order.

Regards,

James B. Saylor

Attachment

# EXHIBIT A

**CONFIDENTIAL**

| | | |
|---|---|---|
| 202-559 [redacted] | 410-344 [redacted] | 844-814- [redacted] |
| 202-908 [redacted] | 410-344 [redacted] | 844-816- [redacted] |
| 240-207 [redacted] | 410-344 [redacted] | 855-211- [redacted] |
| 240-207 [redacted] | 410-441 [redacted] | 855-211- [redacted] |
| 240-215 [redacted] | 410-441 [redacted] | 855-211- [redacted] |
| 240-308 [redacted] | 410-618 [redacted] | 855-211- [redacted] |
| 240-308 [redacted] | 410-630 [redacted] | 855-211- [redacted] |
| 240-308 [redacted] | 443-201 [redacted] | 855-256- [redacted] |
| 240-308 [redacted] | 443-203 [redacted] | 855-257- [redacted] |
| 240-308 [redacted] | 443-205 [redacted] | 855-330- [redacted] |
| 240-324 [redacted] | 443-221 [redacted] | 855-430- [redacted] |
| 240-324 [redacted] | 443-221 [redacted] | 855-494- [redacted] |
| 240-681 [redacted] | 443-221 [redacted] | 855-494- [redacted] |
| 240-799 [redacted] | 443-221 [redacted] | 855-494- [redacted] |
| 301-241 [redacted] | 443-221 [redacted] | 855-816- [redacted] |
| 301-241 [redacted] | 443-221 [redacted] | 888-212- [redacted] |
| 301-304 [redacted] | 443-221 [redacted] | 888-497- [redacted] |
| 301-358 [redacted] | 443-353 [redacted] | 301-579- [redacted] |
| 301-579-3445 | 443-353 [redacted] | 301-579- [redacted] |
| 301-579 [redacted] | 443-569 [redacted] | 301-685- [redacted] |
| 301-579 [redacted] | 443-569 [redacted] | 316-854- [redacted] |
| 301-579 [redacted] | 443-569 [redacted] | 316-854- [redacted] |
| 301-579 [redacted] | 443-569 [redacted] | 316-854- [redacted] |
| 301-579 [redacted] | 571-210 [redacted] | 410-344- [redacted] |
| 301-579 [redacted] | 571-210 [redacted] | 410-630- [redacted] |
| 301-579 [redacted] | 571-385 [redacted] | 443-205- [redacted] |
| 301-579 [redacted] | 571-765 [redacted] | 443-221- [redacted] |
| 301-579 [redacted] | 667-228 [redacted] | 563-554- [redacted] |
| 301-685 [redacted] | 667-228 [redacted] | 563-554- [redacted] |
| 410-226 [redacted] | 667-312 [redacted] | 563-554- [redacted] |
| 410-344 [redacted] | 703-348 [redacted] | 641-243- [redacted] |
| 410-344 [redacted] | 703-520 [redacted] | 641-243- [redacted] |
| 410-344 [redacted] | 703-520 [redacted] | 641-243- [redacted] |
| 410-344 [redacted] | 703-570 [redacted] | 712-335- [redacted] |
| 410-344 [redacted] | 833-316 [redacted] | 712-335- [redacted] |
| 410-344 [redacted] | 844-761 [redacted] | 712-335- [redacted] |